**FILED**

**NOVEMBER 8, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**07 C 6357**

| | |
|---|---|
| PROMINENT CONSULTING, LLC, | |
| Plaintiff, | |
| v. | No. |
| ALLEN BROTHERS, INC., | |
| Defendant. | |

**JUDGE CASTILLO
MAGISTRATE JUDGE DENLOW**

## COMPLAINT

Plaintiff, Prominent Consulting, LLC ("Prominent"), by its attorneys, for its Complaint against Defendant, Allen Brothers, Inc. ("Allen Brothers"), states as follows:

### Nature of the Action

1.  This is an action by Prominent for injunctive relief and damages relating to Allen Brother's copyright infringement of Prominent's intellectual property. More specifically, Prominent possesses copyrights in the computer source code it used to create a website for Allen Brothers. Allen Brothers now has stolen Prominent's source code, and has used and is using the source code to create and operate a new website that Allen Brothers is now independently hosting. Allen Brothers' actions in this regard constitute copyright infringement and a violation of the Computer Fraud and Abuse Act.

### Parties

2.  Prominent is a Delaware limited liability company with its principal place of business in Cook County, Illinois. Prominent provides various enterprise technology consulting and marketing-related services.

3.     Allen Brothers is an Illinois corporation with its principal place of business in Cook County, Illinois.  Allen Brothers sells meats and other foodstuffs to individuals and commercial customers in a variety of ways, including through a printed catalog and internet website.

## Allegations Common to All Counts

### Prominent and Allen Brothers Form a Working Relationship

4.     In April 2004, Allen Brothers and Prominent decided to pursue an agreement wherein Prominent would design, develop, and operate a new website for Allen Brothers.

5.     Throughout the remainder of 2004, in furtherance of the agreement, Prominent worked to develop the new website, including by authoring and creating software for the new site.

6.     Kurt Seidensticker, Managing Director of Prominent, and his wife, Laura Seidensticker, put forth significant effort to design, develop and operate the new website and related software.  For both Kurt and Laura Seidensticker, development of the new Allen Brothers' website was a full time effort; they were motivated, however, by their belief that they could and would develop a best-in-class e-commerce website for Allen Brothers and that they would be fairly compensated as a result.

7.     Prominent launched the new Allen Brothers' website on February 17, 2005.

8.     Throughout the course of its development and management of Allen Brothers' website, Prominent developed new features for the website.  For example, during September and October 2005, Prominent developed a specialized Shipping Calendar for the Allen Brothers' website that tracked processing and shipping of internet orders.  It was written in JavaScript and HTML, and was unlike any other calendar used by any e-commerce website on the Internet.  It

provided real-time updates as to the available delivery dates and costs associated with the contents of the customer's shopping cart.

9.      For a variety of reasons, Allen Brothers had difficulty accurately conveying to customers the date on which their delivery would arrive prior to Prominent's creation of the Shipping Calendar.  The calendar thus cleared up a lot of customer confusion and support issues for Allen Brothers and is a tool of significant value.

<u>Prominent's Copyrights and Other Rights Under the<br>Parties' Web Site Development and License Agreement</u>

10.     On January 11, 2005, prior to the launch of Allen Brothers' new website, the parties memorialized their working relationship by entering into a Web Site Development and License Agreement ("Development Agreement"), a copy of which is attached hereto as Exhibit 1.  Among other things, the Development Agreement addresses services, fees, and the ownership and usage of the parties' respective intellectual property.

11.     The Development Agreement memorializes the parties' rights and obligations, including ownership and rights to the intellectual property associated with the new website.

12.     In part, Section 5.A.(2) confirms Prominent's intellectual property rights in the software it developed to run the new website:

> The parties contemplate that there shall be Intellectual Property Rights in the following New Web Site components:  . . . (v) all other software, including all code and customizations which allow the Allen Brothers IP to be displayed, reviewed and experienced or which allows the Allen Brothers products to be purchased, except to the extent that such software is otherwise owned by a third party or by Allen Brothers as of the Effective Date, all templates, all content creation, data management, display or other tools, all toolsets, all frameworks, all development techniques, all construction methods, all customizations or enhancements to any existing works or software, except to the extent that such customizations are owned by or licensed to a third party by the terms of another agreement (collectively the "Consultant's [Prominent's] Software").  The parties agree that the New Web

Site will consist of the Allen Brothers IP and the Consultant's Software, that neither party will have the right to operate or maintain the New Web Site except to the extent that such rights are granted in this Agreement.

