IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PROMINENT CONSULTING, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>ALLEN BROTHERS, INC.,<br><br>    Defendant. | No. 07 C 6357<br><br>Judge Castillo<br>Magistrate Judge Denlow |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Pursuant to Rules 65(a) and 65(b) of the Federal Rules of Civil Procedure, Plaintiff Prominent Consulting, LLC ("Prominent"), by and through its undersigned attorneys, respectfully submits this Memorandum of Law in support of its Motion for Temporary Restraining Order and Preliminary Injunction against Defendant Allen Brothers, Inc. ("Allen Brothers"), and in support thereof states as follows:

**I.      INTRODUCTION**

Prominent spent significant time and creative effort developing and maintaining a website for Allen Brothers in exchange for a commission based on Allen Brothers' internet sales. Prominent had been managing and updating the Allen Brothers' website since its launch in February 2005. On September 29, 2007, after various disputes had arisen between the parties, Allen Brothers stopped using Prominent's services, and instead launched a new website outside of Prominent's control. However, rather than independently developing its new website, Allen Brothers simply stole the computer source code that Prominent developed. In doing so, Allen Brothers has infringed and is continuing to infringe Prominent's copyrights in the source code. Allen Brothers' actions are causing and will continue to cause Prominent irreparable harm.

Accordingly, Prominent seeks a temporary restraining order and preliminary injunction prohibiting Allen Brothers, and its officers, agents, servants, employees, and attorneys, and those in active concert with them, from: (i) infringing Prominent's copyrights; (ii) operating the www.allenbrothers.com website through its infringing use of Prominent's copyrights; and (iii) engaging in any further unauthorized access of Prominent's source code.

## II.   FACTS

### A.   Prominent Develops and Maintains a Website for Allen Brothers

Allen Brothers is an Illinois corporation that sells meats and other foodstuffs to individuals and commercial customers in a variety of ways, including through a printed catalog and internet website.  On January 11, 2005, Prominent and Allen Brothers memorialized a contractual agreement whereby Prominent would develop and maintain a website for Allen Brothers in exchange for a commission based upon Allen Brothers' internet sales ("Development Agreement").  (Seidensticker Aff. ¶ 6 and Ex. A, attached hereto as Exhibit 1.)  Prominent spent significant time and energy developing the website, with Prominent employees working almost exclusively to develop the website during a seven month period in late-2004 and early-2005.  The website was launched on February 17, 2005.  (*Id*., ¶ 7.)

In addition to developing the Allen Brothers' website, Prominent developed associated website applications and continued developing these applications during the entire period of time it managed the Allen Brothers' website.  (*Id*., ¶ 10.)  During September and October 2005, for example, Prominent developed a specialized Shipping Calendar that allowed customers to select a specific delivery date for products ordered.  (*Id*., ¶ 16.)  The Shipping Calendar was written in JavaScript and HTML, and was unlike any other calendar used by any e-commerce website on the Internet.  (*Id*., ¶ 16.)  It provided real-time updates as to the available delivery dates and costs associated with the contents of the customer's shopping cart.  (*Id*., ¶ 16.)

For a variety of reasons, explained by Laura Seidensticker in her accompanying Affidavit, Allen Brothers had difficulty accurately conveying to customers the date on which their delivery would arrive prior to Prominent's creation of the Shipping Calendar. (*Id*., ¶¶ 17-19.) The calendar thus cleared up a lot of customer confusion and support issues for Allen Brothers and is a tool of significant value.

B. **Prominent Used its Intellectual Property in Creating the Website and Related Software**

Prominent developed the Allen Brothers' website and related software using Java 2 Enterprise Edition (J2EE) technology. (*Id*., ¶¶ 8-9.) The website consisted of web pages designed using JavaServer Pages (JSP) technology, JavaScript technology, HTML Source Code, Cascading Style Sheets, images, code generated by server based software utilizing J2EE technology, and relational database technology ("Code"). (*Id*., ¶ 8-9.) The Code is unique and was independently developed by Prominent and is the result of its employee's intellectual conception and thought. (*Id*., ¶ 7.)

