**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PROMINENT CONSULTING, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07 C 6357 |
| | ) | |
| **ALLEN BROTHERS, INC.,** | ) | Judge Ruben Castillo |
| | ) | |
| Defendant. | ) | Magistrate Judge Morton Denlow |
| | ) | |

<u>**ALLEN BROTHERS' VERIFIED ANSWER**</u>

Defendant Allen Brothers, Inc. ("Allen Brothers"), by its attorneys, for its Verified

Answer to the Complaint filed by Plaintiff Prominent Consulting, LLC ("Prominent") hereby

states as follows:

1.     This is an action by Prominent for injunctive relief and damages relating to Allen
Brother's copyright infringement of Prominent's intellectual property. More specifically,
Prominent possesses copyrights in the computer source code it used to create a website for Allen
Brothers. Allen Brothers now has stolen Prominent's source code, and has used and is using the
source code to create and operate a new website that Allen Brothers is now independently
hosting. Allen Brothers' actions in this regard constitute copyright infringement and a violation
of the Computer Fraud and Abuse Act.

<u>**ANSWER:**</u>

Allen Brothers admits that Prominent purports to bring an action for injunctive relief and

damages relating to Allen Brothers' alleged copyright infringement of Prominent's intellectual

property, but denies that Prominent is entitled to any relief.  Answering further, Allen Brothers

admits that Prominent claims to have applied for copyright registration, but denies that the

materials contained in Prominent's copyright application are entitled to copyright protection.

Answering further, Allen Brothers denies the remaining allegations in Paragraph 1.

2.      Prominent is a Delaware limited liability company with its principal place of business in Cook County, Illinois. Prominent provides various enterprise technology consulting and marketing-related services.

**ANSWER:**      Allen Brothers admits the allegations in Paragraph 2.

3.      Allen Brothers is an Illinois corporation with its principal place of business in Cook County, Illinois. Allen Brothers sells meats and other foodstuffs to individuals and commercial customers in a variety of ways, including through a printed catalog and internet website.

**ANSWER:**      Allen Brothers admits the allegations in Paragraph 3.

4.      In April 2004, Allen Brothers and Prominent decided to pursue an agreement wherein Prominent would design, develop, and operate a new website for Allen Brothers.

**ANSWER:**

Allen Brothers admits that Allen Brothers and Prominent entered into a Website Development and License Agreement ("Development Agreement") on January 11, 2005. Answering further, Allen Brothers states that the Development Agreement speaks for itself and denies any characterization of the Development Agreement by Prominent that is inconsistent with the express terms of the Development Agreement.  Answering further, Allen Brothers denies the remaining allegations in Paragraph 4.

5.      Throughout the remainder of 2004, in furtherance of the agreement, Prominent worked to develop the new website, including by authoring and creating software for the new site.

**ANSWER:**

Allen Brothers denies that work performed by Prominent in 2004 was pursuant to the Development Agreement.  Further answering, Allen Brothers lacks sufficient knowledge or information to form a belief as to the truth of any remaining allegations in Paragraph 5 and, therefore denies those allegations.

6.      Kurt Seidensticker, Managing Director of Prominent, and his wife, Laura Seidensticker, put forth significant effort to design, develop and operate the new website and related software. For both Kurt and Laura Seidensticker, development of the new Allen Brothers' website was a full time effort; they were motivated, however, by their belief that they could and would develop a best-in-class e-commerce website for Allen Brothers and that they would be fairly compensated as a result.

**ANSWER:**

Allen Brothers admits that Prominent, including Kurt Seidensticker and Laura Seidensticker, performed work in connection with the Allen Brothers website as required under the Development Agreement. Further answering, Allen Brothers lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 6 and, therefore denies those allegations.

7.      Prominent launched the new Allen Brothers' website on February 17, 2005.

**ANSWER:**

Allen Brothers admits that a new Allen Brothers website developed by Prominent was launched in 2005, pursuant to the terms of the Development Agreement. Answering further, Allen Brothers denies any remaining allegations in Paragraph 7.

8.      Throughout the course of its development and management of Allen Brothers' website, Prominent developed new features for the website. For example, during September and October 2005, Prominent developed a specialized Shipping Calendar for the Allen Brothers' website that tracked processing and shipping of internet orders. It was written in JavaScript and HTML, and was unlike any other calendar used by any e-commerce website on the Internet. It provided real-time updates as to the available delivery dates and costs associated with the contents of the customer's shopping cart.

