# EXHIBIT 1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| ALLEN BROTHERS, INC. | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  07 CH 11877 |
| | ) | |
| v. | ) | Hon. Kathleen M. Pantle |
| | ) | |
| SCOTT MARLAND, | ) | |
| DEBBIE MARLAND, | ) | |
| PROMINENT CONSULTING, LLC, | ) | JURY TRIAL DEMANDED |
| KURT SEIDENSTICKER, and | ) | |
| ECHOMOUNTAIN LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff ALLEN BROTHERS, INC., by its attorneys, and for its Amended Complaint against Defendants SCOTT MARLAND, DEBBIE MARLAND, PROMINENT CONSULTING, LLC, KURT SEIDENSTICKER and ECHOMOUNTAIN LLC, hereby states as follows:

### GENERAL ALLEGATIONS

#### The Parties

1.    Plaintiff, Allen Brothers, Inc. ("Allen Brothers") is an Illinois corporation with its principal place of business in Chicago, Illinois.  Allen Brothers is a leading purveyor of fine meats and other fine foods to individual retail consumers through Allen Brothers' printed catalog and Internet Web site as well as to many of the nation's finest steakhouses, restaurants, hotels and country clubs.

2.    Defendant Scott Marland ("Marland") is an individual residing at 5150 W. Winnemac Avenue in Chicago, Illinois.  Marland was the Vice President of Retail

Operations for Allen Brothers from 1993 until he resigned unexpectedly and without prior notice on February 25, 2007.

3.    Defendant Debbie Marland is an individual residing at 5150 W. Winnemac Avenue in Chicago, Illinois. Debbie Marland is married to Marland and, as set forth below in greater detail, is herself a prior employee of Allen Brothers.

4.    Defendant Prominent Consulting, LLC ("Prominent") is a Delaware limited liability company doing business at 1483 Patriot Boulevard in Glenview, Illinois. Prominent, itself and through its wholly owned affiliates, provides a wide range of Information Technology and marketing services.

5.    Defendant Kurt Seidensticker ("Seidensticker") is an individual residing in Cook County, Illinois. Seidensticker, along with his wife, Laura Seidensticker, are the principal owners of Prominent and Seidensticker is a managing member of Prominent.

6.    Defendant echoMountain LLC ("echoMountain") is a Delaware limited liability company doing business at 1483 Patriot Boulevard in Glenview, Illinois. echoMountain is an affiliate of Prominent and, on information and belief, is principally or wholly owned by Seidensticker and his wife. On information and belief, Seidensticker is a managing member of echoMountain. echoMountain is a provider of information technology outsourcing solutions.

**Jurisdiction and Venue**

7.    This Court has jurisdiction in this matter because the acts giving rise to this action occurred in Illinois and the several contracts between the parties was entered into in Illinois. Marland, an Illinois resident, Debbie Marland, an Illinois resident, Seidensticker, an Illinois resident, and Prominent, which conducts business in Illinois, all are subject to personal jurisdiction in this state pursuant to 735 ILCS § 5/2-209.

2

8.　　Venue is proper in this Court pursuant to 735 ILCS § 5/2-101 because Marland and Allen Brothers and Prominent and Allen Brothers entered into agreements and conduct business in Cook County, Illinois and because other tortious acts alleged in the complaint were committed by all defendants in Illinois.

## Factual Background - Claims Against Marland

### I.　　Allen Brothers' Business

9.　　Allen Brothers, a long-standing Chicago company, is one of the nation's largest suppliers of USDA Prime beef, the highest grade available, to fine restaurants and steakhouses both in Chicago and around the world, including Morton's, Del Frisco's, Gene & Georgetti, Lawry's, Nine and the Chicago Chop House.

10.　　Allen Brothers also sells its fine meats and a wide variety of other exclusive food products directly to consumers throughout the United States, through a printed catalog and its Internet Web site. Allen Brothers' USDA Prime beef and other steaks are carefully selected, aged and hand-cut by expert butchers in the Company's state-of-the-art meat processing facility in Chicago, then shipped to catalog and online customers. Allen Brothers' numerous other food products also are sourced, selected, prepared and handled to meet the highest standards of excellence.

### II.　　Allen Brothers' Catalog and Web Site

11.　　Allen Brothers has more than 100,000 catalog and online customers who purchase its products for their personal use. At least 30% of these customers make their purchases from Allen Brothers' custom designed Web site, www.allenbrothers.com.

12.　　Allen Brothers, directed by its president, Todd Hatoff, expends significant time, effort and money to develop, market and sell the products contained in its catalog and on its Web site. Todd Hatoff personally oversees all facets of Allen Brothers'

extensive efforts directed to catalog and online sales, which includes finding and developing sources for the highest quality products and ingredients, creating, developing and producing Allen Brothers' exclusive line of prepared dishes conceived by Allen Brothers' team of award-winning chefs, selecting the items to be sold, establishing appropriate prices, designing the catalog and Web site, photographing Allen Brothers' exclusive products, overseeing all advertising and marketing, monitoring trends in the dining industry and tracking sales.

### III.    Allen Brothers' Exclusive Suppliers, Vendors and Consultants

13.    Allen Brothers has also spent significant time and effort, primarily thorough its owners, and incurred substantial expense to foster strong partnering relationships with Allen Brothers' worldwide network of suppliers and vendors. Some of these suppliers and vendors have exclusive arrangements to provide gourmet food products or ingredients to Allen Brothers for sale to its commercial and retail customers. Todd Hatoff personally initiated relationships with and vetted a significant number of these suppliers and vendors to ensure that those suppliers and vendors can and do maintain the quality and consistency that Allen Brothers requires. Over a period of many years and through investment of significant effort and expense, Allen Brothers also has assembled a team of creative consultants, some of whom work exclusively with Allen Brothers, to design and market Allen Brothers' products.

### IV.    Allen Brothers' Confidential and Highly Valuable Customer Database

14.    Allen Brothers maintains an extensive proprietary database containing information about all customers who make purchases from Allen Brothers' catalog or Web site as well as many prospects likely to have interest in Allen Brothers' exclusive products (the "Allen Brothers Database"). The Allen Brothers Database contains detailed

4

information on 350,000 of Allen Brothers' customers and prospects. The Allen Brothers Database is maintained on a limited-access computer system called the "Mail Order Manager" ("MOM").

15.    Allen Brothers' products, including its Prime beef and other gourmet food products, are exclusive luxury items. Allen Brothers' catalog and online customers are often upscale, high-income consumers of luxury items who enjoy the "finer things in life." There are numerous celebrities and other well-known individuals about whom the Allen Brothers Database contains information. Allen Brothers also has many business customers who make gifts of Allen Brothers' products to their highly valued clients, customers and employees. As such, information regarding the individuals and businesses contained in the Allen Brothers Database – who are proven consumers of luxury products – is highly valuable.

16.    Allen Brothers has employed reasonable efforts to keep the Allen Brothers Database confidential.    The Allen Brothers Database and the MOM system are maintained on Allen Brothers' secure network and server. Only a limited number of management employees at Allen Brothers have access to the MOM system, the Allen Brothers Database and its customer information. All Allen Brothers' employees with access to the Allen Brothers Database or other Allen Brothers' confidential information are required to sign an employment agreement containing confidentiality provisions designed to protect all such information. The privacy statement appearing on Allen Brothers' Web site expressly assures its customers that their personal and purchase information is maintained in security and is protected by strict privacy guidelines.

17.    Allen Brothers derives a significant competitive advantage from having developed and by maintaining the Allen Brothers Database of its catalog and online customers and prospects. These customers and prospects are a highly sought-after demographic by Allen Brothers' competitors as well as numerous other marketers of luxury goods.

