142.    In addition, if Allen Brothers is able to quantify losses or unjust enrichment caused by Prominent's or Seidensticker's actual or threatened misappropriation of its trade secrets, then Allen Brothers may recover those damages pursuant to 765 ILCS § 1065/4.

143.    Prominent's and Seidensticker's surreptitious misappropriation of Allen Brothers' trade secrets was done willingly and maliciously, therefore, Allen Brothers is entitled to recover exemplary damages and attorneys' fees. *Id.*, §§ 1065/4(b), 1065/5.

WHEREFORE, Plaintiff, Allen Brothers, Inc., respectfully requests that this Court enter judgment in its favor and against Defendants Prominent Consulting LLC and Kurt Seidensticker and :

A.    Enjoin Defendants Prominent Consulting LLC and Kurt Seidensticker from disclosing, misappropriating, or utilizing any and all of Allen Brothers' trade secrets;

B.    Order Prominent and Seidensticker to return to Allen Brothers and retain no copy of all computer files, contact lists, customer information, sales data or other trade secrets that they misappropriated;

C.    Award Allen Brothers compensatory damages in an amount in excess of $50,000 to be determined at trial;

D.    Award Allen Brothers exemplary damages, given Prominent's and Seidensticker's willful and malicious conduct;

E.    Award Allen Brothers its reasonable attorneys' fees and costs incurred in prosecuting this action; and

Award it any and all other relief that it deems necessary and just.

## COUNT VIII
### Tortious Interference with Contract
### (Against Prominent, Seidensticker and Debbie Marland)

144.    Allen Brothers repeats and realleges Paragraphs 1-89 herein.

145.   Marland's Employment Agreement constitutes a valid and enforceable contract between Allen Brothers and Marland.   Under the Employment Agreement, Marland had duties and executory obligations to Allen Brothers even following the termination of his employment.

146.   Defendants Prominent, Seidensticker and Debbie Marland were aware of the existence of the Employment Agreement and the restrictions and obligations that it imposed upon Marland.

147.   With such knowledge, and without justification or privilege, defendants Prominent, Seidensticker and Debbie Marland have wrongfully interfered with Marland's performance of his duties and obligations under the Employment Agreement as well as with Allen Brothers' ability to discover and obtain remedy for Marland's prior breaches of the Employment Agreement.

148.   As a direct and proximate result of tortious interference by defendants Prominent, Seidensticker and Debbie Marland, Allen Brothers has suffered and will continue to suffer damages.

WHEREFORE, Plaintiff Allen Brothers, Inc. respectfully requests that this Court enter judgment in its favor and against Defendant Prominent Consulting LLC, Kurt Seidensticker and Debbie Marland and award Allen Brothers damages in an amount to be proven at trial, punitive damages and all other relief that it deems necessary and just, including the costs of pursuing this action.

**COUNT IX**
**Civil Conspiracy**
**(Against Marland, Debbie Marland,**
**Prominent Consulting, LLC and Kurt Seidensticker)**

149.   Allen Brothers repeats and realleges Paragraphs 1-89 herein.

150.    Upon information and belief, Defendants herein agreed to participate in a scheme to thwart Allen Brothers' investigation of Marland's misappropriation of Allen Brothers' Confidential Information and to spoliate evidence.

151.    In furtherance of that agreement, Prominent and Seidensticker, improperly obtained Allen Brothers' Confidential Information and surreptitiously conveyed that information to Marland and Debbie Marland.

152.    That overt act was done in furtherance of and pursuant to the common scheme devised among the Defendants.

153.    As a result of Defendants' misconduct, Allen Brothers has suffered and continues to suffer substantial damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Allen Brothers, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants Scott Marland, Debbie Marland, Prominent Consulting, LLC and Kurt Seidensticker, award damages to Allen Brothers in an amount to be proven at trial, award punitive damages, and award Allen Brothers any and all other relief that it deems necessary and just.

## COUNT X
### Unjust Enrichment
### (Against Prominent)

154.    Allen Brothers repeats and realleges Paragraphs 1-89 herein.

155.    In early 2007, Allen Brothers was in negotiations with Prominent to develop the iChieve Technology through the iChieve Venture.

156.    In furtherance of the iChieve Venture and with the expectation that it would be consummated in writing, Allen Brothers advanced to Prominent $178,559.86

for the sole and exclusive purpose of developing the iChieve Technology for Allen Brothers' benefit.

157.    There was no written agreement executed related to the iChieve Venture of iChieve Technology. Allen Brothers has not received any service, products, remuneration or reimbursement for the amounts that it advanced to Prominent for development of the iChieve Technology.

158.    At the time that Seidensticker and Prominent solicited and accepted the amounts advanced to Prominent for development of the iChieve Technology, Seidensticker and Prominent were aware of their intentional misconduct and unethical business practices alleged herein, including but not limited to their monitoring and misuse of Allen Brothers Confidential Information contained in emails to and from Allen Brothers.

159.    Prominent has unjustly retained the benefit of the amount advance by Allen Brothers for development of the iChieve Technology.

160.    Prominent's retention of amounts paid by Allen Brothers in contemplation of development of the iChieve Technology for the benefit of Allen Brothers violates the fundamental principles of justice, equity and good conscience. Justice and equity dictate that Prominent should return these amounts to Allen Brothers.

WHEREFORE, Plaintiff Allen Brothers, Inc. respectfully requests that this Court enter judgment in its favor and against Defendant Prominent, award damages to Allen Brothers in the amount of $178,559.86 or such other amount to be proven at trial, plus reasonable interest, and to award Allen Brothers any and all other relief that it deems necessary and just.

## COUNT XI
### Spoliation of Evidence
### (Against Debbie Marland, Prominent Consulting, LLC and Kurt Seidensticker)

161. Allen Brothers repeats and realleges Paragraphs 1-89 herein.

162. Pursuant to the Employment Agreement, Marland had a duty to maintain all of Allen Brothers Confidential Information and to return it to Allen Brothers after his resignation. (Employment Ag., **Ex. 1**, § 7.)

163. Pursuant to the Development Agreement, Prominent also had a duty to maintain Allen Brothers' confidential and proprietary information. (Develop. Ag., **Ex. 3**, §§ 5.A(2) and 13).

164. Defendants have engaged in spoliation of evidence through their discussion of means by which Marland could destroy and/or obscure confidential information belonging to Allen Brothers wrongfully in Marland's possession and, on information and belief, the implementation of those means.

165. As a direct and proximate result of Defendants' spoliation of evidence, Allen Brothers has been damaged.

166. The damage to Allen Brothers incurred as a result of Defendants' spoliation of evidence in this matter will be more specifically proven at trial, but will include the costs of its forensic analysis of Marland's personal and business computers, the evidence against Marland that has been lost as a result of the spoliation and Allen Brothers' attorneys' fees.

WHEREFORE, Plaintiff, Allen Brothers, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants Debbie Marland, Prominent Consulting, LLC and Kurt Seidensticker and award them damages in an amount to be

proven at trial, punitive damages, and all other relief that it deems necessary and just, including the costs of pursuing this action.

