## WEB SITE DEVELOPMENT AND LICENSE AGREEMENT

This Web Site and License Development Agreement (this "**Agreement**") is entered into as of the ____ day of January, 2005 (the "**Effective Date**") by and between Allen Brothers, Inc., an Illinois corporation, with offices located at 3737 South Halsted Street, Chicago, IL 60609-1689 (hereinafter referred to as "**Allen Brothers**") and Prominent Consulting, LLC, a Delaware limited liability company with offices located at 1483 Patriot Blvd, Glenview, Illinois 60026 (hereinafter referred to as "**Consultant**"), each a "Party" or collectively "the Parties".

### RECITALS

**WHEREAS**, Allen Brothers operates an internet business which markets and sells products that can be ordered via the world wide web;

**WHEREAS**, Allen Brothers maintains access for its online information, products and services with a secure, electronic network connection to the world wide web ("**Web Site**") at www.allenbrothers.com;

**WHEREAS**, Consultant is in the business of developing web site applications for business that sell products via the world wide web and hosting websites;

**WHEREAS**, Allen Brothers desires that Consultant develop a new and improved web site ("**New Web Site**") and Consultant is willing to undertake such development.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, said Agreement is made between the parties on the following terms and conditions:

1.      **Recitals.** The foregoing Recitals are made a part of this Agreement.

2.      **Services and Fees.**

A.      **Services and Performance Criteria.** Consultant agrees to provide web site development and related services ("**Services**") for Allen Brothers' New Web Site to be known as www.allenbrothers.com as set forth in the B2C Allenbrothers.com E-Commerce partnership web site design, development and marketing Proposal dated August 3, 2004 and amended December 31, 2004 and attached hereto as **Exhibit 1** (the " **Proposal**").

B.      **Service Level.** Consultant represents that the Services shall meet the Service Level (as such term is defined below) for Term of this Agreement;

(1)      The measurements described in this measure of the performance of the New Web Site (the "Service Level") shall be performed by such measuring service as the parties may agree has sufficient technical capability to perform and aggregate the measurements described herein (the "**Measurement Service**").

(2)      The costs and charges of the Measurement Service will be paid for by Allen Brothers. Consultant will manage the operation of the Measurement Service, including the receipt of all real-time access and summary reports. The parties agree that Consultant shall configure the Measurement Service so as to vary the pages requested and the locations from which they are requested, and to remove requesting locations reflecting response time delays outside of Consultant's control.

(3)      "**Response Time**" shall mean the global round trip time for the page request of from a page hosted within the New Web Site to travel from the relevant Major Internet Backbone (as such term is defined below) and to the New Web Site and for the requested page load to reach the relevant major internet backbone. The parties agree that this Service Level shall not

1

include any pages not hosted completely within the New Web Site, including pages which require the submission of payment or customer information, catalog views or any other page load requests not capable of being fulfilled within the New Web Site without response from another server or service.

(4)    "Mean Response Time" shall mean the arithmetic mean of all Response Times for page load requests from the Measurement Service within an applicable Measurement Period (as such term is defined below).

(5)    Mean Response Time shall be measured on a calendar month measuring period (the "Measurement Period").

(6)    "Major Internet Backbone" shall mean geographically diverse major internet connections to the backbones of major internet service providers.

(7)    Regardless of any resultant Mean Response Time calculated by the Measurement Service, Response Times delayed because of force majeure occurrences as described in **Section 14(Q)**, general internet failures or other occurrences outside of the control of Consultant, or not occurring entirely within the New Web Site, shall not be included in the Mean Response Time.

(8)    To the extent that Mean Response Time exceeds the Service Level because of extremely high volume of traffic in excess of the traffic projections included in the proposal, or to the extent that Allen Brothers has delivered to Consultant explicit authorization of an inappropriate change in accordance with **Section 3(C)** below, the Service Level Credit will not apply. Consultant will immediately notify Allen Brothers of levels of traffic which require server and other resources in excess of those contemplated under this Agreement, and the parties will immediately address such resource inadequacy.

(9)    Consultant represents and warrants that, with the foregoing exceptions and conditions, the New Web Site will have Mean Response Time less than or equal to two (2.0) seconds (the "**Mean Response Time Service Level**"). The performance fees to which Consultant is otherwise entitled will be decreased by five percent (5%) for Measurement Periods during which the Mean Response Time exceeds the Mean Response Time Service Level (the "**Service Level Credit**"). Allen Brothers will monitor summary reports from the Measurement Service and will request the Service Level Credit from Consultant in writing if the Mean Response Time exceeds two (2.0) seconds. Consultant will subtract the Service Level Credits for an applicable Measurement Period from the next invoice provided to Allen Brothers. The Service Level Credit and the obligation described in **(10)** below shall be Allen Brother's sole and exclusive remedies for failure of the New Web Site to meet the Mean Response Time.

(10)    If the New Web Site does not meet the Mean Response Time Service Level, Consultant shall, subject to the provisions of **(8)** above and **Section 3(C)** below, repair and modify the New Web Site within thirty (30) days following the Measurement Period, at no expense to Allen Brothers, as necessary to cause the New Web Site to meet Mean Response Time Service Level.

C.    **Server, PDF Conversion and Other Services Reimbursement Fees.** Consultant has procured, or arranged for the provision of on Allen Brothers' behalf, or has planned to procure or planned to arrange for the provision of, the hardware and services described on Exhibit 4 - Server, PDF Conversion and Other Services Reimbursements. The fees described in Exhibit 4 have been paid or will be paid by Allen Brothers to Consultant as described therein. Allen Brothers will pay to Consultant the fees invoiced within thirty (30) days of the receipt of such invoice. Consultant and Allen Brothers agree that Consultant has procured, arranged or arranged for procurement or provision of the hardware and services described in Exhibit 4 only as an accommodation to Allen Brothers. No warranty or guarantee is

made as to the quality or performance of such hardware and services described on Exhibit 4 except to the extent that (i) Consultant has such warranties or guarantees under applicable agreements with third parties and (ii) Consultant has the contractual right to pass such warranties or guarantees through to Allen Brothers.

### D.    Performance Fees.

(1)    Allen Brothers shall pay Consultant the following fees for providing maintenance and modification of the New Web Site and marketing services (hereinafter **"Performance Fees"**):

(a)    From the first date on which the New Web Site is in production and processing sales and for three (3) years thereafter, Consultant shall be paid

(i)    an annual **"Base Commission"** which shall be calculated by taking one and three quarters percent (1.75%) (hereinafter the **"Base Percentage"**) multiplied by the amount of Net Sales (as such term is defined below) generated by the New Web Site between Zero ($0) and Two Million Two Hundred Thousand Dollars and no Cents ($2,200,000.00) during each such year of the three (3) year period (hereinafter the **"Base Amount"**); and

(ii)    an annual **"Bonus Commission"** which shall be calculated by taking five percent (5%) (hereinafter the **"Additional Percentage"**) multiplied by the amount of Net Sales generated by the New Web Site in excess of Two Million Two Hundred Thousand Dollars and no Cents ($2,200,000.00) during each such year of the three (3) year period (hereinafter the **"Additional Amount"**);

(b)    **"Net Sales"** shall mean, as to any period during the Term of the Agreement the amount of all gross sales processed through the New Web Site during such period, minus any credits to end users processed through the New Web Site for returns and recalls and excluding charges for shipping, handling or taxes. For purposes of Net Sales, a sale is considered to take place when it is initially processed through the New Web Site.

(c)    For every year thereafter during the Term, the consultant shall be paid five percent (5%) of the amount of Net Sales generated by the New Web Site in excess of Two Million Two Hundred Thousand Dollars and no Cents ($2,200,000.00) during such year.

(2)    In the event the Agreement has not already been terminated, for purposes of calculating the Performance Fees for years 2005 and 2008, the following equation shall be used:

(a)    **Base Commission.**

(i)    **Year 2005**: For the number of months the New Web Site is up and running during 2005, a Base Commission for 2005 shall be calculated by adding the total monthly portion of Net Sales of Allen Brothers' current web site of the corresponding months of 2003 and dividing that number by the total Net Sales of Allen Brothers' current web site sales for all of 2003 to equal the (**"2005 Percentage Of The Base"**). Two Million Two Hundred Thousand Dollars and no Cents ($2,200,000.00) shall then be multiplied by the 2005 Percentage Of The Base to equal the Base Amount for 2005 and that amount shall be multiplied by the Base Percentage to equal the Base Commission for 2005. (See **Exhibit 3 (a)** for an example.)

(ii)    **Year 2008**: For the remaining balance of months (twelve minus the number of months the New Web Site is up and running during 2005) in 2008,

3

a Base Commission for 2008 shall be calculated by adding the total monthly portion of Net Sales of Allen Brothers' current web site of the corresponding months of 2003 and dividing that number by the total Net Sales of Allen Brothers' current web site for all of 2003 to equal the ("**2008 Percentage Of The Base**"). Two Million Two Hundred Thousand Dollars and no Cents ($2,200,000.00) shall then be multiplied by the 2005 Percentage Of The Base to equal the Base Amount for 2008 and that amount shall be multiplied by the Base Percentage to equal the Base Commission for 2008. The remaining months of 2008 shall equal a Zero ($0) Base Commission. (See **Exhibit 3 (b)** for an example of how to calculate the 2005 & 2008 Base Amount.)

