6.1    <u>Term of Agreement</u>. The initial term of this Agreement is for a period of one (1) year. Thereafter, this Agreement shall automatically renew from year to year unless (a) Depositor instructs IMIPM in writing that the Agreement is terminated; (b) IMIPM instructs Depositor and FlexSAFE Beneficiary in writing after its renewal date that the Agreement is terminated for nonpayment in accordance with Section 6.3; or (c) IMIPM reserves the right to terminate this Agreement, for any reason, other than nonpayment, by providing Depositor and FlexSAFE Beneficiary sixty (60) days written notice of its intent to terminate this Agreement. If the Deposit Materials are subject to another escrow agreement with IMIPM, IMIPM reserves the right, after the initial one year term, to adjust the anniversary date of this Agreement to match the then prevailing anniversary date of such other escrow arrangements.

6.2    <u>Term of FlexSAFE Enrollment</u>. Upon receipt by IMIPM of Depositor's executed Exhibit T, the FlexSAFE Beneficiary will be enrolled for an initial term of one (1) year, unless this Agreement terminates earlier, causing the FlexSAFE Beneficiary enrollment to terminate. Subsequent enrollment terms may be adjusted to the anniversary date of this Agreement and shall automatically renew from year-to-year unless (a) Depositor instructs IMIPM in writing to terminate the FlexSAFE Beneficiary enrollment; (b) FlexSAFE Beneficiary instructs IMIPM in writing to terminate the FlexSAFE Beneficiary; or (c) the enrollment is terminated by IMIPM for nonpayment in accordance with Section 6.3.

6.3    <u>Termination for Nonpayment</u>. In the event of the nonpayment of fees owed to IMIPM, IMIPM shall provide written notice of delinquency to all parties to this Agreement. Unless Depositor has instructed IMIPM to terminate FlexSAFE Beneficiary pursuant to Section 6.2(a), Depositor or FlexSAFE Beneficiary shall have the right to make the payment to IMIPM to cure the default. If the past due payment is not received in full by IMIPM within one (1) month of the date of such notice, then IMIPM shall have the right to terminate this Agreement at any time thereafter by sending written notice of termination to all parties. IMIPM shall have no obligation to take any action under this Agreement so long as any payment due to IMIPM remains unpaid.

6.4    <u>Disposition of Deposit Materials Upon Termination</u>. Subject to the foregoing termination provisions, and upon termination of this Agreement, IMIPM shall destroy, return, or otherwise deliver the Deposit Materials in accordance with Depositor's instructions. If there are no instructions, IMIPM may, at its sole discretion, destroy the Deposit Materials or return them to Depositor. IMIPM shall have no obligation to destroy or return the Deposit Materials if the Deposit Materials are subject to another escrow agreement with IMIPM or have been released to the FlexSAFE Beneficiary in accordance with Section 5.2.

6.5    <u>Survival of Terms Following Termination</u>. Upon termination of this Agreement, the following provisions of this Agreement shall survive:

    a.    The obligations of confidentiality with respect to the Deposit Materials;

    b.    The obligation to pay IMIPM any fees and expenses due;

    c.    The provisions of Article 8; and

    d.    Any provisions in this Agreement which specifically state they survive the termination of this Agreement.

## ARTICLE 7 -- IMIPM'S FEES

7.1    Fee Schedule.  IMIPM is entitled to be paid its standard fees and expenses applicable to the services provided.  IMIPM shall notify the party responsible for payment of IMIPM's fees at least sixty (60) days prior to any increase in fees.  For any service not listed on IMIPM's standard fee schedule, IMIPM will provide a quote prior to rendering the service, if requested.

7.2    Payment Terms. IMIPM shall not be required to perform any service, including release of any Deposit Materials under Article 5, unless the payment for such service and any outstanding balances owed to IMIPM are paid in full.  Initial fees are due upon receipt of a signed contract or receipt of the Deposit Materials whichever is earliest.  Payments on all renewal and services invoices are due net thirty (30) days from date of invoice.  If invoiced fees are not paid, IMIPM may terminate this Agreement in accordance with Section 6.3.

## ARTICLE 8 -- LIABILITY AND DISPUTES

8.1    Right to Rely on Instructions.    IMIPM may act in reliance upon any instruction, instrument, or signature reasonably believed by IMIPM to be genuine.  IMIPM may assume that any employee of Depositor or FlexSAFE Beneficiary who gives any written notice, request, or instruction has the authority to do so.  IMIPM will not be required to inquire into the truth or evaluate the merit of any statement or representation contained in any notice or document. IMIPM shall not be responsible for failure to act as a result of causes beyond the reasonable control of IMIPM.

8.2    Indemnification.  Depositor agrees to indemnify, defend and hold harmless IMIPM from any and all claims, actions, damages, arbitration fees and expenses, costs, attorney's fees and other liabilities ("Liabilities") incurred by IMIPM relating in any way to this escrow arrangement, except where it is adjudged that IMIPM acted with gross negligence or willful misconduct.

8.3    Limitation of Liability. In no event will IMIPM be liable for any incidental, indirect, special, exemplary, punitive or consequential damages, including, but not limited to, damages (including loss of data, revenue, and/or profits), costs or expenses (including legal fees and expenses), whether foreseeable or unforeseeable, that may arise out of or in connection with this Agreement; and in no event shall the collective liability of IMIPM exceed ten times the fees paid under this Agreement.  The foregoing limitation of liability does not apply with respect to any acts of gross negligence, personal injury claims, property damage claims (excluding the Deposit), or intellectual property infringement.

8.4    Dispute Resolution. Any dispute relating to or arising from this Agreement shall be submitted to, and settled by arbitration by a single arbitrator chosen by the San Diego Regional Office of the American Arbitration Association in accordance with the Commercial Rules of the American Arbitration Association.  The arbitrator shall apply California law.  Unless otherwise agreed by Depositor and FlexSAFE Beneficiary, arbitration will take place in San Diego, California, U.S.A.  Any court having jurisdiction over the matter may enter judgment on the award of the arbitrator.  Service of a petition to confirm the arbitration award may be made by First Class mail or by commercial express mail, to the attorney for the party or, if unrepresented, to the party at

the last known business address. If however, Depositor and/or FlexSAFE Beneficiary refuse to submit to arbitration, the matter shall not be submitted to arbitration and IMIPM may submit the matter to any court of competent jurisdiction. Unless adjudged otherwise, any costs of arbitration incurred by IMIPM, including reasonable attorney's fees and costs, shall be divided equally and paid by Depositor and FlexSAFE Beneficiary.

8.5    Controlling Law. This Agreement is to be governed and construed in accordance with the laws of the State of California, without regard to its conflict of law provisions.

8.6    Notice of Requested Order. If any party intends to obtain an order from the arbitrator or any court of competent jurisdiction, which may direct IMIPM to take, or refrain from taking any action, that party shall:

    a.    Give IMIPM at least five (5) business days prior notice of the hearing;

    b.    Include in any such order that, as a precondition to IMIPM's obligation, IMIPM be
paid
        in full for any past due fees and be paid for the reasonable value of the services
        to be rendered pursuant to such order; and

    c.    Ensure that IMIPM not be required to deliver the original (as opposed to a copy)
        of the Deposit Materials if IMIPM may need to retain the original in its possession
        to fulfill any of its other duties.

## ARTICLE 9 -- GENERAL PROVISIONS

9.1    Entire Agreement. This Agreement, which includes Exhibits described herein, embodies the entire understanding between the parties with respect to its subject matter and supersedes all previous communications, representations or understandings, either oral or written. IMIPM is not a party to the License Agreement between Depositor and FlexSAFE Beneficiary and has no knowledge of any of the terms or provisions of any such License Agreement. IMIPM's only obligations to Depositor or FlexSAFE Beneficiary are as set forth in this Agreement. No amendment or modification of this Agreement shall be valid or binding unless signed by both parties hereto, except Exhibit T need not be signed by IMIPM and Exhibit A need not be signed by either party.

9.2    Notices. All notices sent pursuant to Articles 5 and 6 and any Deposit Materials shall be delivered by commercial express mail or sent by certified mail, return receipt requested. All other correspondence including invoices, payments, documents and communications shall be sent First Class U.S. mail and given to the parties at the addresses specified in the attached Exhibit A. It shall be the responsibility of the parties to notify each other as provided in this Section in the event of a change of physical address or e-mail address. The parties shall have the right to rely on the last known address of the other parties. Any correctly addressed notice or last known address of the other parties that is relied on herein that is refused, unclaimed, or undeliverable because of an act or omission of the party to be notified as provided herein shall be deemed effective as of the first date that said notice was refused, unclaimed, or deemed undeliverable by the postal authorities by mail, through messenger or commercial express delivery services.

