# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PROMINENT CONSULTING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07 C 6357 |
| | ) | |
| ALLEN BROTHERS, INC., | ) | Judge Ruben Castillo |
| | ) | |
| Defendant. | ) | Magistrate Judge Morton Denlow |
| | ) | |

### AFFIDAVIT OF TODD HATOFF

Todd Hatoff, being first duly sworn under oath, deposes and states:

1. I am over the age of 21 and reside in Cook County, Illinois.

2. I have personal knowledge of all of the facts set forth in this Affidavit and would be competent to testify thereto if called upon to do so as a witness.

3. I am the President of Allen Brothers, Inc. ("Allen Brothers"). Allen Brothers is a leading purveyor of fine meats and other fine foods to individual retail consumers through Allen Brothers' Internet website and printed catalog as well as to many of the nation's finest steakhouses, restaurants, hotels and country clubs.

### The Second Amended Complaint in the State Court Action

4. I am aware of and have reviewed the Second Amended Complaint filed in pending Illinois state court litigation initiated by Allen Brothers against Prominent and its controlling owner, Kurt Seidensticker ("Seidensticker"), among others, in *Allen Brothers, Inc. v. Marland, et al.*, No. 07 CH 2444 (Circuit Court of Cook County, Chancery Division) (the "State Court Case").

5. A true and correct copy of the Second Amended Complaint filed in the State Court Case is attached hereto as Exhibit 1.

6. The factual allegations against Prominent and Seidensticker contained in the Second Amended Complaint are true and correct, except as to allegations made on information and belief, as to which it is my good faith belief that they are true and correct.

### Background of the State Court Action

7. Scott Marland was an executive level employee of Allen Brothers who resigned suddenly and with no prior notice in February of 2007. After his departure, Allen Brothers discovered that Marland had engaged in suspicious activities immediately preceding his resignation relating to Allen Brothers' confidential information. Allen Brothers initially brought the State Court Case based on clear evidence showing that Marland had viewed, printed and potentially copied onto disks highly valuable Allen Brothers' confidential information on the day immediately preceding his unexpected resignation.

### Discovery of the Betrayal Emails Sent by Kurt Seidensticker of Prominent

8. An examination of Scott Marland's home computers allowed by the court in connection with the State Court Case led to the astonishing discovery of a series of at least ten email communications (collectively, the "Betrayal Emails") to Marland and his wife. Among other things, the Betrayal Emails:

    (i) warned Marland and his wife, ten days before the State Court Case was filed, that Allen Brothers intended to take legal action against Marland and urged him to destroy records and correspondence related to Allen Brothers and to Marland's wrongdoing;

2

    (ii)  disclosed to Marland Allen Brothers' legal strategy reflected in its complaint against Marland, as well as specific legal advice about the State Court Case provided to Allen Brothers by its attorneys;

    (iii)  disclosed to Marland the existence and contents of private investigator reports; and

    (iv)  asserted a series of increasingly blatant and bizarre lies, such as claims that the Allen Brothers' highly confidential information provided in the emails had been obtained by the anonymous source through his role with the "FBI Organized Crime division" and that the anonymous source was "working with Interpol on money laundering."

  9.  As detailed in the Second Amended Complaint, incontrovertible documentary evidence has established that Seidensticker was the anonymous source of the Betrayal Emails sent to Marland and his wife.

### Relationship Between Allen Brothers and Prominent

  10.  Prior to learning of these Betrayal Emails, I believed that I had a close personal friendship with Seidensticker. In addition, Allen Brothers and Prominent had a very close business relationship, which had evolved to the point that Prominent had become Allen Brothers' de facto information technology department. One of the roles served by Prominent was acting as Allen Brothers' email network administrator in conjunction with Prominent's services under the Development Agreement.

  11.  It was this access to Allen Brothers' emails - access that was intended solely to enable Prominent to perform its functions as network administrator - that Seidensticker instead used to spy on Allen Brothers and betray its trust in him and Prominent by passing highly confidential information to Marland and his wife.

### Development of the New Allen Brothers Website Due to Prominent Misconduct

  12.  Upon learning of the Betrayal Emails and Seidensticker's and Prominent's inconceivably malicious misconduct, I determined that Allen Brothers could not

3

prudently continue to use the website designed by Prominent for fear that Prominent and Seidensticker would perpetrate other malicious acts. I decided that Allen Brothers would replace the website designed by Prominent on an emergency basis with a new website *developed by independent contractors* hired by Allen Brothers as soon as possible (the "New Website").

