FIRM I.D. 90839

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| ALLEN BROTHERS, INC., | |
| Plaintiff, | |
| v. | No. 07 CH 11877 |
| SCOTT MARLAND, DEBBIE MARLAND, PROMINENT CONSULTING, LLC, and KURT SEIDENSTICKER, | Hon. Kathleen M. Pantle |
| Defendants. | |

**PROMINENT CONSULTING, LLC'S COUNTERCLAIMS**

Defendant/Counter-Plaintiff Prominent Consulting, LLC ("Prominent"), by its attorneys Vedder, Price, Kaufman & Kammholz, P.C., and for its Counterclaims against Plaintiff/Counter-Defendant Allen Brothers, Inc. ("Allen Brothers"), states as follows:

**Nature of the Action**

1.   This is an action by Prominent relating, among other things, to Allen Brother's breach of a Website Development and License Agreement between these parties. More specifically, Allen Brothers and Prominent entered into a written agreement whereby Prominent would develop a website for Allen Brothers and provide revisions and updates to the website, as well as marketing consulting services in exchange for payment, including commissions based on sales generated by the web site Prominent developed and maintained for Allen Brothers. After the development and implementation of the new website, Allen Brothers' internet sales increased dramatically, to the point that Allen Brothers' believed that Prominent was being excessively compensated at the agreed-upon rates. Allen Brothers then attempted to renegotiate the parties'



agreement, including by the use of express and implied threats of physical and other force against Prominent and its principals and their families. When Prominent refused to restructure the agreement, Allen Brothers accused Prominent of breaching the agreement (but did not terminate the agreement), stopped paying Prominent, stole Prominent's intellectual property (source code) needed to run the new website, and now independently runs that website through its use of Prominent's intellectual property. Allen Brothers' actions in this regard constitute, among other things, a breach of the agreement.

**Parties**

2. Prominent is a Delaware limited liability company doing business in Glenview, Illinois. Prominent provides various enterprise technology consulting and marketing-related services.

3. Allen Brothers is an Illinois corporation with its principal place of business in Chicago, Illinois. Allen Brothers sells meats and other foodstuffs to individuals and commercial customers in a variety of ways, including through a printed catalog and an internet website.

**Allegations Common to All Counts**

Prominent and Allen Brothers Form a Working Relationship

4. In or about October 2003, principals of Prominent and Allen Brothers had dinner together. Present at the dinner were Allen Brothers' President, Todd Hatoff ("Hatoff"), along with Kurt Seidensticker ("Seidensticker"), Managing Director of Prominent, and Craig Widby, Prominent's then Client Services Director.

5. The primary topic of conversation at the dinner was Allen Brothers' website. Seidensticker stated words to the effect that Allen Brothers' then-current website did not effectively portray the quality of Allen Brothers' products, was not receiving as much traffic as the websites of Allen Brothers' competitors, and that the website was operating considerably

slower than the websites of Allen Brothers' competitors. In support of his statements, Seidensticker provided Hatoff with reports and statistics from Alexa.com, a third-party service that tracks relative traffic and performance of websites.

6. In late-November 2003, Hatoff contacted Seidensticker and requested help with Allen Brothers' online marketing. In response, Seidensticker provided Allen Brothers with a consulting report for a strategic internet marketing plan for the 2003 holiday season and going forward. This report described suggested enhancements to Allen Brothers' website, email marketing, and Google AdWords Advertising. Seidensticker provided this report to Hatoff at no charge. Allen Brothers subsequently implemented, through its catalog consultant, and not Prominent, a Google AdWords advertising campaign in December 2003.

7. In March 2004, after experiencing significant outages on their existing website, Allen Brothers entered into an agreement with echoMountain, LLC ("echoMountain") whereby echoMountain would provide hosting services for Allen Brothers' existing website. Prominent and echoMountain are affiliated companies.

8. In April 2004, following the migration of hosting services to echoMountain, Allen Brothers and Prominent agreed to pursue an agreement wherein Prominent would design, develop, and operate a new website for Allen Brothers. Prominent initially offered to design and develop the new website for a flat fee.

9. Over the next several months, the parties engaged in negotiations regarding the development of the website and potential services to be provided in connection therewith. Allen Brothers expressed an interest in having Prominent develop a new website, but it did not want to pay Prominent anything up front. Instead, Allen Brothers, through its outside accountant,

proposed that Allen Brothers pay Prominent principally (but not exclusively) by way of commissions based on sales generated through the new website.

10. Allen Brothers' accountant requested that Prominent propose an equitable commission structure. In response, Prominent proposed a two-tier commission structure whereby Prominent would receive a 1.75% commission on sales up to $2.2 million per year, and a 5% commission on all sales over $2.2 million. The $2.2 million figure was chosen because Allen Brothers' overall website sales for 2004 were approximately $2.2 million.

11. Throughout the remainder of 2004, Prominent worked to develop the new website and software for the new site. Seidensticker and his wife, Laura Seidensticker, put forth significant effort to develop the new website and related software. For both Seidensticker and Laura Seidensticker, development of the new Allen Brothers' website was a full time effort; they were motivated, however, by their belief that they could and would develop a best-in-class e-commerce website for Allen Brothers and that they would be compensated as a result.

