2006) is attached as Exhibit 2 (hereafter, "Development Agreement" refers to the initial agreement and the amendment thereto).

37.   This amendment, however, did not satisfy Allen Brothers for long, as it continued to pressure and threaten Prominent to further restructure the agreement. Allen Brothers also began focusing increasing energy on trying to get Prominent to give up its intellectual property rights under the Development Agreement.

38.   In addition, throughout the remainder of the parties' working relationship, Prominent had to deal with threats of litigation made by Allen Brothers. After a dinner meeting in October 2006, in which Hatoff was present on behalf of Allen Brothers and Seidensticker and Widby attended on behalf of Prominent, Hatoff told Seidensticker that "Allen Brothers' attorneys can't wait to get Craig [Widby] on the stand. He's exactly what they love to get on the stand, and they will tear him apart because of his attitude. You just wait."

39.   During another dinner meeting in February 2007, Hatoff again threatened legal action against Prominent if the company did not capitulate and further restructure the Development Agreement, telling Seidensticker: "You just watch. Craig will be on the stand in April or May sometime."

40.   In February 2007, Hatoff told Seidensticker that he had a conversation with Allen Brothers' outside accountant in which the accountant advised Hatoff that Seidensticker was not the type of person who would simply release Allen Brothers from the Development Agreement, and that perhaps Allen Brothers could entice Prominent to engage in another venture together and subsequently release Allen Brothers from the Development Agreement.

41.   Late in February 2007, Hatoff proposed that the companies enter into a joint venture to develop a software system that would address Allen Brothers' order fulfillment

- 11 -

deficiencies. This software system was referred to as "iChieve", the same brand name Prominent used for its e-commerce website that it had developed for Allen Brothers. Hatoff insisted that if Prominent did not provide a proposal, that Prominent would be in breach of the spirit of the Development Agreement.

42. The iChieve Integrated Enterprise System (IES) that Prominent proposed in response to Hatoff's demand provided order fulfillment, inventory management and warehouse management capabilities, and would exchange order information with Allen Brothers' call center and the website that Prominent had developed. Allen Brothers suggested that by licensing the software to other companies, Prominent could make more money than it currently was making through the Development Agreement. The parties ultimately agreed to proceed with the joint venture; however, Prominent never agreed to release Allen Brothers from the Development Agreement.

43. On March 22, 2007, Hatoff called a meeting at the Standard Club in Chicago to discuss the iChieve joint venture. Invited to the meeting were Hatoff, Robert Hatoff, Allen Brothers' outside accountant, and the Seidenstickers. Unbeknownst to the Seidenstickers, Hatoff also invited Allen Brothers' outside counsel. Upon seeing Allen Brothers' outside counsel, the Seidenstickers stated that they wanted their attorney to participate in the meeting as well.

44. Hatoff became extremely and visibly mad with the Seidenstickers for making this request and stated that their attorney could not be present and that if Prominent was to continue dealing with Allen Brothers that Prominent would have to fire its attorney.

45. Seidensticker became very uncomfortable with the situation and stated that he did not feel comfortable meeting under the present conditions. Hatoff, however, insisted that the meeting go forward, yelling at both parties to meet and discuss the joint venture. The

Seidenstickers stayed at the meeting, but found that the discussion largely related not to the joint venture but to the Development Agreement and the current commission structure. Allen Brothers again declared that Prominent's commission was too great. Allen Brothers' accountant provided spreadsheets showing the commissions Allen Brothers was to pay Prominent and argued that something needed to be done about the size of the commissions.

46. To the extent the joint venture was discussed, it was discussed in the context of the Development Agreement. For example, Allen Brothers' counsel made repeated inquiries as to whether Allen Brothers could get Prominent's intellectual property rights – which rights belonged to Prominent under the Development Agreement and otherwise – if the parties went forward with the joint venture.

47. On May 3, 2007, the parties participated in another meeting at the Standard Club, purportedly to discuss the joint venture. Present at this meeting on behalf of Allen Brothers were: Hatoff, Hatoff's father Robert Hatoff, Allen Brothers' outside accountant, Allen Brothers' outside counsel, and another attorney specializing in intellectual property. Present at the meeting on behalf of Prominent were: Laura and Kurt Seidensticker as well as Prominent's outside counsel, whose expertise is in joint venture arrangements. Hatoff told Prominent that its intellectual property attorney could not attend the meeting.

48. Although the purpose of the meeting was to discuss the general term sheet for the joint venture, the majority of the conversation again related to the Development Agreement and intellectual property rights associated with the website. Allen Brothers' attorneys kept referring to the Development Agreement and seemed disinterested in the actual negotiation of the joint venture.

49. As the meeting went on, it became more and more heated, reaching a crescendo when Allen Brothers' counsel stood up and loudly stated that Seidensticker could die and that Allen Brothers wanted a life insurance policy on his life.

50. Shortly after this, and after additional Allen Brothers' inquiries about obtaining intellectual property rights in the website, Laura Seidensticker firmly stated, "We are not renegotiating the web contract and that's final." The meeting abruptly ended after this statement.