13.     These intellectual property rights are further addressed in Section 5.A.(4) of the Development Agreement as follows:  "As between Consultant [Prominent] and Allen Brothers, Allen Brothers acknowledges and agrees that Allen Brothers shall not own any Intellectual Property Rights in or to Consultant's Software, and all such Intellectual Property Rights in the Consultant's Software shall be owned by Consultant."

14.     Section 5.C. of the Agreement states in pertinent part:  "The parties further agree that Allen Brothers shall not reverse engineer or otherwise try to access the source code of the New Web Site under any circumstance.  However, in the event of termination of this Agreement (i) after the third anniversary of the Effective Date, or (ii) pursuant to Section 7(B)(1)(a) or 7(B)(1)(b), Allen Brothers may develop or have developed a new website which may have the look and feel of the New Web Site, so long as such development does not involve the reverse engineering or other unauthorized access of Consultant's intellectual property or Consultant's software."

15.     Prominent has applied for copyright registration of the source code it authored and created in connection with its development and implementation of Allen Brothers' new website and related software as described above, including with respect to the Shipping Calendar.  Prominent's copyright applications relating to such source code are attached hereto as Group Exhibit 2.

### The New Allen Brothers' Website Has Been an Overwhelming Success

16.     In or around November 2005, Internet Retailer, a leading industry trade journal in online retailing, which delivers strategic and practical business information on multi-channel

4

retailing to more than 250,000 merchants and catalogers each month, selected Allen Brothers'
website as one of the top 50 retailing websites on the internet for 2006.  In the article, Allen
Brother's new website developed by Prominent was characterized as being in the top 50
innovators on the web.  Other websites identified included Amazon.com, eBay.com, and
BestBuy.com. "Retailers on our Top 50 aren't necessarily the biggest, the most profitable, or the
best known – they are the sites that innovate to take online retailing to the next level," said Kurt
Peters, editor of Internet Retailer.

17.     During the holiday season of 2005, Allen Brothers experienced a surge in sales
due in large part to the success of the website and Prominent's online marketing efforts.  The
surge in sales was so great that Allen Brothers did not have sufficient inventory to fill all of its
orders.

18.     Financially, Allen Brothers' online business flourished after the development and
implementation of the new website.  In 2005, the first year of the new website's operational
existence, Allen Brothers' online sales doubled from approximately $2.2 million to
approximately $4.4 million, and increased to approximately $10.2 million in 2006.

19.     From February 25, 2006 through May 15, 2006, Prominent designed,
implemented, and tested a new website infrastructure for Allen Brothers to accommodate the
increased traffic, which new infrastructure included and built upon the original source code the
Seidenstickers created and implemented in late 2004 and early 2005.

20.     Prominent also took steps to increase Allen Brothers' "natural search" page
ranking on Google as part of its ongoing Search Engine Optimization (SEO) strategy.  Increasing
the page rank was a high-priority goal for Allen Brothers.  In early-2005, a Google user
conducting a search of the word "steak" would have come across more than 160 other websites

before coming to the link for Allen Brothers' website; however, after Prominent started taking steps to increase the ranking, Allen Brothers' website moved up.  By February 2007, Allen Brothers' website had moved all the way up to #3.

21.     Allen Brothers was satisfied with Prominent's work and demonstrated this satisfaction by requesting that Prominent provide additional updates and revisions to the website beyond those originally anticipated.

### Allen Brothers Steals Prominent's Intellectual Property

22.     Although the website was a success, Allen Brothers made it known to Prominent that it wanted to restructure the Development Agreement, since Allen Brothers believed that Prominent was earning too much money pursuant to the existing commission structure and its exponentially increasing internet sales.

23.     After repeated refusals to restructure the Development Agreement, Prominent eventually capitulated and, in August 2006, agreed to a lower commission for sales in excess of $10,550,001.00.  This, however, failed to satisfy Allen Brothers for long, and Allen Brothers again started pressuring Prominent to restructure the Development Agreement.

24.     Prominent refused and, in August 2007, Allen Brothers stopped providing Prominent with new content for the website and stopped paying Prominent monies owed under the Development Agreement.

25.     During the period of time it was providing technology consulting and other web-related services for Allen Brothers, Prominent had a system that monitored the Allen Brothers' website Prominent had developed, and this system monitored specific pages of the website.  This system would send alerts to Prominent's staff if there were any issues with the website.