In October and November 2007, Prominent filed copyright applications with the United States Copyright Office for the original source code and the Shipping Calendar developed by Prominent for the creation and maintenance of the Allen Brothers' website. (*Id*., ¶¶ 41-42.)

In the Development Agreement, Section 5.A.(2), Allen Brothers recognized Prominent's intellectual property rights in the Code it developed to run the new website:

> The parties contemplate that there shall be Intellectual Property Rights in the following New Web Site components: . . . (v) all other software, including all code and customizations which allow the Allen Brothers IP to be displayed, reviewed and experienced or which allows the Allen Brothers products to be purchased, except to the extent that such software is otherwise owned by a third party or by Allen Brothers as of the Effective Date, all templates, all content creation, data management, display or other tools, all toolsets, all frameworks, all development techniques, all construction methods, all customizations or enhancements to any

>existing works or software, except to the extent that such customizations are owned by or licensed to a third party by the terms of another agreement (collectively the "Consultant's [Prominent's] Software"). The parties agree that the New Web Site will consist of the Allen Brothers IP and the Consultant's Software, that neither party will have the right to operate or maintain the New Web Site except to the extent that such rights are granted in this Agreement.

Prominent's intellectual property rights are further addressed in Section 5.A.(4) of the Development Agreement as follows: "As between Consultant [Prominent] and Allen Brothers, Allen Brothers acknowledges and agrees that Allen Brothers shall not own any Intellectual Property Rights in or to Consultant's Software, and all such Intellectual Property Rights in the Consultant's Software shall be owned by Consultant." (*Id*., Ex. A.)

    C.    **<u>Allen Brothers Steals Prominent's Code</u>**

Although the website was a success, Allen Brothers made it known to Prominent that it wanted to restructure the Development Agreement, since Allen Brothers believed that Prominent was earning too much money pursuant to the existing commission structure and its exponentially increasing internet sales. Prominent, however, repeatedly refused to restructure the Agreement. (*Id*., ¶ 11.)

In August 2007, Allen Brothers stopped providing Prominent with new content for the website and stopped paying Prominent monies owed under the Development Agreement. (*Id*., ¶ 11.) During the period of time it was providing technology consulting and other web-related services for Allen Brothers, Prominent had a system that monitored the Allen Brothers' website Prominent had developed, and this system monitored specific pages of the website. This system would send alerts to Prominent's staff if there were any issues with the website. (*Id*., ¶ 12.)

At about 4:00 a.m. CDT on September 29, 2007, Prominent was notified by alerts from the monitoring system that the website had issues. Prominent investigated and determined that

the DNS host record for www.allenbrothers.com had changed and was no longer pointing at the website that Prominent had developed and was now pointing at a new website. In other words, Allen Brothers was no longer using the website Prominent had developed, but was now using a new website. (*Id*., ¶ 13.)

Prominent examined Allen Brothers' new website and saw many similarities in the look-and-feel of the new Allen Brothers' website as compared to the website that Prominent had developed for Allen Brothers. The new website was being hosted at Yahoo! Stores, but the pages had been customized from the standard Yahoo! Stores pages to pages that looked like those developed by Prominent. (*Id*., ¶ 14.)

For example, after viewing the new Allen Brothers' website shipping and billing page, Prominent noticed immediately that the new website had the same functionality for its shipping calendar as the Prominent Shipping Calendar. (*Id*., ¶ 21.) Prominent then was able to look at the source code for this page in the browser by selecting in the menu the option "View" and "Source". (*Id*., ¶ 22.) Prominent performed a line-by-line comparison of Allen Brothers HTML and JavaScript Source code and identified significantly identical lines of code from Prominent's Shipping Calendar JavaScript code within Allen Brothers' new website shipping calendar JavaScript code. (*Id*., ¶ 22 and Exs. B1 and B2.)