**ANSWER:**

Allen Brothers admits that Prominent was obligated under the terms of the Development Agreement to develop a website as well as features for the website and, upon information and belief, Prominent did so. Answering further, Allen Brothers lacks sufficient knowledge or

information to form a belief as to the truth of the allegation that "it was written in JavaScript and

HTML." Answering further, Allen Brothers denies the remaining allegations in Paragraph 8.

9.      For a variety of reasons, Allen Brothers had difficulty accurately conveying to customers the date on which their delivery would arrive prior to Prominent's creation of the Shipping Calendar. The calendar thus cleared up a lot of customer confusion and support issues for Allen Brothers and is a tool of significant value.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 9.

10.     On January 11, 2005, prior to the launch of Allen Brothers' new website, the parties memorialized their working relationship by entering into a Web Site Development and License Agreement ("Development Agreement"), a copy of which is attached hereto as Exhibit 1. Among other things, the Development Agreement addresses services, fees, and the ownership and usage of the parties' respective intellectual property.

**ANSWER:**

Allen Brothers admits that Allen Brothers and Prominent entered into the Development

Agreement on or about January 11, 2005.  Allen Brothers states that the Development

Agreement speaks for itself and denies any characterization of the Development Agreement by

Prominent that is inconsistent with the express terms of the Development Agreement.

Answering further, Allen Brothers denies the remaining allegations in Paragraph 10.

11.     The Development Agreement memorializes the parties' rights and obligations, including ownership and rights to the intellectual property associated with the new website.

**ANSWER:**

Allen Brothers states that the Development Agreement speaks for itself and denies any

characterization of the Development Agreement by Prominent that is inconsistent with the

express terms of the Development Agreement.

12.     In part, Section 5.A.(2) confirms Prominent's intellectual property rights in the software it developed to run the new website:

The parties contemplate that there shall be Intellectual Property

Rights in the following New Web Site components: . . . (v) all other software, including all code and customizations which allow the Allen Brothers IP to be displayed, reviewed and experienced or which allows the Allen Brothers products to be purchased, except to the extent that such software is otherwise owned by a third party or by Allen Brothers as of the Effective Date, all templates, all content creation, data management, display or other tools, all toolsets, all frameworks, all development techniques, all construction methods, all customizations or enhancements to any existing works or software, except to the extent that such customizations are owned by or licensed to a third party by the terms of another agreement (collectively the "Consultant's [Prominent's] Software"). The parties agree that the New Web Site will consist of the Allen Brothers IP and the Consultant's Software, that neither party will have the right to operate or maintain the New Web Site except to the extent that such rights are granted in this Agreement.

**ANSWER:**

Allen Brothers states that the Development Agreement speaks for itself and denies any characterization of the Development Agreement by Prominent that is inconsistent with the express terms of the Development Agreement.

13.    These intellectual property rights are further addressed in Section 5 .A. (4) of the Development Agreement as follows: "As between Consultant [Prominent] and Allen Brothers, Allen Brothers acknowledges and agrees that Allen Brothers shall not own any Intellectual Property Rights in or to Consultant's Software, and all such Intellectual Property Rights in the Consultant's Software shall be owned by Consultant."

**ANSWER:**

Allen Brothers states that the Development Agreement speaks for itself and denies any characterization of the Development Agreement by Prominent that is inconsistent with the express terms of the Development Agreement.

14.    Section 5.C. of the Agreement states in pertinent part: "The parties further agree that Allen Brothers shall not reverse engineer or otherwise try to access the source code of the New Web Site under any circumstance. However, in the event of termination of this Agreement (i) after the third anniversary of the Effective Date, or (ii) pursuant to Section 7(B)(1)(a) or 7(B)(1)(b), Allen Brothers may develop or have developed a new website which may have the look and feel of the New Web Site, so long as such development does not involve the reverse engineering or other unauthorized access of Consultant's intellectual property or Consultant's software."

**ANSWER:**

Allen Brothers states that the Development Agreement speaks for itself and denies any characterization of the Development Agreement by Prominent that is inconsistent with the express terms of the Development Agreement.

15.    Prominent has applied for copyright registration of the source code it authored and created in connection with its development and implementation of Allen Brothers' new website and related software as described above, including with respect to the Shipping Calendar. Prominent's copyright applications relating to such source code are attached hereto as Group Exhibit 2.