V.    **Marland's Employment with Allen Brothers**

18.    Marland joined Allen Brothers in 1993 as a salesman. At that time, Marland was 24 years old and had no experience in either the meat industry or with regard to direct marketing. Over the following years, as Marland learned from his employment at Allen Brothers about the meat industry and direct marketing, he was given a series of promotions, first becoming the Associate Director of Catalog Sales, then the Director of Catalog Sales and ultimately, in 2004, the Vice President of Retail Operations.

19.    Throughout his series of positions, Marland's duties were primarily to assist Todd Hatoff in generating and processing catalog and online sales. Marland worked directly with Todd Hatoff and was given access to virtually all of the supplier and vendor contacts Todd Hatoff had established. In order to perform certain responsibilities of his job, Marland also was given access to the Allen Brothers Database.

VI.    **Marland Enters Into an Employment Agreement and Phantom Stock Plan with Allen Brothers**

20.    In 2004, Allen Brothers sought to have Marland enter into an employment agreement in order to provide further protection for Allen Brothers' confidential information, including but not limited to the Allen Brothers Database and the significant amount of other confidential information to which Marland needed access to perform his

6

job. In exchange for entering into an employment agreement, Marland was offered the right to participate in a phantom stock plan, in addition to significant other valuable consideration including an additional $10,000 bonus and a raise in salary of more than $10,000 annually.

21.    On December 27, 2004, as a result of Allen Brothers' efforts, Marland entered into an Employment Agreement with Allen Brothers, a copy of which is attached hereto as **Exhibit 1** (the "Employment Agreement"). The Employment Agreement became effective on January 1, 2005.

22.    A copy of the Allen Brothers Phantom Stock Plan entered into by Marland and provided as a part of the consideration for Marland's undertakings in the Employment Agreement is attached hereto as **Exhibit 2** (the "Phantom Stock Plan").

23.    In the Employment Agreement, Marland acknowledged that "he has acquired Trade Secrets and other Confidential Information as a consequence of his employment with the Company." (Employment Ag., **Ex. 1**, § 7(a).)

24.    The Employment Agreement defines "Confidential Information" as:

> "Confidential Information" includes any information relating to (i) the business, conduct or operations of the Company or any of its respective clients, customers, consultants or licensees; (ii) any methods, ways of doing business, etc., used in the sale, use or marketing of the company's products or services; (iii) the existence or betterment of, or possible new uses or applications for, any such products or services; (iv) any of the Company's product lines, customer lists, sales or dealer network, pricing and purchasing information or policies, non-public catalog information; (v) any inventions, products, machines, production processes, apparatus, molds, formulas, drawings, blueprints, photographs, slides, motion pictures, videotapes, computer software, information stored on the Company's computer or intranet, product specifications, trade secrets, price and discount lists, customers, customer lists, suppliers, supplier lists, personnel data, business and marketing plans, ideas or strategies, financial performance and projections

and cost data; and (vi) the Company's purchasing arrangements and terms with suppliers, research and development, methods, practices, pricing to customers, pricing of materials, conditions of transactions with customers and suppliers, accounting and other systems, financial condition, marketing techniques or practices, merchandising techniques or practices or patents. "Confidential Information" further includes any and all information of whatever nature or kind which the employee has learned of, acquired or obtained knowledge of, conceived, developed, originated, discovered, invented, disclosed or otherwise become aware of during his employment provided that this sentence shall not apply to information within the public domain or generally known within the industry of the Company or entirely unrelated to the activities of the Company.

*(Id.)*

25.     The parties also agreed that any Confidential Information, as defined in the Employment Agreement, will be deemed a "Trade Secret" under the Illinois Trade Secrets Act, 765 ILCS § 1065/1 *et seq.* *(Id.)*

26.     The Employment Agreement prohibits Marland from disclosing any of Allen Brothers' Confidential Information during or after his employment. (Employment Ag., **Ex. 1**, § 7(a).)   He also agreed to return and surrender any records, notes, memoranda, information or documents or other property belonging to the Company upon his termination. *(Id., § 7(b).).*

27.     Marland acknowledged in the Employment Agreement "that the relationships between [Allen Brothers] and its customers are of a near-permanent nature and but for [his] association with [Allen Brothers], [Marland] would not have had contact with [Allen Brothers] customers." *(Id., ¶ 10(b).)*

28.     The Employment Agreement also prohibits Marland from:

solicit[ing], servic[ing], hav[ing] contact with, divert[ing], or attempt[ing] to divert any entity which is, as of the time of termination of [his] employment, or was, in the immediate six-month period prior to such

8

termination, a customer or prospective customer of [Allen Brothers] that [Marland] had prior dealing with or knowledge about.

(*Id.*, ¶ 10(c).)

29.     Under the terms of the Employment Agreement, Marland also may not engage in any business activity that is competitive with any business activity of Allen Brothers for at least 18 months after his termination from Allen Brothers. (*Id.*, § 10(f).) The parties specified a list of companies that they agreed are competitors of Allen Brothers in Exhibit B to the Employment Agreement. (*Id.*, Ex. B thereto.)

30.     The Employment Agreement remains effective from January 1, 2005 until 2 years after Marland's employment terminates, except as to Marland's confidentiality and non-disclosure obligations, which are permanent. (*Id.*, § 4.)

31.     The Phantom Stock Plan provides Marland with certain financial benefits measured by the change in value of hypothetical shares of stock in Allen Brothers. Marland's benefits under the Phantom Stock Plan are tied to his obligations under the Employment Agreement and the Phantom Stock Plan expressly provides that Marland's rights under the Phantom Stock Plan are forfeited upon a breach of the Employment Agreement. (Phantom Stock Plan, **Ex. 2**, §§ 5.6, 5.7. )

32.     The Phantom Stock Plan, like the Employment Agreement, expressly prohibits Marland from engaging in business or any practice that is "in competition with" or "prejudicial to the interests of" Allen Brothers. (Phantom Stock Plan, **Ex. 2**, § 5.7.) Marland's breach of the Employment Agreement and his violation of this prohibition both result in his forfeiture of his rights and benefits under the Phantom Stock Plan. (*Id.*, §§ 5.6, 5.7.)

**VII.    Marland's Repeated Affirmations of Loyalty Following Termination of His Wife's Employment at Allen Brothers**

33.    Marland's wife, Debbie Marland, also was a long-time employee of Allen Brothers. Debbie Marland became employed by Allen Brothers in 1996 as a shipping clerk and occupied a number of different positions, eventually becoming executive assistant to Allen Brothers' Chairman Robert ("Bobby") Hatoff. She remained an Allen Brothers' employee until April of 2006, when her employment was terminated as a result of her persistent pattern of inappropriate workplace conduct. While Debbie Marland's behavior prior to her termination by Allen Brothers might properly have been characterized as providing cause for her termination, out of regard for her years of service and her marital relationship with Marland, her termination was treated as being without cause and she was paid a severance benefit.

34.    Immediately following the termination of Debbie Marland's employment, Allen Brothers was extremely concerned whether Marland remained loyal to Allen Brothers and whether he would continue to perform the responsibilities of his job. On several occasions immediately thereafter and subsequently, and in connection with more than one specific incident involving Marland's wife following the termination of her employment, Allen Brothers requested Marland's express affirmation of his loyalty to Allen Brothers, his desire to continue working for the company and his commitment to the company's success. On each of those occasions, Marland specifically and unequivocally assured Allen Brothers' President Todd Hatoff that Marland remained committed to the company and was willing and able to perform his job and devote his best efforts to the success of Allen Brothers.

10

### VIII.  Marland's Sunday Resignation

35.    On Sunday, February 25, 2007, Marland called Todd Hatoff, the president of Allen Brothers, in Buenos Aires, Argentina, where Todd Hatoff was traveling, and resigned.  Marland's resignation was wholly unexpected and he gave no prior notice whatsoever.  Marland stated that his resignation was effective immediately.  In the period since his resignation, Allen Brothers has learned that Marland engaged in significant misconduct between the time he decided to leave Allen Brothers and the date he resigned.