## COUNT XII
### Fraud
**(Against Kurt Seidensticker and Prominent Consulting, LLC)**

167.    Allen Brothers repeats and realleges Paragraphs 1-89 herein.

168.    Prominent and Seidensticker falsely represented to Todd Hatoff that Prominent was utilizing and would continue to utilize Allen Brothers' Optimization Services budget solely for the benefit of Allen Brothers, including for the purpose of purchasing Internet advertising on behalf of Allen Brothers.

169.    Prominent and Seidensticker knew those representations were false and made such false representations for the purpose of inducing Allen Brothers to fund the Optimization Services budget.

170.    Allen Brothers relied on Prominent's and Seidensticker's false representations as to material facts by funding and continuing to fund the Optimization Services budget.

171.    Prominent and Seidensticker intentionally and wrongfully diverted funds authorized to be used solely in Internet advertising campaigns on behalf of Allen Brothers.

172.    Instead of using those funds to benefit Allen Brothers, Seidensticker and Prominent used them for the benefit of another of Seidensticker's entities and an affiliate of Prominent, echoMountain.

173. As a direct and proximate result of Defendants' false statements of material fact and Allen Brothers' reasonable reliance thereupon, Allen Brothers has been damaged.

WHEREFORE, Plaintiff Allen Brothers, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants Kurt Seidensticker and Prominent Consulting, LLC and award Allen Brothers, Inc. damages in an amount to be proven at trial, punitive damages, and all other relief that it deems necessary and just, including the costs of pursuing this action.

### COUNT XIII
### Conversion
**(Against Kurt Seidensticker, Prominent Consulting, LLC and echoMountain, LLC)**

174. Allen Brothers repeats and realleges Paragraphs 1-89 herein.

175. Prominent, Seidensticker and, on information and belief, echoMountain intentionally and wrongfully diverted funds authorized to be used solely in Internet advertising campaigns on behalf of Allen Brothers.

176. Instead of using those funds to benefit Allen Brothers, Seidensticker and Prominent used them for the benefit of another of Seidensticker's entities and an affiliate of Prominent, echoMountain.

177. At all relevant times, the funds budgeted for use in Internet advertising campaigns on behalf of Allen Brothers were owned exclusively by Allen Brothers.

178. Seidensticker, Prominent and, on information and belief, echoMountain wrongfully and without authorization assumed dominion, control and/or ownership over Allen Brothers' funds by using those funds to purchase Internet advertising on behalf of echoMountain.

179.    As a direct and proximate result of Defendants' conversion of the funds at issue, Allen Brothers has been damaged.

WHEREFORE, Plaintiff Allen Brothers, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants Kurt Seidensticker, Prominent Consulting, LLC and echoMountain LLC and award Allen Brothers, Inc. damages in an amount to be proven at trial, punitive damages, and all other relief that it deems necessary and just, including the costs of pursuing this action.

**COUNT XIV**
**<u>Unjust Enrichment</u>**
**(Against echoMountain LLC)**

180.    Allen Brothers repeats and realleges Paragraphs 1-89 herein.

181.    Prominent, Seidensticker and, on information and belief, echoMountain intentionally and wrongfully diverted funds authorized to be used solely in Internet advertising campaigns on behalf of Allen Brothers.

182.    Instead of using those funds to benefit Allen Brothers, Seidensticker and Prominent used them for the benefit of another of Seidensticker's entities and an affiliate of Prominent, echoMountain.

183.    echoMountain has unjustly retained the benefits of the amounts diverted from Allen Brothers' Internet advertising budgets and instead used to benefit echoMountain.

184.    echoMountain's retention of those benefits violates the fundamental principles of justice, equity and good conscience. Justice and equity dictate that echoMountain should pay to Allen Brothers the amounts that were used to benefit echoMountain.

WHEREFORE, Plaintiff Allen Brothers, Inc. respectfully requests that this Court enter judgment in its favor and against Defendant echoMountain LLC, award damages to Allen Brothers in such amounts to be proven at trial, plus reasonable interest, and to award Allen Brothers any and all other relief that it deems necessary and just.


PLAINTIFF DEMANDS TRIAL BY JURY


Dated: November 13, 2007


ALLEN BROTHERS, INC.

By: _____
One of Its Attorneys


Charles B. Leuin
Kimberly M. DeShano
GREENBERG TRAURIG, LLP (Attorney No. 36511)
77 W. Wacker Drive
Suite 2500
Chicago, Illinois 60601
(312) 456-8400
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing **Plaintiff's Second Amended Complaint** upon all parties to this matter by hand delivery to the following:

> Phil Mullenix, Esq.
> 617 W. Fulton St.
> Chicago, IL 60661
>
> Peter M. Schutzel, Esq.
> McDermott Will & Emery LLP
> 227 West Monroe
> Chicago, IL 60606
>
> James V. Garvey
> Michael J. Waters
> Vedder, Price, Kaufman & Kammholz, P.C.
> 222 N. LaSalle Street, Ste. 2600
> Chicago, IL 60601

This 13th day of November, 2007.

GREENBERG TRAURIG

By: _____
Charles B. Leuin
Attorney For Plaintiff

52

# EXHIBIT 1

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made by and between Allen Brothers, Inc. (the "Company"), and Scott Marland (the "Employee") and is dated December 27, 2004, effective January 1, 2005.

WHEREAS, the Employee acknowledges that during his retention by the Company, he will receive, have access to, and contribute towards Confidential Information as hereinafter defined which is a highly valuable and unique asset of the Company's business and that the disclosure by Employee of any proprietary and/or confidential information of the Company contrary to this Agreement would cause permanent, incalculable and irreparable injury and damage to the Company; and

WHEREAS, the Employee also acknowledges that he has received or will receive specialized knowledge and/or training in the Company's business, at considerable time and expense to the Company, and through such training Employee will acquire increased skills and value in the market place and will have the opportunity to gain close knowledge of and possible influence over customers and employees of the Company by reason of and during the course of his employment with the Company, and will in such capacity possess the good will of the Company, and that this Agreement is necessary in part to protect the Company against unfair loss of said customers, employees, or good will; and

WHEREAS, in connection with Employee's continued employment Employee will have opportunities to obtain wage increases, promotions, favorable job assignments or other improvements in compensation, benefits or responsibilities subject to the Company's discretion; and

WHEREAS, Employee acknowledges and agrees that each of the provisions of this Agreement are reasonable and necessary to preserve the very strong business interest of the Company, its present and potential business activities, and the economic benefits derived therefrom; that they will not prevent him from earning a livelihood in his chosen business and are not an undue restraint on the trade of Employee, or any of the public interests which may be involved. Employee agrees and acknowledges that the relationships between the Company and its customers are of a near-permanent nature, that but for the Employee's employment by the Company, the Employee would not have had contact with the Company's customers, and that the information in which Employee has had and will have access to is of a confidential and proprietary nature, and the good will of the Company and/or customer and insurer relationships which the Employee has enjoyed and will enjoy while employed by the Company are significant and valuable to the Company and that the relationships between the Company, and its employees are valuable assets of the Company deserving of protection from solicitation to assist the Company in its interest in maintaining a stable work force; and

WHEREAS, the restrictive covenant contained herein has been bargained for and is supported by Employee's continued employment upon the terms and conditions contained herein, and the Phantom Stock Plan simultaneously executed by the parties hereto, and by any specialized training and knowledge Employee may hereafter receive; and

© 2004 KLEIN DUB & HOLLEB, LTD.