(See further **Exhibit 3 (c)** for an example matrix of how to calculate the Base Commission for the first five (5) years of the Agreement.)

**(b)    Bonus Commission.**

**(i)    Year 2005:** The Bonus Commission shall be paid to Consultant and shall be calculated by taking any amount over and above the Base Amount and multiplying it by the 2005 Percentage of the Base.

**(i)    Year 2008:** The Bonus Commission shall be paid to Consultant and shall be calculated by taking the Additional Percentage multiplied by any Additional Amount.

(See **Exhibit 3 (d)** for an example matrix of the starting and ending sales amounts with the corresponding Base Percentage and Additional Percentage owed to Consultant.)

In the event the New Web Site does not go into production and begin processing sales in 2005, for purposes of calculating the above Base and Bonus Commission in **Section 2(D)(2)**, each year cited shall be advanced by one.

**(iii)**    The above Performance Fees shall be invoiced by Consultant to Allen Brothers on a quarterly basis, in arrears of such quarter. Such quarterly invoicing shall clearly state the formula and equation used by Consultant to arrive at such Performance Fees. Allen Brothers shall pay such Performance Fees within thirty (30) days of the receipt of such invoice.

**E.    Audit.** Consultant shall at all times be entitled to access and review transaction data on or through the New Web Site for the purpose of determining appropriate Performance Fees.

**F.    Hosting.** Allen Brothers will enter into a Hosting Agreement with echoMountain, LLC under which the New Web Site will be hosted. echoMountain, LLC will be entitled to permit Consultant such access to the New Web site and any hardware or software upon which it is hosted in order to allow Consultant to perform its obligations under this Agreement.

**3.    Accessibility, Control of Look and Feel, Delivery, Acceptance and Installation of New Web Site; Escrow of Materials.**

**A.    Accessibility of New Web Site During Construction.** Throughout the construction of the New Web Site, development and testing versions of the New Web Site shall be accessible to Allen Brothers at a Uniform Resource Locator (URL) provided by the Consultant. Until Allen Brothers has approved and accepted the final New Web Site in accordance with the Acceptance provisions (as such provisions are defined below), the New Web Site shall not be accessible to end-users unless such end-users have entered a valid user password and user identification code. Regardless of Allen Brothers' acceptance of the New Web Site, the Allen Brothers-authorized use of the New Web Site in a production

environment should be considered an explicit acceptance of all work. Consultant and Allen Brothers will select mutually agreeable passwords and user identification codes, which shall be kept confidential. As part of its ongoing support obligations described in **Section 4**, Consultant will use reasonable efforts to review access logs and notify Allen Brothers if there appears to be unauthorized access.

     **B.**    **Control of Look and Feel of Site.**    The New Web Site design and layout shall substantially conform to the New Web Site requirements described in the Proposal (the "**Specifications**"). Allen Brothers will have exclusive editorial and artistic control over the New Web Site and all elements thereof, including the selection of the Allen Brothers Content (as defined herein), and the design and look and feel of all visual elements appearing in the New Web Site. Allen Brothers will provide to Consultant Allen Brothers' proprietary data and content that Allen Brothers determines will be part of the New Web Site including text and visual material regarding itself, Allen Brothers' products, services, pricing, Allen Brothers' Trademarks, and conditions for the New Web Site (including proprietary notices) ("**Allen Brothers Content**"). Consultant will not provide terms of service, privacy policies, disclaimers or other legal, proprietary or other notices.

     **C.**    **Acceptance of Web Site Design and Layout.**    The parties agree that Allen Brothers has reviewed prototypes of the New Web Site prior to the Effective Date and that Allen Brothers accepts the format and layout of the New Web Site for production use immediately after the execution of this Agreement, subject to Consultant's continuing obligation to update and add content to the site described herein. Consultant will also continue to use commercially reasonable efforts to incorporate new functionality into the New Web Site as the parties agree over the Term or as is otherwise provided in the Proposal. To the extent that Consultant advises Allen Brothers that certain changes or new functionality is, in Consultant's reasonable judgment, technically infeasible, likely to degrade performance or functionality or otherwise inappropriate, Consultant shall be entitled to require Allen Brothers to deliver a written request from Todd Hatoff explicitly requesting such change, and Consultant shall not be responsible for, and the Service Levels shall not apply to, degradation in the performance or functionality of the New Web Site resulting from such change or new functionality.

     **D.**    **Conformity.**    The New Web Site design and layout shall substantially conform to the New Web Site requirements described in the Proposal. The Web Site pages shall be in digitized object code readable by machine and appropriate for direct loading into the echoMountain, LLC environment. If Consultant misses the initial delivery date by more than thirty (30) calendar days for reason other than Allen Brothers' failure to provide reasonable and timely cooperation, input, Allen Brothers Content or other necessary Allen Brothers assistance, Allen Brothers may, at its option, notify Consultant in writing that it considers the delay a default by Consultant, which shall entitle Allen Brothers to terminate its license to the Consultant Software and this Agreement pursuant to **Section 7(B)**. In the event Allen Brothers elect to excuse the delay, it shall do so in writing, and shall specify new delivery dates. Both parties agree that this is an accelerated program for database and software development and that time is of the essence for the completion of the project on schedule.

     **E.**    **Allen Brothers Cooperation.**    Both parties acknowledge and agree that Allen Brothers' assistance, input and cooperation is necessary to the continued operation, modification and maintenance of the New Web Site.

     **F.**    **Installation.**    Consultant shall be solely responsible for installing the Web Site Disks and New Web Site pages on the hosting server (the "**Server**"). Consultant will notify Allen Brothers in writing when the Web Site Disks and New Web Site pages have been loaded onto the Server and the New Web Site can be accessed from a remote computer linked to the world wide web, in accordance with **Section 3(A)**.

     **G.**    **Escrow.**    The parties agree that Consultant will execute the escrow agreement attached as Exhibit 5 (the "**Escrow Agreement**"), and will deposit into escrow materials sufficient to allow a reasonably skilled programmer of sufficient training and expertise, with appropriate resources, to modify and update the layout and content of the New Web Site (the "**Application Development Kit**"), provided that nothing in this provision shall be interpreted to require Consultant to deposit material providing

access to the source code of the New Web Site. The parties agree that the Escrow Agreement will provide certain perpetual rights to Allen Brothers to use and operate the New Web Site (provided, however, that Allen Brothers will not have source code access and will have the right to modify the source code of the New Web Site only as is possible by use of the Application Development Kit) and Application Development Kit, in the event a release condition of the Escrow Agreement is satisfied.

**4.    System Maintenance/Revisions.**

**A.    System Maintenance.** Consultant agrees to maintain the New Web Site as set forth in the Proposal and in consideration of the fees set forth in **Section 2(D)** of this Agreement. The maintenance provided by the Consultant shall include Allen Brothers' right to receive at no additional costs all updates, bug fixes and other standard modifications provided by Consultant to its other maintenance customers. Consultant will promptly correct any material errors, defects, bugs, viruses, design flaws or other malfunctions in the New Web Site. Additionally, Consultant agrees to make maintenance modifications to the New Web Site from time to time in accordance with Allen Brothers' reasonable directions.

**B.    Allen Brothers Updates and Revisions.** Consultant shall develop back end content administration tools whereby Allen Brothers will have the ability to update and change key New Web Site content sections which shall include but not be limited to adding, changing and deleting product images and copy in each of the online catalogue sections and the "Specials" section of the home page ("**Updates**"). Allen Brothers may also request reasonable minor revisions in the New Web Site subsequent to Sign Off ("**Revisions**"). Updates and Revisions shall be provided by Allen Brothers in hard copy or written form and Consultant shall be responsible for modifying such Updates and Revisions into machine readable form necessary for loading on the Server. To the extent that such updates and revisions (whether in order to comply with applicable law or at the request of Allen Brothers) constitute significant changes to the New Web Site or require significant additional work on the part of Consultant, such work will be performed at Consultant's then-current time and materials rates.

**5.    Ownership and Rights.**

**A.    Ownership of Intellectual Property Rights.**

**(1)    Definition of "Intellectual Property Rights".** For the purposes of this Agreement, the term "**Intellectual Property Rights**" shall mean any and all patents, copyrights, trade secrets, trademarks, service marks, contractual rights prohibiting the unauthorized disclosure or use of data or data compilations, or any other statutory or common law rights prohibiting the unauthorized disclosure of proprietary information under the laws of the United States, any state or territorial possession of the United States, or any foreign country.

**(2)    Intellectual Property Right Components of the Web Site.** The parties contemplate that there shall be Intellectual Property Rights in the following New Web Site components: (i) Data, which shall include any and all Allen Brothers customer information or other Allen Brothers-provided information, Allen Brothers customer or product data, compilations of data, tracking of data or databases, accessible on or through the New Web Site, including any database interface components owned by Allen Brothers as of the Effective Date; (ii) Text, which shall include all those literary works, documents, or messages that both (a) appear or are accessible on the New Web Site and which (b) describe Allen Brothers customers, products, business practices or were owned by Allen Brothers as of the Effective Date ; (iii) Graphics, which shall include all images, video designs, pictorial works, sketches, or animation that may appear, or are accessible, on the New Web Site; and (iv) Sounds, which shall include all music, voices, or other sounds that are audible on or through the New Web Site (and collectively with the Data, the Text and the Graphics, the "**Allen Brothers IP**"); and (v) all other software, including all code and customizations which allow the Allen Brothers IP to be displayed, reviewed and experienced or which allows the Allen Brothers products to be purchased, except to the extent that such software is otherwise owned by a third party or by Allen Brothers as of the Effective Date, all templates, all

content creation, data management, display or other tools, all toolsets, all frameworks, all development techniques, all construction methods, all customizations or enhancement to any existing works or software, except to the extent that such customizations are owned by or licensed to a third party by the terms of another agreement (collectively the **"Consultant's Software"**). The parties agree that the New Web Site will consist of the Allen Brothers IP and the Consultant's Software, that neither party will have the right to operate or maintain the New Web Site except to the extent that such rights are granted in this Agreement.