9.3    Severability.  In the event any provision of this Agreement is found to be invalid or unenforceable, the parties agree that unless it materially affects the entire intent and purpose of this Agreement, such invalidity or unenforceability shall affect neither the validity of this Agreement nor the remaining provisions herein, and the provision in question shall be deemed to be replaced with a valid and enforceable provision most closely reflecting the intent and purpose of the original provision.

9.4    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the parties.  However, IMIPM shall have no obligation in performing this Agreement to recognize any successor or assign of Depositor unless IMIPM receives clear, authoritative and conclusive written evidence of the change of parties.

9.5    Waiver.  Any term of this Agreement may be waived by the party entitled to the benefits thereof, provided that any such waiver must be in writing and signed by the party against whom the enforcement of the waiver is sought.  No waiver of any condition, or breach of any provision of this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of such condition or breach.  Delay or failure to exercise any right or remedy shall not be deemed the waiver of that right or remedy.

9.6    Regulations.  Depositor is responsible for and warrants compliance with all applicable laws, rules and regulations, including but not limited to customs laws, import, export, and re-export laws and government regulations of any country from or to which the Deposit Materials may be delivered in accordance with the provisions of this Agreement.

9.7    Attorney's Fees. In any litigation or other proceeding by which one party either seeks to enforce its rights under this Agreement (whether in contract, tort, or both) or seeks declaration of any rights or obligations under this Agreement (whether in contract, tort, or both), the prevailing party who has proven in court by court decree, judgment or arbitrator's decision that the other party has materially breached its representation and/or warranty under this Agreement shall be awarded reasonable attorneys' fees, together with any costs and expenses, to resolve the dispute and to enforce final judgement.

9.8    No Third Party Rights.  This Agreement is made solely for the benefit of the Depositor and any enrolled FlexSAFE Beneficiaries to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement unless otherwise agreed to by all the parties hereto.

9.9    Authority to Sign.  Each of the Parties herein represents and warrants that the execution, delivery, and performance of this Agreement has been duly authorized and signed by a person who meets statutory or other binding approval to sign on behalf of its business organization as named in this Agreement.

9.10   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

_____

Depositor

By: _____

Name:_____

Title:_____

Date:_____

Iron Mountain Intellectual Property Management, Inc.

By: _____

Name:_____

Title:_____

Date:_____

**EXHIBIT A**

## DESIGNATED CONTACT

Deposit Account Number _____

**Notices, deposit material returns and communications to <u>Depositor</u> should be addressed to:**

**Invoices to <u>Depositor</u> should be addressed to:**

Company Name:_____
Address:_____
_____
_____
Designated Contact:_____
Telephone:_____
Facsimile:_____
E-mail:_____

_____
_____
_____
_____
Contact: _____
_____
P.O.#, if required:_____

Requests from Depositor to change the designated contact should be given in writing by the designated contact or an authorized employee.

**Agreements, Deposit Materials and notices to IMIPM should be addressed to: (select location)**

**All invoice fee remittances to IMIPM should be addressed to:**

❑ Attn: Client Services
2100 Norcross Parkway, Suite 150
Norcross, GA 30071
Telephone: 770-239-9200
Facsimile: 770-239-9201
E-mail: ipm-clientservices@ironmountain.com

Iron Mountain Intellectual Property Management, Inc.
PO Box 27131
New York, NY 10087-7131

Date:_____

**EXHIBIT B**

### DESCRIPTION OF DEPOSIT MATERIALS

Depositor Company Name _____

Deposit Account Number _____

Product Name _____ Version _____
*(Product Name will appear as Exhibit B Name on Account History report)*

**DEPOSIT MATERIAL DESCRIPTION:**

| Quantity | Media Type & Size | Label Description of Each Separate Item |
|---|---|---|
| _____ | Disk 3.5" or ____ | |
| _____ | DAT tape ____mm | |
| _____ | CD-ROM | |
| _____ | Data cartridge tape ____ | |
| _____ | TK 70 or ____ tape | |
| _____ | Magnetic tape ____ | |
| _____ | Documentation | |
| _____ | Other _____ | |

**PRODUCT DESCRIPTION:**
Environment _____

**DEPOSIT MATERIAL INFORMATION:**
Is the media or are any of the files encrypted?  Yes / No   If yes, please include any passwords and the decryption tools.
Encryption tool name_____ Version _____
Hardware required_____
Software required _____
Other required information_____

I certify for **Depositor** that the above described    **IMIPM** has visually inspected and accepted the
Deposit Materials have been transmitted to IMIPM: above materials *(any exceptions are noted above)*:

Signature:_____    Signature: _____
Print Name: _____    Print Name:_____
Date:_____    Date Accepted: _____
E-mail: _____    Exhibit B#: _____

**EXHIBIT T**

## FLEXSAFE BENEFICIARY ENROLLMENT

Deposit Account Number _____

Pursuant to the FlexSAFE Escrow Agreement ("Agreement"), Depositor hereby enrolls the following as a FlexSAFE Beneficiary:

Notices and communications to FlexSAFE Beneficiary should be addressed to:

Company Name:_____
Address:_____
    _____
    _____
Designated Contact:_____
Telephone:_____
Facsimile:_____
E-mail: _____

Invoices to FlexSAFE Beneficiary should be addressed to:

_____
_____
_____
_____
Contact: _____
_____
P.O.#, if required:_____

_____
Depositor

By: _____

Name:_____

Title:_____

Date:_____

## Exhibit 6

1.  Cusack Meats
2.  Ackerman & Cooke
3.  Amazon or amazon.com
4.  Balducci's
5.  Bruss Company (Golden Trophy)
6.  Buckhead Beef
7.  Chicago Steak Company
8.  Chicago Steaks (Lincoln Packing)
9.  Conestoga Ranch
10. Conestoga Steaks
11. Consumers Packing Company
12. Dartagnan or dartagnan.com
13. Dean and Deluca or deananddeluca.com
14. Grand Gourmet Food or grandgourmetfood.com
15. Harry& David
16. Haute at Home (Goodheart)
17. Home Bistro
18. Kansas City Steaks
19. L & L Packing Company
20. Label's or lobels.com
21. Lobstergram Catalog or www.livelob.com
22. Maple Leaf Farms of mapleleaf.com
23. Niman Ranch or nimanranch.com
24. Nueske's
25. Omaha Steaks International
26. Pfaelzer Brothers
27. Prairie Grive Farms
28. Preferred Meats or preferedmeats.com
29. Prime Access
30. Prime Connection
31. Prince Meat Company
32. Ruprecht
33. Sayersbrook
34. Seabear
35. Smith & Wolensky
36. Snake River Farms or snakeriverfarms.com
37. Stock Yards Packing Company
38. The Honey Baked Ham Company
39. Vlcek's Gourmet Meats
40. Wyoming Buffalo Company
41. Yamabeef
42. McKensie
43. Rocke's Meat House
44. My Butcher.com
45. Uptown Prime
46. Superior Steaks
47. Pat's Prime Meats

# EXHIBIT 4

Aug 31 06 03:09p    PROMINENT CAPITAL GROUP    312-896-1556    p.1

Execution Copy

## FIRST AMENDMENT TO
## WEBSITE DEVELOPMENT AND LICENSE AGREEMENT

THIS AMENDMENT TO WEBSITE DEVELOPMENT AND LICENSE AGREEMENT (**"First Amendment"**) is made as of the of 31st day of August, 2006, by and between Allen Brothers, Inc., an Illinois corporation (hereinafter referred to as **"Allen Brothers"**), and Prominent Consulting, LLC, a Delaware limited liability company (hereinafter referred to as **"Consultant"**);

WHEREAS, Allen Brothers and Consultant entered into that certain Web Site Development and License Agreement dated as of the 11th day of January, 2005, (hereinafter referred to as the **"Agreement"**);

WHEREAS, the parties agree that Consultant has generally performed its obligations in accordance with the Agreement up through and including the date of execution of this First Amendment;

WHEREAS, the parties agree that Consultant shall at the request of Allen Brothers pursuant to the terms of the New Web Site Agreement perform additional services for Allen Brothers to prepare a web site for the sale of seafood products, to be modeled on the New Web Site;

WHEREAS, the parties agree that in the event Allen Brothers wishes Consultant to create a seafood web site, Consultant shall be compensated for additional services performed by receiving commissions based on the sales through the seafood web site to be created in addition to the commissions based on the New Web Site;

WHEREAS, in accordance with Section 14, Paragraph C of the Agreement, the parties may vary, amend and modify the Agreement in writing pursuant to their signatures to such an amendment;

WHEREAS, this First Amendment to the Agreement is intended to be, and is, an amendment and modification of the Agreement. All terms and conditions of the Agreement not expressly modified or amended by this First Amendment shall remain in full force and effect; and

NOW, THEREFORE, in consideration of the mutual promises hereinafter stated, the sufficiency and mutuality of are hereby agreed upon and acknowledged by all parties, Allen Brothers and Consultant hereby agree that the Website Development and License Agreement shall be amended as follows:

1.    **INCORPORATION OF RECITALS**.    The foregoing recitals are hereby incorporated into and made a part hereof.