13.　　I reached this decision due to the harm that Prominent and Seidensticker had already inflicted and could further inflict if they continued to engage in conduct like the Betrayal Emails and despite a number of factors that made it very difficult and risky to switch to a new website, including:

(i)　　the relative success that Allen Brothers had theretofore enjoyed from its use of the website designed by Prominent;

(ii)　　the perils of attempting to deploy the New Web Site in Allen Brother's busiest time of year for its mail order business operations (i.e., Thanksgiving, Christmas and New Year's); and

(iii)　　despite the fact that Allen Brothers had been so totally dependent on Prominent for almost all of Allen Brothers' Internet related activities.

**Allen Brothers Retains Independent Contractor Internet Experts for New Website**

14.　　Allen Brothers retained two independent Internet website development companies to take responsibility for developing the New Website. Allen Brothers retained a company called The Rimm-Kaufman Group, a Web consulting firm for online retailers, to supervise the development of the New Website, including providing consulting, oversight and data entry for all product data.

15.　　In addition, on the recommendation of The Rimm-Kaufman Group, Allen Brothers retained a website development company called Solid Cactus, Inc. ("Solid Cactus") to develop Allen Brothers' new website. Solid Cactus has expertise in

4

developing retail websites that utilize the Yahoo! Stores platform. Because of the pressing need to get Allen Brothers' Internet sales out of Prominent's control and avoid the risk of further sabotage, Allen Brothers was advised that Yahoo! Stores would provide the quickest and most proven alternative website.

### The Solid Cactus Contract

16. A true and correct copy of the contract between Allen Brothers and Solid Cactus is attached hereto as Exhibit 2 (the "Solid Cactus Contract").

17. The Solid Cactus Contract states that any and all source code used in the development and/or operation of the Website would "remain the exclusive property of Solid Cactus." Ex. 2, Terms & Conditions (j). In addition, Solid Cactus indemnified Allen Brothers against all claims in connection with "infringement of any patent, copyright, trademark, trade secret, or other actual or alleged intellectual property right of any third party." Ex. 2, Appendix, ¶ 10(C).

18. During their development of the New Website, Solid Cactus informed Allen Brothers that Solid Cactus was unsure it could deliver a working shipping calendar functionality for the New Website because that functionality was not typically used with Yahoo! Stores.

19. Allen Brothers retained another independent contractor, Nik Krimm, to develop the shipping calendar functionality for the New Website.

### Allen Brothers' Critical Sales During the Holiday Season

20. The Holiday Season is an enormously important time for Allen Brothers' retail business. Allen Brothers' retail customers customarily make many purchases

during the period from November to January for gifts and entertaining. In addition, Allen Brothers' corporate gift business is a very important part of Allen Brothers' annual sales.

21.     Historically, approximately 40-50% of Allen Brothers' retail sales revenue is derived from sales during the fourth quarter of the calendar year. Of those sales, approximately 50% of all orders typically come via Allen Brothers' Internet website.

### Harm to Allen Brothers from Any Disruption in Website

22.     It is critically important for Allen Brothers to have a fully functioning Internet website. Allen Brothers' retail customers tend to be either Internet customers or telephone customers. That is, most of Allen Brothers' customers typically utilize the same method of ordering rather than placing both Internet orders and telephone orders.

23.     Allen Brothers customers who place their orders over the Internet expect Allen Brothers to have a fully functional and easy to use website. The damage to Allen Brothers' goodwill and its customer relations would be incalculable if Allen Brothers did not have a functioning website. Even greater harm would be caused by any disruption in Allen Brothers' website during the Holiday Season, when Allen Brothers' customers often are rushing to get their holiday shopping completed and to plan dinners and parties at which they will serve Allen Brothers' exclusive products.

6

24. If Allen Brothers were unable to take orders over the Internet from the present date until January 2008, I estimate that Allen Brothers would lose approximately $8-9 million in sales.

Further Affiant Sayeth Not.

_____
Todd Hatoff

Subscribed and sworn to
this _19th_ day of November, 2007.

_____
NOTARY PUBLIC

OFFICIAL SEAL
MARY ANN GONZALEZ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-20-2009

7