12. Prominent launched the new Allen Brothers' website on February 17, 2005.

<u>Prominent's Intellectual Property and Other Rights Under the<br>Web Site Development and License Agreement</u>

13. On January 11, 2005, prior to the launch of Allen Brothers' new website, the parties memorialized their relationship by entering into a Web Site Development and License Agreement ("Development Agreement"), a copy of which is attached hereto as Exhibit 1. Among other things, the Development Agreement addresses services, fees, and the ownership and usage of intellectual property rights.

14. The three-year Development Agreement provided for the following two-tier commission structure:

2.D.(1)  Allen Brothers shall pay Consultant [Prominent] the following fees for providing maintenance and modification of the New Web Site and marketing services (hereinafter "Performance Fees"):

(a)  From the first date on which the New Web Site is in production and processing sales and for three (3) years thereafter, Consultant shall be paid

(i)  an annual "Base Commission" which shall be calculated by taking one and three quarters percent (1.75%) (hereinafter the "Base Percentage") multiplied by the amount of Net Sales (as such term is defined below) generated by the New Web Site between Zero ($0) and Two Million Two Hundred Thousand Dollars and no Cents ($2,200,000.00) during each such year of the three (3) year period (hereinafter the "Base Amount"); and

(ii)  an annual "Base Commission" which shall be calculated by taking five percent (5%) (hereinafter the "Additional Percentage") multiplied by the amount of Net Sales generated by the New Web Site in excess of Two Million Two Hundred Thousand Dollars and no Cents ($2,200,000.00) during each such year of the three (3) year period (hereinafter the "Additional Amount");

(b)  "Net Sales" shall mean, as to any period during the Term of the Agreement the amount of all gross sales processed through the New Web Site during such period, minus any credits to end users processed through the New Web Site for returns and recalls and excluding charges for shipping, handling or taxes.  For purposes of Net Sales, a sale is considered to take place when it is initially processed through the New Web Site.

(c)  For every year thereafter during the Term, the consultant shall be paid five percent (5%) of the amount of Net Sales generated by the New Web Site in excess of Two Million Two Hundred Thousand Dollars and no Cents ($2,200,000.00) during such year.

15.  The Development Agreement, Section 2.D.(2), further states how performance fees will be calculated for the years 2005 and 2008.

16. Under the Development Agreement, the commissions were to be paid in exchange for Prominent's rendering of various services as set forth therein related to the development and implementation of Allen Brothers' new website.

17. Under the Development Agreement, Exhibit 1, Section 8(b) Prominent would "… provide effective ongoing management of on-line advertisement, marketing and promotions using Allen Brothers' advertising budget."

18. The Development Agreement, Section 4.B., also provides that Allen Brothers will pay Prominent additional amounts for updates and revisions to the new website that constitute significant changes or require significant additional work, with such work to be performed by Prominent and paid for by Allen Brothers at Prominent's then-current time and materials rates.

19. The Development Agreement also addresses ownership and rights to the intellectual property associated with the new website. In part, Section 5.A.(2) confirms Prominent's intellectual property rights in the software it developed to run the new website:

> The parties contemplate that there shall be Intellectual Property Rights in the following New Web Site components: . . . (v) all other software, including all code and customizations which allow the Allen Brothers IP to be displayed, reviewed and experienced or which allows the Allen Brothers products to be purchased, except to the extent that such software is otherwise owned by a third party or by Allen Brothers as of the Effective Date, all templates, all content creation, data management, display or other tools, all toolsets, all frameworks, all development techniques, all construction methods, all customizations or enhancements to any existing works or software, except to the extent that such customizations are owned by or licensed to a third party by the terms of another agreement (collectively the "Consultant's [Prominent's] Software"). The parties agree that the New Web Site will consist of the Allen Brothers IP and the Consultant's Software, that neither party will have the right to operate or maintain the New Web Site except to the extent that such rights are granted in this Agreement.

20. These intellectual property rights are further addressed in Section 5.A.(4) of the Development Agreement as follows: "As between Consultant [Prominent] and Allen Brothers, Allen Brothers acknowledges and agrees that Allen Brothers shall not own any Intellectual Property Rights in or to Consultant's Software, and all such Intellectual Property Rights in the Consultant's Software shall be owned by Consultant."

21. Section 5.C. of the Agreement states in pertinent part: "The parties further agree that Allen Brothers shall not reverse engineer or otherwise try to access the source code of the New Web Site under any circumstance. However, in the event of termination of this Agreement (i) after the third anniversary of the Effective Date, or (ii) pursuant to Section 7(B)(1)(a) or 7(B)(1)(b), Allen Brothers may develop or have developed a new website which may have the look and feel of the New Web Site, so long as such development does not involve the reverse engineering or other unauthorized access of Consultant's intellectual property or Consultant's software."