51. After the meeting, the Hatoffs asked the Seidenstickers if they would join them in the bar downstairs for a drink. During the conversation, both parties agreed that the joint venture was not going to happen. At that point, Robert Hatoff started asking Laura Seidensticker questions about her children such as: "So, Laura, tell me about your kids... What are their names? Where do they go to school? How do they get there? Do they take a bus? Who takes them to school? When do they leave for school?". This is the first time Robert Hatoff ever engaged Laura in conversation.

52. Immediately following this series of questions, Todd Hatoff stated, "Have you been watching Soprano's? A lot of people are getting whacked on that show . . . even the kids."

53. On June 26, 2007, Hatoff called Laura Seidensticker and an argument ensued. Hatoff insisted that the Seidenstickers meet him at his offices and if they refused, they would be in breach of contract and Allen Brothers would sue Prominent. Hatoff further stated that he wanted to meet with the Seidenstickers alone. By this point, the Seidenstickers feared for their well-being and the well-being of their children. As such, they agreed to meet Hatoff, but only in a public place where security personnel would be present.

54. The parties met in a public place, but Hatoff did not come alone. With him were the agent who previously threatened Seidensticker over the phone and another employee of Allen

Brothers. In fear, Seidensticker asked the agent if he was going to follow through on his threat to hold a gun to his head. The agent confirmed that Allen Brothers no longer wanted to continue with the iChieve IES development, but stated that Allen Brothers wanted to use the website through the end of the contract term.

55. Seidensticker responded by stating that Prominent would continue to operate the website, but would not renew the Development Agreement at the end of the term in January 2008. If necessary, Seidensticker stated that the Development Agreement could be extended on a month-by-month basis until Allen Brothers could effectively develop a website through some other means.

Allen Brothers Steals Prominent's Intellectual Property

56. On July 31, 2007, after determining that it could no longer maintain a working relationship with Allen Brothers, and literally fearing for the safety of its personnel and their families, Prominent provided Allen Brothers with a 180-day written notice of termination pursuant to Section 7(c)(2) of the Development Agreement.

57. Although Prominent was to maintain and update the Allen Brothers' website for the next 180 days, Allen Brothers stopped providing Prominent with new content for the website.

58. Allen Brothers also stopped paying Prominent monies owed under the Development Agreement. Allen Brothers presently owes Prominent more than $900,000 and will owe Prominent at least several hundred thousand dollars more for commissions through the end of the contract term.

59. On September 29, 2007, Allen Brothers launched another website. As Prominent would later learn, this new website not only had the same look and feel as the one developed by Prominent for Allen Brothers, but, in direct violation of the Development Agreement and Prominent's intellectually property rights thereunder and otherwise, Allen Brothers stole and

made use of the HTML source code, unique tracking code and JavaScript code developed and owned by Prominent.

## COUNT I
### (BREACH OF CONTRACT)

60. Prominent restates and realleges each preceding paragraph as if specifically set forth herein.

61. The Development Agreement is a valid and enforceable contract.

62. Prominent has performed all of its obligations under the Development Agreement.

63. Allen Brothers has breached the Development Agreement by failing to pay Prominent monies owed under the Development Agreement, breaching the intellectual property provisions in the Agreement, and by breaching the hosting provision.

64. With respect to the payment provisions, Prominent is entitled to commissions under the Development Agreement in accordance with Section 2.D.

65. Pursuant to the terms of the Development Agreement, and based upon Allen Brothers' net sales through its website, Allen Brothers owes Prominent for unpaid commissions from June 2007 through September 30, 2007, in the amount of $157,336.76.

66. Allen Brothers also owes Prominent for commissions under the Development Agreement for the time period from October 1, 2007 through January 12, 2008. Based on Allen Brothers' historical net sales, Prominent estimates these commissions at approximately $350,000.

67. Moreover, Allen Brothers owes Prominent for additional work specifically requested by Allen Brothers and performed by Prominent done in accordance with the Development Agreement's system maintenance/revisions provision, Section 4.B., which provides that Allen Brothers will compensate Prominent for updates and revisions to the website

that constitute significant changes to the website or that require significant additional work. Allen Brothers is to pay Prominent for such updates and revisions at Prominent's then-current time and materials rates.

68. Allen Brothers has not paid Prominent for numerous work items that fall within the system maintenance/revision provision, including at least the following items at the following amounts owed: (i) website content updates ($120,000); (ii) restaurant.com integration ($13,500); (iii) Honolulu Fish Company developments ($48,000); (iv) enhanced shipping calendar ($36,000); (v) absteaks.com development and maintenance ($24,000); (vi) creation of a new website infrastructure ($216,000); (vii) travel expenses associates with updates and/or revisions ($3,000); (viii) hosting services ($85,000); (ix) cooking suggestions addition ($21,000); (x) MOM XL data upgrade ($30,000); (xi) inclusion of a wine club on the website ($27,000); (xii) inclusion of a live lobster program on the website ($24,000); (xiii) assessment of order fulfillment issues ($4,500); (xiv) the creation of an e-gift certificate program on the website ($12,000); (xv) search for I.T. Systems Administrator ($12,000); (xvi) warehouse operations assessment ($44,000); (xvii) creation of Chef Art Smith category on website ($16,500); (xviii) consulting on Prime magazine with Stagnito Communications ($2,200); (xix) development of high-performance email delivery system ($36,000); and (xx) radio show software and content updates for Rush Limbaugh, Glenn Beck, Whoopi Goldberg and Ed Shultz ($46,300).