26.     At about 4:00 a.m. CDT on September 29, 2007, Prominent was notified by alerts from the monitoring system that the website had issues.  Prominent investigated and determined

that the DNS host record for www.allenbrothers.com had changed and was no longer pointing at the website that Prominent had developed and was now pointing at a new website. In other words, Allen Brothers was no longer using the website Prominent had developed, but was now using a new website.

27.     Prominent examined Allen Brothers' new website and saw many similarities in the look-and-feel of the new Allen Brothers' website as compared to the website that Prominent had developed. The new website was being hosted at Yahoo! Stores, but the pages had been customized from the standard Yahoo! Stores pages to pages that looked like those developed by Prominent.

28.     For example, after viewing the new Allen Brothers' website shipping and billing page, Prominent noticed immediately that the new website had the same functionality for its shipping calendar as the Prominent Shipping Calendar.

29.     Prominent then was able to look at the source code for this page in the browser by selecting in the menu the option "View" and "Source". Prominent performed a line-by-line comparison of Allen Brothers HTML and JavaScript Source code and identified significantly identical lines of code from Prominent's Shipping Calendar JavaScript code within Allen Brothers' new website shipping calendar JavaScript code.

30.     It is clear that Allen Brothers did not independently develop its code for numerous reasons, including:

      (a)     Some of the code copied by Allen Brothers is obsolete and would not have been included had Allen Brothers independently developed its website. For example, there are references to a variable called "hawaiianFish", which refers to the Honolulu Fish Company products, which have not been sold by Allen Brothers since July 26, 2006, yet are contained within the source code for Allen Brothers shipping calendar code.

(b)     There is a comment in the code for the shipping calendar on the new website that states "this is legacy code, partially refactored."  This phrase indicates that  the programmer was attempting to re-engineer code that was obtained from Prominent's Shipping Calendar JavaScript code.

(c)     There are "fingerprints" in the new website code that demonstrates the code was copied from Prominent.  For example, websites can have Custom Style Sheets (CSS) that define the look-and-feel of the website.  Almost every page in the new Allen Brothers' website contains CSS style tags that were unique in name and used exclusively in the Prominent website style sheets.  Allen Brothers' new website does not have style sheets that define these tags, and are therefore not functional within the Allen Brothers' website.

(d)     Several pages on the new website contain links to pages which are only functional in the Prominent website, and are not functional in the new Allen Brothers' website.

(e)     Website images on the two sites are labeled identically.  For example, Prominent used pixel images called steaks.gif and tanpixel.gif.  The new Allen Brothers' website contains many pages that refer to these images, and they are used in the same way and manner as in the Prominent website.

(f)     Many of the pages use unique identifiers or numbering that was proprietary to the Prominent e-commerce website.  For example, the "Gift Order Information" page has a link containing a URL parameter of "category=57".  This refers to Prominent's unique numbering system for the product categories displayed on Prominent's e-commerce website.  Prominent's website used this numbering in the link in order to dynamically display categories.  The Allen Brothers' website does not have this capability.  In addition, there is no reason that the Allen Brothers' website would have the same numbering scheme for categories.

(g)     There are also many pages in the new Allen Brothers' website with the same "name" and "id" values for images as in the Prominent IP, like "Image451".  The images would not have the same naming convention unless the code was copied from the Prominent intellectual property.

31.     There is thus overwhelming direct evidence of copying by Allen Brothers.

32.     In all, Prominent performed a complete line-by-line comparison of the Allen Brothers' new website to Prominent's original implementation in February 2005 as well as to the latest version in August 2007, and determined that the HTML source code used by Allen Brothers was substantially copied for all product pages (over 286 pages).

33.     Prominent also determined that 35 of 37 HTML source code pages for non-product pages were copied as well.

34.    The only way for Allen Brothers to have copied Prominent's Code would be by using an automated tool or web browser to download the Code.  Under either scenario, Allen Brothers would have also had to create a secure account and place an order on the website in order to obtain access to all of the Code associated with the purchase elements of the website, including but not limited to the Shipping Calendar created by Prominent.

35.    On at least one occasion in September 2007, Allen Brothers' Vice President of Marketing accessed the website, signed into a secure account, and placed an order, which would have provided Allen Brothers with the access it needed to view Prominent's Code for the shipping calendar.