        D.      **Allen Brothers did not Independently Develop its Code**

It is clear that Allen Brothers did not independently develop the code it using to operate www.allenbrothers.com. There are multiple lines of code within the new Allen Brothers' shipping calendar code that appear exactly as they do in the Prominent Shipping Calendar code; however, the code is irrelevant and obsolete when used outside of Prominent's Shipping Calendar. For example, there are references to a variable called "hawaiianFish", which refers to the Honolulu Fish Company products, which have not been sold by Allen Brothers since July 26,

2006, yet are contained within the source code for Allen Brothers shipping calendar code. (*Id*., ¶ 24.)

In addition, there is a comment in the Allen Brothers' shipping calendar JavaScript code that states "this is legacy code, partially refactored." This means that the programmer was attempting to re-engineer code that was obtained from Prominent's Shipping Calendar JavaScript code. (*Id*., ¶ 25.)

Prominent also reviewed the other pages in this new Allen Brothers' website and found that a majority of the pages contain code from the website Prominent created. There are many "fingerprints" in the new website code that shows that the code was copied from Prominent. For example, web sites can have Cascading Style Sheets (CSS) that define the look-and-feel of the website. (*Id*., ¶ 26.) Almost every page in the new Allen Brothers' website contains CSS style tags that were unique in name and used exclusively in the Prominent website style sheets. However, Allen Brothers' new website does not have style sheets that define these tags, and are therefore not functional within the Allen Brothers' website, but indicate the HTML source code was copied from Prominent. (*Id*., ¶ 27.)

Several pages on the new website contain links to pages which are only functional in the Prominent website, and are not functional in the new Allen Brothers' website. These remnant links are formatted to use JSP technology which is the technology used by Prominent's implementation and not by Allen Brothers' implementation, and thus do not function. In addition, some of these links contain embedded URL parameters which are solely unique to Prominent's implementation and tracking. (*Id*., ¶ 28.)

Prominent created the look-and-feel of the Allen Brothers' website through the use of CSS, HTML Source Code, and unique images. One method that Prominent employed to layout

pages was to use 1x1 pixel images, called steaks.gif and tanpixel.gif. The new Allen Brothers' website contains many pages that refer to these images, and they are used in the same way and manner as in the Prominent website. The way these images were used is proprietary to Prominent. (*Id*., ¶ 29.)

Many of the pages also use unique identifiers or numbering that was proprietary to the Prominent e-commerce website. For example, the "Gift Order Information" page has a link containing a URL parameter of "category=57". (*Id*., ¶ 30.) This refers to Prominent's unique numbering system for the product categories displayed on Prominent's e-commerce website. Prominent's website used this numbering in the link in order to dynamically display categories. The Allen Brothers' website does not have this capability. In addition, there is no reason that the Allen Brothers' website would have the same numbering scheme for categories. (*Id*., ¶ 31.)

There are also many pages in the new Allen Brothers' website with the same "name" and "id" values for images as in the Prominent IP, like "Image451". (*Id*., ¶ 32.) The images would not have the same naming convention unless the code was copied from the Prominent intellectual property. Allen Brothers' "Contact Us" page uses marketing tracking codes which are unique to Prominent's e-commerce website, and specifically the Marketing Sources ID which is used to internally track marketing results within Prominent's e-commerce system. (*Id*., ¶ 33.)

In all, Prominent performed a complete page-by-page comparison of the Allen Brothers' website to Prominent's original implementation in February 2005 as well as to the latest version in August 2007, and determined that the HTML source code used by Allen Brothers was substantially copied for all product pages (over 286 pages). (*Id*., ¶ 34.) Prominent also determined that 35 of 37 HTML source code pages for non-product pages were copied as well. (*Id*., ¶ 35.)