**ANSWER:**

Allen Brothers admits that attached as Group Exhibit 2 to the complaint are documents that purport to be copyright applications filed on behalf of Prominent on October 7, 2007 and November 8, 2007. Answering further, Allen Brothers denies that the materials contained in Prominent's copyright application are entitled to copyright protection. Answering further, Allen Brothers denies the remaining allegations in Paragraph 15.

16.    In or around November 2005, Internet Retailer, a leading industry trade journal in online retailing, which delivers strategic and practical business information on multi-channel retailing to more than 250,000 merchants and catalogers each month, selected Allen Brothers' website as one of the top 50 retailing websites on the internet for 2006. In the article, Allen Brother's new website developed by Prominent was characterized as being in the top 50 innovators on the web. Other websites identified included Amazon.com, eBay.com, and BestBuy.com. "Retailers on our Top 50 aren't necessarily the biggest, the most profitable, or the best known – they are the sites that innovate to take online retailing to the next level," said Kurt Peters, editor of Internet Retailer.

**ANSWER:**

Allen Brothers admits that Internet Retailer recognized Allen Brothers' website as one of the top 50 retailing websites on the internet for 2006. Answering further, Allen Brothers lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 16 and, therefore denies those allegations.

17.     During the holiday season of 2005, Allen Brothers experienced a surge in sales due in large part to the success of the website and Prominent's online marketing efforts. The surge in sales was so great that Allen Brothers did not have sufficient inventory to fill all of its orders.

**ANSWER:**

Allen Brothers admits that the holiday season is its busiest time of year and that Allen Brothers experienced a surge in sales during the holiday season in 2005. Answering further, Allen Brothers denies that it had any significant problem satisfying its customer orders during that time. Answering further, Allen Brothers denies the remaining allegations in Paragraph 17.

18.     Financially, Allen Brothers' online business flourished after the development and implementation of the new website. In 2005, the first year of the new website's operational existence, Allen Brothers' online sales doubled from approximately $2.2 million to approximately $4.4 million, and increased to approximately $10.2 million in 2006.

**ANSWER:**

Allen Brothers admits that its online business flourished after the development and implementation of the new website, neither admitting nor denying that it was as a result of the website developed by Prominent. Answering further, Allen Brothers states that the figures alleged by Prominent in Paragraph 18 would represent confidential business information belonging to Allen Brothers and that by including such information in its complaint, Prominent has breached Section 5(a) of the Development Agreement. As such, Allen Brothers neither confirms nor denies the truth of the remaining allegations in Paragraph 18.

19.    From February 25, 2006 through May 15, 2006, Prominent designed, implemented, and tested a new website infrastructure for Allen Brothers to accommodate the increased traffic, which new infrastructure included and built upon the original source code the Seidenstickers created and implemented in late 2004 and early 2005.

**ANSWER:**

Allen Brothers admits that as website traffic increased, Prominent's equipment was no longer capable of handling the demands placed upon it by the traffic. At Prominent's request, Allen Brothers paid over $150,000 for additional hardware to enable Prominent to perform the services Prominent was obligated to perform under the Development Agreement. Answering further, Allen Brothers lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 19 and, therefore denies those allegations.

20.    Prominent also took steps to increase Allen Brothers' "natural search" page ranking on Google as part of its ongoing Search Engine Optimization (SEO) strategy. Increasing the page rank was a high-priority goal for Allen Brothers. In early-2005, a Google user conducting a search of the word "steak" would have come across more than 160 other websites before coming to the link for Allen Brothers' website; however, after Prominent started taking steps to increase the ranking, Allen Brothers' website moved up. By February 2007, Allen Brothers' website had moved all the way up to #3.

**ANSWER:**

Allen Brothers admits that pursuant to its obligations under the Development Agreement, Prominent provided certain "optimization services" to Allen Brothers which were paid for separately by Allen Brothers. Answering further, Allen Brothers lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 20 and therefore denies those allegations.

21.    Allen Brothers was satisfied with Prominent's work and demonstrated this satisfaction by requesting that Prominent provide additional updates and revisions to the website beyond those originally anticipated.

**ANSWER:**

Allen Brothers admits that Prominent performed updates and revisions to the website, as required by the Development Agreement. Answering further, Allen Brothers admits that it was generally satisfied with Prominent's performance under the Development Agreement, until Allen Brothers discovered that Prominent and Kurt Seidensticker had engaged in material misconduct by spying on Allen Brothers' email communications and relaying confidential information from those communications to a litigation opponent of Allen Brothers.