### IX.    Specific Instances of Marland's Failure to Perform His Job Responsibilities Prior to His Resignation

36.    In the month leading up to Marland's sudden resignation, there were several specific instances where he failed to perform basic responsibilities of his job, causing significant harm to Allen Brothers.

37.    For example, in Todd Hatoff's absence, Marland was responsible for authorizing marketing emails to be sent to certain Allen Brothers' customers under an Allen Brothers' email marketing campaign.  One of Allen Brothers' outside direct marketing consultants designs a continuing email marketing campaign whereby approximately every six days, customers who have provided their email address for the purpose of receiving updates from Allen Brothers are sent an email highlighting featured products (an "Email Blast").  During a period in February 2007 when Todd Hatoff was traveling, Marland was responsible for providing final approval to the direct marketing consultant for each Email Blast.  At least four Email Blasts were scheduled in February as part of this campaign, but Marland neglected to provide the required approval for the Email Blasts to be sent.

11

38.    During the period leading up to his resignation, Marland also failed to provide timely authorization of payment to various other Allen Brothers' marketing consultants.

X.    **Marland Accesses and Prints Critical Allen Brothers Confidential Information in Preparation for His Resignation.**

39.    Between February 19, 2007 and February 24, 2007, Marland accessed, printed and deleted various computer files and confidential information from Allen Brothers' network and computers and, the day before his unexpected resignation, Marland used his computer to access a device attached to Allen Brothers' system used to "burn" CD-ROMs that can hold significant amounts of data and information.

40.    Specifically, on February 19, 2007, Marland received an email from an Allen Brothers' customer regarding a significant order to be shipped to the Bahamas. Marland forwarded this email from his Allen Brothers email account to Debbie Marland at her business and personal email addresses. There is no legitimate business reason for Marland to have forwarded this customer email to a non-Allen Brothers employee.

41.    During that same week, Marland also deleted one of his two user profiles from the MOM system. Marland also accessed approximately 11 customer files contained in the Allen Brothers Database during the week of February 19, 2007. Allen Brothers has been unable to ascertain any legitimate business purpose for Marland engaging in those activities.

42.    Between February 21 and 23, 2007, Marland also accessed a spreadsheet of Allen Brothers' 10-year sales history and a schedule of mailing dates for all catalog orders from January through June 2007. Allen Brothers is aware of no legitimate business reason for those actions. Moreover, Allen Brothers' catalog mailing schedule

and changes in sales patterns during corresponding time periods is sensitive Allen Brothers' confidential information.

43.    On Friday, February 23, 2007, Marland visited the Web site of Five Herds Trading Co., a company that sells bison meat and other beef products and a competitor of Allen Brothers. Allen Brothers has no business relationship with that company nor was any such business relationship under consideration.

44.    Among the most troubling actions Marland engaged in using Allen Brothers' computer systems occurred on Saturday February 24, 2007, the day before his unexpected resignation. On that non-business day (the "Crucial Saturday"), Marland came into Allen Brothers' offices. During his employment at Allen Brothers, it was extremely rare for Marland to work on weekends and virtually unprecedented for him to do so other than (a) during the Holiday season, the busiest time for Allen Brothers' catalog and Internet sales, or (b) when Marland was working on a major project, such as a product photography shoot. On the Crucial Saturday, there obviously was no holiday season activity and there was no Allen Brothers project in which Marland was involved.

45.    While at Allen Brothers' offices on the Crucial Saturday, Marland called one of his subordinates, Mark Felix, and requested Felix's computer login information, purportedly to retrieve certain contact information that Marland claimed only was on Felix's computer. Using Felix's login information, Marland logged into his own computer as Felix.

46.    One or more witnesses also observed Marland go into the private office of Todd Hatoff on the Crucial Saturday. It was out of the ordinary for Marland to enter Todd Hatoff's private office when he was not present, other than occasionally to leave

13

materials on Todd Hatoff's desk. When Todd Hatoff next returned to his private office, there were no materials left there by Marland, however, items in Todd Hatoff's desk appeared to have been disturbed.

47.   On the Crucial Saturday, immediately preceding his unexpected Sunday resignation, Marland engaged in the following acts using Allen Brothers' computer system, none of which was related to any work legitimately performed for Allen Brothers at that specific time:

- Marland printed a spreadsheet of Allen Brothers' 2006 inventory;
- printed two copies of an Allen Brothers' contact list maintained by Marland, a 15 page list containing approximately 250 contacts;
- accessed the Allen Brothers Database on the MOM system;
- accessed two other Allen Brothers inventory files;
- accessed the Allen Brothers Direct CD drive, a device used to create a CD-ROMs on which significant amounts of Allen Brothers' confidential information could be copied and stored;
- accessed a spreadsheet indicating Allen Brothers' sales history from 1997-2006;
- accessed the mailing schedule for Allen Brothers' catalog for January – June 2007;
- changed the contact information on a life insurance policy; and
- deleted more than 100 files from his computer.

48.   In the course of his normal duties as Vice President of Allen Brothers, Marland would have no need to have accessed or printed any of the data or files that he accessed and printed on the Crucial Saturday, many if not all of which contained confidential information belonging to Allen Brothers. In addition, while he accessed the

Direct CD drive, there are no CD-ROMs that Marland prepared on that date for legitimate Allen Brothers' purposes.

49.    The contacts list that Marland printed out contained the names, addresses, phone numbers and email addresses for at least six of Allen Brothers' major wholesale customers. Two of those specific customers are listed on Exhibit B to the Employment Agreement, which specifies the companies for which Marland is prohibited from working for 18 months following his employment at Allen Brothers.

50.    Marland's contact list also included the names and contact information for at least 45 of Allen Brothers' exclusive suppliers and vendors as well as names of Allen Brothers' creative team and consultants. All of this information is specifically deemed Confidential Information that Marland is prohibited from disclosing under the Employment Agreement.

<u>**Factual Background - Claims Against Prominent and Seidensticker**</u>

I.    **Allen Brothers' Engagement of Prominent to Develop and Maintain the allenbrothers.com Web site.**

51.    On    January 11, 2005, Allen Brothers and Prominent entered into a Website Development and License Agreement (the "Development Agreement"). A true and correct copy of the Development Agreement is attached hereto as **Exhibit 3**. Pursuant    to    the    Development    Agreement,    Prominent    was    to    develop www.allenbrothers.com to permit Allen Brothers' customers to purchase its products online. (Develop. Ag., **Ex. 3**, § 2.A.) Under the Development Agreement, Prominent is to perform several discrete sets of services: (i) Web site development services (the "Development Services") and, in connection with the operation of the Web site, (ii) Web site software maintenance services (the "Maintenance Services") and (iii) a variety of

15

marketing services ("Marketing Services" and together with the Development Services and the Maintenance Services, collectively, the "Services"). In consideration for Prominent's performance of the Services, Allen Brothers agreed to pay Prominent a commission based upon the sales generated by the Web site that Prominent developed. (*Id.*, § 2.D.)

52.    In the Development Agreement, the parties acknowledged that incident to Prominent's performance of the Services, Prominent would be given access to Allen Brothers' confidential and proprietary information. (Develop. Ag., **Ex. 3**, §§ 5.A(2), 13.) Prominent agreed that this Allen Brothers confidential information would remain the intellectual property of Allen Brothers and that Prominent would not use or disseminate this Allen Brothers' confidential information to any third parties. (*Id.*, §§ 5.A.(2), 13.A.) The parties also acknowledged that any disclosure of Allen Brothers' confidential information in violation of the Development Agreement would cause Allen Brothers irreparable harm and would support the imposition of injunctive relief. (*Id.*, § 13.F.)