WHEREAS, the parties agree that the Company has a protectable interest as hereinafter described; and

WHEREAS, the parties acknowledge and agree that this Agreement is reasonably limited in temporal and geographic scope and adequately and reasonably protects the Company's near-permanent customer relationships and Confidential Information as hereinafter defined; and

WHEREAS, the Employee acknowledges that the restrictive covenant contained herein is ancillary to a valid Employment contract.

NOW, THEREFORE, in consideration of the premises contained in this Agreement, as well as Employee's continued employment by the Company pursuant to the terms and conditions contained herein, the Phantom Stock Plan simultaneously executed by the parties hereto, his promotion to the office of Vice President, the supplement to his year-end bonus of $10,000, the increase in his annual compensation by $10,400 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Recitals – The above recitals are hereby incorporated by this reference and made part of this Agreement, as if each such recital were fully restated herein.

2.    Definition of Company – "Company" means Allen Brothers, Inc., its successors and assigns and any of its present or future subsidiaries or organizations controlled by it, controlling it, or under common control with it.

3.    Employee Duties -- The Employee at time of execution of this Agreement is employed in the position of Director of Catalog Division and as of the effective date of this Agreement shall be promoted to the office of Vice President of the Company. Employee shall have the authority and responsibility customarily and historically given to a Vice President with primary responsibility for the Catalog Division. Employee agrees to devote his full and undivided time and attention during the Company's customary business hours, to the business of the Company. During the term of this Agreement Employee agrees to perform those duties and services as may be designated by the Company's President or such other individual as designated by the Company to the best of his ability and in a professional manner.

4.    Employment – The Company employs the Employee and the Employee accepts employment upon certain terms and conditions agreed upon orally between the parties and upon the terms and conditions in this Agreement. The term of this Agreement shall begin on the day and year first written above and shall end two (2) years after the employment of the Employee terminates; provided however, that paragraph 7 shall survive termination of this Agreement. The Company considers its relationship with Employee to be very important, however, the execution of this Agreement by the Company does not ensure Employee any specific term of employment with the Company. Employee's employment by the Company is and will be terminable at the will of either party to this Agreement at any time.

© 2004 KLEIN DUB & HOLLEB, LTD.

2

5. __Lack of Conflict With Past Employment__ -- Employee hereby acknowledges that he is not bound by any noncompete or nonsolicitation restriction with any organization that would restrict the fulfillment of the terms of his employment with the Company.

6. __Notification of Existence of Agreement__ -- Employee agrees that in the event that he is offered employment with another Employer at any time during the existence of this Agreement, the business of which is in any way competitive with the Company, Employee shall immediately advise said other employer of the existence of this Agreement and shall immediately provide said other employer with a copy of this Agreement and all of its terms.

7. __Nondisclosure/Confidentiality__

(a)    Employee acknowledges and agrees that the information, observations, and data obtained by him in the course of his employment by the Company concerning the business and affairs of the Company are the property of the Company. Employee agrees that the Company has a legitimate interest and need to maintain this information in confidence during and subsequent to his employment. Therefore, Employee agrees he will forever keep secret, confidential and inviolate and never disclose, either during or after his employment by the Company any Confidential Information. Employee further acknowledges that it would be possible for an employee, upon termination of his association with the Company, to use the knowledge or information obtained while working for or with the Company to benefit other individuals or entities. Employee acknowledges that the Company has expended considerable time and resources in the development of certain trade secrets, confidential knowledge, data or other proprietary information of the Company, including without limitation, Confidential Information. "Confidential Information" includes any information relating to (i) the business, conduct or operations of the Company or any of its respective clients, customers, consultants or licensees; (ii) any methods, ways of doing business, etc., used in the sale, use or marketing of the Company's products or services, (iii) the existence or betterment of, or possible new uses or applications for, any such products or services; (iv) any of the Company's product lines, customer lists, sales or dealer network, pricing and purchasing information or policies, non-public catalog information; (v) any inventions, products, machines, production processes, apparatus, molds, formulas, drawings, blueprints, photographs, slides, motion pictures, videotapes, computer software, information stored on the Company's computer or intranet, product specifications, trade secrets, price and discount lists, customers, customer lists, suppliers, supplier lists, personnel data, business and marketing plans, ideas or strategies, financial performance and projections and cost data; and (vi) the Company's purchasing arrangements and terms with suppliers, research and development, methods, practices, pricing to customers, pricing of materials, conditions of transactions with customers and suppliers, accounting and other systems, financial condition, marketing techniques or practices, merchandising techniques or practices or patents. "Confidential Information" further includes any and all information of whatever nature or kind which the employee has learned of, acquired or obtained knowledge of, conceived, developed, originated, discovered, invented, disclosed or otherwise become aware of during his employment provided that this sentence shall not apply to information within the public domain or generally known within the industry of the Company or entirely unrelated to the activities of the Company. The parties agree that Confidential Information is an extremely valuable Company asset and shall be deemed to be a "Trade Secret" pursuant to the Illinois Trade

© 2004 KLEIN DUB & HOLLEB, LTD.

3

Secrets Act. Employee agrees that he has acquired Trade Secrets and other Confidential Information as a consequence of his employment with the Company and that in the event of employment by Employee in contravention to paragraph 10 hereinbelow, Employee hereby covenants that he anticipates using to the Company's detriment such Trade Secrets or other Confidential Information.

(b)    Employee recognizes that the Company has received, and in the future will receive, from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and, in some cases, to use it only for certain limited purposes. Employee agrees that he owes the Company and such third parties, both during his employment and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person (except in a manner that is consistent with the Company's agreement with the third party) or use it for the benefit of anyone other than the Company or such third party (consistent with the Company's agreement with the third party), unless expressly authorized to act otherwise by the President of the Company.

8.    <u>Return of Materials</u> -- Employee will, at any time upon the request of the Company, and in any event upon the termination of his employment, for whatever reason, immediately return and surrender to the Company originals and all copies of all records, notes, memoranda, information and documents and other property belonging to the Company, created or obtained by Employee as a result of or in the course of or in connection with Employee's employment with the Company hereunder, including Confidential Information. Employee acknowledges that all such materials are, and will always remain, the exclusive property of the Company.

9.    <u>Creations and Other Matters</u> -- Employee agrees that all ideas, writings, compilations, preparations, inventions, discoveries or improvements, including but not limited to manuals, financial reporting methods, processes or techniques, programs, products, or other creations (collectively, the "Inventions") which Employee, individually or with others, may originate or develop while employed with the Company, relating to the business of the Company, or the Company's actual or demonstrably anticipated research or development, or which result from any work performed by Employee for the Company, shall belong to and be the sole property of the Company. Employee further agrees, without further consideration, to promptly disclose each such Invention to the President of the Company. Employee agrees that he will not at any time, except as authorized by the Company, publish or disclose any information or knowledge concerning any Inventions. With respect to Inventions made or conceived by Employee from the date of this Agreement during the course of his retention and with the use of the Company facilities, materials, or personnel, either solely or jointly with others during his retention by the Company if based on or related to confidential or secret information, without any obligation on the part of the Company to pay royalty or any other consideration to him therefor:

(a)    The parties acknowledge that Exhibit A annexed hereto, contains a complete list of all Inventions, patented or unpatented, including a brief description thereof, which Employee made or conceived prior to his employment. The Inventions set forth in Exhibit A are excluded from this Agreement. The parties further acknowledge that any and all

© 2004 KLEIN DUB & HOLLER, LTD.