        **(3)**    **Intellectual Property Rights Owned by Allen Brothers**. As between Consultant and Allen Brothers, Consultant acknowledges and agrees that Consultant shall not own any Intellectual Property Rights in or to the Data, Text, Graphics, or Sounds (the "**Site Elements**") that are accessible on or through the New Web Site, and that Consultant will not acquire any Intellectual Property Rights in any such Data, Text, Graphics, or Sounds. Allen Brothers grants to Consultant a U.S.-only, non-exclusive, limited license solely to the extent necessary for Consultant to develop, access and operate the New Web Site and for other related tasks performed under this Agreement. Allen Brothers represents and warrants that it has, and will continue to have for as long as they are used in the New Web Site, all necessary Intellectual Property Rights in such Site Elements, or that it has appropriate license to such Intellectual Property Rights to such Site Elements which permit the Site Elements to be used, displayed and exploited in the manner in which they are used, displayed or exploited in the New Web Site. Allen Brothers shall notify Consultant in writing of any licenses to such Intellectual Property Rights in such Site Elements. Except to the extent that Consultant is notified in writing of any such licenses or any restrictions related to the use, display or exploitation of such Intellectual Property Rights in such Site Elements, Allen Brothers represents and warrants that they are without restrictions on usage, display or exploitation other than the general restrictions of this Agreement. To the extent any Site Elements created by Consultant pursuant to this Agreement are not deemed "works made for hire" under the federal Copyright Law, and not covered in **Section 5(A)(4)**, Consultant hereby transfers and assigns to Allen Brothers all right, title, and interest held by Consultant and any subcontractor used by Consultant in and to the Intellectual Property Rights in the Site Elements pursuant to this Agreement, and all renewals, extensions, or continuations of the merchandising rights therein now or hereafter owned or acquired. Allen Brothers shall have the right to obtain and hold in its own name all Intellectual Property Right registrations and other evidence of rights that may be available for the Site Elements pursuant to this Agreement and Consultant agrees not to contest, or assist others in contesting, Allen Brothers' right to claim or register such Intellectual Property Rights.

        **(4)**    **Intellectual Property Rights Owned by Consultant and Licensed to Allen Brothers**. As between Consultant and Allen Brothers, Allen Brothers acknowledges and agrees that Allen Brothers shall not own any Intellectual Property Rights in or to Consultant's Software, and all such Intellectual Property Rights in the Consultant's Software shall be owned by Consultant.

        **B.**    **Third Party Intellectual Property Rights.** To the extent Consultant plans to incorporate or incorporates any third party Intellectual Property Rights into the New Web Site, Consultant shall identify such third party Intellectual Property Rights on **Exhibit 2** hereto or on an amendment thereto along with the owner of the third party Intellectual Property Rights and the source of Consultant's authority to incorporate the third party Intellectual Property Rights into the New Web Site or Site Elements. Consultant will have the responsibility to obtain at its expense and on Allen Brothers' behalf, all permissions necessary to incorporate and use such third party Intellectual Property Rights on an irrevocable (except to the extent terminated in accordance with this Agreement), worldwide, perpetual (except to the extent terminated in accordance with this Agreement) basis as part of the New Web Site.

        **C.**    **Look and Feel.** The parties agree that the New Web Site will contain the intellectual property of both parties and that the look and feel of the New Web Site necessarily contains the intellectual property of both parties. The parties further agree that Allen Brothers shall not reverse engineer or otherwise try to access the source code of the New Web Site under any circumstances.

However, in the event of termination of this Agreement (i) after the third anniversary of the Effective Date, or (ii) pursuant to **Section 7(B)(1)(a)** or **7(B)(1)(b)**, Allen Brothers may develop or have developed a new web site which may have the look and feel of the New Web Site, as long as such development does not involve the reverse engineering or other unauthorized access of Consultant's intellectual property or Consultant's Software.

     **D.**     **Indemnification.**

     **(1)**     **Indemnification.** Each party shall indemnify and hold the other party, its officers, directors, agents and employees, harmless from any and all losses, costs, fees, including attorneys' fees at all levels, or liability arising out of any claim by a third party seeking remedies at law or equity as a result of conduct by the party that constitutes a breach of that party's warranties and representations under **Section 5** of this Agreement.

     **(2)**     **Allen Brothers Indemnification.** Allen Brothers shall indemnify and hold Consultant, its officers, directors, agents and employees, harmless from any and all losses, costs, fees, including attorneys' fees at all levels, or liability arising out of any claim by a third party seeking remedies at law or equity as a result of a retail sale conducted through the New Web Site, including any injury, death, monetary liability, claim brought by a consumer protection organization, government or governmental regulatory agency.

     **(3)**     **Procedures In The Event Of An Indemnification Claim.** In the event of any claim for indemnification, the indemnified party shall give prompt written notice of such claim to the indemnifying party, and the indemnifying party shall be entitled to defend and settle such claim, at its expense and in its sole discretion using counsel acceptable to the indemnified party, provided that any settlement does not subtract from any rights granted to the indemnified party under this Agreement or the total functionality of the New Web Site. The indemnified party shall cooperate with the indemnifying party in the defense of any claim subject to this **Section 5**.

**6.**     **Limited License to Use Consultant's Software.**

     **A.**     **License.** Subject to **Section 5 and 12**, Consultant hereby grants to Allen Brothers during the Term a perpetual (except as may be terminated in accordance with this Agreement), non-exclusive, U.S.-only license to use, execute and display solely for, and solely in connection with, the development, construction, enhancement and continuing operation and maintenance of the New Web Site, the Consultant's Software. No license is granted and no usage rights are conveyed for Consultant's Software other than as explicitly described here. For the avoidance of doubt, the usage of Consultant's Software for any other web site, in any jurisdiction not explicitly licensed herein or in any manner for which no performance fees are paid under this Agreement, are explicitly and strictly prohibited.

     **B.**     **Copyright Notice.** Consultant will program into all web pages created hereunder, so that it appears at the beginning of all visual displays of such web pages the following copyright notice **"Copyright [current year] Allen Brothers, Inc."**, provided, however, that Allen Brothers hereby agrees that such notice does not change the nature of the ownership or intellectual property rights described hereunder.

**7.**     **Term and Termination of Agreement.**

     **A.**     **Term.** This Agreement commences on the Effective Date and shall continue until terminated pursuant to the terms of this Agreement as provided herein.

     **B.**     **Termination by Allen Brothers.**

     **(1)**     Allen Brothers shall be entitled to terminate this Agreement:

(a)    immediately if a petition in bankruptcy is filed by or against Consultant, or if Consultant becomes insolvent, or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law, or if Consultant discontinues its business or if a receiver is appointed for it or its business, provided, further, that if Consultant becomes a debtor in a bankruptcy proceeding the parties agree that this Agreement is an "executory contract" and that Consultant is a "licensor of a right to intellectual property" as those terms are used in 11 U.S.C. § 365(n), as amended from time to time;

(b)    upon the expiration of fifteen (15) calendar days following written notice e **to** Consultant of a failure to perform any of its material obligations under this Agreement, except to the extent that such failure is caused by Allen Brothers' failure to cooperate in good faith and provide appropriate content, information, input, acceptance or Allen Brothers IP provided that Consultant has not remedied the failure to perform as otherwise provided herein to Allen Brothers' reasonable satisfaction; and

(c)    for convenience at any time after the three year anniversary of the Effective Date.

(2)    In the event Allen Brothers terminates this Agreement for any reason other than cause as above stated in **Section 7.B.(1)(a)** or **7.B.(1) (b)**, before Consultant has earned a total of Eighty Thousand Dollars and no Cents ($80,000.00) under **Section 2(D)** of this Agreement, Allen Brothers shall, within sixty (60) days of such termination, pay Consultant the difference between what Consultant has earned under such **Section 2(D)** of this Agreement and Eighty Thousand Dollars and no Cents ($80,000.00).

C.    **Termination by Consultant.**

(1)    Prior to Sign Off of Delivery Phase.    Unless an invoice of Consultant is reasonably disputed by Allen Brothers and Allen Brothers has provided timely, detailed and supported notice of its grounds for dispute, if Allen Brothers fails to make any payment within thirty (30) days of receipt of an invoice from Consultant prior to the Sign Off of the Delivery Phase, the Consultant may terminate this Agreement and Consultant shall be entitled to direct echoMountain, LLC to discontinue the use of Consultant Software upon thirty (30) days written notice to Allen Brothers. Such termination shall become effective upon Consultant giving Allen Brothers thirty (30) calendar days' prior written notice of its intent to terminate and such default is not remedied by Allen Brothers by the end of the end of such thirty calendar day notice. Such termination shall only be effective if Consultant is not in material default at that time of its obligations under this Agreement.    Consultant shall have the right to stop work under this Agreement for reason of Allen Brothers' failure to make payments when due and upon such thirty (30) day written notice and such stoppage shall not be considered a default for the purposes of this paragraph.