2.    **EFFECTIVE DATE**.  This First Amendment shall be effective from January 1, 2006 through the termination of this Agreement.  The Effective Date of the Agreement shall remain January 11, 2005.

1

Execution Copy

3.    **SERVICES AND PERFORMANCE CRITERIA**.  Section 2 - Services and Fees, Paragraph A. – Services and Performance Criteria of the Agreement shall be amended in its entirety and replaced with the following:

"A.    **Services and Performance Criteria**.    Consultant agrees to provide web site development and related services ("Services) for Allen Brothers' as follows:

(1)    A Web Site to be known as www.allenbrothers.com as set forth in the B2C allenbrothers.com E-Commerce partnership web site design, development and marketing Proposal dated August 3, 2004 and amended December 31, 2004 and attached hereto as **Exhibit 1** (the "**Proposal**").

(2)    At no additional cost to Allen Brothers other than the Performance Fees paid for sales through such web site and the server, PDF conversion and other services reimbursement fees described in Section 2(C), at the election of Allen Brothers, a second web site displaying and offering for sale seafood to be known as [To Be Determined].com by Allen Brothers, Inc. (the "**Seafood Web Site**"). The Seafood Web Site shall be linked to allenbrothers.com. Consultant shall perform and provide the Seafood Web Site in the same manner as the New Web Site pursuant to the terms of this Agreement.  Each of the parties' respective rights and obligations described in this Agreement as pertaining to the New Web Site shall be completely and fully interpreted to also apply to the Seafood Web Site from and after January 1, 2006, provided, however, that Consultant shall be entitled to receive Performance Fees for sales on the New Web Site regardless of whether the Seafood Web Site is created or put into production.    Nothing in this Agreement shall preclude Allen Brothers from awarding the creation and maintenance of the Seafood Web Site to another consultant and in such event, Consultant acknowledges and agrees that Consultant shall not be required to perform any services or tasks related to the Seafood Web Site (other than including a link to the Seafood Web Site on the New Web Site), nor shall Consultant be entitled to any Performance Fees as a result of such Seafood Web Site during the term of this Agreement or any extension thereof, and all references to the Sea Food Web Site shall be deleted from this Agreement."

4.    **PERFORMANCE FEES**.  Section 2 - Services and Fees, Paragraph D. – Performance Fees of the Agreement shall be amended as follows to include the following provisions only with respect to sales made on dates including and after January 1, 2006:

" D.    Performance Fees.

(1)    Allen Brothers shall pay Consultant the following fees for providing maintenance and modification of the New Web Site and Seafood Web Site and marketing services (hereinafter "**Performance Fees**"):

2

Execution Copy

(a)    From January 1, 2006 forward through the remaining term of the Agreement, Consultant shall be paid:

(i)    an annual "**Base Commission**" which shall be calculated by taking one and three quarters percent (1.75%) (hereinafter the "**Base Percentage**") multiplied by the amount of Net Sales (as such term is defined below) generated by the New Web Site and the Seafood Web Site between Zero ($0) and Two Million Two Hundred Thousand Dollars and no Cents ($2,200,000.00) during each such year of the three (3) year period (hereinafter the "**Base Amount**"); and

(ii)    an annual "**Bonus Commission**" which shall be calculated by multiplying the following Net Sales by the corresponding additional percentage (the "**Additional Percentage**"):

| Net Sales: | Add. Percentage: |
|---|---|
| For the year 2005: | Paid under original formula. |
| Between $2,200,000.00 and $10,550,000.00: | 5.0% |
| In excess of $10,550,001.00: | 2.5% |

during each such year of the remaining term of the Agreement (hereinafter depending on which Additional Percentage used, the "**Additional Amount**");

(b)    "**Net Sales**" shall mean, as to any period during the Term of the Agreement, the amount of all gross sales processed through the New Web Site or the Seafood Web Site during such period, minus any credits to end users processed through the New Web Site or the Seafood Web Site for returns and recalls and excluding charges for shipping, handling or taxes. For purposes of net sales, a sale is considered to take place when it is initially processed through the New Web Site or the Seafood Web Site.

(2)    In the event the Agreement has not already been terminated, for purposes of calculating the Performance Fees for years 2005 and 2008 or later years of the Agreement, the following equation shall be used:

(a)    **Base Commission.**

(i)    **Year 2005**: Paid in full under the original terms of the Agreement.

(ii)    **Year 2008**: From January 1, 2008 to February 17, 2008, the Base Commission shall be paid for Net Sales from $0 to $169,905.00.

3

Execution Copy

(See further **Exhibit 3(c)** for an example matrix of how to calculate the Base Commission for the first five (5) years of the Agreement.)

(iii)    **Years 2009 and later**: No Base Commission shall be payable during 2009 or later years of the Agreement.

**(b)    Bonus Commission.**

(i)    **Year 2005**:    The Bonus Commission shall be paid to Consultant and shall be calculated by taking any amount over and above the Base Amount and multiplying it by the 2005 Percentage of the Base.

(ii)    **Year 2008**:    The Bonus Commission shall be paid to Consultant as provided in Exhibit 3(d) below and shall be calculated by taking the Additional Percentage multiplied by any Additional Amount.

(See **Exhibit 3(d)** for an example matrix of the starting and ending sales amounts with the corresponding Base Percentage and Additional Percentage owed to Consultant.)

(iii)    The above Performance Fees shall be invoiced by Consultant to Allen Brothers on a quarterly basis, in arrears of such quarter. Such quarterly invoicing shall clearly state the formula and equation used by Consultant to arrive at such Performance Fees. Allen Brothers shall pay such Performance Fees within thirty (30) days of the receipt of such invoice."

5.    **EXHIBIT 3(d)**. Exhibit 3(d) of the Agreement shall be removed in its entirety and replaced with the following:

"**Exhibit 3(d)**. The following matrix describes the Performance Fees to be paid:

2005    February 17, 2005 – December 31, 2005

| $0 | to | $2,030,094.00 | 1.75% |
| $2.030,095.00 | and | higher | 5.00% |

2006    Full Year

| $0 | to | $2,200,000.00 | 1.75% |
| $2,200,001.00 | to | $10,550,000.00 | 5.00% |
| $10,550,001.00 | and | higher | 2.50% |

2007    Full Year

| $0 | to | $2,200,000.00 | 1.75% |
| $2,200,001.00 | to | $10,550,000.00 | 5.00% |

Execution Copy

| | | | |
|---|---|---|---|
| $10,550,001.00 | and | higher | 2.50% |

**2008** Paid for Net Sales occurring from Jan. 1st – Feb. 16th. Net Sales amounts are for total sales during Jan. 1st – Feb. 16th 2008

| | | | |
|---|---|---|---|
| $0 | to | $169,905.00 | 1.75% |
| $169,906.00 | to | $814,772.00 | 5.00% |
| $814,773.00 | and | higher | 2.50% |

**2008** Paid for Net Sales occurring Feb. 17th & Thereafter. Net Sales amounts are for total sales during 2008

| | | | |
|---|---|---|---|
| $0 | to | $2,200,000.00 | 0% |
| $2,200,001.00 | to | $10,550,000.00 | 5.00% |
| $10,550,001.00 | and | higher | 2.50% |

**2009 and Later Years**

| | | | |
|---|---|---|---|
| $0 | to | $2,200,000.00 | 0% |
| $2,200,001.00 | to | $10,550,000.00 | 5.00% |
| $10,550,001.00 | and | higher | 2.50%" |

6.    **NOTICE OF TERMINATION BY ALLEN BROTHERS.**  Pursuant to Section 7. Term and Termination of Agreement, Subsection B. (1) (c), for its convenience, Allen Brothers may terminate this Agreement as of January 12, 2008 by delivering notice of such termination to Consultant. The consequences of such termination shall be in accordance with the terms of the Agreement.

7.    **CONFLICT.**   To the extent that the provisions of the Agreement are inconsistent with the provisions of this First Amendment, the provisions of this First Amendment shall control.  In all other respects, the provisions of the Agreement shall remain in full force and effect, unmodified in any manner whatsoever.