The Allen Brothers Website Has Been an Overwhelming Success

22. In or around November 2005, Internet Retailer, a leading industry trade journal in online retailing, which delivers strategic and practical business information on multi-channel retailing to more than 250,000 merchants and catalogers each month, selected Allen Brothers' website as one of the top 50 retailing websites on the internet for 2006. In the article, Allen Brother's new website developed by Prominent was characterized as being in the top 50 innovators on the web. Other websites identified included Amazon.com, eBay.com, and BestBuy.com. "Retailers on our Top 50 aren't necessarily the biggest, the most profitable, or the best known – they are the sites that innovate to take online retailing to the next level," said Kurt Peters, editor of Internet Retailer.

23. During the 2005 holiday season, Allen Brothers experienced a surge in sales due in large part to the success of the website and Prominent's online marketing efforts. The surge in sales was so great that Allen Brothers did not have sufficient inventory to fill all of its orders.

24. Financially, Allen Brothers' online business flourished after the development and implementation of the new website. In 2005, the first year of the new website's operational existence, Allen Brothers' online sales doubled from approximately $2.2 million to approximately $4.4 million, and then further increased to approximately $10.2 million in 2006.

25. As the result of this success and the additional revenue generated, Allen Brothers contemplated purchasing advertising on the Rush Limbaugh radio show. On or about February 24, 2006, without Allen Brothers notifying Prominent, Rush Limbaugh discussed Allen Brothers on his radio show which generated a level of traffic to the website in excess of that contemplated under the Development Agreement. Allen Brothers then decided to pursue an advertising relationship with Rush Limbaugh to commence on May 15, 2006. As the result of this initiative, Prominent undertook a project to architect a new website infrastructure to handle the increased level of traffic that was not contemplated under the parties' original Agreement. From February 25, 2006 through May 15, 2006, Prominent architected, designed, implemented, and tested a new website infrastructure for Allen Brothers to accommodate this increased traffic.

26. Prominent also took steps to increase Allen Brothers' "natural search" page ranking on Google as part of its ongoing Search Engine Optimization (SEO) strategy. Increasing the page rank was a high-priority goal for Hatoff. In early-2005, a Google user conducting a search of the word "steak" would have come across more than 160 other websites before coming to the link for Allen Brothers' website; however, after Prominent started taking steps to increase

the ranking, Allen Brothers' website moved up. By February 2007, Allen Brothers' website had moved all the way up to # 3.

27. Allen Brothers was satisfied with Prominent's work and demonstrated this satisfaction by requesting that Prominent provide additional maintenance, updates and revisions to the website beyond those originally anticipated.

<u>Allen Brothers Pressures Prominent to Renegotiate the Development Agreement</u>

28. Soon thereafter, Allen Brothers made it known to Prominent that Allen Brothers wanted to restructure the Development Agreement, since Allen Brothers believed that Prominent was earning too much money.

29. On May 23, 2006, Hatoff invited Seidensticker to have dinner with him and Allen Brothers' outside accountant at Yoshi's Cafe in Chicago. Hatoff explained to Seidensticker that the topic for the meeting would be the expansion of the business relationship between Prominent and Allen Brothers due to the success to-date of the relationship.

30. Upon arriving for the dinner meeting, however, Seidensticker realized he had been invited under false pretenses. Both Hatoff and the accountant discussed the alleged inequities of the Development Agreement, and that Allen Brothers wanted some changes to the agreement. Allen Brothers did not want to pay Prominent for the work it had already completed, but only wanted to compensate it for future work at an hourly rate, and no longer wanted to pay Prominent the commissions detailed in the Development Agreement.

31. Allen Brothers purported to justify its position by contending that the increased web traffic was due, in part, to increased publicity and advertising unrelated to Prominent's efforts, such as the discussions of Allen Brothers by Rush Limbaugh during his radio broadcasts.

32. Seidensticker insisted that the compensation received to date by Prominent was far less than the actual work performed by Prominent, and that had the parties' arrangement been

on a "work for hire" basis, Allen Brothers would have paid significantly higher sums to that point in time. Seidensticker thus would not and did not agree to restructure the Development Agreement.

33. Allen Brothers, however, continued to pressure Prominent to restructure the Development Agreement, including by becoming increasingly forceful and threatening with its demands.

34. For example, on July 31, 2006, an agent of Allen Brothers, purportedly at the direction of Hatoff, threatened Seidensticker during a phone call in which his wife Laura participated by speakerphone. The agent demanded that Prominent relinquish commissions under the Development Agreement. During the call, the agent stated: "Kurt, I'm not holding a gun to your head. Besides, I don't even own a gun, but if I did own a gun, I would be holding it to your head right now."

35. From this point in time until the end of the working relationship between Allen Brothers and Prominent, the principals of Prominent had an extensive and real fear for their physical safety as well as for the safety of their families, which Allen Brothers threatened on more than one occasion.

36. Following various Allen Brothers' express and implied threats, Prominent's principals, being concerned about what might happen to them or their family should Prominent not restructure the Development Agreement, capitulated and agreed to a lower commission for sales in excess of $10,550,001.00, Prominent's forecasted sales for the website in 2006. Prominent would still receive commissions according to the original two-tiered structure for sales less than this amount. A copy of the Amended Development Agreement (dated August 31,