69. In total, Allen Brothers owes Prominent $821,000 for work performed pursuant to Section 4.B. of the Development Agreement.

70. Allen Brothers also has breached the intellectual property provisions of the Agreement.

71. As noted above, Section 5 of the Development Agreement addresses the parties' respective intellectual property rights.

72. In breach of each of these sections of the Development Agreement, Allen Brothers has developed, or someone has developed on behalf of Allen Brothers, another website that utilizes Prominent's intellectual property, as defined in the Development Agreement.

73. In addition, Allen Brothers has breached Section 5.C. of the Development Agreement by developing a website with the look and feel of the website developed by Prominent prior to either termination of the Development Agreement (i) after the third anniversary of the Effective Date, or (ii) pursuant to Section 7(B)(1)(a) or 7(B)(1)(b).

74. Allen Brothers continued and further breach of the Development Agreement has caused and will continue to cause Prominent irreparable harm.

75. Section 13.F. of the Development Agreement specifically provides that "breach by either party will cause the other party great and irreparable damage".

76. Finally, Allen Brothers breached the hosting provision in the Development Agreement.

77. Pursuant to Section 2(F) of the Development Agreement, Allen Brothers is required to enter into a Hosting Agreement with echoMountain, LLC for the hosting services of its website. As stated in the Section 2(F), such Hosting Agreement is necessary to allow Prominent to perform its obligations under the Development Agreement.

78. Allen Brothers, however, has stopped making payments to echoMountain and is now using Yahoo! for hosting services.

79. Prominent has suffered damages as a direct and proximate result of Allen Brother's breaches in an amount to be proved at trial.

WHEREFORE, Prominent respectfully requests that this Court enter judgment in its favor and against Allen Brothers and:

(a) Enter judgment in favor of Prominent and against Allen Brothers for damages sustained by Prominent in an amount of at least $1,328,336 plus reasonable interest;

(b) Enjoin Allen Brothers' continuing violation of Prominent's rights in intellectual property under the Web Development Agreement; and

(c) Award Prominent any and all other relief it deems necessary and just.

## COUNT II
### (QUANTUM MERUIT – PLEAD IN THE ALTERNATIVE TO COUNT I)

80. Prominent restates and realleges each preceding paragraph as if specifically set forth herein.

81. Prominent performed services requested by and for Allen Brothers, including but not limited to the development of a website for Allen Brothers, as well as making significant revisions and updates to the Allen Brothers' website.

82. Allen Brothers received the benefit of the services provided by Prominent.

83. Allen Brothers has not compensated Prominent for many of the services provided to it by Prominent, including relation to the revisions and updates referenced in Paragraph 68 of these Counterclaims.

84. It would be unjust for Allen Brothers to retain the benefit of Prominent's work without sufficiently compensating Prominent for its work.

WHEREFORE, Prominent respectfully requests that this Court enter judgment in its favor and against Allen Brothers, award Prominent damages in an amount of at least $1,328,336 plus reasonable interest, and to award Prominent any and all other relief it deems necessary and just.

## COUNT III
### (UNJUST ENRICHMENT – PLEAD IN THE ALTERNATIVE TO COUNT I)

85. Prominent restates and realleges each preceding paragraph as if specifically set forth herein.

86. Prominent spent significant time and money to develop and operate Allen Brothers' website and all of the software associated with the website, and did so under the belief that it would be fairly compensated for its work and that it would retain intellectual property rights in the software that it developed.

87. Allen Brothers, however, has failed to sufficiently pay Prominent for the work performed at the request and on behalf of Allen Brothers.

88. Allen Brothers is also making unauthorized use of Prominent's software and is unfairly profiting from Prominent's hard work and ingenuity.

89. Allen Brothers' failure to pay monies earned by Prominent for work done to benefit Allen Brothers, violates fundamental principles of justice, equity and good conscience.

90. Likewise, Allen Brothers' use of Prominent's HTML source code, unique tracking code and JavaScript code as well as the look and feel of the website developed by Prominent, also violates fundamental principles of justice, equity and good conscience.

91. As a direct and proximate result, Prominent has suffered damages in an amount to be proved at trial.

WHEREFORE, Prominent respectfully requests that this Court enter judgment in its favor and against Allen Brothers, award Prominent damages in an amount of at least $1,328,336 plus reasonable interest, and to award Prominent any and all other relief it deems necessary and just.

## Jury Demand

Prominent hereby demands a trial by jury on all issues and claims triable by jury.

Dated: November 8, 2007

Respectfully submitted,

PROMINENT CONSULTING, LLC

By: _____
One of Its Attorneys

James V. Garvey
Michael J. Waters
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL 60601-1003
T: (312) 609-7500
F: (312) 609-5005