## COUNT I
## (COPYRIGHT INFRINGEMENT)

36.    Prominent restates and realleges each preceding paragraph as if specifically set forth herein.

37.    Prominent possesses copyrights in the software it used to develop and operate the website it created for Allen Brothers, including in relation to the original source code developed and the Shipping Calendar (the "Prominent Copyrights").

38.    Allen Brothers possessed notice of Prominent's ownership of and rights in the Prominent Copyrights, and even agreed to same by way of the Development Agreement.

39.    Allen Brothers copied the Prominent Copyrights or caused same to be copied.

40.    Many of the codes, including the HTML source code, unique tracking code and JavaScript code, used by Allen Brothers in its new website are identical or substantially similar to the Prominent Copyrights.  Allen Brothers is using same in commerce.

41.    Allen Brothers' conduct and activities were and are unauthorized and constitute copyright infringement under the United States Copyright Act, 17 U.S.C. § 101, *et seq*.

42.     Allen Brothers' infringement has been and continues to be willful within the meaning of the Copyright Act.

43.     Allen Brothers continued and further infringement of the Prominent Copyrights has caused and will continue to cause Prominent irreparable harm.

44.     Upon information and belief, Allen Brothers has derived substantial revenue for the sale of products on its new website.

45.     Prominent has suffered damages as a direct and proximate result of Allen Brother's copyright infringement in an amount to be proved at trial.

WHEREFORE, Prominent respectfully requests that this Court enter judgment in its favor and against Allen Brothers and:

(a)     Temporarily, preliminarily and permanently enjoin Allen Brothers from infringing Prominent's Copyrights as identified in Group Exhibit 2;

(b)     Temporarily, preliminarily and permanently enjoin Allen Brothers from operating the www.allenbrothers.com website, until such time that Allen Brothers develops a website that does not use or rely upon Prominent's intellectual property;

(c)     Enter judgment in favor of Prominent and against Allen Brothers for damages sustained by Prominent in an amount to be determined at trial; and

(d)     Award Prominent any and all other relief it deems necessary and just.

## COUNT II
## (VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT)

46.     Prominent restates and realleges each preceding paragraph as if specifically set forth herein.

47.     The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(4), provides a civil remedy against one who: "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the

thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."

48.    Allen Brothers exceeded its authorized access of a protected computer when it accessed the website with an intent to defraud Prominent by stealing Prominent's intellectual property and breaching the Development Agreement.

49.    Through its unauthorized access, Allen Brothers obtained Prominent's valuable copyrights, including such as have been used to help generate millions of dollars in internet sales for Allen Brothers over the past year.

50.    Allen Brothers then used Prominent's Copyrights to create a new website.

51.    Allen Brothers has violated the CFAA by virtue of its acts above.

52.    As a direct and proximate result of Allen Brothers' unauthorized access, Prominent has suffered damages in that Prominent's source code has been unlawfully used by Allen Brothers to breach the Development Agreement and infringe Prominent's Copyrights.

53.    Allen Brothers continued and further unauthorized access to Prominent's source code has caused and will continue to cause Prominent irreparable harm.  Prominent has also been irreparably harmed by Allen Brothers' use of Prominent's source code for its new website.

54.    Upon information and belief, Allen Brothers has derived substantial revenue for the sale of products on its new website, which Allen Brothers was able to develop and operate by unlawfully accessing Prominent's source code.

WHEREFORE, Prominent respectfully requests that this Court enter judgment in its favor and against Allen Brothers and:

(a)    Temporarily, preliminarily and permanently enjoin Allen Brothers from engaging in any further unauthorized access of Prominent's source code;

(b)     Temporarily, preliminarily and permanently enjoin Allen Brothers from operating the www.allenbrothers.com website, until such time that Allen Brothers develops a website that does not use or rely upon Prominent's source code.

(c)     Enter judgment in favor of Prominent and against Allen Brothers for damages sustained by Prominent in an amount to be determined at trial; and

(d)     Award Prominent any and all other relief it deems necessary and just.

### Jury Demand

Prominent hereby demands a trial by jury on all issues and claims triable by jury.

Dated:  November 8, 2007                    Respectfully submitted,

                                           PROMINENT CONSULTING, LLC

                                           By:/s/James V. Garvey_____
                                                One of Its Attorneys

James V. Garvey
Michael J. Waters
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL  60601-1003
T: (312) 609-7500
F: (312) 609-5005