III. **ARGUMENT**

A. <u>**Standard for Granting a Temporary Restraining Order and/or Preliminary Injunction**</u>

The Court is to consider four factors in determining whether to issue a temporary restraining order or preliminary injunction: (1) whether the plaintiff has at least a reasonable likelihood of success on the merits (i.e., better than negligible); (2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (3) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and (4) whether the granting of a preliminary injunction will disserve the public interest. *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 613 (7th Cir. 1982); *Ty, Inc. v. West Highland Publishing, Inc.*, No. 98 C 4091, 1998 WL 698922, *6 (N.D. Ill. Oct. 5, 1998); *Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 610 F. Supp. 360, 364-65 (N.D. Ill. 1984). In evaluating these factors, the Court is to take a "sliding scale" approach which, according to the Seventh Circuit, "is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh competing considerations and mold appropriate relief.'" *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895-96 (7th Cir. 2001), citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

1. <u>**Prominent Has a Likelihood of Success on the Merits**</u>

To establish copyright infringement, a plaintiff must prove two elements: (1) ownership of a valid copyright, and (2) copying by the defendant. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991). Prominent will be able to demonstrate both of these elements in this action.

a. <u>**Prominent Owns of a Valid Copyright in its Source Code**</u>

Copyright protection is warranted for works that are the result of "some minimal degree

of creativity," or "the existence of […] intellectual production, of thought, and conception." *Id*. at 362. Copyright protection begins at the moment of creation of "original works of authorship fixed in any tangible medium of expression," including "pictorial, graphic, and sculptural" works and sound recordings. 17 U.S.C. § 102(a). A work is "fixed" in a tangible medium of expression "when its embodiment in a copy […] is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. §102(a).

Creating source code for software and websites is work that requires some minimal degree of creativity, intellectual production and conception, and is thus worthy of copyright protection. *See, e.g.*, *QSRSoft, Inc. v. Restaurant Technology, Inc.*, No. 06 C 2734, 2006 WL 2990432, *12 (Oct. 19, 2006) (providing copyright protection for a data engine, source code and website); *CRC Press, LLC v. Wolfram Research, Inc.*, 149 F.Supp.2d 500, 505 (C.D. Ill. 2000) (providing copyright protection for computer software). Prominent's source code is likewise the result of significant time, effort, creativity, intellectual production and conception. Moreover, by way of the Development Agreement, Section 5.A.(2), Allen Brothers has already recognized Prominent's intellectual property rights in Prominent's software and the underlying code. Accordingly, Prominent is entitled to copyright protection of its source code.

### b. Allen Brothers Copied Prominent's Protected Work

Once it is established that a party has a valid copyright, whether registered or not, the next question is whether another person has copied the protected work.[1] *JCW Investments, Inc.*

---

[1] Defendants occasionally argue that plaintiffs cannot obtain injunctions for works that have yet to receive copyright registration; however, courts have rejected this argument, holding that the Copyright Act itself does not impose such a requirement but instead empowers district courts to issue injunctions "on such terms as it may deem reasonable to prevent or restrain infringement of *a* copyright," rather than only *registered* copyrights. *See, e.g.*, *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1349 (8th Cir.1994); *Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490, 1499 n. 17 (11th Cir.1984).

*v. Novelty, Inc.*, 482 F.3d 910, 915 (7th Cir. 2007). Direct evidence of copying is often hard to come by, and courts thus permit an inference of copying "where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work." *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 450 (7th Cir. 2001) *citing Atari*, 672 F.2d at 614.

Here, Allen Brothers clearly had access to the website source code. Not only did Prominent develop the website for Allen Brothers, but any internet user could view the source code by simply clicking "view" and then "source" on Internet Explorer or any other web browser. In addition, the code being utilized by Allen Brothers' for its new website is substantially similar to Prominent's source code.

While access and substantial similarity are enough to establish copying, this is one of the rare situations where there also is direct evidence of copying. As detailed above, Allen Brothers clearly has copied Prominent's source code:

- Some of the code copied by Allen Brothers is obsolete and would not have been included had Allen Brothers independently developed its website. For example, there are references to a variable called "hawaiianFish", which refers to the Honolulu Fish Company products, which have not been sold by Allen Brothers since July 26, 2006, yet are contained within the source code for Allen Brothers' shipping calendar code.

- There is a comment in the code for the shipping calendar on the new website that states "this is legacy code, partially refactored." This phrase indicates that the programmer was attempting to re-engineer code that was obtained from Prominent's Shipping Calendar JavaScript code.