22.    Although the website was a success, Allen Brothers made it known to Prominent that it wanted to restructure the Development Agreement, since Allen Brothers believed that Prominent was earning too much money pursuant to the existing commission structure and its exponentially increasing internet sales.

**ANSWER:**

Allen Brothers admits that the Development Agreement was renegotiated in part because Allen Brothers believed that the very expensive radio advertising, optimization services and other Internet marketing, the cost of all of which was being paid for separately by Allen Brothers and which very significantly increased ecommerce traffic through the Allen Brothers website, were resulting in over-compensation to Prominent. Answering further, Allen Brothers admits that on or about August 31, 2006, Allen Brothers and Prominent negotiated a first amendment to the Development Agreement, which Prominent agreed to willingly and without duress. Allen Brothers denies the remaining allegations in Paragraph 22.

23.    After repeated refusals to restructure the Development Agreement, Prominent eventually capitulated and, in August 2006, agreed to a lower commission for sales in excess of $10,550,001.00. This, however, failed to satisfy Allen Brothers for long, and Allen Brothers again started pressuring Prominent to restructure the Development Agreement.

**ANSWER:**

Allen Brothers admits that on or about August 31, 2006, Allen Brothers and Prominent negotiated a first amendment to the Development Agreement, which Prominent agreed to willingly and without duress. Answering further, Allen Brothers states that the amendment speaks for itself and denies any characterization inconsistent with its terms. Allen Brothers denies the remaining allegations in Paragraph 23.

24.    Prominent refused and, in August 2007, Allen Brothers stopped providing Prominent with new content for the website and stopped paying Prominent monies owed under the Development Agreement.

**ANSWER:**

Allen Brothers admits that it justifiably stopped providing Prominent with new content for the website and stopped paying Prominent when it discovered Prominent's unconscionably egregious and unethical actions of secretly spying on Allen Brothers by monitoring Allen Brothers' emails and providing confidential information from those emails to a litigation opponent of Allen Brothers. Answering further, Allen Brothers denies any remaining allegations in Paragraph 24.

25.    During the period of time it was providing technology consulting and other web-related services for Allen Brothers, Prominent had a system that monitored the Allen Brothers' website Prominent had developed, and this system monitored specific pages of the website. This system would send alerts to Prominent's staff if there were any issues with the website.

**ANSWER:**

Allen Brothers lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 25 and, therefore denies those allegations.

26.    At about 4:00 a.m. CDT on September 29, 2007, Prominent was notified by alerts from the monitoring system that the website had issues. Prominent investigated and determined that the DNS host record for www.allenbrothers.com had changed and was no longer pointing at the website that Prominent had developed and was now pointing at a new website. In other words, Allen Brothers was no longer using the website Prominent had developed, but was now using a new website.

**ANSWER:**

Allen Brothers admits that it retained two separate industry leading Internet firms -- The Rimm-Kaufman Group, a Web consulting firm for online retailers, and Solid Cactus, a Yahoo! Store website developer, to develop a new website for Allen Brothers as well as another independent contractor, Nik Krimm, to develop the calendar function for the website. Allen Brothers admits that this new website went "live" on or about September 28, 2007. Answering further, Allen Brothers lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 26 and, therefore denies those allegations.

27.    Prominent examined Allen Brothers' new website and saw many similarities in the look-and-feel of the new Allen Brothers' website as compared to the website that Prominent had developed. The new website was being hosted at Yahoo! Stores, but the pages had been customized from the standard Yahoo! Stores pages to pages that looked like those developed by Prominent.

**ANSWER:**

Allen Brothers admits that the new website was being hosted by Yahoo! Stores. Allen Brothers denies that following Prominent's material breaches of the Development Agreement that Prominent had any right to control Allen Brothers use of the look-and-feel of the website developed by Prominent. Except as specifically admitted, Allen Brothers denies the allegations contained in Paragraph 27.

28.    For example, after viewing the new Allen Brothers' website shipping and billing page, Prominent noticed immediately that the new website had the same functionality for its shipping calendar as the Prominent Shipping Calendar.

**ANSWER:**

Allen Brothers admits that the website implemented on or about September 28, 2007 had

a shipping calendar functionality. Allen Brothers lacks sufficient knowledge or information to

form a belief as to what Prominent noticed and, as such, denies any remaining allegations in

Paragraph 28.