53.    Allen Brothers and Prominent agreed that Prominent retained all intellectual property rights related to the software, code, templates and development techniques used in creating the Allen Brothers' Web site. (Develop. Ag., **Ex. 3**, § 5.A(2).) In part because Prominent was retaining these property rights as well as maintaining the site, which is Allen Brothers' primary means of processing consumer orders, Prominent also warranted to Allen Brothers:

> No portion of any elements delivered hereunder will contain any protection feature designed to prevent its use. [Prominent] further warrants that it will not impair the operation of any such Web Site Pages in any way other than by order of a court of law or in accordance with the terms of this Agreement.

(*Id.*, § 10.E.)

16

**II.    Expansion of Relationship Between Allen Brothers and Prominent.**

54.    Pursuant to the terms of the Development Agreement, Prominent performed the Development Services and successfully completed the Allen Brothers Web site, which went into operation in the Spring of 2005. Allen Brothers and Prominent worked very closely and effectively with each other to complete development of the Web site, forging a strong working relationship between the two companies. In consequence, over time, Prominent began to perform a wide range of information technology services for Allen Brothers, eventually becoming the functional equivalent of Allen Brothers' "Information Technology Department." Based on that functional relationship, which was actively fostered by Prominent, Allen Brothers entrusted Prominent completely with the development, operation, maintenance and control of all dimensions and aspects of Allen Brothers' Internet presence and related functions. In performing those services on Allen Brothers' behalf, Prominent exercised extensive judgment based on its vastly superior expertise and experience.

55.    The Marketing Services contemplated by the Development Agreement were not spelled out in detail in that Agreement. Instead, those Marketing Services evolved to the mutual benefit of Allen Brothers and Prominent - that is, by Prominent's performance of the Marketing Services, the revenues derived by Allen Brothers from its Web site increased, thereby increasing the compensation paid by Allen Brothers to Prominent. While Prominent had originally represented to Allen Brothers that there would be no additional expense to Allen Brothers arising from Prominent's provision of the Marketing Services, Prominent ultimately requested that Allen Brothers pay substantial third party costs related to the Marketing Services and Allen Brothers agreed to pay certain reasonable costs in connection with those services. In addition, as traffic

on Allen Brothers' Web site increased, Prominent's equipment no longer was able to handle the demands placed upon it by that traffic. At Prominent's request, Allen Brothers paid in excess of $150,000 for additional hardware to allow Prominent to perform the services required from Prominent in the Development Agreement.

56.     The Marketing Services performed by Prominent fell into several discrete categories. First, Prominent performed a wide variety of Web site related functions known in the e-commerce trade as "optimization," the process by which the owner of a Web site engages in various activities (such as the placement of ads with other Web sites, etc.) for the purpose of maximizing e-commerce traffic on Allen Brothers' Web site (collectively, the "Optimization Services"). As evidence of the extent of the trust and confidence that Allen Brothers placed in Prominent and the depth of their relationship, as part of Prominent's Optimization Services, Prominent was allowed oversight of a consistently increasing annual budget paid by Allen Brothers and to be expended on the purchase of advertising on other Web sites and for the procurement or performance of other optimization efforts. In the first year of the parties' relationship, that budget was approximately $150,000 and grew to $300,000 budgeted for 2006, which budget was exceeded by Prominent, and $750,000 budgeted for 2007. Second, Prominent performed significant tracking, analysis and reporting of the use and performance of Allen Brothers Web site (collectively, the "Analytics Services"). Third, Prominent administered Allen Brothers' "Email Blast" program, a program by which Allen Brothers would send emails, under which Prominent would design and propose various specific Email Blasts, obtain approval of those Email Blasts from Allen Brothers, send the Email Blasts and monitor

compliance with all laws and regulations relating to such marketing (collectively, the "Blasting Services").

57.    In addition to Prominent's Development, Maintenance and Marketing Services relating to Allen Brothers' Web site, until July 2007, Prominent had acted as Allen Brothers' email network administrator. As the email network administrator, Prominent had access to the email passwords and email accounts of all Allen Brothers' personnel.

58.    Long prior to the execution of the Development Agreement, Todd Hatoff, the President of Allen Brothers, and Seidensticker, a managing member of Prominent, were close friends who actively maintained a social relationship. During the course of the business dealings between Allen Brothers and Prominent, that social relationship continued, in addition to the very close working relationship that Prominent sought to, and eventually did, develop with Allen Brothers.

59.    On or about August 31, 2006, Allen Brothers and Prominent negotiated a first amendment to the Development Agreement (the "First Amendment"). A true and correct copy of the First Amendment is attached hereto as **Exhibit 4**. A certain degree of contentiousness appeared in the negotiations between Allen Brothers and Seidensticker surrounding the First Amendment, reflecting economic tensions between, on the one hand, Allen Brothers' belief that very expensive radio advertising, Optimization Services and Blasting Services, the cost of all of which were being paid for separately by Allen Brothers and which very significantly increased ecommerce traffic through the Allen Brothers Web site, were resulting in over-compensation to Prominent, and on the other hand, Prominent's belief that the Marketing Services and other "IT services" it was

performing for Allen Brothers were not being accorded sufficient economic weight in Allen Brothers' calculation of the relative value it was deriving from Prominent's performance of the Services.  On information and belief, the principals of Prominent, Seidensticker in particular, would come to harbor enormous resentment, anger and hostility towards Allen Brothers on account of Prominent's belief that the First Amendment was unfair to Prominent - which resentment, anger and hostility Prominent and its principals concealed from Allen Brothers.

### III.    Allen Brothers Joint Venture Negotiations with Prominent.

60.    In early 2007, just before Marland's resignation, Allen Brothers and Prominent had begun to engage in negotiations surrounding the formation of  a joint venture to develop certain software programs to be owned by Allen Brothers and Prominent or by their respective owners, to be known as "iChieve." (the "iChieve Venture")  The contemplated software programs were intended to have specific functionality for use in a "business-to-consumer" Web site, like Allen Brothers'.  From Allen Brothers' perspective, the purpose of the iChieve Venture would be to develop Web site software and technology that Allen Brothers wished to utilize in connection with its own Web site (collectively, the "iChieve Technology").  However, the parties believed that the iChieve Technology, once developed, would be highly valuable to and desired by third parties with "business-to-consumer" Web sites similar to Allen Brothers' and that the iChieve Technology could therefore be profitably sold to such third parties by the iChieve Venture.

61.    Allen Brothers and Prominent discussed various alternative deal structures for the iChieve Venture.  However, the parties mutually appropriated a very high priority to commencing development of the iChieve Technology immediately in order that it

might be completed in time for Allen Brothers to use it during Allen Brothers' busiest time of the year, the 4th calendar quarter. Consequently, the parties, after an initial meeting, made the decision to proceed with the commencement of the development of the iChieve Technology even though no agreement had been reached by the parties on the deal structure of the iChieve Venture. Accordingly, between May 11, 2007 and June 4, 2007, Allen Brothers advanced $178,559.86 to Prominent to fund Prominent's costs of developing the iChieve Technology despite the absence of mutual agreement on the terms of iChieve Venture.

62.    The negotiations related to the deal structure of the iChieve Venture soon became mired in disagreement. At a meeting held on May 3, 2007, after a long afternoon of unsuccessful negotiating, Allen Brothers offered to agree to a deal structure in which Allen Brothers and Prominent (or their owners) would not be joint venturers, but instead, only Prominent (or its principals) would be the owners of the iChieve Venture, and that Allen Brothers would be a licensee, and earn both royalties on any other licenses of the iChieve Technology that might be entered into and, in the instance where Allen Brothers introduced the iChieve Venture to a licensee, a commission on the sale of that license (collectively, the "New iChieve Business Arrangement"). Prominent immediately indicated enthusiastic support of the New iChieve Business Arrangement.

63.    Following that meeting, Prominent's counsel was to prepare proposals for the New iChieve Business Arrangement. More than a month elapsed during which, on the one hand, Allen Brothers continued to fund Prominent's development of the iChieve Technology, but on the other hand, no proposals were received from Prominent's counsel.