Inventions not listed in Exhibit A are subject to the terms of this Agreement and that the Employee shall inform the Company promptly and fully of all such Inventions by a written report, setting forth in detail the procedures employed and the results achieved by such Inventions.

(b)　　The parties acknowledge that the Inventions not listed in Exhibit A are created at the insistence of the Company and agree that the Inventions shall be deemed work made for hire under the United States Copyright laws and that the Company shall have the unlimited right to supervise and control Employee and to direct Employee as to all respects of the creation of the Inventions. No rights are reserved to Employee.

(c)　　In the event that any such Invention is determined by a court of competent jurisdiction to not be a work made for hire under the United States Copyright laws, the Employee hereby irrevocably assigns and agrees to assign to the Company all of his rights to such Invention, all copyrights in such Invention (including all rights of every kind in the Invention for the entire duration of the copyright) and, if applicable to applications for United States and/or foreign letters patent and to United States and/or foreign letters patent granted upon such Inventions, without further consideration.

(d)　　For purposes of this Agreement, an Invention shall be deemed to have been made during the period of Employee's employment if during such period, the Invention was conceived, in part or in whole, or first actually reduced to practice, and Employee agrees that any patent application filed within one (1) year after termination of his employment shall be presumed to relate to an Invention made during his employment unless Employee can provide evidence as to the contrary.

This Section shall not apply to an Invention for which no equipment, supplies, facility, Confidential Information or other trade secret information of the Company was used and which was developed entirely on Employee's own time, unless the Invention relates (a) to the business of the Company or (b) to the Company's actual or demonstrably anticipated research or development, or (c) the Invention results from any work performed by Employee for the Company.

10.　Nonsolicitation/Noncompete Provisions — Employee acknowledges and agrees that each of the provisions of this Agreement are reasonable and necessary to preserve the very strong business interests of the Company, its present and potential business activities, and the economic benefits derived therefrom; that they will not prevent him from earning a livelihood in his chosen occupation and are not an undue restraint on the trade of Employee, or any of the public interests which may be involved. Therefore, and as further protection against the unauthorized disclosure by the Employee of Confidential Information and as a further inducement for the Company to continue to employ the Employee, Employee agrees and acknowledges:

(a)　　that so long as he is an Employee of the Company, he will devote his best efforts and all of his business time, efforts, and attention to furthering the very strong business

© 2004 KLEIN DUB & HOLLEB, LTD.

5

interests of the Company, and that he will not directly or indirectly engage in any business activity which is competitive with any business activity conducted by the Company;

(b)     that the relationships between the Company and its customers are of a near-permanent nature and but for the Employee's association with the Company the Employee would not have had contact with the Company's customers;

(c)     that the information in which Employee has had and will have access to is of a confidential and proprietary nature, and the good will of the Company and/or customer and supplier relationships which the Employee has enjoyed and will enjoy while employed by the Company are significant and valuable to the Company;

(d)     that the relationships between the Company and its employees are valuable assets of the Company deserving of protection from solicitation to assist the Company in its interest in maintaining a stable work force, and because of this interest, Employee agrees that at no time during the term of his employment by the Company, and for a period of eighteen (18) months thereafter, will he directly or indirectly recruit, solicit, divert, employ or cause to be employed by a third party any person who is an employee of the Company;

(e)     that because of the Company's valuable interest in its customer relationships, during and for a period of eighteen (18) months following the termination of Employee's employment with the Company for any reason, Employee will not solicit, service, have contact with, divert or attempt to divert any entity which is, as of the time of the termination of Employee's employment, or was, in the immediate six-month period prior to such termination, a customer or prospective customer of the Company that Employee had prior dealings with or knowledge about;

(f)     that Employee recognizes and understands that the business of the Company is national in scope, extending to all of the 50 states of the United States of America and Employee agrees that Employee will not during, and for a period of eighteen (18) months after termination of the Employee's employment with the Company for any reason, in any form or manner, directly or indirectly, on his own behalf or in combination with others, engage in, or become interested in (as an employee, partner, stockholder, agent, owner, independent contractor, or in any other relation or capacity), any business activity which is competitive with any business activity conducted by the Company, including, any of the following companies (or such companies' successors or assigns) listed on Exhibit B hereto, which list may be modified upon notice to Employee from time to time.

(g)     that Employee will not at any time take any action or do anything which unfairly or unlawfully injures or damages the business prospects or good will of the Company; and

(h)     Employee will not disparage or demean the Company to anyone or make any negative statements about the Company orally or in writing unless otherwise required by law after final court order by a court of competent jurisdiction.

© 2004 KLEIN DUB & HOLLEB, LTD.

11.    Term Severability – It is intended that the covenants contained in Sections 10(d)(e) and (f) shall be deemed to be a series of separate and severable covenants, one for each successive month during the term of said covenant. Except for time coverage, each separate covenant shall be deemed identical in its terms with the covenant contained in said Sections 10(d)(e) and (f). If, in any judicial proceeding, a Court should refuse to enforce all of the separate covenants included in Sections 10(d)(e) and/or (f) because taken together they cover too long a period of time, then it is intended that the last of such covenants in time which, if eliminated, would permit the remaining separate covenants to be enforced in such proceeding shall, for the purpose of such proceeding, be deemed eliminated from the provisions hereof, provided that there shall only be eliminated such last covenants in time as are absolutely necessary to permit the remaining covenants in time to be enforced in such proceeding.

12.    Geographic Severability – It is intended that the covenant contained in Section 10(f) shall be deemed to be a series of separate and severable covenants, one for each city in which the Company has customers or has solicited customers. Except for geographic coverage, each such separate covenant shall be deemed identical in its terms with the covenant contained in said Section 10(f). If, in any judicial proceeding, a Court should refuse to enforce all of the separate covenants deemed included in Section 10(f) because taken together they cover too extensive a geographic area, then it is intended that those of such covenants which, if eliminated, would permit the remaining separate covenants to be enforced in such proceedings shall, for the purpose of such proceeding be deemed eliminated from the provisions hereof, provided that there shall only be eliminated such separate covenants as are absolutely necessary to permit the remaining separate covenants to be enforced in such proceeding.

13.    Injunctive and Other Relief -- Employee acknowledges and agrees that the restrictions contained in this Agreement will not prevent or hinder him from obtaining gainful employment in the industry. Employee further acknowledges and agrees that the restrictions contained in this Agreement will not cause him any undue hardship and are reasonable and necessary in order to protect the Company's legitimate interests and that any violation thereof would result in irreparable injury to the Company.

Employee acknowledges and agrees that a breach of any of the covenants herein contained would cause irreparable injury to the Company's business and that monetary damages will be extremely difficult or impossible to ascertain and will not afford an adequate remedy. Employee further acknowledges and agrees that the Company has a right or interest which may be legally protected and that the benefits of granting injunctive relief to the Company would outweigh any possible injury to Employee as a result thereof. Therefore, in the event of any such breach, or threatened breach, in addition to such other remedies which may be provided by law or contained herein, the Company shall have the right to specific performance of the covenants herein contained by way of temporary and/or permanent injunctive relief, as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such breach, which rights shall be cumulative, all as the Company elects.