(2)    Subsequent to Sign Off of Delivery Phase.    Consultant may terminate this Agreement upon one hundred eighty (180) days prior written notice to Allen Brothers, but, in no event shall such termination occur before the expiration of three (3) years from the Effective Date of this Agreement.

D.    **Effect of Termination.**

(1)    In the event of termination of this Agreement for any reason, the licenses granted under this Agreement shall terminate. Nothing in this or any other Section of this Agreement shall be interpreted to allow any rights in or access to the Consultant's Software or the New Web Site after any termination, provided, however, that the parties agree that the Escrow Agreement provides for additional rights of Allen Brothers in the event of certain grounds for termination.

(2)    In the event of termination of this Agreement for any reason subsequent to the Delivery Phase, Consultant agrees to provide for the orderly transfer of all data it has accumulated through the New Web Site including, but not limited to, email addresses, number of "hits" on the New Web Site and financial information of each end user. This information shall be transferred to Allen Brothers within thirty (30) days of such termination.

(3)    Both Parties acknowledge and agree that although Consultant provides the functionality of the New Web Site through Consultant's Software, Allen Brothers retains ownership of all Allen Brothers IP.

E.    **Waiver of Equitable Relief.**  Consultant acknowledges that Allen Brothers' uninterrupted use of the web site pages and New Web Site are of the essence of this Agreement and that the damages to Allen Brothers in the event of an interruption cannot be reasonably or adequately compensated in an action at law and that such interruption would cause Allen Brothers irreparable harm and damage. Therefore, in the event of termination of this Agreement for any reason whereupon Allen Brothers has paid all undisputed fees and expenses up to the date of such termination, Consultant waives any rights to equitable relief by way of temporary, preliminary, or permanent injunction or such other equitable relief as any court of competent jurisdiction may have authority to order except in the event Allen Brothers uses any Consultant Intellectual Property Rights in excess of any license or other authorization granted by Consultant to Allen Brothers, then Consultant may seek injunctive relief to prevent Allen Brothers' unlicensed or unauthorized use of Consultant's Intellectual Property Rights.  Except for unauthorized or unlicensed use of Consultant's Intellectual Property Rights, Consultant agrees that its sole remedy against Allen Brothers in the event of default or breach of this Agreement for any reason whatsoever shall be money damages.

**8.**    **Grant of Rights and License to Consultant.**  Subject to the terms and provisions hereof, Allen Brothers hereby grants to Consultant the following non-exclusive, non-assignable license (the "**License**"), during the Term of this Agreement:

A.    **Operation.**    To operate the New Web Site on behalf of Allen Brothers and to process inquiries regarding the New Web Site operation from New Web Site visitors.  At all times herein, Consultant will operate the New Web Site in a manner reasonable satisfactory to Allen Brothers.

B.    **Trademarks.**    To use whatever trademarks, trade names, copyrights, and other intellectual property rights belonging to Allen Brothers, and to depict Allen Brothers' business on the New Web Site in a manner approved in advance by Allen Brothers and otherwise in a manner consistent with Consultant's obligations under this Agreement.

C.    **Publicity.**    To use the name of Allen Brothers in the publication of customer lists, to generally reference Allen Brothers as a customer and to direct potential customers of Consultant to the publicly available New Web Site as an example of Consultant's work.

**9.**    **Reports and Visits.**

A.    **Reports.**  Consultant shall provide Allen Brothers a short written report of the progress of the work to date every four (4) weeks.  This report shall contain any anticipated problems (whether or not resolved) and any delay in fixed or tentative schedules.

B.    **Visits to the Site.**  From time to time and upon reasonable advance notice, Allen Brothers shall allow access to its premises for purposes of project review and discussion between Allen Brothers' and Consultant's management personnel regarding the status of the work being performed.

**10.**    **Consultant Warranties.**    Consultant hereby represents, warrants and covenants to Allen Brothers as follows:

**A.      Authority.** Consultant has the full right, power, legal capacity and authority to enter into this Agreement and to carry out its terms.

**B.      No Conflicts.** Consultant warrants it is under no obligation or restriction, nor will it assume any such obligation or restriction that does or would in any way interfere or conflict with, or does or would present a conflict of interest concerning the work to be performed by it under this Agreement. Consultant hereby also warrants and agrees that it shall not during the term of this Agreement, and two (2) years following the termination of the Agreement, perform similar Services or otherwise share the software used in the New Web Site with any entity engaged in the retail (internet, catalogue or otherwise) sale of raw, unprepared, fresh or frozen beef, poultry or other meat products, to the extent that such Services or software would be used to perform such retail sales. Such entities shall include, but not be limited to those named on Exhibit 6. The parties agree that (i) the foregoing shall not be interpreted to prevent Consultant from providing Services for such parties to the extent that Consultant's Services are contractually restricted from being used for the retail (internet, catalogue or otherwise) sale of unprepared, fresh or frozen beef, poultry or other meat products; (ii) the foregoing shall not apply if Allen Brothers has terminated this Agreement other than pursuant to **Section 7(B)(1)(a)** or **7(B)(1)(b)**; and (iii) the foregoing shall not apply to Consultant's provision of Services to entities engaged in the retail sale of prepared food, complete meals, or other retail sales other than the sale of raw, unprepared beef, poultry and other meat, regardless of whether such food or meals may contain meat products.

Consultant acknowledges and agrees that the above restriction is reasonable and necessary for the protection of Allen Brother's business and goodwill and that Allen Brothers will suffer irreparable injury if Consultant engages in the prohibited conduct. If Consultant breaches or threatens to breach this **Section 10(B)**, Allen Brothers, in addition to any other remedies available to it, may obtain specific performance and/or injunctive relief, without the posting of a bond. Upon any breach of this **Section 10(B)**, whether or not there is litigation, the restrictions as to duration contained therein shall extend for a period at least equal to the total period of such breach(es).

**C.      Warranty of Title.** Except only as specifically provided otherwise in this Agreement, Consultant has the authority to convey to Allen Brothers the full right, title and interest in the Site Elements and all creative works incorporated therein, and to license to Allen Brothers the Consultant's Software, to the extent that such rights and license are otherwise provided under this Agreement. Consultant is the sole author of all works it has employed in the performance of this Agreement except any third party Intellectual Property Rights set forth in **Exhibit 2**.

**D.      Warranty of Performance.** The parties agree that material programming errors and defects in a web site are a normal occurrence in the type of work that Consultant is performing. To the extent that any such errors or defects in the New Web Site are caused by Consultant or its subcontractors or third party licensors, Consultant shall promptly use its reasonable efforts to remedy them as they are discovered.

**E.      Warranty Against Disabling of New Web Site.** No portion of any elements delivered hereunder will contain any protection feature designed to prevent its use. Consultant further warrants that it will not impair the operation of any such Web Site Pages in any way other than by order of a court of law or in accordance with the terms of this Agreement.

**F.      Warranties of Compatibility.** Consultant's Software incorporated into the New Web Site will be fully compatible with the Server on which the New Web Site is loaded;

**G.      Warranty of Expertise.** Consultant is highly skilled and experienced in producing multimedia products, and that it also possesses the additional expertise needed to develop and produce the particular multimedia product outlined herein. Consultant acknowledges that Allen Brothers is relying upon the skill and expertise of Consultant for the performance of this Agreement. Consultant agrees to notify Allen Brothers whenever Consultant does not have the necessary skill and expertise to fully perform hereunder.

**H.    No Liens.** Except to the extent that a party brings a legal action in connection with the enforcement of its rights under this Agreement or in its intellectual property, there are and will be no liens, claims, encumbrances, legal proceedings, restrictions, agreements or understanding that might conflict or interfere with, limit, or be inconsistent with or otherwise affect any of the provisions of this Agreement or the enjoyment by Allen Brothers of any rights in the Web Site or any elements thereof.

**I.    Third Party Rights.** Consultant warrants that Consultant's Software does not infringe on any Intellectual Property Rights of any person or entity, nor has any claim of such infringement been threatened or asserted, nor is such a claim pending against Consultant (or to the best of Consultant's knowledge, any entity from which Consultant has obtained such rights). Allen Brothers warrants that the Allen Brothers IP does not infringe on any Intellectual Property Rights of any person or entity, nor has any claim of such infringement been threatened or asserted, nor is such a claim pending against Allen Brothers (or to the best of Allen Brothers' knowledge, any entity from which Allen Brothers has obtained such rights).

**11.    Allen Brothers Warranties.** Allen Brothers hereby represents and warrants to Consultant as follows:

**A.    Corporate Authority.** Allen Brothers has the full right, power, legal capacity and authority to enter into this Agreement and to carry out the terms hereof.

**B.    No Liens.** There are and will be no liens, claims, encumbrances, legal proceedings, restrictions, agreements or understanding that might conflict or interfere with, limit, or be inconsistent with or otherwise affect any of the provisions of this Agreement or the enjoyment by Consultant of any of the rights granted to Consultant by Allen Brothers hereunder.

**C.    Third Party Rights.** With respect to any Allen Brothers materials provided to Consultant, Allen Brothers has authorization for the unrestricted use of such materials in connection with the advertising, promotion, and exploitation on the New Web Site on the Internet as provided herein. The use by Consultant of any Allen Brothers materials will not violate the rights of any third party and will not give rise to any claim of such violation.