8.    **NOTICE.**    The notice addresses for Consultant provided in Section 14(K) shall be replaced with the following:

> If to Consultant:
> Prominent Consulting, LLC
> 1483 Patriot Blvd.
> Glenview, Illinois 60026
> Attention: Kurt Seidensticker
> Facsimile: 312-896-1556
> E-mail: kurt@prominentconsulting.com

> With a copy to:
> Sidley Austin LLP
> Attention: Jonathan C. Wagner
> One South Dearborn Street
> Chicago, IL 60603
> Facsimile: 312-853-7036
> E-mail: jwagner@sidley.com

Aug 31 06 03:11p    PROMINENT CAPITAL GROUP    312-896-1556    p.6

Execution Copy

IN WITNESS WHEREOF, the parties have caused this First Amendment to be executed by their duly authorized representatives as of the date first written above.

**ALLEN BROTHERS:**

Allen Brothers, Inc., an Illinois corporation

By: _____
    Bobby Hatoff, Chairman of the Board
    and C.E.O.

**CONSULTANT:**

Prominent Consulting, LLC, a Delaware limited liability company

By: _____
    Kurt Seidensticker, Authorized Officer

6

# EXHIBIT 5

# Addressed in Motion Filed by Plaintiff Allen Brothers, Inc.

# EXHIBIT 6

# Addressed in Motion Filed by Plaintiff Allen Brothers, Inc.

# EXHIBIT 7

Google Inc.
1600 Amphitheatre Parkway
Building #45
Mountain View, CA 94043



Main 650 253.0000
Fax 650 253.0001
www.google.com

July 9, 2007

*Via Fax and Fedex*

Kimberly DeShano
Greenberg Traurig
77 W. Wacker Drive, Suite 2500
Chicago, IL 60601

Re: *Allen Brothers, Inc. v. Scott Marland*, Circuit Court of Cook County, Illinois, Case Number 07 CH 11877

Dear Ms. DeShano:

Pursuant to the Subpoena issued in the above-referenced matter, we have conducted a diligent search for documents and information accessible on Google's systems that are responsive to your request. Our response is made in accordance with state and federal law, including the Electronic Communications Privacy Act. See 18 U.S.C. § 2701 et seq. By this response, Google does not waive any objection to further proceedings in this matter.

Enclosed is the following information regarding the user accounts specified in the Subpoena: (1) Registration information for the Gmail account scottmarlandwatchoutforhatoffs@gmail.com; (2) Information regarding session timestamps and originating IP address for recent logins by this account.

To the extent any document provided herein contains information exceeding the scope of your request, protected from disclosure or otherwise not subject to production, if at all, we have redacted such information or removed such data fields.

Finally, in accordance with Section 2706 of the Electronic Communications Privacy Act, Google requests reimbursement in the amount of $75 for reasonable costs incurred in processing your request. Please forward your payment to Google Custodian of Records, at the address above and please write the Internal Reference Number (63115-061507-7024) on your check. The federal tax ID number for Google is 77-0493581.

Very truly yours,

Matt Stone
Legal Investigations Support

Enclosures

**Registration Information**

| | |
|---|---|
| Email | ScottMarlandWatchOutForHatoffs@gmail.com |
| Status | Enabled (user deleted account) |
| Services | Talk, Toolbar, Search History, Gmail |
| Name | Scott Marland Watch Out For Hatoffs |

Secondary email bob.schwimmer@gmail.com

| | |
|---|---|
| Created on | 21-Apr-2007 06:38:04 pm GMT |
| Lang | en |
| IP | 64.241.37.140 |

**Logs**

All times are displayed in UTC/GMT.

ScottMarlandWatchOutForHatoffs@gmail.com

| Date/Time | IP | Subnet |
|---|---|---|
| 23-May-2007 02:11:55 pm | 76.204.175.230 | 255.255.255.255 |
| 23-May-2007 02:11:55 pm | 76.204.175.230 | 255.255.255.255 |
| 06-May-2007 07:26:30 pm | 71.239.21.137 | 255.255.255.255 |
| 06-May-2007 07:26:30 pm | 71.239.21.137 | 255.255.255.255 |

Google Confidential and Proprietary

# EXHIBIT 8

# Output from ARIN WHOIS

ARIN Home Page    ARIN Site Map    ARIN WHOIS Help    Tutorial on Querying ARIN's WHOIS

Search for : [                    ]    [ Submit Query ]

## Search results for: ! NET-76-204-175-224-1

```
CustName:    PROMINENT CAPITAL-070404082938
Address:     Private Address
City:        Plano
StateProv:   TX
PostalCode:  75075
Country:     US
RegDate:     2007-04-04
Updated:     2007-04-04

NetRange:    76.204.175.224 - 76.204.175.231
CIDR:        76.204.175.224/29
NetName:     SBC-76-204-175-224-29-0704042950
NetHandle:   NET-76-204-175-224-1
Parent:      NET-76-192-0-0-1
NetType:     Reassigned
Comment:
RegDate:     2007-04-04
Updated:     2007-04-04

RAbuseHandle: ABUSE6-ARIN
RAbuseName:   Abuse - Southwestern Bell Internet
RAbusePhone:  +1-800-648-1626
RAbuseEmail:  abuse@sbcglobal.net

RNOCHandle: SUPPO-ARIN
RNOCName:   Support - Southwestern Bell Internet Services
RNOCPhone:  +1-800-648-1626
RNOCEmail:  support@swbell.net

RTechHandle: IPADM2-ARIN
RTechName:   IPAdmin-SBIS
RTechPhone:  +1-800-648-1626
RTechEmail:  ipadmin@att.com

OrgAbuseHandle: ABUSE6-ARIN
OrgAbuseName:   Abuse - Southwestern Bell Internet
OrgAbusePhone:  +1-800-648-1626
OrgAbuseEmail:  abuse@sbcglobal.net

OrgNOCHandle: SUPPO-ARIN
OrgNOCName:   Support - Southwestern Bell Internet Services
OrgNOCPhone:  +1-800-648-1626
OrgNOCEmail:  support@swbell.net
```

```
OrgTechHandle: IPADM2-ARIN
OrgTechName:   IPAdmin-SBIS
OrgTechPhone:  +1-800-648-1626
OrgTechEmail:  ipadmin@att.com

# ARIN WHOIS database, last updated 2007-07-19 19:10
# Enter ? for additional hints on searching ARIN's WHOIS database.
```

*If contact information is out of date or incorrect, please contact hostmaster@arin.net. Include all relevant information in your e-mail and ARIN will investigate the matter.*

# EXHIBIT 2

17 May 2007 4:47    SOLIDCACTUSFAX    5707067192    P.2

**SOLID**CACTUS®
your partner in e-commerce success
1-888-361-9814

07/10/07

# STORE DEVELOPMENT SERVICE AGREEMENT

THIS SERVICE AGREEMENT, by and between Solid Cactus, Inc., having an office at 100 North Wilkes-Barre Blvd., Suite 175, Wilkes-Barre, PA 18702 (hereinafter referred to as "Solid Cactus"), and Client (as further identified herein), is entered into for the purpose of Solid Cactus assisting in the creation and/or modification of Client's website and/or Yahoo! Store ® (hereinafter separately and collectively referred to as the "Website").

WHEREAS, this Service Agreement is to be incorporated into and used in conjunction with the terms and conditions contained in the Appendix attached hereto (the Service Agreement and Appendix hereinafter collectively referred to as the "Agreement").

NOW THEREFORE, in consideration of the mutual promises set forth herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## I. PARTIES

**Solid Cactus:**
Solid Cactus, Inc.
100 North Wilkes-Barre Blvd., Suite 175
Wilkes-Barre, PA  18702

**Client:**
Allen Brothers, Inc
3737 South Halsted Street
Chicago, Illinois 60609

**SOLID**CACTUS®
your partner in e-commerce success

100 North Wilkes-Barre Blvd., Wilkes-Barre, PA 18702 · Toll Free: 1-888-361-9814 · International: 570-706-7150 · Fax: 570-706-7190

10/04/2007 15:23    7738909377    ALLEN BROTHERS INC    PAGE 03/21

# ⚏SOLIDCACTUS™
your partner in e-commerce success

## II. PROJECT SPECIFICATIONS & FEES

| Client: | Allen Brothers, Inc | | Prepared By | Date |
|---|---|---|---|---|
| | 3737 South Halsted Street | Jan Baiden | Kathleen Gaul | 07/10/07 |
| | Chicago, Illinois 60609 | 773-869-8253 | | |

Pursuant to this Agreement Solid Cactus will provide the following services to Client:

| | Price |
|---|---|
| **Enterprise Package** | $15,000.00 |

The Enterprise Package includes the following:

**Shell Design & Programming**
Includes aesthetic design and programming of the header, left navigation, footer, outer background. Logo design and custom programmed features are not included unless otherwise noted. Mouseover for left navigation, mailing list sign up, top navigation for general store links (not dynamically generated), search box, background around outside of the site, footer with copyright information last update timestamp and general store links, secure shopping graphic all have to be in the shell description. HTML fields can be provided at the client's request.