- There are "fingerprints" in the new website code that demonstrates the code was copied from Prominent. For example, websites can have CSS that define the look-and-feel of the website. Almost every page in the new Allen Brothers' website contains CSS style tags that were unique in name and used exclusively in the Prominent website style sheets. Allen Brothers' new website does not have style sheets that define these tags, and are therefore not functional within the Allen Brothers' website.

- Several pages on the new website contain links to pages which are only functional in the Prominent website, and are not functional in the new Allen Brothers' website.

- Website images on the two sites are labeled identically. For example, Prominent used pixel images called steaks.gif and tanpixel.gif. The new Allen Brothers' website contains many pages that refer to these images, and they are used in the same way and manner as in the Prominent website.

- Many of the pages use unique identifiers or numbering that was proprietary to the Prominent e-commerce website. For example, the "Gift Order Information" page has a link containing a URL parameter of "category=57". This refers to Prominent's unique numbering system for the product categories displayed on Prominent's e-commerce website. Prominent's website used this numbering in the link in order to dynamically display categories. The Allen Brothers' website does not have this capability. In addition, there is no reason that the Allen Brothers' website would have the same numbering scheme for categories.

- There are also many pages in the new Allen Brothers' website with the same "name" and "id" values for images as in the Prominent IP, like "Image451". The images would not have the same naming convention unless the code was copied from the Prominent intellectual property.

Prominent also has been able to complete a substantial side-by-side comparison of the two websites, as set forth in the detailed infringement analysis attached to the Affidavit of Laura Seidensticker.

Accordingly, there is overwhelming circumstantial *and* direct evidence of copying by Allen Brothers. As such, Prominent not only has "some likelihood of success on the merits," it will almost certainly succeed on the merits of its copyright claim.[2]

### 2. **Probability of Irreparable Harm**

The threshold consideration in a motion for a preliminary injunction is the moving party's likelihood of success on the merits. *West Highland Publishing, Inc.*, 1998 WL 698922 at

---

[2] Due to the presumptions of irreparable harm associated with copyright infringement, Prominent's Motion for Temporary Restraining Order and Preliminary Injunction focuses primarily on Prominent's copyright infringement claim. However, Prominent is also likely to succeed on its Computer Fraud and Abuse Act claim, since Allen Brothers has exceeded authorized access to Prominent's source code when its accessed the code through a protected computer with the intent to infringe Prominent's copyrights.

*7. Once likelihood of success is established, there is a well-recognized presumption that damages incurred by copyright infringement are by their very nature irreparable and not susceptible of monetary measurement, rendering any remedy at law inadequate. *Id*. at *59-60; *CRC Press*, 149 F.Supp.2d at 510. This presumption is based on the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations. *West Highland Publishing, Inc.*, 1998 WL 698922 at *19.

In addition to the presumption of irreparable harm in this situation, Prominent will continue to suffer irreparable harm if Allen Brothers' infringing conduct is not enjoined. Allen Brothers has effectively hijacked Prominent's intellectual property. Where Prominent once had control over its creations, it now has none. Prominent has been positively recognized in the industry for its creation of the Allen Brothers' website, and Prominent's reputation and good standing in the internet consulting community is thus tied to the website. If there are problems with the website that exist or develop (such as broken links which are already present), Prominent's reputation is at substantial risk. Thus, Allen Brothers has not only taken away Prominent's control over its intellectual property, but has taken away Prominent's control over its reputation, the value of its services, and its ability to develop future clients who consider Prominent's past work in assessing whether to retain the company.

### 3. **Balance of Hardships**

"The greater the chances that the plaintiff will succeed, the less likely the balance of harms must weigh in plaintiff's favor." *Florists' Transworld Delivery, Inc. v. Originals Florists & Gifts, Inc.*, No. 00 C 4458, 2000 WL 1693980, *3 (N.D. Ill. Nov. 9, 2000). Because Prominent is extremely likely to succeed on its copyright claim, the balance of hardships consideration is of less importance than in other cases in which the plaintiff requests preliminary

injunctive relief, but relies on a weaker case. Nevertheless, the balance of hardships weighs in Prominent's favor.