29.    Prominent then was able to look at the source code for this page in the browser by
selecting in the menu the option "View" and "Source". Prominent performed a line-by-line
comparison of Allen Brothers HTML and JavaScript Source code and identified significantly
identical lines of code from Prominent's Shipping Calendar JavaScript code within Allen
Brothers' new website shipping calendar JavaScript code.

**ANSWER:**

Allen Brothers admits that the programming of the current website is "open source code,"

which means it uses a software development method based on distributed peer review and

transparency of process and that the hallmark of open source code is that it can be viewed

openly.    Answering further, Allen Brothers denies, upon information and belief, that any

protectable source code belonging to Prominent exists on the current Allen Brothers website.

Allen Brothers lacks sufficient knowledge or information to form a belief as to what Prominent

looked at or any comparison it performed and, as such, denies any remaining allegations in

Paragraph 29.

30.    It is clear that Allen Brothers did not independently develop its code for numerous
reasons, including:

(a)    Some of the code copied by Allen Brothers is obsolete and would not have
been included had Allen Brothers independently developed its website. For example, there are
references to a variable called "hawaiianFish", which refers to the Honolulu Fish Company
products, which have not been sold by Allen Brothers since July 26, 2006, yet are contained
within the source code for Allen Brothers shipping calendar code.

(b)    There is a comment in the code for the shipping calendar on the new
website that states "this is legacy code, partially refactored." This phrase indicates that the

programmer was attempting to re-engineer code that was obtained from Prominent's Shipping Calendar JavaScript code.

(c)     There are "fingerprints" in the new website code that demonstrates the code was copied from Prominent. For example, websites can have Custom Style Sheets (CSS) that define the look-and-feel of the website. Almost every page in the new Allen Brothers' website contains CSS style tags that were unique in name and used exclusively in the Prominent website style sheets. Allen Brothers' new website does not have style sheets that define these tags, and are therefore not functional within the Allen Brothers' website.

(d)     Several pages on the new website contain links to pages which are only functional in the Prominent website, and are not functional in the new Allen Brothers' website.

(e)     Website images on the two sites are labeled identically. For example, Prominent used pixel images called steaks.gif and tanpixel.gif. The new Allen Brothers' website contains many pages that refer to these images, and they are used in the same way and manner as in the Prominent website.

(f)     Many of the pages use unique identifiers or numbering that was proprietary to the Prominent e-commerce website. For example, the "Gift Order Information" page has a link containing a URL parameter of "category=57". This refers to Prominent's unique numbering system for the product categories displayed on Prominent's e-commerce website. Prominent's website used this numbering in the link in order to dynamically display categories. The Allen Brothers' website does not have this capability. In addition, there is no reason that the Allen Brothers' website would have the same numbering scheme for categories.

(g)     There are also many pages in the new Allen Brothers' website with the same "name" and "id" values for images as in the Prominent IP, like "Image451". The images would not have the same naming convention unless the code was copied from the Prominent intellectual property.

**ANSWER:**

Allen Brothers admits that it did not develop its code for the new website as Allen Brothers does not develop code.  Further answering, Allen Brothers states that it retained two separate independent industry leading Internet firms -- The Rimm-Kaufman Group, a Web consulting firm for online retailers, and Solid Cactus, a Yahoo! Store website developer, to develop a new website, as well as an independent contractor, to develop the calendar functionality for the website.  Answering further, Allen Brothers denies, upon information and

belief, that any protectable source code belonging to Prominent exists on the current Allen Brothers website.

31.    There is thus overwhelming direct evidence of copying by Allen Brothers.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 30.

32.    In all, Prominent performed a complete line-by-line comparison of the Allen Brothers' new website to Prominent's original implementation in February 2005 as well as to the latest version in August 2007, and determined that the HTML source code used by Allen Brothers was substantially copied for all product pages (over 286 pages).

**ANSWER:**

Allen Brothers denies, upon information and belief, that any protectable source code belonging to Prominent exists on the current Allen Brothers website. Allen Brothers lacks sufficient knowledge or information to form a belief as to any comparison Prominent performed or what it believes it determined and, as such, denies any remaining allegations in Paragraph 32.

33.    Prominent also determined that 35 of 37 HTML source code pages for non-product pages were copied as well.

**ANSWER:**

Allen Brothers denies, upon information and belief, that any protectable source code belonging to Prominent exists on the current Allen Brothers website. Allen Brothers lacks sufficient knowledge or information to form a belief as to what Prominent believes it determined and, as such, denies any remaining allegations in Paragraph 33.