64.    Finally, on June 13, 2007, Prominent circulated to Allen Brothers Prominent's first set of proposals for the New iChieve Business Arrangement, which was followed one week later by a second set of proposals from Prominent for the New iChieve Business Arrangement. Upon Allen Brothers discovery of the perfidy of Prominent and Seidensticker described below, Allen Brothers terminated further discussions with Prominent over the New iChieve Business Arrangement, though Allen Brothers did not immediately advise Prominent of this fact out of an apprehension that premature disclosure by Allen Brothers might lead to calamitous retribution by Prominent, such as shutting down Allen Brothers' Web site. In the end, however, in reliance on the parties' agreement to develop the iChieve Technology for their joint benefit, Allen Brothers fronted almost $180,000 to Prominent for development of the iChieve Technology.    Allen Brothers has not received any products, services, remuneration or reimbursement in exchange for this amount.

### Factual Background - Grievous Misconduct by Prominent and Participation by the Marlands

I.    **Allen Brothers Files Suit and Discovers Additional Misconduct by Marland.**

65.    After discovering Marland's significant misconduct and potential misappropriation of Allen Brothers' Confidential Information at and prior to the time of his resignation, Allen Brothers filed its complaint against Marland in this matter on May 2, 2007. On the same day, Allen Brothers filed a motion for limited expedited discovery and for a preservation order. In this motion, Allen Brothers informed the Court of its concern that if Marland had copied or stored any Allen Brothers' Confidential Information on his personal computer or other storage device, it could be altered, deleted or destroyed before discovery could commence. Accordingly, Allen Brothers requested

that it be permitted to immediately inspect and copy Marland's personal computers, hard drives, disks and other media for company information and that Marland be ordered to preserve all such computers and devices until such an inspection had occurred.

66.    The Court granted Allen Brothers' motion on May 4, 2007, and ordered that an independent forensic computer consultant be permitted to create a copy of the data, documents and information on Marland's personal computers and computer devices.

67.    On May 8 and 9, 2007, Elijah Technologies, a forensic computer expert selected pursuant to the provisions of the Court's Order, went to Marland's home and made a forensic image of Marland's two desktop computers, one laptop computer, a 120 GB external hard drive and six CDs (the "Forensic Images").

68.    Allen Brothers' counsel retained another forensic computer expert, Kroll Associates ("Kroll"), to review the Forensic Images for Allen Brothers' Confidential Information or other information related to the company, its customers, vendors or competitors. Kroll conducted this review on June 4 to 8, 2007.

69.    Kroll discovered several documents and files on Marland's personal computers and storage media that relate to Allen Brothers and contain Allen Brothers' Confidential Information, including:

- proof pages from Allen Brothers print catalog, including product prices;

- spreadsheets of Allen Brothers catalog products and their costs for October 2005, November 2005, and Spring 2006;

- email correspondence between Marland and Allen Brothers customers from December 2006 through February 2007;

- promotional information from one of Allen Brothers' competitors, Pfalelzer Brothers;

23

- a database query specifically designed to be used in connection with information from Allen Brothers' call center database; and

- numerous emails forwarding copies of Marland's resume that contains confidential information regarding Allen Brothers' catalog sales.

## II.    Prominent and Seidensticker's Outrageous Breach of Trust and the Marlands' Participation Therein.

70.    In addition to the Allen Brothers' Confidential Information found on Marland's computers through examination of the Forensic Images, Allen Brothers discovered on Marland's computer an email from the anonymous email address "scottmarlandwatchoutforhatoffs@gmail.com" dated April 21, 2007, 11 days before Allen Brothers filed its Complaint in this matter (the "April Seidensticker Email"). A true and correct copy of this email is attached hereto as **Exhibit 5**. While the author of the April Seidensticker Email took pains to obscure his identity, as is shown below and will be proved in this matter, the author was Seidensticker. The April Seidensticker Email warned Marland that he was under scrutiny and that the Hatoffs (the owners of Allen Brothers) intended to take action against him.

71.    In the April Seidensticker Email, Seidensticker instructed Marland to set up a private and similarly anonymous email address through "gmail," the free email service provided by Google, and directed Marland to contact the sender for information on technical direction on how to delete computer files so the data could not be recovered by Allen Brothers for use as evidence in this lawsuit. (*Id.*)

72.    Debbie Marland, Marland's wife, subsequently used her computer at her current place of employment, ManagCare, Inc., to set up a gmail account with the address "icareaboutscott@gmail.com" so that she could communicate with the sender of the April

Seidensticker Email, now known to be Seidensticker. Ms. Marland had additional email communications with Seidensticker between their two clandestine gmail accounts between at least May 3 through May 25, 2007. A true and correct copy of that chain of email correspondence is attached hereto as **Exhibit 6** (the "May Seidensticker Emails") .

73.    In the May Seidensticker Emails, Seidensticker discloses Allen Brothers Confidential Information of the greatest sensitivity, including detailed information regarding Allen Brothers' legal strategy in its complaint against Marland, the existence and contents of private investigator reports and specific legal advice provided to Allen Brothers by its attorneys.

74.    For example, one entire paragraph of the May Seidensticker Email was copied verbatim from an email sent to Allen Brothers by its counsel that discussed the terms of Marland's phantom stock agreement. Similarly, following Allen Brothers' receipt of confidential legal advice from its counsel regarding a possible press release related to this matter, Seidensticker advised Marland that Allen Brothers was considering such a press release and, based upon legal advice that had been provided to Allen Brothers, how Marland should respond to such a release if issued. On more than one occasion, Seidensticker offered to send to Scott and Debbie Marland copies of legal documents that Allen Brothers had not yet filed with the court or that had just been filed.

75.    The reason that Seidensticker was able to obtain and misuse this sensitive information is as simple as it is reprehensible - as administrator of the Allen Brothers' email system, Seidensticker - as a principal of Prominent - had total access to Allen Brothers' email even though that access was intended only to enable Prominent to perform its function as Allen Brothers' network administrator. Instead, Seidensticker

used that access to spy on Allen Brothers' most sensitive communications and then to pass highly confidential information on to Marland so he could attempt to avoid liability in this suit.

76.    In the May Seidensticker Emails, Seidensticker provided explicit instructions to Debbie Marland on how she and Marland could attempt to obstruct and thwart Allen Brothers' investigation and pursuit of its claims against Marland and the recovery of Allen Brothers' Confidential Information. Specifically, Seidensticker suggested that the Marlands reformat their home computers, re-install their operating systems, and replace their hard drives in order to keep Allen Brothers from discovering that Marland had copied Allen Brothers' Confidential Information from the MOM database to his home computer. Seidensticker also directed Debbie Marland to only access her gmail account from her work computer as Seidensticker opined that it would be more difficult for Allen Brothers to obtain that information in discovery.

77.    Seidensticker also disclosed to the Marlands highly sensitive information regarding the fair market value of Allen Brothers, the compensation of its executives and the value of Marland's phantom stock interest in Allen Brothers. Some of this financial information, including a portion of the information that was based on hypothetical performance metrics and therefore was highly inaccurate, could only have been obtained by Seidensticker by intercepting communications between Allen Brothers and its counsel.

**III.    Evidence that Seidensticker Wrongfully Monitored Allen Brothers' Email, Intercepted Privileged Communications and Passed Information to Marland.**

78.    Upon reviewing the April Seidensticker Email, Allen Brothers was convinced for several reasons that the source of that email was Seidensticker. First, there was information in that email that was possessed only by Seidensticker. For example,

26

the April Seidensticker Email contains a sloppy attempt to implicate Allen Brothers' long-time corporate counsel Robert Schwimmer ("Schwimmer") as the source of that email. Schwimmer was known by Seidensticker to be Allen Brothers' legal counsel, and Seidensticker had often heard Schwimmer referred to as Allen Brothers' "protector" by Todd Hatoff. Further, Schwimmer had negotiated with Seidensticker in connection with the iChieve Technology. The April Seidensticker Email bears a "signature" which reads: "the protector RIS," using Schwimmer's initials and a term that Todd Hatoff had used to describe Schwimmer. *See* **Ex. 5.** Todd Hatoff never referred to Schwimmer as the "protector" of Allen Brothers to anyone other than Seidensticker.