14.    General Release of Claims -- In consideration of the Company entering into this Employment Agreement with Employee and also in consideration of Employee's employment by the Company and its providing to Employee the Phantom Stock Plan simultaneously executed by

© 2004 KLEIN DUB & HOLLEB, LTD.

7

the parties hereto, Employee hereby releases and forever discharges the Company and its directors, officers, agents and employees, from any and all causes of action or claims of any type that Employee might have from the beginning of the world through the date of this Agreement, arising or which could have arisen out of Employee's employment relationship with the Company, including claims under the Age Discrimination In Employment Act of 1967 as amended (29 U.S.C. § 626), ("ADEA"), Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e, et seq., ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981, the National Labor Relations Act, 29 U.S.C. § 151, et seq., the Fair Labor Standards Act, 29 U.S.C. § 201, et seq., the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq., ("ADA"), the Illinois Human Rights Act, the Illinois Wage Payment and Collection Act, and/or any other federal, state or local statute, law, ordinance, regulation or order including, but not limited to, claims of age discrimination or breach of contract and whether for back pay, earned or accrued vacation pay, bonus, earned commissions, damages and any other relief or remedy at law or at equality. Employee further covenants and agrees never to institute directly or indirectly or to participate in (unless otherwise required by law) any action or proceeding of any kind against the Company, its directors, officers, agents and/or employees, based on or related to his employment relationship with the Company, through the date of signing of this Employment Agreement, it being understood that there is no intent herein to interfere with the Equal Employment Opportunity Commission's right to enforce Title VII, the EPA, the ADA, or the ADEA and that this sentence shall not operate to prevent a claim by Employee for breach of this Employment Agreement or for unemployment compensation or a claim to determine the validity of the ADEA waiver; provided however that with respect to an ADEA claim the Company shall be entitled to recover from Employee its attorney's fees and costs related to such action in the event Employee does not fully prevail in such a claim.

15. **Attorneys' Fees and Costs** — Employee agrees that in the event the Company institutes any action to enforce and/or prosecute this Agreement, the Company shall be entitled to recover from Employee its reasonable attorneys' fees and costs if successful in such action.

16. **Severability** — The language of all parts of this Agreement shall in all cases be construed as a whole, and it is the intent of the parties that this Agreement be construed in the broadest possible sense. The parties believe the time restrictions herein to be reasonable. However, in the event that a court of competent jurisdiction deems any provision hereof to be unreasonable, void or unenforceable, such provision(s) shall be deemed severed from the remainder of the Agreement, which shall continue in all other respects to be valid and enforceable. It is the intent of the parties that any such provision(s) of this Agreement declared void, unreasonable or unenforceable shall be deemed by a court of competent jurisdiction revised to the minimum amount necessary in order to be valid and enforceable.

17. **Binding Effect/Applicable Law/Forum** — This Agreement and all of Employee's obligations arising under it shall be governed by, and construed under the law of the State of Illinois; shall survive the termination of Employee's employment regardless of the manner of such termination; and shall be binding upon Employee's heirs, executors and administrators. Any action hereunder shall be filed in a court of competent jurisdiction located in Illinois.

© 2004 KLEIN DUB & HOLLEB, LTD.

8

Employee specifically acknowledges that this Agreement does not obligate the Company to continue to employ him in any capacity for any period of time.

18.    Limit of Scope of Litigation – To the extent permitted by law, the parties agree that in order to reduce the scope of any potential litigation hereunder, as well as to further commit to the understandings contained herein, and in further consideration of the benefits conferred hereunder, that neither party will contest the acknowledgement, factual assertions, enforceability or reasonableness of any clause contained herein.

19.    The terms of any Exhibit attached hereto are incorporated herein by reference.

EXECUTED as of the day and year written above

SCOTT MARLAND

_____
Signature

_____
Print Name

ALLEN BROTHERS, INC.

By: _____
Signature

Print Name

_____
Title

© 2004 KLEIN DUB & HOLLEB, LTD.

9

# EXHIBIT A TO AGREEMENT BETWEEN
## ALLEN BROTHERS, INC. AND SCOTT MARLAND

Pursuant to the Agreement between Allen Brothers, Inc. and Scott Marland (the "Employee") entered into on _December 27_____, 200_8_ the following is a complete list of all inventions, patented or unpatented, which Employee made or conceived prior to his employment with Allen Brothers, Inc.:

## NONE

SCOTT MARLAND                                    ALLEN BROTHERS, INC.

_____                            _____
Signature                                        Signature

DATED: _12/27/04_

K:\Allen Brothers, Inc\Documents,_Policies\Marland Employment Agreement.doc

© 2004 KLEIN DUB & HOLLEB, LTD.

EXHIBIT B

# Allen Brothers Block List

**URL**

| | | |
|---|---|---|
| 1 | *Cusack Meats | No website available |
| 2 | Ackerman & Cooke | No website available |
| 3 | Amazon or amazon.com | http://www.amazon.com |
| 4 | Balducci's | No website available |
| 5 | Bruss Company, IBP Corporation (Golden Trophy) | No website available |
| 6 | Buckhead Beef | http://www.buckheadbeef.com |
| 7 | Chicago Meat Authority | http://www.chicagomeat.com |
| 8 | Chicago Steak Company | http://www.chicagosteaks.com |
| 9 | Chicago Steaks (Lincoln Packing) | http://www.chicagosteaks.com |
| 10 | Conestoga Ranch | No website available |
| 11 | Conestoga Steaks | No website available |
| 12 | Consumers Packing Company | http://www.consumerspacking.com |
| 13 | Dartagnan or dartagnan.com | https://www.dartagnan.com/ |
| 14 | Dean and Deluca or deananddeluca.com | http://www.deandeluca.com |
| 15 | Freedman Food Service | http://www.freedmanfoods.com |
| 16 | G & W Packing Co., Inc. | No website available |
| 17 | Grand Gourmet Food or grandgourmetfood.com | http://www.grandgourmetfood.com |
| 18 | Harry & David | http://www.harryanddavid.com |
| 19 | Haute at Home (Goodheart) | http://www.goodheart.com |
| 20 | Home Bistro | http://thehomebistro.com |
| 21 | Kansas City Steaks | http://www.kcsteak.com |
| 22 | L & L Packing Company | http://www.worldsbeststeak.com |
| 23 | Lobel's or lobels.com | http://www.lobels |
| 24 | Lobstergram Catalog or www.livelob.com | http://lobstergram.netizen.org |
| 25 | Maple Leaf Farms or mapleleaf.com | http://www.mapleleaffarms.com |
| 26 | The Meat Factory, Inc. | No website available |
| 27 | Niman Ranch or nimanranch.com | http://www.nimanranch.com |
| 28 | New City Pkg and Provisions | No website available |
| 29 | Newport Meats Packing | No website available |
| 30 | Nueske's | http://www.nueskes.com |
| 31 | Omaha Steaks International | www.omahasteaks.com |
| 32 | Pfaelzer Brothers | http://www.pfaelzerbrothers.com |
| 33 | Prairie Grive Farms | http://www.prairiegrovefarms.com |
| 34 | Preferred Meats or preferedmeats.com | http://www.preferredmeats.com |
| 35 | Prime Access | http://www.primeaccess.net |
| 36 | Prime Connection | No website available |
| 37 | Prince Meat Company | http://www.entreestoexcellence.com |
| 38 | Quantum Foods | www.quantumfoods.com |
| 39 | Richard's Packing Co. | No website available |
| 40 | Roberts Packing Co. | No website available |

© 2004 KLEIN DUB & HOLLEB, LTD.