**12.    Limitation of Liability.**

**A.    LIMITATION OF LIABILITY.** WITH THE EXCEPTION OF THE INDEMNIFICATION OBLIGATIONS SET FORTH IN **SECTION 5(D)**, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY, WHETHER IN CONTRACT OR IN TORT OR UNDER ANY OTHER LEGAL THEORY (INCLUDING, WITHOUT LIMITATION, STRICT LIABILITY AND NEGLIGENCE) FOR LOST PROFITS OR REVENUES, LOSS OR INTERRUPTION OF USE OR SIMILAR ECONOMIC LOSS, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR SIMILAR DAMAGES, ARISING OUT OF OR IN CONNECTION WITH THE PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT, OR FOR ANY CLAIM MADE AGAINST EITHER PARTY BY ANY OTHER A THIRD PARTY, EVEN IF THE PARTY AGAINST WHOM THE CLAIM IS MADE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH CLAIM; NOR IN ANY EVENT SHALL CONSULTANT BE LIABLE WITH RESPECT TO OR BE DEEMED IN ANY WAY TO BE A PARTY TO ANY TRANSACTION FACILITATED, PROCESSED OR CONDUCTED THROUGH THE NEW WEB SITE. IN NO EVENT SHALL EITHER PARTY'S ENTIRE, CUMULATIVE LIABILITY UNDER ANY CLAIM MADE BY THE OTHER PARTY FOR DAMAGES ARISING OUT OF THIS AGREEMENT OR THE LICENSE GRANTED HEREUNDER EXCEED THE TOTAL AMOUNT OF FEES ACTUALLY PAID BY ALLEN BROTHERS TO CONSULTANT UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE DATE OF SUCH CLAIM.

**B.    Exclusions.** Notwithstanding the foregoing, the limitations of liability set forth in this **Section 12** will not apply to losses in connection with (i) death or personal injury caused by either party; (ii) either party's breach of the confidentiality provisions set forth in **Section 13**; (iii) either party's breach

of the intellectual property or indemnification provisions set forth in **Section 5**; and (iv) failures to pay Performance Fees due under **Section 2**.

**13.    Confidentiality.**  During the term of this Agreement, Consultant shall, by virtue of the Services provided, learn the identities of Allen Brothers customers who are on the catalog mailing list.  Additionally, Consultant may from time to time learn other proprietary and confidential information developed by Allen Brothers in connection with its retail mail order business.  The identities of Allen Brothers customers, including without limitation, those customers who order products from the New Web Site, and any and all recipients of orders from the New Web Site, and, in general, all parties who are on the Allen Brothers' mailing list (collectively **"Allen Brothers Customers"**) and other confidential and proprietary information of Allen Brothers shall hereinafter be referred to as "Allen Brothers Confidential Information."  During the term of this Agreement, Allen Brothers shall have access to Consultant's Software, Consultant's business processes or other confidential business information of Consultant (collectively, the "**Consultant Confidential Information**").    Collectively, Allen Brothers Confidential Information and Consultant Confidential Information will be referred to as Confidential Information.  A party receiving the Confidential Information of the other party will be referred to as "**Receiver**" and the party owning the Confidential Information in question will be referred to as a "**Discloser.**"

**A.**    It is agreed and understood by a Receiver that the Confidential Information that comes into its possession during the term of this Agreement and in connection with the Receiver's performance hereunder, including, during the term of this Agreement and thereafter, shall be held in the strictest confidence by Receiver.  A Receiver shall have no right to use or to disseminate to third parties Confidential Information other than and in connection with the discharge of its duties hereunder, or other than with the written consent of Allen the Discloser.

**B.**    In conjunction with a Receiver's discharge of its duties hereunder, the Receiver shall establish and maintain the strictest safeguards with regard to preserving the confidential nature of this Confidential Information.  As part of its safeguards, Receiver shall post signs in all relevant, accessible areas clearly stating that the project is subject to the strictest levels of confidentiality.  Receiver shall have all employees and others working on behalf of Receiver with access to Confidential Information, sign confidentiality agreements previously approved as to form by Discloser, copies of which shall be given to Discloser.  Receiver shall maintain a list of all those who have access to the Confidential Information and shall provide such list and any updates thereto to the Discloser upon request.  Receiver shall permit Discloser to inspect the relevant premises during reasonable business hours upon twenty-four (24) hours notice.  Allen Brothers reserves the right to "seed" the New Web Site in order to ensure compliance with the terms of this Agreement.  Each party hereby agrees and acknowledges that in no event are a Discloser's activities with regard to preserving confidentiality to be interpreted or otherwise construed as a release or waiver of any and all claims Discloser may have against Receiver in the event of a breach of confidentiality.

**C.**    In conjunction with a party's discharge of its duties hereunder, a party may acquire additional confidential information from Allen Brothers or others.  Each party hereby agrees not to use such information except for the purpose of discharging its obligations hereunder, and not to disclose or transfer such confidential information to others without the other party's prior written consent.  Upon termination or expiration of this Agreement, or at any time the other party so requests, each party agrees to destroy or return to the other party any written, printed or other materials embodying such Confidential Information, including all copies or excerpts thereof and all information pertaining to the Allen Brothers customers in connection with this Agreement.

**D.**    Neither party shall directly or indirectly disclose to the public or the trade any of the terms of this Agreement without the prior written consent of the other.

**E.**    Notwithstanding this **Section 13** or any other portion of this Agreement, nothing in this **Section 13** shall be interpreted to prevent Consultant or Allen Brothers from complying with an order or subpoena by a court of competent jurisdiction.

**F.**     Each party agrees and acknowledges that the provisions of this **Section 13** are reasonably necessary for the protection of the parties and they are of a unique, special and extraordinary character and have a peculiar value, loss of which cannot be reasonably or adequately compensated in damages in any action of law, and a breach by either party of these provisions will cause the other party great and irreparable damage. Accordingly, a party damaged or potentially damages by a breach of the terms of this **Section 13**, in addition to any other remedies, shall be entitled to the remedies of injunction, without the posting of a bond, specific performance and other equitable relief in the event of a breach, attempted breach, or repudiation of this Agreement by the other party.

**14.     Miscellaneous.**

**A.     Assignment.**  Neither party may assign or subcontract its rights or obligations under this Agreement, either in whole or in part, without the prior written consent of the other party, which shall not be unreasonably withheld, provided, however, that Allen Brothers may in its sole discretion assign its rights under this Agreement to a wholly-owned subsidiary.     Anything herein to the contrary notwithstanding, either party may assign without prior written consent its rights and obligations under this Agreement to a successor in interest due to its acquisition, merger, or reorganization.  The rights and obligations of this Agreement shall inure to the benefit of and be binding on any such successors or assigns.  Notwithstanding the foregoing, nothing in this provision shall be interpreted to allow Allen Brothers, any successor, any assign or any other party which may become entitled to exercise the rights of Allen Brothers under this Agreement to use the New Web Site or any of Consultant's Software except to the extent explicitly granted hereunder.

**B.     Compliance with Rules, Laws and Regulations.**  The parties shall comply with all federal, state, and local laws and regulations applicable to their performance as described in this Agreement, however, nothing in this Agreement shall be construed as providing either party with a private right of action against the other party under any such laws and regulations.

**C.     Entire Agreement.**  This Agreement constitutes the entire agreement between the parties relating to the subject matter of this Agreement and supersedes all prior understandings, agreements, discussions, or representations, whether written or oral, with respect to such subject matter. This Agreement cannot be varied, modified, waived, or amended except in a writing executed by both parties to this Agreement.  Each party to this Agreement acknowledges that it has not executed it in reliance on any promise, representation, inducement, or warranty that is not contained herein.

**D.     Modifications to Agreement.**  Modifications and amendments to this Agreement, including any exhibits hereto, shall be enforceable only if they are in writing and are signed by authorized representatives of both parties.

**E.     No Agency.**  Nothing contained in this Agreement will be construed as creating any agency, partnership, joint venture or other form of joint enterprise between the parties.

**F.     Independent Contractors.**  The parties acknowledge that Consultant will perform its obligations hereunder as an independent contractor.  The manner and method of performing such obligations will be under Consultant's sole control and discretion.  Allen Brothers' sole interest is in the result of such services.  If Allen Brothers is found liable for any payroll taxes (for example, FICA, federal, state, or local income tax required to be withheld), unemployment taxes, or insurance costs (including worker's compensation) or other taxes or insurance costs as a result of Consultant's employees or agents, Allen Brothers shall have the right to recover such taxes or costs (including penalties and interest thereon) from Consultant.

**G.     Waiver.**  No term or provision of this Agreement shall be deemed waived and no breach excused unless such waiver or consent is in writing and signed by the party claimed to have waived or consented.  A waiver by either of the parties of any of the covenants, conditions or agreements to be performed by the other hereunder shall not be construed to be a waiver of any succeeding breach thereof.

**H.    Governing Law.** This Agreement will be governed by the and subject to the laws (except the choice of law principles) and exclusive jurisdiction of the courts of the State of Illinois.

**I.    Publicity.** Consultant may use the name of Allen Brothers in press releases, sales material and literature only with the written consent of Allen Brothers.