**Homepage Body Design & Programming**
Includes aesthetic design and programming of the area within the shell on the homepage. Design may include multiple areas for product, graphic, or text display. The homepage will also include a promotional Graphic in homepage body description.

**Section Body Design & Programming**
Includes aesthetic design and programming of the area within the shell on the section page (page containing links the more specific sub-sections which contain products) Design may include multiple areas for product or text display

**Item Page Body Design & Programming**
Includes aesthetic design and programming of the area within the shell on the item page Design will include placement of the product image, product name, pricing, options, descriptions, or any other item level fields within the editor. Links to shipping info, warranty info, or other types of information can be implemented at the clients request.

**Checkout Manager Design**
The checkout manager is not RTML driven and therefore can not take on the look of the rest or your store automatically. On the shopping cart page, the shell design from the rest of the store will be implemented with HTML, CSS, and PHP for the left navigation (so that navigation links are updated dynamically with the navigation in the rest of your store). Custom navigation features such as cascading menu, expanding nav bar, etc are not included unless otherwise noted. On checkout pages the left navigation will not be implemented to keep customers progressing through the checkout process.

* Merchants that are not are NOT using Merchant Solutions, and therefore do not have web hosting built into your store, will need to purchase web hosting http://www.solidcactus.com/yahoo-webhosting.html. Solid Cactus does not provide hosting for these scripts.

**Cross Sell**
When a customer navigates to an item page they can click on either the product image or product name of any of the cross sell items to activate a window displaying the enlarged cross sell item, the price, sale price, and an order button. Within the window will be a colored header matching your color scheme and your logo. Includes design of a cross sell display (product image, name, price, cross sell header such as "you may also be interested in") Administrative control to specify 3 cross sell products by ID for each product page Clicking product image or name will change current page to the product page of the cross sell. If no cross sell items are specified the field, and the cross sell header will not be displayed at all.
**Vertical cross sells require the design and reformatting of the entire item page - This will incur additional costs if complete item page programming is not already covered by another portion of the project

**Click to Enlarge v3.0**
Click to enlarge provides the ability to show an enlarged version of the thumbnail image shown on the item page. This feature also allows Client to add multiple supplementary images and a brief description of each. Once Client has populated the image fields and published the thumbnails of the supplementary images will be shown below the main product image as smaller tiled thumbnails. When a user clicks on a thumbnail, a "pop-in" window will be open in the center of the available browser space allowing the user to view the enlarged image without any additional scrolling. Thumbnails of all images will be shown on the pop-in display for easy browsing. Thumbnails on the item page for additional alternative product images are only included if the project includes "Item Page Body Design & Programming", otherwise the thumbnails can only be accessed from the pop-up window.

**Dynamic Paging**
Dynamic paging dynamically breaks sub-section pages into multiple pages, and has a sorting features that allows the customer to order products by cost, name, or the order you have the listed in the editor. Display will show the number of pages within the section, and

highlight the page the customer is currently on. Page reload is not required when navigating through pages or changing the sort option. Paging will be implemented for one type of section page unless otherwise noted., so all section pages can use their existing layout or the new layout with paging. Paging template has a pre-defined design that will be modified to match the color scheme of your store. Custom sorting criteria can be implemented for an additional fee. This is a license for use on one store, additional stores will require an additional user license. License is for a finished product and not for the source code used to arrive at that finished product.

Login - Account Registration
Account sign in link will be on every page allowing the customer to sign in, or create an account. The customer will never be forced to login to place an order. Upon checkout the customer can specify a password to have their information saved for future purchases. Upon return the customer can login into their account using email address and the password specified during their previous purchase. Logging in will populate the customers name, shipping, billing, and email addresses.
**Credit card information is never saved. Design of account page is predefined but will be matched to your color scheme. Additional information can be collected within the customer account, messages can be displayed on the rest of the store once logged in, and login fields (email address and password) can be displayed on every page of the store for an additional fee.
NOTE: This is a license for use on one store, additional stores will require an additional user license. License is for a finished product and not for the source code used to arrive at that finished product.

Advanced Search
Customers can search by keyword within a price range by clicking an "advanced search" link below the normal search page. Search results will be shown in a paged format allowing them to skip through pages by clicking the page number or next/previous links. Results can be sorted by price lowest to highest/highest to lowest, or by relevance.
Additional search and sort criteria can be programmed for an additional fee. Design of search and results page is predefined. Advanced search fields can be implemented on all pages of the store for an additional fee.
An additional monthly fee applies for this service.

* The first 3 months of hosting are Free for Advanced Search. After 3 months, the rate is $50 per month per license.

NOTE: This is a monthly license for use on one store, additional stores will require an additional user license. License is for a finished product and not for the source code used to arrive at that finished product.

Google Analytics Installation
Solid Cactus will install scripts necessary to activate the Client's Google Analytics account on the Client's Yahoo! Store. Clients must supply a valid Google Analytics Account Number and any necessary scripts from Google Analytics prior to the installation. The Yahoo! Checkout Manager version 3 is needed in order to capture the majority of the Google Analytics data. Clients are advised to use either Yahoo! Merchant Solutions Web Hosting or their own 3rd party Web Hosting to store the necessary script files. Solid Cactus does not provide web hosting for these scripts.

Total Yahoo! Store SEO Package

Breadcrumbs
Text links representing the path leading from the homepage to the current page. Breadcrumbs will always show the parent categories (first category the item was created in) regardless of whether an alternative path was taken or not.

Categorized Site Map
Site map categorized dynamically based on parent/child relationship of your section and items.

Change Page Name Field to Text
Page titles converted to text from images

Dynamically Generated META Tags
In the case that you have not manually created the META keywords and descriptions for each page, this feature will dynamically generate them

Dynamically Generated Title Tags
If page titles are not being generated this feature will use the page name and create the page title from it.

Image Alt Tags
When the mouse is placed over a product or section image, the product/section name will be shown within a small window. If a slow connection causes images to load slowly the alternate text will be displayed until the images do load

Related Items
At the bottom of item page text links are displayed to items within the same parent section as the current item

Text Based Navigation
Left navigation switched to text from images

| | |
|---|---|
| **Item Page Multiple Add-to-Cart**<br>On the item page items that can be purchased in addition to the main item will be displayed along with checkboxes and pricing. Selected items will be added to the cart along with the main item once the order button is clicked. | $500.00 |

| | |
|---|---|
| **Dedicated Resources**<br><br>All design and programming required hereunder shall be completed by Solid Cactus no later later than August 1, 2007 (the "Deadline"), whereby a completed project is defined by programming completed to a degree that there are no major issues with the display and/or functionality of the Website and the Website is able to take orders. If at this point any aspects of the Website provided to Client by Solid Cactus hereto are not published due to administrative or other work required by Client, the project is considered complete under this Agreement for the purposes of the Deadline. Also, in order for the Deadline to apply as described herein, Client may not exceed one (1) design revision per "page concept".<br><br>In order to ensure that programming and quality control checks are done by the Deadline, dedicated staff members will be set aside to plan and work on the project. To avoid compromising the quality of the end product Solid Cactus will utilize extended work hours, rapid project management techniques and expect last moment updates leading up to the delivery date.  The amount payable under this section shall only be paid in the event that Solid Cactus delivers the completed Website in accordance with the terms of this Agreement on or before the Deadline. | $5,000.00 |
| **Consultation**<br><br>The consultant assigned the project will provide direction throughout the course of the project ensuring that we execute the vision of the client within the guidelines of best practice.<br>Consultants will involve more specialized or technical resources within Solid Cactus to aid in decision making when appropriate. | $0.00 |
| **Documentation & Quality Assurance**<br><br>Documentation will be provided the at the end of the project outlining new variables, their function, and how to use them. Quality assurance will be done to ensure what is programmed is in line with the mockups designed and features function as outlined in the documentation. Due to inconsistencies with the way each browser renders code, small variances between browsers may be unavoidable. This will be minimized as much as possible. | $0.00<br><br>There is no cost associated with this service at this time |
| **Training & Support**<br><br>Training & Support for custom features and variables will be provided upon completion of programming<br>Getting Started Webinar is available for basic Y Store training (store set up and general maintenance) at no cost.<br>If one-on-one training is required a quote can be provided to purchase blocks of training time. | $0.00<br><br>There is no cost associated with this service at this time |
| **Total Due:**<br>(Does not include monthly fees, if applicable.) | $20,500.00 |

One time fees will be charged in accordance with the payment terms in Section III of this Agreement.
If applicable, monthly fees are charged in advance for the following month's service.
Populating store database with product information is not included.