Presumably, Allen Brothers will claim hardship in the form of potential lost business if it is required to stop using the website by its infringing use of Prominent's copyrights. This hardship, however, "merits little equitable consideration." *Atari*, 672 F.2d at 620. As stated by the Seventh Circuit, "Advantages built upon deliberately plagiarized make-up do no seem to us to give the borrower any standing to complain that his vested interests will be disturbed." *Id.*, *citing My-T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir. 1934). This is true even if the injunction might force the infringer out of business, because an infringer should not be able to construct its business around an infringing product. *West Highland Publishing, Inc.*, 1998 WL 698922 at *20, *citing DSC Communications Corp. v. DGI Technologies, Inc.*, 898 F.Supp. 1183, 1195 (N.D. Tex. 1995) ("If the correct standard for balancing the hardships were whether the infringer would be forced out of business, then a knowing infringer could construct its business around an infringing product and effectively prevent the legitimate copyright holder from obtaining relief or enforcing its rights.")). In sum, to claim that an injunction will harm business, when that business relies on the defendant's infringement, is to pervert the meaning of the balance of hardships test. *Horn Abbot*, 601 F. Supp. at 369.

Moreover, it is questionable how much business Allen Brothers would lose if it is forced to stop using Prominent's intellectual property, as it has a strong catalog business with a call center capable of handling additional order processing, or else Allen Brothers can always use the website it had before it started using the website designed by Prominent. Prominent also is harmed by Allen Brothers' continued infringement because, as described above, Prominent is unable to control its intellectual property and thus its reputation, the value of its services, and its

ability to generate new business. Prominent's business is entitled to as much protection as Allen Brothers, if not more so given that Prominent is not the infringing party. *West Highland Publishing, Inc.*, 1998 WL 698922 at *20.

### 4. Public Policy

The granting of temporary restraining orders and preliminary in the copyright context serves the public interest in maintaining the integrity of copyright law. *CRC*, 149 F.Supp.2d at 510. "The public is generally interested in upholding intellectual property rights, encouraging innovation and creativity, and rewarding those that take the risk and invest resources in pursuit of such innovation and creativity." *QSRSoft*, 2006 WL 2990432 at *12. Accordingly, it is in the public's interest that the Court grant the requested relief.

## IV. BOND

Prominent seeks entry of a temporary restraining order without being required to post a bond. Prominent is only seeking an injunction with respect to the clear and blatant infringement of its intellectual property rights, which Prominent has already shown. There is, therefore, little to no chance that if an injunction issues Allen Brothers will ultimately be found to have been wrongfully enjoined or restrained. Moreover, the Web Development agreement between the parties specifically states that "breach by either party will cause the other party great and irreparable damage" and that "a party damaged or potentially damaged by a breach of the terms of this Section 13 [including in relation to Prominent's software], in addition to any other remedies, shall be entitled to the remedies of injunction, without the posting of a bond, specific performance and other equitable relief. . . ." Accordingly, only a modest bond, if any, is appropriate. *LCOR, Inc. v. Murray*, 1997 WL 136278, at *12 (N.D. Ill. 1997).

- 15 -

## V. **CONCLUSION**

For all of the foregoing reasons, Prominent has satisfied the requirements for the issuance of a temporary restraining order and preliminary injunction. Accordingly, Prominent respectfully requests that the Court enter a temporary restraining order that prohibits Allen Brothers, and its officers, agents, servants, employees, and attorneys, and those in active concert with them, from from: (i) infringing Prominent's copyrights; (ii) operating the www.allenbrothers.com website through its infringing use of Prominent's intellectual property; and (iii) engaging in any further unauthorized access of Prominent's source code.

Dated: November 15, 2007                    PROMINENT CONSULTING, LLC

                                                                         By: s/James V. Garvey
                                                                             One of Its Attorneys

James V. Garvey, Bar No. 06224992
Michael J. Waters, Bar No. 06280008
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL  60601-1003
T: 312-609-5005
F: 312-609-5005

CHICAGO/#1709497.4