34.    The only way for Allen Brothers to have copied Prominent's Code would be by using an automated tool or web browser to download the Code. Under either scenario, Allen Brothers would have also had to create a secure account and place an order on the website in order to obtain access to all of the Code associated with the purchase elements of the website, including but not limited to the Shipping Calendar created by Prominent.

**ANSWER:**

Allen Brothers denies that it copied any source code belonging to Prominent or used an automated tool or web browser to download any such code. Allen Brothers denies any remaining allegations in Paragraph 34.

35.    On at least one occasion in September 2007, Allen Brothers' Vice President of Marketing accessed the website, signed into a secure account, and placed an order, which would have provided Allen Brothers with the access it needed to view Prominent's Code for the shipping calendar.

**ANSWER:**

Allen Brothers denies that any orders placed by the Allen Brothers' Vice President of Marketing were related to viewing source code for any shipping calendar.

## COUNT I
## (COPYRIGHT INFRINGEMENT)

36.    Prominent restates and realleges each preceding paragraph as if specifically set forth herein.

**ANSWER:**

Allen Brothers restates each preceding Answer as if specifically set forth herein.

37.    Prominent possesses copyrights in the software it used to develop and operate the website it created for Allen Brothers, including in relation to the original source code developed and the Shipping Calendar (the "Prominent Copyrights").

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 37.

38.    Allen Brothers possessed notice of Prominent's ownership of and rights in the Prominent Copyrights, and even agreed to same by way of the Development Agreement.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 38.  Answering further, Allen Brothers states that the Development Agreement speaks for itself and denies any characterization of the Development Agreement by Prominent that is inconsistent with the express terms of the Development Agreement.

39.    Allen Brothers copied the Prominent Copyrights or caused same to be copied.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 39.

40.    Many of the codes, including the HTML source code, unique tracking code and JavaScript code, used by Allen Brothers in its new website are identical or substantially similar to the Prominent Copyrights. Allen Brothers is using same in commerce.

**ANSWER:**

Allen Brothers denies, upon information and belief, that any protectable source code belonging to Prominent exists on the current Allen Brothers website.  Answering further, Allen Brothers admits that Prominent claims to have applied for copyright registration, but denies that the materials contained in Prominent's copyright application are entitled to copyright protection.

41.    Allen Brothers' conduct and activities were and are unauthorized and constitute copyright infringement under the United States Copyright Act, 17 U.S.C. § 101, *et seq.*

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 41.

42.    Allen Brothers' infringement has been and continues to be willful within the meaning of the Copyright Act.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 42.

43.    Allen Brothers continued and further infringement of the Prominent Copyrights has caused and will continue to cause Prominent irreparable harm.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 43.

44.    Upon information and belief, Allen Brothers has derived substantial revenue for the sale of products on its new website.

**ANSWER:**

Allen Brothers admits that the Allen Brothers website is functional and that online sales

have been made through the website.

45.    Prominent has suffered damages as a direct and proximate result of Allen Brother's copyright infringement in an amount to be proved at trial.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 45.

## COUNT II
## (VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT)

46.    Prominent restates and realleges each preceding paragraph as if specifically set forth herein.

**ANSWER:**

Allen Brothers restates each preceding Answer as if specifically set forth herein.

47.    The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(4), provides a civil remedy against one who: "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."

**ANSWER:**

Allen Brothers states that the Computer Fraud and Abuse Act speaks for itself and denies

any characterization of the Computer Fraud and Abuse Act by Prominent that is inconsistent

with the express terms of the statute.

48.    Allen Brothers exceeded its authorized access of a protected computer when it accessed the website with an intent to defraud Prominent by stealing Prominent's intellectual property and breaching the Development Agreement.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 48.  Further answering, Allen Brothers

denies that it could have accessed without authorization computers, servers or other systems

belonging to Allen Brothers.

49.    Through its unauthorized access, Allen Brothers obtained Prominent's valuable copyrights, including such as have been used to help generate millions of dollars in internet sales for Allen Brothers over the past year.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 49.  Further answering, Allen Brothers

denies that it could have accessed without authorization computers, servers or other systems

belonging to Allen Brothers.

50.    Allen Brothers then used Prominent's Copyrights to create a new website.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 50.