79.     The April Seidensticker Email contains other factual information known only to a very small and trusted inner circle of Allen Brothers owners and advisors, including the Hatoffs and their legal counsel and investigators. Outside of that trusted inner circle, the only person who possessed that specific factual information was Seidensticker, who had been told the information by Todd Hatoff. In addition, the April Seidensticker Email demonstrates an inordinately high level of technical knowledge about computers and emails that could only be enjoyed by an industry expert, and that is therefore consistent with Seidensticker's background.

80.     On or about June 26, 2007, Todd Hatoff confronted Seidensticker with the April Seidensticker Email.   Seidensticker denied having any involvement with its preparation or transmittal.

81.     The "smoking gun" confirming that the April Seidensticker Email and the May Seidensticker Emails came from Seidensticker was discovered when Allen Brothers obtained the response to its subpoena in this matter to Google (the "Google Subpoena

Response"). A true and correct copy of the Google Subpoena Response is attached hereto as **Exhibit 7**. The Google Subpoena Response shows the IP addresses from which several of the May Seidensticker Emails were sent. One of those IP addresses is registered to Prominent, as shown on the IP address registration attached hereto as **Exhibit 8**.

82.    The fact that the April Seidensticker Email and the May Seidensticker Emails incontrovertibly came from Prominent, combined with the unique knowledge of detailed information contained in those emails possessed only by Seidensticker, the technical knowledge possessed by Seidensticker and conveyed in the emails and the hostility Seidensticker exhibited toward Allen Brothers, all conclusively establish that Seidensticker sent the emails in breach of Prominent's contract, its fiduciary duty to Allen Brothers and all imaginable ethical business standards.

**IV.    Prominent's Failure to Perform the Functions Required by the Development Agreement Following Allen Brothers' Discovery of Seidensticker's and Prominent's Misdeeds.**

83.    Even before Todd Hatoff confronted Seidensticker with the April Seidensticker Email on June 26, 2007 (and Seidensticker untruthfully denied any involvement with that email), the quality of Prominent's performance of Marketing Services for Allen Brothers had begun to deteriorate substantially.

84.    At his meeting with Todd Hatoff on June 26, 2007, Seidensticker feigned indignant outrage at being accused of sending the April Seidensticker Email. Immediately following that meeting, Seidensticker caused a further drastic decrease in the quality of the services that Prominent provided to Allen Brothers. Seidensticker refused to have direct contact with Todd Hatoff and other Allen Brothers personnel, despite the fact that close and frequent communication and coordination between key

personnel at Allen Brothers and at Prominent was essential to Prominent's performance of virtually all of the Marketing Services and the parties' course of dealing was to have such close and frequent communication throughout the parties' relationship. In particular, Seidensticker had personally overseen and consulted with Allen Brothers regarding performance of the majority of the Marketing Services. His refusal to deal with Allen Brothers, among other failures in performance, resulted in deficient performance of the Marketing Services and harm to Allen Brothers.

85.     Prominent's intentional failure to use good faith efforts in performing the Marketing Services, its refusal to perform its obligations consistently with the course of performance under the Development Agreement and its other breaches of the Development Agreement in performing the Marketing Services and otherwise have caused and continue to cause substantial harm to Allen Brothers in the form of lost sales and increased costs to Allen Brothers.

## V.   Seidensticker's and Prominent's Theft of Funds from Allen Brothers' Optimization Services Budget to Benefit echoMountain.

86.     After learning of Prominent's material breaches of the Development Agreement, Allen Brothers began to take over certain of the Marketing Services performed by Prominent, including but not limited to some or all of the Optimization Services that Prominent had performed but as to which Prominent no longer was dedicating its good faith efforts.

87.     On or about September 5, 2007, Allen Brothers obtained access to a Google account reflecting information about one of the Internet advertising campaigns that Prominent was responsible for administering on behalf of Allen Brothers as part of the Optimization Services. Upon examining the advertising history reflected for that

account, Allen Brothers discovered that Prominent and Seidensticker had further betrayed the trust and confidence reposed in them by Allen Brothers. In administering that Internet advertising campaign, Prominent and Seidensticker committed theft of funds from the Allen Brothers' budget Prominent controlled to benefit another of Seidensticker's companies, echoMountain.

88.    While Allen Brothers had entrusted Prominent and Seidensticker with a total budget of over $1.2 million dollars for Optimization Services to be expended solely for Allen Brothers' benefit, Prominent and Seidensticker misused that budget by purchasing advertising to drive traffic to echoMountain's Web page for the exclusive benefit of echoMountain. Prominent and Seidensticker used Allen Brothers' money to pay for the cost of advertisements for echoMountain, despite the fact that the advertisements provided absolutely no benefit to Allen Brothers.

89.    To date, Allen Brothers has been able to identify at least $20,000 that Seidensticker and Prominent misappropriated to purchase Internet advertising to benefit echoMountain, expenditures which were not authorized and did not benefit Allen Brothers.

## COUNT I
### Injunctive Relief for Breach of Employment Agreement
### (Against Marland)

90.    Allen Brothers repeats and realleges Paragraphs 1-89 herein.

91.    The Employment Agreement is a valid and enforceable contract.

92.    Allen Brothers has performed all of its obligations to Marland under the Employment Agreement.

93.    Marland has breached Section 8 of the Employment Agreement by, *inter alia*:

- accessing Allen Brothers' sales and customer data, in a manner not related to and/or exceeding the scope of his duties as Vice President;

- making and/or printing copies of Allen Brothers' customer, supplier, vendor and consultant contact information;

- retaining copies of Allen Brothers sales and customer data;

- deleting his second user name from the MOM system;

- deleting files from his computers issued by Allen Brothers;

- participating in a conspiracy to interfere with Allen Brothers' investigation of Marland's wrongdoing and to spoliate evidence.

94.    The information that Marland accessed, used and/or deleted constitutes Confidential Information, as defined in Section 7(a) of the Employment Agreement.

95.    Marland has breached Section 7 of the Employment Agreement by using and/or disclosing Allen Brothers' Confidential Information (as defined therein) related to its customer and vendor contact as well as its catalog and online sales data.

96.    On information and belief, Marland also has used and/or intends to use Allen Brothers' Confidential Information to contact or solicit Allen Brothers' customers or potential customers, or used or intends to use Allen Brothers' Confidential Information to compete with Allen Brothers in violation of Section 10(e) and (f) of the Employment Agreement and in violation of Section 5.7 of the Phantom Stock Plan.

97.    Marland's several breaches of the Employment Agreement have caused and will in the future cause Allen Brothers to suffer irreparable harm, including lost business and strained customer and vendor relationships.    Marland's continued and

further breaches of the Employment Agreement will cause Allen Brothers to suffer further lost business and erosion to customer and vendor relationships.

98.    The Employment Agreement expressly provides that if Marland violates any of its terms, monetary damages will be difficult to ascertain and will not afford an adequate remedy to Allen Brothers. (Employment Ag., **Ex. 1**, § 13.) It also provides that Allen Brothers is entitled to injunctive relief in the case of Marland's breach. (*Id.*)

99.    Marland's several breaches of the Employment Agreement result in a forfeiture of his rights and benefits under the Phantom Stock Plan. (Phantom Stock Plan, **Ex. 2**, §§ 5.6, 5.7.)