11

| 42 | Sayersbrook | http://www.sayersbrook.com |
| 43 | Seabear | http://www.seabear.com |
| 44 | Smith & Wolensky | http://www.smithandwollensky.com |
| 45 | Snake River Farms or snakeriverfarms.com | http://www.snakeriverfarms.com |
| 46 | Stock Yards Packing Company | www.stockyards.com |
| 47 | The Honey Baked Ham Company | http://www.honeybaked.com |
| 48 | Vlcek's Gourmet Meats | http://www.vlcekmeat.com |
| 49 | Wyoming Buffalo Company | http://www.wyomingbuffalocompany.com |
| 50 | Any U.S. Food Service meat company subsidiary or operation | |
| 51 | Any Sysco competitor, meat company, subsidiary or operation | |

SCOTT MARLAND

_____
Signature

DATED: _10/27/04_____

ALLEN BROTHERS, INC.

_____
Signature

© 2004 KLEIN DUB & HOLLEB, LTD.

12

# EXHIBIT 2

# ALLEN BROTHERS, INC.
## PHANTOM STOCK PLAN

THIS AGREEMENT is made as of this _27_ day of _December_, 2004 by and between ALLEN BROTHERS, INC., an Illinois corporation, ("Employer") and Scott Marland, ("Employee"), effective January 1, 2005.

## WITNESSETH:

WHEREAS, Employer desires to encourage Employee to contribute to the success of its operations;

WHEREAS, Employer deems it to be in its best interests to adopt a phantom stock plan to reward Employee for his contributions to the success of Employer.

NOW, THEREFORE, the parties hereto agree to adopt the following phantom stock plan:

## ARTICLE I
## DEFINITIONS

1.1    "Account" means the account established and maintained by the Administrator for Employee with respect to his total interest in the Plan.

1.2    "Administrator" means the person or persons designated by Employer pursuant to Section 2.1 to administer the Plan on behalf of Employer.

1.3    "Agreement" means the Allen Brothers, Inc. Phantom Stock Agreement, as amended and in effect from time to time.

1.4    "Beneficiary" or "Beneficiaries" means the person or persons to whom the share of Employee's Account is payable on his death, as provided in the Plan, designated in accordance with the provisions of Section 8.2.

1.5    "Board" means the Board of Directors of Employer.

1.6    "Cause" has the meaning provided in Section 5.6.

1.7    "Common Stock" means the common stock of Employer.

1.8    "Disability" means a physical or mental condition of Employee resulting from bodily injury, disease, or mental disorder which renders him incapable of continuing his usual and customary employment with Employer. The disability of Employee shall be determined by a licensed physician chosen by the Administrator.

1.9   "Early Retirement" means termination of Employee's Employment with Employer for reasons other than Cause at any time after the attainment by Employee of age 60 and prior to his attainment of age 65.

1.10   "Effective Date" is January 1, 2005, provided, however, that the dates of effectiveness of the provisions of this Agreement is set forth in Article IX.

1.11   "Employment Agreement" means that employment agreement between the Employer and Employee executed simultaneously herewith.

1.12   "Fair Value" means the value as determined pursuant to Article IV hereof.

1.13   "Forfeiture" means that portion of Employee's Account which ceases to be credited to Employee's Account, as a result of (i) his termination of employment under Section 5.5 or (ii) his violation of the provisions of Section 5.6.

1.14   "Normal Retirement" means termination of Employee's employment with Employer for reasons other than Cause at any time after attainment by Employee of age 65.

1.15   "Phantom Interest" means the deferred interest in Employer's Fair Value, expressed as a percentage, contributed by Employer for the benefit of Employee in accordance with the terms of the Plan.

1.16   "Plan" means the Allen Brothers, Inc. Phantom Stock Plan established by this Agreement.

1.17   "Year" means the calendar year, which is Employer's accounting year.

## ARTICLE II
## ADMINISTRATION

2.1   POWERS AND RESPONSIBILITIES OF EMPLOYER

Employer, acting through its Board, shall be empowered to appoint and remove the Administrator from time to time as it deems necessary for the proper administration of the Plan. Any person, including, but not limited to, the directors, shareholders, officers, and employees of Employer shall be eligible to serve as Administrator. An Administrator may resign or be removed at any time. Employer, upon the resignation or removal of the Administrator, shall promptly designate a successor Administrator. If Employer does not appoint an Administrator, the Board will function as the Administrator.

## 2.2    ALLOCATION AND DELEGATION OF RESPONSIBILITIES

If more than one person is appointed as Administrator, the responsibilities of each Administrator may be specified by Employer. In the event that no such delegation is made by Employer, the Administrators may allocate the responsibilities among themselves, in which event the Administrators shall notify Employer of such action and specify the responsibilities of each Administrator.

## 2.3    POWERS, DUTIES AND RESPONSIBILITIES

The primary responsibility of the Administrator is to administer the Plan subject to the specific terms of the Plan.  The Administrator shall administer the Plan in accordance with its terms and shall have the power to determine all questions arising in connection with the administration, interpretation, and application of the Plan. Any such determination by the Administrator shall be conclusive and binding upon all persons. The Administrator may correct any defect, supply any information, or reconcile any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of this Plan. The Administrator shall have all powers necessary or appropriate to accomplish his duties under this Plan.

The Administrator shall be charged with the duties of the general administration of the Plan, including, but not limited to, the following:

(a)    to authorize and direct all disbursements from the Plan;

(b)    to maintain all necessary records for the administration of the Plan;

(c)    to interpret the provisions of the Plan and to make and publish such rules for regulation of the Plan as are consistent with the terms hereof;

(d)    to assist Employee regarding his rights, benefits, or elections available under the Plan;

(e)    to appoint advisors deemed necessary or desirable in connection with the administration of the Plan.

## 2.4    MAJORITY ACTIONS

Except where there has been an allocation and delegation of administrative authority pursuant to Section 2.2, if there shall be more than one Administrator, they shall act by a majority of their number, but may authorize one or more of them to sign all papers on their behalf.

Allen Brothers, Inc.
Phantom Stock Plan (Scott Marland)
December 20, 2004
875175v4

3

# ARTICLE III
## CONTRIBUTION AND ALLOCATION

Employer is contemporaneously herewith making a contribution to Employee's Account of a Phantom Interest equal in value to one half of one percent (.5%) of the Fair Value of Employer. The Employer in its sole discretion, may, from time to time increase the percentage of the Phantom Interest contributed to Employee's Account.

# ARTICLE IV
## VALUATION OF EMPLOYEE'S ACCOUNT

The value of Employee's Account at any time shall be an amount equal to the Employee's Phantom Interest expressed as a decimal, multiplied by the Fair Value of Employer as determined in accordance with the provisions of Exhibit I.