**J.    Exhibits.** Exhibits hereto are an integral part of this Agreement, and any reference herein to this Agreement shall be deemed to mean and include a reference to such Exhibit.

**K.    Notice.** All written notices required to be given pursuant to this Agreement may be delivered by hand, certified mail, return receipt requested, facsimile, overnight couriers, or e-mail provided that the delivery method utilized includes a record of actual delivery to the specified address or facsimile number. Notices should be directed as follows:

If to Allen Brothers:

Allen Brothers, Inc.
3737 South Halsted St.
Chicago, IL  60609-1689
Attention: Scott Marland
Facsimile: 800-890-9146
E-Mail:  scottm@allenbrothers.com

with a copy to:

Arnstein & Lehr LLP
120 South Riverside Plaza, Suite 1200
Chicago, Illinois 60606-3910
Attention:  Konstantinos Armiros
Facsimile:  312-876-0288
E-Mail:  karmiros@arnstein.com

If to Consultant:

Prominent Consulting, LLC
1483 Patriot Blvd.
Glenview, Illinois 60026
Attention:  Kurt Seidensticker
Facsimile:  312-896-1556
E-Mail:  kurt@prominentconsulting.com

with a copy to:

Mayer, Brown, Rowe & Maw LLP
190 S. La Salle Street
Chicago, IL 60603
Attention: Rebecca S. Eisner
Facsimile: 312-701-7711
E-mail: rseisner@mayerbrownrowe.com

**L.    Severability.** If any term or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.  In the event a court of competent jurisdiction would otherwise hold any part  hereof unenforceable by reason of its

geographic or business scope or duration, said part shall be construed as if its geographic or business scope or duration had been more narrowly drafted so as not to be invalid or unenforceable.

**M.**     **Headings Not Controlling.** The headings in this Agreement are for reference purposes only and shall not be construed as a part of this Agreement.

**N.**     **Conflict.** In the event of any conflict between the terms or conditions of the Proposal and the body of this Agreement, the terms of this Agreement shall prevail.

**O.**     **Survival.** In the event this Agreement is terminated, the provisions of **Sections 5, 7, 8, 10, 11, 12, 13 and 14** survive and continue in full force and effect.

**P.**     **Counterparts.** This Agreement may be executed in two counterparts, each of which shall be deemed an original and both of which together shall constitute one and the same document.

**Q.**     **Force Majeure.** Neither party shall be responsible for any failure to comply with or for any delay in the performance of the terms of this Agreement, including but not limited to unavailability of the New Web Site, where such failure or delay is caused by or in any manner arises or results from a cause beyond the reasonable control of the affected party. These events shall include but not be restricted to power outage, fire, flood, earthquake, serious accident, civil disturbance, war, rationing, allocation or embargo, strikes or labor problems or failures in public networks, inability to secure necessary materials, acts of God or acts of any government or any branch or agency therein.

[signature page follows]

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date:

**Allen Brothers, Inc.,**
an Illinois corporation

By: _____
Todd Hatoff, Vice President

**Prominent Consulting, LLC**
a Delaware limited liability company

By: _____
Kurt Seidensticker,
Authorized Officer

## EXHIBIT 1

**Prominent Consulting, LLC**
**B2C Allenbrothers.com E-Commerce partnership web site design,**
**development and marketing proposal for**
**Allen Brothers, Inc.**

 P R O M I N E N T

Prominent Consulting, LLC
1483 Patriot Blvd
Glenview, IL 60026

December 31, 2004

Todd Hatoff
President
Allen Brothers, Inc.
3737 South Halsted Street
Chicago, Illinois 60609-1689

RE:    B2C Allenbrothers.com E-Commerce web site design, development and marketing proposal

Dear Todd:

I would like the opportunity to discuss with you the following proposal for a new e-commerce site. The features and services I have presented below should greatly improve your sites capabilities from a static HTML based ordering site, to a premium e-commerce system that is more representative of your business and products focus on quality and excellence. I feel this new site proposal will greatly improve your e-commerce efforts, increase your customer base, and make allenbrothers.com a world-class e-commerce site superior to its competitors as well as one of the best designed e-commerce sites on the internet. The following is a list of services and features to be provided at site launch. Features scheduled for subsequent releases are denoted with an asterisk as well as the scheduled release, which may be negotiated as to priority.

SCOPE OF SERVICES

1.  Online Catalog Design and Implementation – Bringing your catalog print collateral online by providing an interactive online version of your catalog that allows your customers to flip and buy and allows reuse of existing creative investments.

    a.  Created and Updated as new catalogs are created using high-resolution PDF versions of your catalog.

    b.  Realistic Page Turning. Animated page flipping that emulates turning pages to provide a comfortable and familiar shopping experience

    c.  Multiple Catalog Views. Three different ways (thumbnail, normal, or magnified) for shoppers to view product information in the online catalog.

    d.  Virtual Sticky Notes. Allowing users to place notes on any double-page spread that they want to earmark.

    e.  Email-to-a-Friend. Users can share catalog via email for virtual marketing to increase distribution.

    f.  User Feedback. Engage shoppers by getting feedback on what they think about your online catalog.

    g.  High and Low Bandwidth Options. Two versions of catalog available to optimize the experience for all users.

    h.  E-Commerce Integration. Integrate with e-commerce system and create end-to-end online catalog commerce solution.

Allen Brothers, Inc.
December 31, 2004
Page 2

2.  E-Commerce Site Design and Implementation – traditional e-commerce site with product HTML
    pages.

    a.  Site Quality Enhancements

        i.   Multiple Image Sizes provided by Allen Brothers from catalog shoots.

        ii.  Cleaner, more elegant site design with similar design layout to williamssonoma.com,
             redenvelope.com, abercrombie.com, clinique.com.

        iii. User friendly, inviting, removal of SKU's except on order page.

        iv.  Product Searching by catalog SKU, keywords, etc.

        v.   Recently Viewed Items **R2

    b.  Shopping Cart System

        i.   Shopping Cart with ability to save the cart for later access

        ii.  E-mail cart to friend

        iii. Fast and easy checkout

        iv.  Integrated with recommendations

        v.   Shopping Cart to Wish List conversion **R3

        vi.  Recently Viewed Items ** R2

    c.  Merchandising:

        i.   Best Sellers – Automated.

        ii.  Automated Cross-Sell

        iii. Administered Up-Sell and Cross-Sell Recommendations **R3

        iv.  What's New

        v.   Specials and Promotions – promotional codes from emails as well as listed
             promotions.

        vi.  Gift Baskets/Ideas – Based on occasion or recipient **R4

        vii. Recommendations – Personalized recommendations based on products customer
             has purchased, placed in your Shopping Cart or Wish List, or recently viewed. –
             Automated.

    d.  FedEx Ship Manager Integration and Customization

        i.   Online Tracking – Allows customers to check the status of shipments anytime
             **R2

Allen Brothers, Inc.
December 31, 2004
Page 3

      ii.   FedEx Ship E-Mail Alert to customer **R2

      iii.   Back-end systems integration (MOMS)

      iv.   Address Verification System **R2

  e.  Customer On-line Accounts

      i.   Order Status & History **R2

      ii.   Online Address Book -- Stores the shipping addresses of your family, business associates and friends for faster checkout t **R2

      iii.   Recipe Box -- Saves your favorite recipes in one convenient place **R4

      iv.   Gift Reminders/Lists – Birthdays, Anniversaries, Previous Purchases **R4

      v.   Wish List **R3

      vi.   Gift Certificate Management

      vii.   Mail Order Manager Integration

  f.  Payment System

      i.   Payment Authorization and Validation

      ii.   Settlement at Shipping

3.  Google/PageRank™ Search Engine Optimization Implementation – Optimize site to increase its ranking in Google's search engine.

  a.  On-The-Page Factors Optimization – Title Tag, Keywords in the Body Text, Anchor Text optimization.

  b.  Internal Navigation Structure and linkage of your pages, in order to best distribute PageRank™ within your site.

  c.  PageRank™ Optimization through external marketing and partnership links to your site.

4.  Dydacomp, Mail Order Manager Integration

5.  Analytics Reporting **R2

  a.  Traffic Reporting

  b.  Commerce Reporting – Product Information

  c.  Merchandising Drilldown -- Drilldown Merchandising Analysis, delivers a complete view into your product hierarchy so business executives can easily see how each product category, sub-category and individual SKI is performing with granularity.

Allen Brothers, Inc.
December 31, 2004
Page 4

    i.  Obtain a full view of your product hierarchy for complete and thoughtful decision-making

    ii.  Increase average order size by identifying popular products to cross-sell and up-sell.

    iii.  Determine which product families and products need more or less promotion to meet your growth goals and fulfill your desired sales mix.

d.  Campaign Drilldown – Obtain complete view into campaign hierarchy so marketing executives can quickly see how each campaign, marketing activity and offer is performing with amazing granularity

    i.  Obtain a full understanding of your campaign hierarchy in one view for complete and thoughtful decision-making

    ii.  Interactively compare campaign performance at multiple levels to identify top performers for future decisions on budget and resource allocation.

    iii.  Encourage customers to engage in repeat business by targeting them with the most effective campaigns.

e.  Visual Path Reporting – Visually interpret the paths people use to reach destinations pages.