17 May 2007 4:48    SOLIDCACTUSFAX    5707067192    p.6

# 𝗠SOLID CACTUS®
your partner in e-commerce success

## III. PAYMENT TERMS

| Client: | Allen Brothers, Inc | | | Prepared By | Date |
|---|---|---|---|---|---|
| | 3737 South Halsted Street | Jan Baiden | | Kathleen Gaul | 07/10/07 |
| | Chicago, Illinois 60609 | 773-869-8253 | | | |

### Step 1: Choose your payment terms:

| | 50/50 Payment Schedule | Deposit to begin project: **$10,250.00** |
|---|---|---|

Deposit to begin project:    **$10,250.00**
Final 50% Payment of:    **$10,250.00**
Total to be paid under this payment schedule:
Initial deposit to be received by  **7/10/2007**  for contract validation. Balance of account due 30 days after the initial deposit.

**Upon receipt of this signed contract, your on-file credit card will be charged for the initial deposit. If you have chosen to Pay in Full, the charge will reflect such.
***If Client does not indicate a Payment Schedule selection upon signing, Client will be responsible for the 50/50 Payment Schedule by default.
****The fees contained in this Section III do not include the additional monthly fees to be paid by Client for certain features, products, applications and/or programs as listed above in Section II.

### Step 2: Enter Your Payment Method:

| ☐ Credit Card (Info Below) | ☐ Credit Card Currently on File |
|---|---|

### Step 3: Enter Your Payment Information (if applicable):

Payment Method:  ☐ Visa  ☐ MC  ☐ Amex  ☐ Discover

Card Number: _____    Signature: _____

Name on Card: _____    Expiration Date: _____

# SOLIDCACTUS
your partner in e-commerce success

1-888-361-9814

## IV. TERMS & CONDITIONS

a. Client acknowledges that they have viewed, understand and hereby accept all terms and conditions associated with this Service Agreement contained herein.

b. Client further acknowledges that they have viewed, understand and hereby accept all terms and conditions associated with this Service Agreement located in the Appendix attached hereto. (Service Agreement and Appendix collectively referred to as the "Agreement").

c. Client further acknowledges that they have the right and the obligation to have this Agreement reviewed by an attorney.

d. Client further acknowledges and agrees to be bound by these Terms and Conditions for the life of the Agreement, and where so stated, beyond the term of this Agreement.

e. Customers with a new Yahoo Store, or an existing Yahoo Store using the default templates, can have up to 5000 templates switched at no cost. Additional templates will be charged at $50/1000 templates thereafter unless otherwise noted.

f. Where stipulated above in Section II, Client is to be provided certain features, products, applications and/or programs for an additional monthly fee. Such monthly fees are to be paid by Client in advance for the upcoming month's service, unless stated otherwise herein.

g. Client acknowledges and agrees that populating the Client's website and/or Yahoo! Store database with product information is not included in any way whatsoever in the Service to be provided to Client by Solid Cactus. Notwithstanding the foregoing, Solid Cactus understands and expressly covenants that Client will be provided free and unhindered access to the Website during development and after publication in order to populate product information.

h. Client acknowledges and agrees that the Website is to be hosted by Yahoo! using the Yahoo! Store platform pursuant to a separate and independent agreement to be entered into between Client and Yahoo! and that there will be additional fees charged by Yahoo! for the use of the Yahoo! Store Platform.

i. Client acknowledges and agrees that the Service to be provided to Client by Solid Cactus actively supports the following browsers: Firefox 2.0, Internet Explorer 6.0, Internet Explorer 7.0, and Safari 2.0. As such, these browsers will display the Client's final website and/or Yahoo! Store in a manner that reasonably matches Client's approved mock-ups. Solid Cactus makes no claims or representations as to any other browser's performance with respect to the Service to be provided to Client by Solid Cactus and/or Client's website and/or Yahoo! Store.

j. Proprietary Rights in the Website. Upon completion of the Service and payment in full of the Total Due stipulated in Section II of this Service Agreement, Client shall be considered the exclusive owner of all intellectual property rights, including but not limited to federal copyrights, in the final published Website, including but not limited to, all text, artwork, graphics, pictures, photos, images and other such materials, but excluding any and all stock photography provided to Client by Solid Cactus and used in the development and design of the Website (the "Stock Photography"), and also excluding any and all source code used in the development and/or operation of the Website (the "Source Code"), whereby such Source Code shall remain the exclusive property of Solid Cactus, and excluding all uncompiled and/or layered files used in the development of the Website, which shall also remain the exclusive property of Solid Cactus. Notwithstanding anything in this paragraph or in this Agreement to the contrary, Client shall have full intellectual property rights to the "look" of the Website and shall be able to fully exercise such rights in perpetuity without any interference from Solid Cactus.

k. Licenses and Proprietary Restrictions. Provided Client is not in default of the Agreement and provided Client continues to pay the related monthly fees to Solid Cactus, Client is granted and accepts licenses for the use of the features and/or applications provided to Client subject to an additional monthly fee ("Special Features") as well as all related the Source Code. Additionally, provided Client is not in default of the Agreement, Client is granted and accepts a license for the use of all other Source Code. Furthermore, provided Client is not in default of the Agreement, Client is also granted and accepts a license for the use of the Stock Photography. All licenses referenced in this Section are to be nonexclusive, nontransferable, and nonsublicensable and Client may not alter, modify, distribute, resell or otherwise provide the Source Code, Special Features and/or Stock Photography to any other person or entity. Client further acknowledges and agrees that the Source Code, Special Features and any documentation or other information that Client is provided in connection therewith constitutes and/or contains valuable intellectual property and proprietary and confidential information of Solid Cactus (collectively, "Proprietary Property"), and that Solid Cactus is providing access and use of the Proprietary Property under a duty of confidentiality. Client agrees not to (i) use or allow others to use the Proprietary Property in any manner not authorized under this Agreement, (ii) disclose the Proprietary Property except as authorized under this Agreement, (iii) reverse engineer, decompile, alter, modify and/or disassemble the Proprietary Property, or (iv) use the Proprietary Property to create any product, service or system that competes with the Solid Cactus Service.

**Please fax ALL PAGES of this Agreement to 570-706-7190**

\*\*\*Please note: This price quote is only valid until: 7/10/2007

# SOLIDCACTUS
your partner in e-commerce success

## **SOLID**CACTUS®
your partner in e-commerce success

## V. SIGNATURE

I hereby agree to all terms and conditions set forth in this Service Agreement and to all terms and conditions set forth in the Appendix attached hereto. I further authorize Solid Cactus to charge my credit card or other account in accordance with the payment method specified above. I further acknowledge that either payment in full or a deposit is required in order to begin work on the project.

Signature: _____        **Client:**

Print Name: _____Janice Baiden____              **Allen Brothers, Inc**

Title: ___VP Marketing___

Date: __7/13/07__

| Please fax ALL PAGES of this Agreement to 570-706-7190 |

***Please note: This price quote is only valid until: 7/10/2007**

## **SOLID**CACTUS®
your partner in e-commerce success

100 North Wilkes-Barre Blvd., Wilkes-Barre, PA 18702  ·  Toll Free: 1-888-361-9814  ·  International: 570-706-7190  ·  Fax: 570-706-7190

Page  7of  12

# APPENDIX

1. **GENERAL.** The Terms and Conditions contained in this Appendix are incorporated into and made part of the Service Agreement above (the Service Agreement and Appendix are collectively referred to as the "Agreement"), between Client (as defined above in the Service Agreement) and Solid Cactus, Inc. ("Solid Cactus") regarding the services and all related software, programs, features and/or applications to be provided to Client by Solid Cactus and further described in the Service Agreement (the "Service").

2. **SERVICE.** Solid Cactus will provide the Service to Client in accordance with the Service Agreement. Solid Cactus will conduct its activities in a reasonable manner as would normally be expected from a service provider engaging in the types of services described in the Service Agreement. Subject to Client's compliance with this Agreement, the Service will be provided in accordance with the specifications of Solid Cactus as set forth in the Service Agreement. Client must report any error or defect to Solid Cactus, comply with Solid Cactus' instructions, maintenance procedures, and cooperate reasonably in diagnosis and correction of any error or defect. A reasonable effort will be made to keep the Service available 24 hours a day, 7 days a week, but Solid Cactus makes no guarantee of the Service's availability at any certain times or for any certain amount of time.

3. **COMPENSATION**

A. Costs and payments for the Service are to be described in the Service Agreement. Additionally, where necessary, Client will pay all additional expenses related to Solid Cactus providing Service to Client pursuant to Client's prior written approval. Such expenses may include but are not limited to image fees, domain name registration, site submission fees, software technical support, express delivery fees, host service provider fees, filing fees, third party service charges, and third party software license fees.