51.    Allen Brothers has violated the CFAA by virtue of its acts above.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 51.

52.    As a direct and proximate result of Allen Brothers' unauthorized access, Prominent has suffered damages in that Prominent's source code has been unlawfully used by Allen Brothers to breach the Development Agreement and infringe Prominent's Copyrights.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 52.

53.    Allen Brothers continued and further unauthorized access to Prominent's source code has caused and will continue to cause Prominent irreparable harm. Prominent has also been irreparably harmed by Allen Brothers' use of Prominent's source code for its new website.

**ANSWER:**

Allen Brothers denies the allegations in Paragraph 53.

54.    Upon information and belief, Allen Brothers has derived substantial revenue for the sale of products on its new website, which Allen Brothers was able to develop and operate by unlawfully accessing Prominent's source code.

**ANSWER:**

Allen Brothers admits that the Allen Brothers website is functional and that online sales have been made through the website. Answering further, Allen Brothers denies the remaining allegations in Paragraph 54.

## AFFIRMATIVE DEFENSES

### First Defense

### (Unclean Hands)

Based on Prominent's egregious and unethical behavior in improperly monitoring Allen Brother's confidential email communications and relaying information taken from those emails to a litigation opponent of Allen Brothers, as well as other material misconduct by Prominent, Prominent is barred from asserting any claims for relief against Allen Brothers by the doctrine of unclean hands.

### Second Defense

### (Laches)

Prominent is barred from asserting any claims for relief against Allen Brothers by the doctrine of Laches.

### Third Defense

### (Mitigation of Damages)

Prominent's claims are barred because it failed to mitigate damages.

### Fourth Defense

### (Material Breach)

Prominent materially breached the Development Agreement and thus cannot enforce the terms of the Agreement against Allen Brothers.

## Fifth Defense

### (Failure to Allege Jurisdiction or Venue)

Prominent's claims should be dismissed for failure to allege proper jurisdiction or venue.

## Sixth Defense

### (Lack of Originality)

Prominent's claims are barred for lack of originality sufficient for protection under the Copyright Act.

## Seventh Defense

### (Invalidity of Copyright)

Prominent's claims for copyright infringement are barred because the copyright registrations are invalid and unenforceable.

## Eighth Defense

### (Functionality)

Prominent's claims are barred in whole or in part by the doctrine of functionality.

## Ninth Defense

### (Public Domain)

Prominent's claim for copyright infringement is barred because the work for which copyright protection is claimed is in the public domain.

## Tenth Defense

### (Fair Use)

Prominent's claim for copyright infringement is barred in whole or in part by the doctrine of fair use.

## Eleventh Defense

### (Copyright Misuse)

Prominent's claim for copyright infringement is barred because Prominent has misused the copyrights-in-suit.

## Twelfth Defense

### (Estoppel)

Prominent's claims are barred by the doctrine of estoppel.

## Thirteenth Defense

### (Waiver)

Prominent's claims are barred by the doctrine of waiver.

## Fourteenth Defense

### (Innocent Infringer)

Any and all acts alleged by Prominent to have been performed by Allen Brothers, if performed at all, were performed with lack of knowledge, lack of willful intent and without malice or ill-will.

## Fifteenth Defense

### (No Statutory Damages)

Based on the facts alleged, Prominent cannot obtain statutory damages against Allen Brothers pursuant to 17 U.S.C. § 504, *et seq.*

## Sixteenth Defense

### (Cumulative and Redundant Lawsuits)

Prominent seeks damages for the same alleged activities from Allen Brothers in a separate lawsuit and is not entitled to a double recovery for the same alleged money damages.

## Jury Demand

Allen Brothers hereby demands a trial by jury on all issues and claims triable by jury.

Dated: November 19, 2007

Respectfully submitted,

ALLEN BROTHERS, INC.

By:/s/ _____
One of Its Attorneys

Charles B. Leuin (ARDC No. 6225447)
Tanisha R. Jones (ARDC No. 6283173)
**GREENBERG TRAURIG LLP**
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601
T: (312) 456-8400
F: (312) 456-8435

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 19, 2007.

Todd Hatoff

## **CERTIFICATE OF SERVICE**

I, Charles B. Leuin, an attorney, hereby certify that on November 19, 2007, I caused the foregoing VERIFIED ANSWER to be served upon counsel of record by electronic delivery via the ECF/CM court system.

_____/s/Charles B. Leuin_____