100.    Allen Brothers is entitled to recover all reasonable attorneys' fees and costs incurred in enforcing the Employment Agreement against Marland. (Employment Ag., **Ex. 1**, § 15.)

WHEREFORE, Plaintiff, Allen Brothers, Inc., respectfully requests that this Court enter judgment in its favor and against Defendant, Scott Marland, on this Count and, accordingly:

A.    Enjoin Defendant Scott Marland from breaching the Employment Agreement by using or disclosing any and all of Allen Brothers Confidential Information, as defined therein;

B.    Enjoin Marland from soliciting, servicing, contacting, diverting or attempting to divert any customer or potential customer of Allen Brothers for 18 months from February 24, 2007;

C.    Enjoin Marland from engaging in any business activity which is competitive with Allen Brothers' business, as defined in the Employment Agreement, but specifically the sale of premium beef and other fine dining products, for 18 months from February 24, 2007;

D.    Order Marland to return to Allen Brothers all computer files, contact lists, vendor information, customer information, consultant information, sales data or other Confidential Information that he copied, saved, printed, emailed or otherwise retained;

E.    Order an accounting of all monies and other benefits that Marland has
derived, directly or indirectly, from his breaches of the Employment
Agreement;

F.    Declare that all of Marland's rights and benefits under the Phantom Stock
Plan have been forfeited;

G.    Enter judgment in favor of Allen Brothers and against Marland in the
amount to be determined at trial, including Allen Brothers' attorneys' fees
and costs; and

H.    Award it any and all other relief that it deems necessary and just.

## COUNT II
### Breach of Fiduciary Duty
### (Against Marland)

101.    Allen Brothers repeats and realleges Paragraphs 1-89 herein.

102.    As the Vice President of Retail Operations for Allen Brothers, Marland
owed the highest fiduciary duties of loyalty, honesty, candor, rectitude, care and good
faith to Allen Brothers and to act solely in the best interest of Allen Brothers.

103.    Marland has breached, or will inevitably breach his fiduciary duties to
Allen Brothers by:

- Copying and retaining customer, vendor and consultant information, sales
data and other trade secrets and confidential information;

- Disclosing communications with Allen Brothers' suppliers and vendors to
third parties;

- Deleting and destroying confidential information on the Allen Brothers
Database; and

- Using time and effort while still employed at Allen Brothers for his future
business operations and dealings.

104.    As a result of Marland's breach of his fiduciary duties, Allen Brothers has
been damaged to an extent that cannot be calculated or ascertained, but which includes,

lost investment of money and resources and potential strained relationships with customers and vendors.

WHEREFORE, Plaintiff, Allen Brothers, Inc., respectfully requests that this Court enter judgment in its favor and against Defendant, Scott Marland; order Marland to disgorge and forfeit any an all compensation paid to him while he was in breach of his fiduciary duties to Allen Brothers; and award it any and all other relief that this Court deems necessary and just.

**COUNT III**
**Declaratory Judgment of Forfeiture of Rights Under Phantom Stock Plan**
**(Against Marland)**

105.    Allen Brothers repeats and realleges Paragraphs 1-89 herein.

106.    The Phantom Stock Plan is a valid and enforceable contract.

107.    Allen Brothers has fully performed all of its obligations under the Phantom Stock Plan and has a legal and tangible interest in the administration of the Phantom Stock Plan.

108.    Marland has breached his obligations under the Employment Agreement and under Section 5.7 of the Phantom Stock Plan as outlined herein. Marland's interest in the Phantom Stock Plan is adverse to Allen Brothers.

109.    Marland's breach of his obligations under the Employment Agreement constitute grounds for a termination "for Cause" under the Phantom Stock Plan. (Phantom Stock Plan, **Ex. 2**, § 5.6.) Upon Marland's termination "for Cause," he forfeits all rights and benefits under the Phantom Stock Plan. (*Id.*)

110.    Marland's breach of his obligations under Section 5.7 of the Phantom Stock Plan also results in a forfeiture of his rights under the Phantom Stock Plan. (*Id.*)

34

111.    There is an actual and justiciable controversy regarding Marland's breach of his obligations under the Employment Agreement and the Phantom Stock Plan and his forfeiture of all rights that otherwise may be possessed and benefits that otherwise may be due to Marland under the Phantom Stock Plan.

112.    A declaration regarding Marland's forfeiture of his rights and benefits under the Phantom Stock Plan will terminate this controversy.

WHEREFORE Plaintiff, Allen Brothers, Inc., respectfully requests that this Court enter judgment in its favor and against Defendant, Scott Marland; declare that grounds existed for Marland's termination for Cause and that he has forfeited any and all rights under the Phantom Stock Plan; and award it any and all other relief that this Court deems necessary and just.

## COUNT IV
### Violation of Illinois Trade Secrets Act (765 ILCS  § 1065/1 *et seq.*)
### (Against Marland)

113.    Allen Brothers repeats and realleges Paragraphs 1-89 herein.

114.    The Allen Brothers Database on the MOM system, Allen Brothers' supplier and vendor network, its creative team, its historical sales data as well as its development of its catalog and online retail sales are all trade secrets as defined in 765 ILCS § 1065/2(d) (the "Trade Secrets Act"). This information is sufficiently secret in order to derive economic value from not being generally known to others who could get economic value from its disclosure or use. Allen Brothers developed this information at great expense over a long period of time and has taken reasonable efforts to maintain its secrecy. This confidential information regarding online and catalog retail sales and

35

suppliers and vendors for its catalog and online products is a valuable part of Allen Brothers' business and is not known or available to its competitors or to the public.

115.   In the Employment Agreement, Marland acknowledged that this information was a trade secret under the Trade Secrets Act. (Employment Ag., **Ex. 1**, § 7(a).)

116.   Marland acquired Allen Brothers' trade secrets while employed as an officer of the Company and while under a contractual and fiduciary obligation to maintain their confidentiality.   Marland secretly accessed, copied and printed Allen Brothers' trade secrets, many of which he was not authorized to access, in the days before he unexpectedly resigned.   He also disclosed at least one communication between Allen Brothers and one of its vendors regarding a retail sale to a third party, which may have contained confidential ordering information.   Thus, Marland knowingly misappropriated Allen Brothers' trade secrets through these surreptitious means in breach of his duty of loyalty and confidentiality to the Company.

117.   On information and belief, Marland is utilizing or will utilize Allen Brothers' customer information, vendor contacts and sales history data in his efforts to obtain future employment in the retail food industry or otherwise utilize Allen Brothers' confidential information in his subsequent employment.   Thus, it is inevitable Marland will disclose Allen Brothers' trade secrets in obtaining employment, and possibly in a new position with one of Allen Brothers' competitors.

118.   Allen Brothers will be irreparably injured by any use or disclosure of its trade secrets by Marland.   Allen Brothers' damages from such misappropriation will be difficult to ascertain and/or calculate.   Thus, pursuant to 765 ILCS § 1065/3, Allen

36

Brothers is entitled to an injunction to prevent Marland from any actual or threatened misappropriation of its trade secrets.

119.    In addition, if Allen Brothers is able to quantify losses or unjust enrichment caused by Marland actual or threatened misappropriation of its trade secrets, then Allen Brothers may recover those damages pursuant to 765 ILCS § 1065/4.

120.    Marland's surreptitious misappropriation of Allen Brothers' trade secret was done willingly and maliciously, therefore, Allen Brothers is entitled to recover exemplary damages and attorneys' fees. *Id.*, §§ 1065/4(b), 1065/5.