# ARTICLE V
## DETERMINATION AND
## DISTRIBUTION OF EMPLOYEE'S ACCOUNT

### 5.1    DETERMINATION OF EMPLOYEE'S VESTED ACCOUNT

Subject to the provisions of Sections 5.4, 5.6 and 5.7, Employee's Account is at all times fully vested and non-forfeitable.

### 5.2    DETERMINATION OF VALUE

If Employee's employment is terminated for reasons other than Cause, the Fair Value of Employee's Account shall be calculated as of the date of his termination of employment and shall be distributed in accordance with the provisions of Section 5.3.

### 5.3    DISTRIBUTION OF BENEFITS

If Employee's employment is terminated on account of his death, Disability or Normal Retirement, payment of benefits shall commence not more than thirty (30) days after determination of the Fair Value of his Account. In the event that Employee's employment is terminated on account of his voluntary termination of employment prior to his attainment of age 60 or if his employment is terminated by Employer without Cause before his attainment of age 60, payment of benefits shall commence not later than the five year anniversary of the date of his termination of employment. In the case of Employee's voluntary termination of employment prior to age 60, the amount of his benefit will be subject to vesting in accordance with Section 5.4. In the case of Employee's termination on account of death, Disability, Normal Retirement, termination by Employer without Cause prior to his attainment of age 60, or voluntary termination by

Employee prior to his attainment of age sixty (60), Employee's Account will be distributed over five (5) years in twenty (20) equal quarterly installments.

If Employee's termination of employment constitutes an Early Retirement, Employee's Account will be distributed over a period equal to five years plus a number of years equal to the difference between 65 and Employee's age as of the date of his Early Retirement, and such benefit shall be paid in a number of equal quarterly installments determined by multiplying the number of years of payment by four.

No interest shall be paid on Employee's Account, either before or after determination of its Fair Value.

5.4    VOLUNTARY TERMINATION OF EMPLOYEE'S EMPLOYMENT

In the event that Employee voluntarily terminates his employment before January 1, 2010, his Account shall be vested in accordance with the following schedule:

| Date of Termination | Percentage of Account |
|---|---|
| Prior to January 1, 2006 | 0% |
| After December 31, 2005 and Prior to January 1, 2007 | 20% |
| After December 31, 2006 and Prior to January 1, 2008 | 40% |
| After December 31, 2007 and Prior to January 1, 2009 | 60% |
| After December 31, 2008 and Prior to January 1, 2010 | 80% |
| January 1, 2010 and Afterwards | 100% |

5.5    DEATH OF EMPLOYEE AFTER TERMINATION OF EMPLOYMENT AND PRIOR TO COMMENCEMENT OF DISTRIBUTIONS

In the event that Employee dies after his termination of employment for reasons other than Cause, but prior to the commencement of distributions hereunder, Employee's Account shall be distributed to his Beneficiary, or if there is none, to his estate, in the same manner as though Employee remained alive, in accordance with the provisions of Section 5.3, except that distribution of the Account shall commence with the first day of the month following the month in which Employer learns of Employee's death.

5.6    TERMINATION OF EMPLOYEE'S EMPLOYMENT FOR CAUSE

In the event that Employee's employment is terminated for Cause, Employee's Account shall be forfeited and Employee shall have no further rights under this Agreement or otherwise.

Employee's employment shall be terminated for Cause on account of Employee's embezzlement, other misappropriation of corporate funds, other acts of dishonesty as it regards Employer or the conviction of a felony offense, or if Employee breaches the Employment Agreement. A termination of Employee's employment as a result of his violation of the provisions of Section 5.7 shall also constitute a termination for Cause.

### 5.7   COMPETITION WITH EMPLOYER RESULTS IN FORFEITURE

Employee shall not, while he is employed by Employer, or if his employment with Employer has terminated, for as long as any portion of his Account remains undistributed, engage in any business or practice, either as a shareholder or owner or partner, director, officer, employee, consultant, or otherwise, in competition with the Employer, or otherwise take any actions prejudicial to the interests of Employer. If the Administrator determines that Employee has violated this provision or in the event that the Employee breaches the Employment Agreement, the Board may declare that Employee's rights are terminated hereunder and his Account, or the remaining undistributed portion thereof, shall be declared a Forfeiture.

### 5.8   EVENTS PERMITTING EMPLOYEE TO RECEIVE BENEFITS IN A LUMP SUM

(a)    In the event of the sale of substantially all of the assets of Employer, Employee will have the option or receiving his entire Account in a lump sum as of the date of the occurrence of such event. This option must be exercised within the ninety (90) day period commencing with the closing of the sale of Employer's assets. A transfer of assets by Employer to one or more wholly-owned subsidiaries or second tier subsidiaries does not constitute a sale of assets.

(b)    The option granted in subsection (a) must be exercised within the ninety (90) day period following the sale of substantially all of the assets of the Employer, by written notice to Employer to the effect that Employee has exercised his option to receive his Account in a lump sum.

(c)    In the event that Employee does not exercise this option, the payment of Employee's Account shall be in accordance with the provisions of Section 5.3, except that the initial payment shall be made on the first day of the month following the month in which the option provided in this Section 5.8 expires.

(d)    The value of Employee's Account in such event shall be determined in accordance with the provisions of Section 5.11.

5.9    DISSOLUTION OF EMPLOYER; TRANSFER OF COMMON STOCK

(a)    In the event that Employer is dissolved, Employee will be entitled to receive his Account out of the proceeds available from distribution in liquidation. The value of his Account shall be equal to the proceeds available for distribution after satisfaction of all liabilities of Employer, multiplied by his Phantom Interest expressed as a decimal. Such amount shall be paid within thirty (30) days of the date that the amounts available for distribution are determined by the independent public accountant regularly engaged by Employer.

(b)    If more than fifty percent (50%) of the Common Stock is transferred to persons in a single transaction who are not shareholders of Employer prior to the transfer, Employee, at his option, will be entitled to have his Account valued in accordance with the provisions of Section 5.11, and commence receiving his entire Account in accordance with the distribution provisions described in Section 5.8. Distribution of such amounts will commence within thirty (30) days of the date of exercise of Employee's option.

(c)    The option granted in subsection (b) must be exercised within the ninety (90) day period following a sale of Common Stock described in such subsection, by written notice to Employer to the effect that Employee has exercised his option to commence receiving his Account balance.

(d)    In the event the Employee does not exercise his option, Employee's Account shall not be distributable until his employment with Employer is terminated.

5.10    PURCHASE OF INSURANCE ON LIFE OF EMPLOYEE

Employer may purchase a policy of insurance on the life of Employee. Employee agrees to cooperate in Employer's efforts to obtain such insurance coverage. If Employer maintains a policy on Employee's life, Employer will pay the premiums and be the beneficiary of such policy. Employer is not required to continue such coverage even if it acquires a policy on Employee's life. If there is insurance coverage at the time of Employee's death, the entire proceeds of the policy will be applied as the initial payment in distribution of his Account, and the remaining balance of the Account will be distributed in accordance with the provisions of Section 5.3, or, if the Account is already being distributed, to the payment of the remaining balance of the Account. In the event that the proceeds from the insurance on Employee's life exceed the remaining unpaid portion of the Account, the excess of the proceeds will be retained by Employer.