6.  Marketing

    a.  E-mail Marketing

        i.  Monthly Newsletter

        ii.  Special Offers Via Email

        iii.  Advance Notice of New Products/Sales

        iv.  Personalized Marketing -- Notification of upcoming events/holidays/previous gift purchases, gift reminders – Automated. **R4

        v.  E-mail Item to Friend

        vi.  E-mail Shopping Cart **R2

        vii.  E-mail Wish List **R3

    b.  Catalog Request

    c.  Cross/Partner Marketing – Gifts, Grilling, Cooking, Chef, Caterers, etc. [PHASE II]

    d.  Chef's Corner – featured chefs recommendations, recipes

7.  Administration Site

    a.  Catalog/Item Management

    b.  Up-Sell Management **R3

Allen Brothers, Inc.
December 31, 2004
Page 5

     c.   Promotion Management

     d.   Reporting

     e.   Marketing Administration

     f.   Merchandising Administration

8.  On-Going Site Enhancements, Marketing and Operations

     a.   Continuously enhance and improve the site based on performance, customer feedback, and technology and market conditions.

     b.   Advertising, Marketing, and Promotion Management – provide effective ongoing management of on-line advertisement, marketing and promotions using Allen Brother's advertising budget.

CLOSING

I appreciate the confidence you have placed with me and my company and I look forward to working with you in the future. A part of this proposal is a Performance License Fee which is a critical element to the success of your future site. This performance fee provides the element necessary to allow Prominent to lead your successful effort in the e-commerce marketplace. It will elevate your site's quality to a level of excellence and provides the ongoing incentive to continuously improve and enhance your site and e-commerce sales.

Best regards,


Kurt Seidensticker
Chief Executive Officer
Prominent Consulting, LLC

## EXHIBIT 2

### Pre-Existing Works

The following pre-existing third party software has been incorporated into the Allen Brothers Web Site:

| Name of Software | Copyright Owner | Source of Consultant's Right |
|---|---|---|
| BEA Web Logic Server 8.1 | BEA Systems, Inc. | Limited License |
| Oracle 10 G – Standard Edition | Oracle Corporation | Limited License |
| Apache Web Server 2.0 | Apache | Open Source License |
| Red Hat Linux ES 3 | Red Hat, Inc. | Owned by Allen Brothers |
| Jakarta Struts, Commons | Apache | Open Source License |
| Sun Java 2 Platform, Standard Edition, version 1.4.2 (J2SE) | Sun | Licensed at no Cost |
| Borland Jbuilder X Foundation Edition | Borland Software | Limited License used only during development of New Web Site |
| Macromedia DreamWeaver MX 2004 | Macromedia, Inc. | Limited License used only during development of New Web Site |
| RichFX | Rich Catalog | |
| NetIQ Web Trend 7 + On Demand | | |

## EXHIBIT 3

**3(a).  Assuming  2003 monthly sales were as shown (note total is correct – monthly figures are estimates) below:**

| Month of | 2003 Sales |
|---|---|
| January | $495,000.00 |
| February | $495,000.00 |
| March | $495,000.00 |
| April | $617,000.00 |
| May | $617,000.00 |
| June | $618,000.00 |
| July | $537,000.00 |
| August | $537,000.00 |
| September | $538,000.00 |
| October | $900,000.00 |
| November | $1,100,000.00 |
| December | $3,123,000.00 |
| Total | $10,072,000.00 |

**Then if site became active on 11/1, the <u>2005 Percentage of the Base</u> would be:**

Total Nov. and Dec. 2003 Sales divided by
Total Sales

$4,223,000.00/
$10,072,000.00

41.93%

**Therefore, if the Base Amount is $2,200,000.00 for a full year, which is then multiplied by the 2005 Percentage of the Base, the <u>Base Amount</u> for 2005 would equal:**

Base Amount multiplied by
2005 Percentage of the Base times

$2,200,000.00
x 41.93%

$922,419.00

The Base Commission for years two and three will be based on a Base Amount of $2,200,000.00.

3(b). **The fourth year will have to account for the remaining balance of our three year agreement as follows:**

**The first ten months base will be computed as follows to equal the <u>2008 Percentage of the Base</u>:**

| | |
|---|---|
| Total Jan thru Oct. 2003 Sales divided by<br>Total Sales | $5,849,000.00/<br>$10,072,000.00 |
| Stated as the 2008 Percentage of the Base | 58.07% |

**Therefore, if the Base Amount is $2,200,000.00 for a full year, which is then multiplied by the 2008 Percentage of the Base, the <u>Base Amount for 2008</u> would equal**

| | |
|---|---|
| Base Amount multiplied by<br>2005 Percentage of the Base times | $2,200,000.00<br>x 58.07% |
| | $1,277,581.00 |

**The last two months base will be the remaining base as computed above of $922,419.00 ($2,200,000.00 less $1,277,581.00)**

3(c). **For example, if sales would be equal to an annualized amount of $2,200,000.00 per year, the <u>Base Commission</u> due would be computed as follows:**

| | | Sales | | Base<br>Percentage | Base<br>Commission | |
|---|---|---|---|---|---|---|
| 2005 | Nov and Dec | $922,419.00 | x | 1.75% | $16,142.00 | |
| 2006 | Full Year | $2,200,000.00 | x | 1.75% | $38,500.00 | |
| 2007 | Full Year | $2,200,000.00 | x | 1.75% | $38,500.00 | |
| 2008 | Full Year | $1,277,581.00<br>$922,419.00 | x | 1.75%<br>0.00% | $22,358.00<br>$0 | |
| | Total | $7,522,419.00 | | | $115,500.00 | |
| 2009 | Full Year | $2,200,000.00 | times | No Base % | $0 | three years and two months at $922,419.00 at $2,200,000.00 per year |

3(d). **A matrix highlighting the actual plan then could be:**

| | | Starting | | | Ending | Percentages |
|---|---|---|---|---|---|---|
| 2005 | Nov and Dec | $0<br>$922,420.00 | to<br>and higher | | $922,419.00<br>$0 | 1.75%<br>5.00% |

| 2006 | Full Year | $0 | to | $2,200,000.00 | 1.75% |
| | | $2,200,000.00 | and higher | | 5.00% |
| 2007 | Full Year | $0 | to | $2,200,000.00 | 1.75% |
| | | $2,200,001.00 | and higher | | 5.00% |
| 2008 | Full Year | $0 | to | $1,277,581.00 | 1.75% |
| | | $1,277,582.00 | to | $2,200,000.00 | 0.00% |
| | | $2,200,000.00 | and higher | | 5.00% |
| 2009 | Full Year | $0 | to | $2,200,000.00 | 0% |
| | | $2,200,001.00 | and higher | | 5.00% |

**Exhibit 4**

**Server, PDF Conversion and Other Incurred Costs Reimbursement**

**Section 1**

| Description of Hardware, Software or Service | Fee | Recurrence? | Payment Status/ Schedule |
|---|---|---|---|
| Rich FX Catalog Setup | $2,500.00 | One-time | Paid |
| Rich FX Catalog Conversion | $3,080.00 | One-time | Paid |
| Rich FX Catalog Serving for 3 Months | $750.00 | One-time | Paid |
| NetIQ WebTrends Professional Edition | $3,387.46 | One-time | Paid |
| HP ProLiant Database Server | $12,356.67 | One-time | Paid |
| Rich FX Catalog Serving | $250.00 for up to 50,000 catalog views; $450.00 total for 50,001 – 100,000 catalog views; $450.00 + $40.00 for each additional up to 10,000 catalog views for catalog views above 100,000 | Monthly | To be invoiced quarterly as incurred by Consultant |

**Section 2**

| Description of A la Carte Service | Fee |
|---|---|
| Changing copy or price in PDF (up to 5 changes) per PDF) | $10 per change / $50 minimum per page |
| Unscheduled replacement of a PDF | Contract page price |
| Changes to integration after sign off that require re-work from RichFX | $95 / hour |
| Changing left navigation bar | $300 |
| Changing help / instructions, email to a friend, feedback, top navigation Bar | $50 each |
| Changing color or page alias in top navigation bar | $50 |
| Changing any copy or price in pop up (for text extraction clients) | $25 per product |
| Changing copy or price in PDF (up to 5 changes per PDF) | $10 per change/ $50 minimum per page |
| Changing merchandising instructions (URLs or bridge pages) | $25 per batch |
| Replacement of a PDF | $70/page |
| Changes to integration that require re-work from RichFX | $95 / hour |
| Regenerating a catalog after any change (required after any change above. charged in addition to the change) | $300 |

**Exhibit 5**

**Escrow Agreement**

# FLEXSAFE ESCROW AGREEMENT

Deposit Account Number _____

This agreement ("Agreement") is effective _____, 20_____ between Iron Mountain Intellectual Property Management, Inc. ("IMIPM") and _____ ("Depositor"), who collectively may be referred to in this Agreement as the parties ("Parties") and who are more fully identified in Exhibit A.

A.    Depositor and Depositor's client have entered or will enter into a license agreement, development agreement, and/or other agreement regarding certain proprietary technology of Depositor (referred to in this Agreement as the "License Agreement").

B.    Depositor desires to avoid disclosure of its proprietary technology except under certain limited circumstances.

C.    Depositor desires to establish an escrow with IMIPM to provide for the retention, administration and controlled access of the proprietary technology materials of Depositor.

D.    The parties desire this Agreement to be supplementary to the License Agreement pursuant to 11 United States [Bankruptcy] Code, Section 365(n).