B. All invoices from Solid Cactus shall be paid in accordance with their terms by all stipulated due dates, and if not, Client shall be considered to be in default ("Default"). Client will be notified of such Default and will be given fifteen (15) days to fully cure. Upon failure to cure, any amount still due shall bear interest at the lesser of the rate of 1.5% per month or the maximum rate allowed by law. Client will also pay all costs of collection, including reasonable attorney's fees, for the collection of any amount due upon failure to cure Default.

C. In the event of failure to cure Default, Solid Cactus has the right to cease any ongoing services, as well as relinquishing all rights conveyed to Client by Solid Cactus under the Agreement. In the event that the Total Due to Solid Cactus under the Service Agreement is to be paid in monthly installments, upon failure to cure Default, all monthly payments, regardless of due date, will become immediately due in full. In the event of failure to cure Default, Client will be obligated to return all Solid Cactus materials immediately to Solid Cactus.

4. **REPRESENTATIONS & WARRANTIES**

A. <u>Representations and Warranties of Solid Cactus.</u> Solid Cactus warrants and represents to the Client as follows:

i. Solid Cactus is a duly organized and validly existing corporation, in good standing under the laws of the Commonwealth of Pennsylvania, and has the requisite power and authority to enter into and carry out the Agreement

ii. To Solid Cactus' knowledge, there is no action, proceeding, or investigation, pending or threatened, which questions, directly or indirectly, the validity or enforceability of the Agreement.

iii. Solid Cactus has all requisite power and authority, has taken all actions required by Applicable Law, and has obtained all consents which are necessary to authorize or enable it to execute and deliver the Agreement and to consummate the transactions contemplated in the Agreement. The individual(s) executing the Agreement on behalf of Solid Cactus have been duly authorized and are empowered to bind Solid Cactus to the Agreement.

B. <u>Representations and Warranties of Client.</u> Client acknowledges, warrants, and represents to Solid Cactus as follows:

i. To Client's knowledge, there is no action, proceeding, or investigation pending or threatened which questions, directly or indirectly, the validity or enforceability of the Agreement.

ii. Neither the execution of the Agreement nor the consummation by Client of the transactions contemplated by the Agreement will (I) conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default, or result in a termination of, any agreement or instrument to which the Client is a party, (ii) violate any restriction to which Client is subject, or (iii) constitute a violation of any Applicable Laws.

iii. Client has taken all actions required by Applicable Law, and have obtained all consents which are necessary to authorize or enable them to execute and deliver the Agreement and to consummate the transactions contemplated in the Agreement. The individual(s) executing the Agreement on behalf of Client has been duly authorized and are

17 May 2007 4:49    SOLIDCACTUSFAX    5707067192    p.10

empowered to bind Client to the Agreement.

iv.   Client acknowledges and agrees that Client is to obey all Copyright and other applicable laws. Solid Cactus will not be responsible if Client provides or uses another party's protected material in violation of Copyright or other applicable laws.

**5.   TERM AND TERMINATION**

A.   Unless stipulated otherwise in the Service Agreement, this Agreement is effective from the date of the Contract Signing and shall be in effect until the Service and/or project is completed and Client has paid in full in accordance with the Agreement, or until the Agreement is terminated by either party in writing pursuant to this Section.

B.   Unless stipulated otherwise in the Service Agreement, either party may terminate the Agreement at any time upon adequate notice. Absent willful misconduct or gross negligence, sixty (60) days notice shall be deemed adequate. Payment in full for all services performed prior to termination will be required within sixty (60) days of termination.

C.   INTENTIONALLY DELETED

D.   Upon termination of the Agreement, all Client data, Client confidential information, and other Client information within possession of Solid Cactus will belong to Client and will be returned within a reasonable period of time in a manner agreed upon by the parties.

E.   Upon the termination of the Agreement, all Solid Cactus data, Solid Cactus confidential information, and other Solid Cactus information within possession of Client will belong to Solid Cactus and will be returned within a reasonable period of time in a manner agreed upon by the parties.

**6.   LICENSE; PROPRIETARY RESTRICTIONS.**   Unless otherwise stipulated in the Service Agreement, during the Term of the Agreement Client is granted and accepts a license to use the Service. Both parties acknowledge and agree that such license is to be nonexclusive, nontransferable, and nonsublicensable. Client may not distribute, resell or otherwise provide the Service, or any aspects thereof, to any other person or entity. Client further acknowledges and agrees that the Service and any documentation or other information that Client is provided in connection therewith constitutes or contains valuable intellectual property and proprietary and confidential information of Solid Cactus (collectively, "Proprietary Property"), and that Solid Cactus is providing access and use of the Proprietary Property under a duty of confidentiality. Client agrees not to (i) use or allow others to use the Proprietary Property in any manner not authorized under this Agreement, (ii) disclose the Proprietary Property except as authorized under this Agreement, (iii) reverse engineer, decompile, disassemble or attempt to obtain the source code for any Proprietary Property, or (iv) use the Proprietary Property to create any product, service or system that competes with the Service.

**7.   INTELLECTUAL PROPERTY**

A.   Client acknowledges that NO aspects of the Service provided by Solid Cactus to Client are to be considered "works made for hire" under the 1976 Copyright Act.

B.   Solid Cactus will not acquire any rights to Client's goodwill, trademark, copyright or other property of Client. All Client data and Client lists, trade secrets and Client customer lists, shall be the sole possession of Client and Solid Cactus shall have no right to them.

C.   Client will not acquire any rights to Solid Cactus' goodwill, trademark, copyright or other property of Solid Cactus. All Solid Cactus data and Solid Cactus lists, trade secrets and Solid Cactus customer lists, shall be the sole possession of Solid Cactus and Client shall have no right to them.

D.   Except as stipulated otherwise herein, Client acknowledges and agrees that Solid Cactus will retain all right, title and interest in and to any materials provided to Client by Solid Cactus, and all intellectual property relating to any of the foregoing, including but not limited to, copyrights, patents and trademarks.

E.   INTENTIONALLY DELETED.

**8.   CONFIDENTIALITY**

A.   Each party will protect the confidential information of the other party which shall include but not be limited to any and all information produced by any party for the purposes of providing the Service, from misappropriation and unauthorized use or disclosure, and at a minimum, will take precautions at least as great as those taken to protect its own confidential information of a similar nature.

B.   Without limiting the foregoing, the receiving party will: (a) use such confidential information solely for the purposes for which it has been disclosed; and (b) disclose such confidential information only to those of its employees, agents, consultants and others who have a need to know the same for the purpose of performing this Agreement and who are informed of and agree to a duty of nondisclosure.

C.   The receiving party may also disclose confidential information of the disclosing party to the extent necessary to comply with applicable law or legal process; provided that the receiving party uses reasonable efforts to give the disclosing party prompt, advance notice thereof and provides reasonable cooperation to the disclosing party to

minimize the extent or scope of any such disclosure.

D. Upon request of the other party, or in any event upon any termination or expiration of the Term, each party will return to the other all materials, in any medium, that contain, embody, reflect or reference all or any part of any confidential information of the other party.

9. **FORCE MAJEURE.** Neither party is responsible for any failure to perform its obligation under this Agreement if such failure is caused by acts of God, war, strikes, revolutions, lack or failure of transportation facilities, laws or governmental regulations or other causes that are beyond the reasonable control of such party. The forgoing does not excuse nonpayment. The party facing an event of force majeure will use commercially reasonable efforts to remedy a failure caused by such event. If such event makes it commercially unreasonable for Solid Cactus to continue to provide the Services, Solid Cactus may terminate this Agreement upon written notice to Client, and Solid Cactus shall within three (3) days of such notice of cancellation, refund by certified bank check, all payments made by Client to Solid Cactus under this Agreement.

10. **INDEMNIFICATION**

A. Client hereby agrees to indemnify, defend, and hold harmless Solid Cactus against, and agree to pay and hold harmless Solid Cactus for all liabilities, obligations, losses, damages, penalties, claims, actions, suits, judgments, settlements, out-of-pocket costs, expenses and disbursements (including reasonable costs of investigation, and reasonable attorneys, accountants and expert witness fees), of whatsoever kind and nature that are imposed on or incurred by Solid Cactus as a consequence of or in connection with (i) any material misrepresentation by Client, (ii) any breach by Client of a warranty or covenant contained herein, or (iii) any failure by Client to perform in accordance with this Agreement.