WHEREFORE, Plaintiff, Allen Brothers, Inc., respectfully requests that this Court enter judgment in its favor and against Defendants, Scott Marland and :

A.    Enjoin Defendants Scott Marland from disclosing, misappropriating, or utilizing any and all of Allen Brothers' trade secrets;

B.    Order Marland to return to Allen Brothers all computer files, contact lists, customer information, sales data or other trade secrets that he misappropriated;

C.    Award Allen Brothers compensatory damages in an amount in excess of $50,000 to be more specifically determined at trial;

D.    Award Allen Brothers exemplary damages, given Marland's willful and malicious conduct;

E.    Award Allen Brothers its reasonable attorneys' fees and costs incurred in prosecuting this action; and

F.    Award it any and all other relief that it deems necessary and just.

## COUNT V
## Injunctive Relief and Damages for Breach of Development Agreement
### (Against Prominent)

121.    Allen Brothers repeats and realleges Paragraphs 1-89 herein.

122.    The Development Agreement is a valid and enforceable contract.

37

123.    Allen Brothers has performed all of its obligations to Prominent under the Development Agreement.

124.    Prominent has breached Section 13 of the Development Agreement by surreptitiously and intentionally intercepting, accessing, misappropriating and using for its own purposes various confidential information belonging to Allen Brothers, including but not limited to highly sensitive legal advice regarding strategy for Allen Brothers' claims against Marland, as well as information regarding Allen Brothers' market value and executive compensation. The information that Prominent accessed, intercepted and misused constitutes Confidential Information, as defined in Sections 5.A(2) and 13 of the Development Agreement.

125.    Prominent has breached Section 13 of the Development Agreement by disclosing to Debbie Marland Allen Brothers' Confidential Information (as defined therein) as well as other confidential email communications between Allen Brothers and its counsel for the express purpose of thwarting Allen Brothers' claims against Marland in this lawsuit and by seeking to induce Marland and Debbie Marland to spoliate evidence relevant to this matter.

126.    Prominent has breached Section 2 of the Development Agreement through its failure to perform Marketing Services as required under the terms of the Development Agreement and the course of performance of the parties over the term of the Development Agreement.

127.    Prominent has breached Section 2 of the Development Agreement through its intentional and wrongful misuse of the funds provided to Prominent for its performance of the Optimization Services.

128.    Prominent's continued and further breach of the Development Agreement has caused and will in the future cause Allen Brothers to suffer irreparable harm, including lost business, erosion of customer and vendor relationships and the expense and business disruption of creating and implementing a new Web site for Allen Brothers.

129.    The Development Agreement expressly provides that if Prominent violates its confidentiality provisions, monetary damages will be difficult to ascertain and will not afford an adequate remedy to Allen Brothers. (Develop. Ag., **Ex. 3**, § 13.F.)  It also provides that Allen Brothers is entitled to injunctive relief in the case of Prominent's breach. (*Id.*)

130.    Allen Brothers has suffered damages as a direct and proximate result of Prominent's prior breaches of the Development Agreement in an amount to be proved at trial.

WHEREFORE, Plaintiff, Allen Brothers, Inc., respectfully requests that this Court enter judgment in its favor and against Defendant, Prominent Consulting, LLC, on this Count and,

A.    Enjoin Defendant Prominent Consulting from breaching the Development Agreement by using or disclosing any and all of Allen Brothers Confidential Information, as defined therein;

B.    Enjoin Prominent from impairing or obstructing the operations of the www.allenbrothers.com Web site, until such time that Allen Brothers can engage a new Web site developer to establish and host a comparable Web site;

C.    Order Prominent to continue performing Marketing Services using industry best practices until such time as Allen Brothers procures a replacement vendor or vendors;

D.    Order Prominent to assist in the orderly transfer of all domain names containing any Allen Brothers mark, including but not limited to "AB" and "Allen Brothers";

39

E.  Order Prominent to take all actions necessary to instruct and authorize Google, Yahoo!, MSN, and any other third party vendor, including Email Blast providers, to provide all account related information requested by Allen Brothers or any Allen Brothers' designee;

F.  Enjoin Prominent from contacting Scott or Debbie Marland for the duration of this lawsuit;

G.  Order Prominent to return to Allen Brothers and retain no copy whatsoever of all "Allen Brothers IP" (as defined in Section 5.A(2) of the Development Agreement) and "Allen Brothers Customers" (as defined in Section 13 of the Development Agreement);

H.  Enter judgment in favor of Allen Brothers and against Prominent for damages sustained by Allen Brothers in an amount to be determined at trial; and

I.  Award it any and all other relief that it deems necessary and just.

## COUNT VI
### Breach of Fiduciary Duty
### (Against Prominent)

131.  Allen Brothers repeats and realleges Paragraphs 1-89 herein.

132.  As set forth in greater detail herein, Prominent came to serve as the functional equivalent of Allen Brothers' Information Technology Department. Based on the facts and circumstances and in light of the special relationship that existed between Prominent and Allen Brothers, and that was solicited and fostered by Prominent, Allen Brothers placed its trust in Prominent such that Prominent gained superiority and influence over Allen Brothers with respect to matters of technology.

133.  As such, Prominent owed Allen Brothers a fiduciary duty in connection with Prominent's performance of services in connection with Allen Brothers' technology and had the duty to act solely in the best interest of Allen Brothers in performing all such services.

134.    Prominent breached its fiduciary duties to Allen Brothers through the misconduct described herein.

135.    As a result of Prominent's breaches of its fiduciary duties, Allen Brothers has been damaged in an amount to be proved at trial.

WHEREFORE, Plaintiff Allen Brothers, Inc. respectfully requests that this Court enter judgment in its favor and against Defendant Prominent Consulting, LLC on this Count, award damages to Allen Brothers, Inc. in an amount to be proved at trial, award punitive damages, order Prominent Consulting, LLC to disgorge and forfeit any and all compensation it received while it was in breach of its fiduciary duties to Allen Brothers, and award Allen Brothers, Inc. any and all other relief that this Court deems necessary and just.

### COUNT VII
### Violation of Illinois Trade Secrets Act (765 ILCS § 1065/1 et seq.)
### (Against Prominent and Seidensticker)

136.    Allen Brothers repeats and realleges Paragraphs 1-89 herein.

137.    The information regarding Allen Brothers' customers and internal operations to which Prominent and Seidensticker had access in order to perform their responsibilities to Allen Brothers under the Development Agreement and otherwise constitutes trade secrets as defined in 765 ILCS § 1065/2(d) (the "Trade Secrets Act"). For example, information regarding strategy devised by Allen Brothers' counsel to maximize the extent of recovery in the Marland matter constitutes trade secrets under the Trade Secrets Act. Such information is sufficiently secret in order to derive economic value from not being generally known to others who could get economic value from its disclosure or use. Allen Brothers developed this information at significant expense and

41

has taken reasonable efforts to maintain its secrecy. This confidential information has significant value and is not known or available to the public. Such information certainly was not intended to be made available to Marland when Allen Brothers was preparing and pursuing its claims against him.

138.    In the Development Agreement, Prominent acknowledged that this information was confidential and proprietary to Allen Brothers. (Development Ag., **Ex. 3**, § 13.) Thus, this information also constitutes a trade secret under the Illinois Trade Secrets Act. 765 ILCS 1065/3(a).

139.    Prominent and Seidensticker acquired access to Allen Brothers' trade secrets while performing Services for Allen Brothers under the terms of the Development Agreement. Prominent and Seidensticker acted unconscionably when they accessed and misused Allen Brothers' trade secrets for purposes of interfering with Allen Brothers' claims against Marland.

140.    Prominent and Seidensticker utilized and disclosed these trade secrets to Debbie Marland in the April Seidensticker Email and the May Seidensticker Emails in an attempt to thwart Allen Brothers' attempt to discover the full extent of Marland's breaches of his Employment Agreement.

141.    Allen Brothers will be irreparably injured by any further use or disclosure of its trade secrets by Prominent or Seidensticker. Allen Brothers' damages from such misappropriation will be difficult to ascertain and/or calculate. Thus, pursuant to 765 ILCS § 1065/3, Allen Brothers is entitled to an injunction to prevent Prominent and Seidensticker from any actual or threatened misappropriation of its trade secrets.