5.11    ADJUSTMENT OF FAIR VALUE TO REFLECT SALE PRICE.

In the event that within one year after the date of determination of Fair Value, (i) a sale of substantially all of the assets of Employer occurs, or (ii) more than fifty percent of the Common Stock is sold in a single transaction to parties who were not shareholders of Employer prior to the sale, the Fair Value of Employee's Account shall

be adjusted to reflect the purchase price in such transaction. In the case of a sale of assets, the Fair Value shall be the total consideration received by Employer in such sale, (including the amount of any liabilities assumed by the purchaser), increased by the fair market value of any assets retained by Employer, and decreased by the amount of any liabilities retained by Employer. In the case of a sale of more than fifty percent (50%) of the Common Stock, the Fair Value shall be an amount equal to the purchase price paid for such Shares of Common Stock, multiplied by a fraction, the numerator of which is the total number of outstanding shares of Common Stock, and the denominator of which is the number of shares of Common Stock which are sold.

In the event that distributions of Employee's Account have already commenced, the remaining installments will be adjusted to reflect the revised Fair Value. In the event that distributions have not commenced, the amount of the distribution will be calculated to reflect the revised Fair Value.

If Fair Value is being calculated as a result of a sale described in Section 5.8 or 5.9, Fair Value shall be the amount determined in accordance with the provisions of this Section 5.11.

## ARTICLE VI
## SPENDTHRIFT PROVISION

No rights of Employee or any other person entitled to payments under this Agreement shall be subject to the claim of any creditor of Employee or to attachment, garnishment or other legal process by any creditor of Employee. Any attempt by Employee or other person entitled to payments under this Agreement to assign, transfer, or encumber any benefits under this Agreement shall be void.

## ARTICLE VII
## AMENDMENT OR TERMINATION OF AGREEMENT
## AND BENEFIT OF AGREEMENT

This Agreement may be amended or terminated at any time by action of Employer's Board provided that no amendment or termination will reduce Employee's Account balance. If Employer terminates the Plan, Employee's Account will be paid to Employee in a lump sum within thirty (30) days of the date of the determination of the Fair Value of the Account. This Agreement shall be binding on and inure to the benefit of Employer, its successors and assigns, and Employee and his heirs, executors, administrators, legal representatives, and beneficiaries.

## ARTICLE VIII
## MISCELLANEOUS

### 8.1   NO ADDITIONAL EMPLOYMENT RIGHTS

Nothing in this Agreement shall be deemed to give Employee any additional rights to continued employment, nor does this Agreement create a fiduciary relationship between Employer and Employee, his estate or any other person.

### 8.2   DESIGNATION OF BENEFICIARY

Employee or other persons entitled to payment of benefits under Article V of this Agreement shall have the right to designate from time to time, in a writing delivered to Employer, a person or persons to receive any unpaid installments in the event that Employee or other persons entitled to benefits under Article V of this Agreement dies before the end of the installment period. Such beneficiary designation shall remain in force until Employee delivers to Employer a revised beneficiary designation. In the event that at the time of Employee's death no beneficiary designation had theretofore been delivered by Employee to Employer, or if the designated beneficiary had predeceased Employee, the benefits payable hereunder shall be paid to Employee's estate.

### 8.3   GOVERNING LAW

This Agreement shall be governed by the laws of the State of Illinois. Employer shall have the exclusive right to interpret and administer this Agreement and its exercise of that right shall be binding on all persons for all purposes. No officer or director of Employer shall be liable to any persons for actions or omissions related to the interpretation and administration of this Agreement unless attributable to his willful misconduct or lack of good faith.

### 8.4   DISPUTES

Any disputed claim or interpretation arising from this Agreement shall be referred initially to the Administrator for resolution. If Employee and the Administrator have not resolved their differences, the matter shall be submitted to Employer's Board of Directors, whose determination shall be final.

## ARTICLE IX
## EFFECTIVE DATE

This Agreement shall become effective on January 1, 2005.

IN WITNESS WHEREOF, Scott Marland has signed this Agreement, and Allen Brothers, Inc. has caused this Agreement to be executed by its duly authorized officer as of the day and date first written above.

ALLEN BROTHERS, INC.

SCOTT MARLAND

By: _____

President

## EXHIBIT 1

## DETERMINATION OF FAIR VALUE
## OF EMPLOYEE'S ACCOUNT

The Fair Value of Employer shall be determined as of the date of Employee's termination of employment with Employer for any reason (including Employer's death or Disability) other than Cause. The Fair Value of the Account will be determined by the independent public accountant ("Accountant") regularly engaged by Employer. In the event that the determination of Fair Value is being performed as a result of Employee's death, the proceeds of any insurance policy on the life of Employee owned by Employer shall not be included in the assets of Employer for the purpose of such determination. The Fair Value of Employer shall be multiplied by Employee's Phantom Interest expressed as a decimal.

The Fair Value of Employer shall be equal to the weighted average of the EBITDA of Employer (as adjusted below) ("Adjusted EBITDA") for the three years immediately preceding the year in which Employee's termination of employment with Employer terminates, multiplied by a multiplier of seven, and reduced by the amount of all Employer Loans reflected on Employer's audited balance sheet as of the end of the year preceding the year with respect to which the Adjusted EBITDA is being determined. The term "Employer Loans" includes all bank loans, officer loans and any other loans made to Employer and reflected on Employer's audited balance sheet. The three year weighted average Adjusted EBITDA is calculated by taking the sum of (i) the most recently preceding year's Adjusted EBITDA multiplied by three, (ii) the second most recently preceding year's Adjusted EBITDA multiplied by two, and (iii) the third most recently preceding year's Adjusted EBITDA multiplied by one, and dividing such sum by six.

Adjusted EBITDA will be calculated by making adjustments to Employer's EBITDA for a particular year for items as determined by the Employer's regularly employed certified public accounting firm and in Employer's sole discretion.

Allen Brothers, Inc.
Phantom Stock Plan (Scott Marland)
December 20, 2004
875175v4

11

Following is an example of the calculation of the Fair Value of Employer for the year 2004, using actual adjusted figures for the years 2001, 2002 and 2003, which results in an estimated Fair Value of Employer equal to $9,085,733.00.

|  | Actual 2003 | Audited 12/31 2002 | 2001 | Weighted Average |
|---|---|---|---|---|
| Net profit | 631,965 | 585,473 | 589,108 | |
| Taxes | 10,000 | 17,092 | 430,562 | |
| Depreciation | 171,809 | 216,234 | 272,113 | |
| Interest | 85,562 | 103,618 | 372,161 | |
| Other Adjustment Items | 830,855 | 431,710 | 343,862 | |
| Adjusted EBITDA | 1,730,191 | 1,354,127 | 2,007,806 | |
| Multiplier | 7 | 7 | 7 | |
| Sub-Total | 12,111,337 | 9,478,889 | 14,054,642 | |
| Less debt | 2,213,770 | 2,463,318 | 3,264,083 | |
| Sub-Total | 9,897,567 | 7,015,571 | 10,790,559 | |
| Weighting Factor | 3 | 2 | 1 | |
| Weighted Average | 29,692,701 | 14,031,142 | 10,790,559 | 9,085,733 |

# EXHIBIT 3