## ARTICLE 1 -- DEPOSITS

1.1    <u>Obligation to Make Deposit</u>.    Upon the signing of this Agreement by the parties, Depositor shall deliver to IMIPM the proprietary technology and other materials ("Deposit Materials") to be deposited under this Agreement.

1.2    <u>Identification of Tangible Media</u>.    Prior to the delivery of the Deposit Materials to IMIPM, Depositor shall conspicuously label for identification each document, magnetic tape, disk, or other media upon which the Deposit Materials are written or stored.    Additionally, Depositor shall complete Exhibit B to this Agreement by listing each such media by the item label description, the type of media and the quantity.    Exhibit B shall be signed by Depositor and delivered to IMIPM with the Deposit Materials.    Unless and until Depositor makes the initial deposit with IMIPM, IMIPM shall have no obligation with respect to this Agreement, except the obligation to notify Depositor regarding the status of the account as required in Section 3.2.

1.3    <u>Acceptance of Deposit</u>.    When IMIPM receives the Deposit Materials, IMIPM will conduct a visual deposit inspection.    At completion of the deposit inspection, if IMIPM determines that the labeling of the media matches the item descriptions and quantity on Exhibit B, IMIPM will date and sign Exhibit B and mail a copy thereof to Depositor.    If IMIPM determines                                                                                                    that the labeling does not match the item descriptions or quantity on Exhibit B, IMIPM will (a) note the discrepancies in writing on Exhibit B; (b) date and sign Exhibit B with the exceptions noted; and (c) mail a copy of Exhibit B to Depositor.    IMIPM's acceptance of the deposit occurs upon the signing of Exhibit B by IMIPM.    OTHER THAN IMIPM'S INSPECTION OF THE DEPOSIT MATERIALS, IMIPM SHALL HAVE NO OBLIGATION TO THE ACCURACY,

COMPLETENESS, FUNCTIONALITY, PERFORMANCE OR NON-PERFORMANCE OF THE DEPOSIT MATERIALS.

1.4    Depositor's Representations.  Depositor represents as follows:

     a.     Depositor lawfully possesses all of the Deposit Materials deposited with IMIPM;

     b.     With respect to all of the Deposit Materials, Depositor has the right and authority to grant to IMIPM the rights as provided in this Agreement;

     c.     As of the effective date of this Agreement, the Deposit Materials are not the subject of any liens or encumbrances; however, any liens or encumbrances made after the execution of this Agreement will not prohibit, limit, or alter the rights and obligations of IMIPM under this Agreement; and

     d.     The Deposit Materials are readable and useable in their current form or, if any portion of the Deposit Materials is encrypted, the decryption tools and decryption keys have also been deposited.

1.5    Deposit Updates.  Updates to the Deposit Materials will be added to the existing deposit. All deposit updates shall be listed on a new Exhibit B and Depositor shall sign the new Exhibit B.  Each Exhibit B will be held and maintained separately within the escrow account. An independent record will be created which will document the activity for each Exhibit B.  Any deposit updates shall be held in accordance with Sections 1.2 through 1.4. All references in this Agreement to the Deposit Materials shall include the initial Deposit Materials and any updates.

1.6    Removal of Deposit Materials.  The Deposit Materials may be removed and/or exchanged only on written instructions signed by Depositor or as otherwise provided in this Agreement.

## ARTICLE 2 -- FLEXSAFE BENEFICIARY ENROLLMENTS

2.1    FlexSAFE Enrollment(s).  After IMIPM's acceptance of the Deposit Materials, Depositor may enroll one or more beneficiaries ("FlexSAFE Beneficiary") under this Agreement. Depositor will execute and submit to IMIPM a FlexSAFE Beneficiary Enrollment document, referenced in this Agreement as Exhibit T, listing each beneficiary to be enrolled as a FlexSAFE Beneficiary under the Agreement.  Upon IMIPM's receipt of Exhibit T or any additional Exhibit T thereto, IMIPM will issue an enrollment letter and a copy of this Agreement to the FlexSAFE Beneficiary.

## ARTICLE 3 -- CONFIDENTIALITY AND RECORD KEEPING

3.1    Confidentiality.  IMIPM shall have the obligation to reasonably protect the confidentiality of the Deposit Materials.  Except as provided in this Agreement or any subsequent agreement between the Parties, IMIPM shall not disclose, transfer, make available or use the Deposit Materials.  IMIPM shall not disclose the terms of this Agreement to any third party.  If IMIPM receives a subpoena or any other order from a court or other judicial tribunal pertaining to the disclosure or release of the Deposit Materials, IMIPM will immediately notify the parties to this

Agreement unless prohibited by law. It shall be the responsibility of Depositor and/or FlexSAFE Beneficiary to challenge any such order; provided, however, that IMIPM does not waive its rights to present its position with respect to any such order. IMIPM will not be required to disobey any order from a court or other judicial tribunal, including, but not limited to, notices delivered pursuant to Section 8.6 below.

3.2    Status Reports.  IMIPM shall provide to Depositor and FlexSAFE Beneficiary a report profiling the account history semi-annually. Depositor will notify IMIPM if the account history is not to be provided to FlexSAFE Beneficiary.

## ARTICLE 4 -- **RIGHT TO MAKE COPIES**

4.1    Right to Make Copies.  IMIPM shall have the right to make copies of the Deposit Materials as reasonably necessary to perform this Agreement. IMIPM shall copy all copyright, nondisclosure, and other proprietary notices and titles contained on the Deposit Materials onto any copies made by IMIPM. With all Deposit Materials submitted to IMIPM, Depositor shall provide any and all instructions as may be necessary to duplicate the Deposit Materials including but not limited to the hardware and/or software needed.  Any copying expenses incurred by IMIPM as a result of a request to copy will be borne by the party requesting the copies. Alternatively, IMIPM may notify Depositor requiring its reasonable cooperation in promptly copying the Deposit Materials in order for IMIPM to perform this Agreement.

## ARTICLE 5 -- **RELEASE OF DEPOSIT**

5.1    Release of Deposit Upon Depositor's Instruction.  Upon receipt by IMIPM of written instruction(s) directly from Depositor, Depositor's trustee in bankruptcy or a court of competent jurisdiction, IMIPM will release a copy of the Deposit Materials to the FlexSAFE Beneficiary identified in the instruction(s).  However, IMIPM is entitled to receive any fees due IMIPM before making the release.  FlexSAFE Beneficiary's enrollment will terminate upon the release of the Deposit Materials held by IMIPM.

5.2    Filing for Release of Deposit by FlexSAFE Beneficiary.

       a.    Upon notice to IMIPM by FlexSAFE Beneficiary of the occurrence of a release condition as defined in Section 5.3, IMIPM shall provide Depositor with a copy of FlexSAFE Beneficiary's notice by commercial express mail.  Such notice from FlexSAFE Beneficiary will be signed and on company letterhead.  From the date IMIPM mails the notice requesting release of the Deposit Materials, Depositor shall have sixty (60) days to deliver to IMIPM contrary instructions ("Contrary Instructions").

            Contrary Instructions shall mean the written representation by Depositor that a Release Condition has not occurred or has been cured.  Such notice shall be signed and on company letterhead.  Upon receipt of Contrary Instructions, IMIPM shall send a copy of the Contrary Instructions to FlexSAFE Beneficiary by commercial express mail.  Additionally, IMIPM shall notify both Depositor and FlexSAFE Beneficiary that there is a dispute to be resolved pursuant to Section

8.4. Subject to Section 6.3, IMIPM will continue to store the Deposit Materials without release pending (a) joint instructions from Depositor and FlexSAFE Beneficiary; (b) dispute resolution pursuant to Section 8.4; or (c) order of a court.

b.    If no Contrary Instructions are given to IMIPM, Depositor agrees that IMIPM shall deliver a copy of the Deposit Materials to the FlexSAFE Beneficiary who provides IMIPM with all of the following:

1.    Copy of the current License Agreement between Depositor and FlexSAFE Beneficiary;

2.    Written demand that a copy of the Deposit Materials be released and delivered to FlexSAFE Beneficiary;

3.    Written notice that the copy of the Deposit Materials being released to FlexSAFE Beneficiary only be used as permitted under the License Agreement;

4.    Specific delivery instructions along with any fees due IMIPM; and

5.    Written notice that the release of the copy of the Deposit Materials is pursuant to 11 United States Code Section 365(n) or other applicable federal or state bankruptcy, insolvency, reorganization or liquidation statute.

5.3    <u>Release Conditions</u>. As used in this Agreement, "Release Condition" shall mean the existence of any one or more of the following circumstances, uncorrected for more than thirty (30) days:

a.    Entry of an order for relief under 11 of the United States Bankruptcy Code;

b.    The making by Depositor of a general assignment for the benefit of creditors;

c.    The appointment of a general receiver or trustee in bankruptcy of Depositor's business or property; or

d.    Action by Depositor under any state or federal insolvency or similar law for the purpose of its bankruptcy, reorganization, or liquidation.

5.4    <u>Right to Use Following Release</u>. Unless otherwise provided in the License Agreement, upon release of the Deposit Materials in accordance with this Article 5, FlexSAFE Beneficiary shall have the right to use the Deposit Materials for the sole purpose of continuing the benefits afforded to FlexSAFE Beneficiary by the License Agreement. FlexSAFE Beneficiary shall be obligated to maintain the confidentiality of the released Deposit Materials.

## ARTICLE 6 -- **TERM AND TERMINATION**