B. Solid Cactus agrees to (i) notify Client in writing promptly after Solid Cactus becomes aware of such claim, (ii) give Client sole control of the settlement, compromise, negotiation, and defense of any such action (provided that Client may not agree to any settlement that involves injunctive or equitable relief affecting Solid Cactus or admission of liability by Solid Cactus without obtaining Solid Cactus's prior consent), and (iii) cooperate reasonably and in good faith in the defense of any such legal action. In connection with any such third party claim, Solid Cactus may, at its election and expense, have the right to participate in the defense of such third party claim. Additionally, Client agrees to give prompt written notice to Solid Cactus upon the receipt of notice of any claim by a third party against Client which might give rise to a claim against Solid Cactus stating the nature and the basis of such claim and, if ascertainable, the amount thereof.

C. Solid Cactus hereby agrees to indemnify, defend, and hold harmless Client against, and agrees to pay and hold harmless Client for all liabilities, obligations, losses, damages, penalties, claims, actions, suits, judgments, settlements, out-of-pocket costs, expenses and disbursements (including reasonable costs of investigation, and reasonable attorneys, accountants and expert witness fees), of whatsoever kind and nature that are imposed on or incurred by Client as a consequence of or in connection with (i) any material misrepresentation by Solid Cactus, (ii) any breach by Solid Cactus of a warranty or covenant contained herein, (iii) any failure by Solid Cactus to perform in accordance with this Agreement, or (iv) infringement of any patent, copyright, trademark, trade secret, or other actual or alleged intellectual property right of any third party arising out of or from Solid Cactus's license of or use of the Website.

D. Client agrees to (i) notify Solid Cactus in writing promptly after Client becomes aware of such claim, (ii) give Solid Cactus sole control of the settlement, compromise, negotiation, and defense of any such action (provided that Solid Cactus may not agree to any settlement that involves injunctive or equitable relief affecting Client or admission of liability by Client without obtaining Client's prior consent), and (iii) cooperate reasonably and in good faith in the defense of any such legal action. In connection with any such third party claim, Client may, at its election and expense, have the right to participate in the defense of such third party claim. Additionally, Solid Cactus agrees to give prompt written notice to Client upon the receipt of notice of any claim by a third party against Solid Cactus which might give rise to a claim against Client stating the nature and the basis of such claim and, if ascertainable, the amount thereof.

E. If an injunction or order requires Client to stop using the Website because of a claim of infringement or other violation of a third party's rights, or if Solid Cactus believes their is a reasonable likelihood that Client's use of the website infringes upon or violates such rights, Solid Cactus shall be entitled at it's own expense and option to either:
    (i) procure the right for Client and it's customers to continue using the Website; or
    (ii) make such alteration modifications or adjustments to the Website so that they become non-infringing without incurring a material diminution in performance or function; or
    (iii) replace the Website with non-infringing substitutions provided that such substitutes do not entail a material diminution in performance or function.

11. **EXCLUSIONS; LIMITATIONS ON LIABILITY**

A. INTENTIONALLY DELETED

B. NO REPRESENTATION OR WARRANTY MADE UNDER THIS AGREEMENT APPLIES TO THE EFFECT OF ANY CONDITION OUTSIDE THE REASONABLE CONTROL OF SOLID CACTUS, INCLUDING WITHOUT LIMITATION ANY (i) FAILURE IN TELECOMMUNICATIONS, (ii) FAILURE BY CLIENT TO COMPLY WITH THIS

AGREEMENT, OR (III) CONDITION IN, OR COMBINATION OF ANY SERVICE, SOFTWARE, HARDWARE, SYSTEM, EQUIPMENT, PROCESS, METHOD, DATA OR INFORMATION USED OR PROVIDED BY ANY THIRD PARTY.

C.    EXCEPT AS SET FORTH IN SECTION 4, CLIENT HAS NOT AND DOES NOT RECEIVE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OR ARISING FROM COURSE OF DEALING OR PERFORMANCE, REGARDING THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AVAILABILITY, ACCURACY OF SERVICE OR DATA, ERROR-FREE PERFORMANCE OF SERVICE OR DATA, NONINFRINGEMENT OR NONINTERFERENCE WITH DATA. CLIENT'S SOLE REMEDY FOR BREACH OF ANY REPRESENTATION OR WARRANTY IS TO TERMINATE THIS AGREEMENT IN ACCORDANCE WITH ITS TERMS.

D.    UNDER NO CIRCUMSTANCES MAY CLIENT RECOVER DAMAGES UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, PUNITIVE OR SIMILAR DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF REVENUE, PROFITS OR BUSINESS, COSTS OF DELAY, LOST OR DAMAGED DATA OR DOCUMENTATION, OR LIABILITIES TO THIRD PARTIES, ARISING FROM ANY SOURCE, EVEN IF THE LIABLE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CLIENT'S TOTAL CUMULATIVE RECOVERY OF DAMAGES UNDER THIS AGREEMENT MAY NOT EXCEED THE FEES PAID BY CLIENT UNDER THE AGREEMENT DURING THE 6-MONTH PERIOD PRIOR TO THE EVENT GIVING RISE TO LIABILITY.

12.    NOTICE.    All notices under the Agreement must be in writing and must be given by first class mail, certified or registered with return receipt requested, or by Federal Express or such other nationally-recognized overnight courier, provided that the recipient is required to sign for such notice, and will be deemed to have been duly given upon receipt. All such notices will be sent to the parties at their respective addresses as listed on the Service Agreement. Any party may change such party's address by notice duly given pursuant to this Section.

13.    ENTIRE AGREEMENT. Except as otherwise provided herein, this Appendix and Service Agreement represent the entire understanding among the parties with respect to the subject matter of this Agreement, and as such this Agreement supersedes any and all prior understandings, agreements, or obligations. Each party acknowledges and agrees that the other has not made any representations, warranties or agreements of any kind, except as expressly set forth herein.

14.    HEADINGS AND INTERPRETATION.    The Section headings of this Agreement are intended for reference and may not by themselves determine the construction or interpretation of the Agreement. They are for convenience only and are not intended to expand or restrict the scope or substance of the provisions of the Agreement. Also, in all references herein to any parties, persons, entities or corporations, the use of any particular gender, or the plural or singular number is intended to include the appropriate gender and number as the text of the Agreement may require. Wherever used herein, the singular shall include the plural, the plural shall include the singular, and pronouns shall be read as masculine, feminine or neutral as the context requires

15.    WAIVER AND SEPARABILITY. The waiver of any breach of any provision of the Agreement will not operate or be construed as a waiver of any subsequent breach of the same or other provision of this Agreement. If any portion of the Agreement is determined to be invalid or unenforceable, that portion of the Agreement will be adjusted, rather than voided, to achieve the intent of the parties under the Agreement. The invalidity or unenforceability of any provision of the Agreement shall not affect the validity or enforceability of any other provision of the Agreement, which shall remain in full force and effect.

16.    MODIFICATION AND ASSIGNMENT. This Agreement may not be amended or modified except by an instrument signed in writing on behalf of each of the parties hereto. Neither party shall have the right to assign their respective rights and obligations arising under the Agreement without the consent of the other party. Any attempt by a party to assign their respective rights and obligations arising under the Agreement, without the consent of the other party shall be null and void.

17.    NON-SOLICITATION. Client agrees that it will not solicit the engagement and/or employment of the services of any of the employees of Solid Cactus (either directly or through agents), without written permission of Solid Cactus, during the term of this Agreement and any extension thereof and continuing for a period of one (1) year following its expiration or termination.

18.    SURVIVAL OF OBLIGATIONS. This Agreement will be binding on, and inure to the benefit of, the executors, administrators, heirs, successors, and assigns of the parties.

19.    COUNTERPARTS. The Agreement may be executed in one or more counterparts, all of which taken together will constitute one and the same Agreement.

20.    GOVERNING LAW AND VENUE. The laws of the Commonwealth of Pennsylvania govern this Agreement, without reference to its choice of law principles. This Agreement and any disputes relating hereto shall be governed by and construed in all respects, including validity, interpretation, and effect, in accordance with the laws of the Commonwealth of Pennsylvania. All disputes under this Agreement may be heard only in the courts of the

Commonwealth of Pennsylvania located in Luzerne County or the United States District Court for the Eastern District of Pennsylvania. All parties acknowledge and agree to submit to personal jurisdiction and venue in the courts stipulated herein.

21. **FURTHER ASSURANCES.** In connection with the transactions contemplated under the Agreement, the parties agree to cooperate fully with each other in furtherance of the consummation of the Agreement, and to execute and deliver such further instruments or take such further actions as may be reasonably necessary and proper to effectuate and carry out the transactions contemplated hereunder.

**ACKNOWLEDGED AND AGREED:**

Signature: _____

Name: _____Janice  G  Baiden_____

Title: _____VP  Marketing_____

Date: ____7/13/07____