**H.     Governing Law.** This Agreement will be governed by the and subject to the laws (except the choice of law principles) and exclusive jurisdiction of the courts of the State of Illinois.

**I.     Publicity.** Consultant may use the name of Allen Brothers in press releases, sales material and literature only with the written consent of Allen Brothers.

**J.     Exhibits.** Exhibits hereto are an integral part of this Agreement, and any reference herein to this Agreement shall be deemed to mean and include a reference to such Exhibit.

**K.     Notice.** All written notices required to be given pursuant to this Agreement may be delivered by hand, certified mail, return receipt requested, facsimile, overnight couriers, or e-mail provided that the delivery method utilized includes a record of actual delivery to the specified address or facsimile number. Notices should be directed as follows:

If to Allen Brothers:

Allen Brothers, Inc.
3737 South Halsted St.
Chicago, IL 60609-1689
Attention: Scott Marland
Facsimile: 800-890-9146
E-Mail: scottm@allenbrothers.com

   with a copy to:

   Arnstein & Lehr LLP
   120 South Riverside Plaza, Suite 1200
   Chicago, Illinois 60606-3910
   Attention: Konstantinos Armiros
   Facsimile: 312-876-0288
   E-Mail: karmiros@arnstein.com

If to Consultant:

Prominent Consulting, LLC
1483 Patriot Blvd.
Glenview, Illinois 60026
Attention: Kurt Seidensticker
Facsimile: 312-896-1556
E-Mail: kurt@prominentconsulting.com

   with a copy to:

   Mayer, Brown, Rowe & Maw LLP
   190 S. La Salle Street
   Chicago, IL 60603
   Attention: Rebecca S. Eisner
   Facsimile: 312-701-7711
   E-mail: rseisner@mayerbrownrowe.com

**L.     Severability.** If any term or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated. In the event a court of competent jurisdiction would otherwise hold any part  hereof unenforceable by reason of its

geographic or business scope or duration, said part shall be construed as if its geographic or business scope or duration had been more narrowly drafted so as not to be invalid or unenforceable.

**M.**    **Headings Not Controlling.**  The headings in this Agreement are for reference purposes only and shall not be construed as a part of this Agreement.

**N.**    **Conflict.**  In the event of any conflict between the terms or conditions of the Proposal and the body of this Agreement, the terms of this Agreement shall prevail.

**O.**    **Survival.**  In the event this Agreement is terminated, the provisions of **Sections 5, 7, 8, 10, 11, 12, 13 and 14** survive and continue in full force and effect.

**P.**    **Counterparts.**  This Agreement may be executed in two counterparts, each of which shall be deemed an original and both of which together shall constitute one and the same document.

**Q.**    **Force Majeure.** Neither party shall be responsible for any failure to comply with or for any delay in the performance of the terms of this Agreement, including but not limited to unavailability of the New Web Site, where such failure or delay is caused by or in any manner arises or results from a cause beyond the reasonable control of the affected party.  These events shall include but not be restricted to power outage, fire, flood, earthquake, serious accident, civil disturbance, war, rationing, allocation or embargo, strikes or labor problems or failures in public networks, inability to secure necessary materials, acts of God or acts of any government or any branch or agency therein.

[signature page follows]

01/11/2005 14:28 FAX  312 876 0288        ARNSTEIN & LEHR LLP                        ☑ 003/003

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date:

Allen Brothers, Inc.,
an Illinois corporation

By: _____
Todd Hatoff, Vice President

Prominent Consulting, LLC
a Delaware limited liability company

By: _____
Kurt Seidensticker,
Authorized Officer

<u>**EXHIBIT 1**</u>

**Prominent Consulting, LLC**
**B2C Allenbrothers.com E-Commerce partnership web site design,**
**development and marketing proposal for**
**Allen Brothers, Inc.**



**PROMINENT**

Prominent Consulting, LLC
1483 Patriot Blvd
Glenview, IL 60026

December 31, 2004

Todd Hatoff
President
Allen Brothers, Inc.
3737 South Halsted Street
Chicago, Illinois 60609-1689

RE:    B2C Allenbrothers.com E-Commerce web site design, development and marketing proposal

Dear Todd:

I would like the opportunity to discuss with you the following proposal for a new e-commerce site. The features and services I have presented below should greatly improve your sites capabilities from a static HTML based ordering site, to a premium e-commerce system that is more representative of your business and products focus on quality and excellence. I feel this new site proposal will greatly improve your e-commerce efforts, increase your customer base, and make allenbrothers.com a world-class e-commerce site superior to its competitors as well as one of the best designed e-commerce sites on the internet. The following is a list of services and features to be provided at site launch. Features scheduled for subsequent releases are denoted with an asterisk as well as the scheduled release, which may be negotiated as to priority.

SCOPE OF SERVICES

1.  Online Catalog Design and Implementation – Bringing your catalog print collateral online by providing an interactive online version of your catalog that allows your customers to flip and buy and allows reuse of existing creative investments.

    a.  Created and Updated as new catalogs are created using high-resolution PDF versions of your catalog.

    b.  Realistic Page Turning. Animated page flipping that emulates turning pages to provide a comfortable and familiar shopping experience

    c.  Multiple Catalog Views. Three different ways (thumbnail, normal, or magnified) for shoppers to view product information in the online catalog.

    d.  Virtual Sticky Notes. Allowing users to place notes on any double-page spread that they want to earmark.

    e.  Email-to-a-Friend. Users can share catalog via email for virtual marketing to increase distribution.

    f.  User Feedback. Engage shoppers by getting feedback on what they think about your online catalog.

    g.  High and Low Bandwidth Options. Two versions of catalog available to optimize the experience for all users.

    h.  E-Commerce Integration. Integrate with e-commerce system and create end-to-end online catalog commerce solution.

Allen Brothers, Inc.
December 31, 2004
Page 2

2.  E-Commerce Site Design and Implementation – traditional e-commerce site with product HTML pages.

   a.  Site Quality Enhancements

      i.  Multiple Image Sizes provided by Allen Brothers from catalog shoots.

      ii.  Cleaner, more elegant site design with similar design layout to williamssonoma.com, redenvelope.com, abercrombie.com, clinique.com.

      iii.  User friendly, inviting, removal of SKU's except on order page.

      iv.  Product Searching by catalog SKU, keywords, etc.

      v.  Recently Viewed Items **R2

   b.  Shopping Cart System

      i.  Shopping Cart with ability to save the cart for later access

      ii.  E-mail cart to friend

      iii.  Fast and easy checkout

      iv.  Integrated with recommendations

      v.  Shopping Cart to Wish List conversion **R3

      vi.  Recently Viewed Items ** R2

   c.  Merchandising:

      i.  Best Sellers – Automated.

      ii.  Automated Cross-Sell

      iii.  Administered Up-Sell and Cross-Sell Recommendations **R3

      iv.  What's New

      v.  Specials and Promotions – promotional codes from emails as well as listed promotions.

      vi.  Gift Baskets/Ideas – Based on occasion or recipient **R4

      vii.  Recommendations – Personalized recommendations based on products customer has purchased, placed in your Shopping Cart or Wish List, or recently viewed. – Automated.

   d.  FedEx Ship Manager Integration and Customization

      i.  Online Tracking – Allows customers to check the status of shipments anytime **R2

Allen Brothers, Inc.
December 31, 2004
Page 3

           ii. FedEx Ship E-Mail Alert to customer **R2

           iii. Back-end systems integration (MOMS)

           iv. Address Verification System **R2

    e. Customer On-line Accounts

           i. Order Status & History **R2

           ii. Online Address Book -- Stores the shipping addresses of your family, business associates and friends for faster checkout t **R2

           iii. Recipe Box -- Saves your favorite recipes in one convenient place **R4

           iv. Gift Reminders/Lists – Birthdays, Anniversaries, Previous Purchases **R4

           v. Wish List **R3

           vi. Gift Certificate Management

           vii. Mail Order Manager Integration

    f. Payment System

           i. Payment Authorization and Validation

           ii. Settlement at Shipping

3. Google/PageRank™ Search Engine Optimization Implementation – Optimize site to increase its ranking in Google's search engine.

    a. On-The-Page Factors Optimization – Title Tag, Keywords in the Body Text, Anchor Text optimization.

    b. Internal Navigation Structure and linkage of your pages, in order to best distribute PageRank™ within your site.

    c. PageRank™ Optimization through external marketing and partnership links to your site.

4. Dydacomp, Mail Order Manager Integration

5. Analytics Reporting **R2

    a. Traffic Reporting

    b. Commerce Reporting – Product Information

    c. Merchandising Drilldown -- Drilldown Merchandising Analysis, delivers a complete view into your product hierarchy so business executives can easily see how each product category, sub-category and individual SKI is performing with granularity.

Allen Brothers, Inc.
December 31, 2004
Page 4

        i. Obtain a full view of your product hierarchy for complete and thoughtful decision-making

        ii. Increase average order size by identifying popular products to cross-sell and up-sell.

        iii. Determine which product families and products need more or less promotion to meet your growth goals and fulfill your desired sales mix.

    d. Campaign Drilldown – Obtain complete view into campaign hierarchy so marketing executives can quickly see how each campaign, marketing activity and offer is performing with amazing granularity

        i. Obtain a full understanding of your campaign hierarchy in one view for complete and thoughtful decision-making

        ii. Interactively compare campaign performance at multiple levels to identify top performers for future decisions on budget and resource allocation.

        iii. Encourage customers to engage in repeat business by targeting them with the most effective campaigns.

    e. Visual Path Reporting – Visually interpret the paths people use to reach destinations pages.

6. Marketing

    a. E-mail Marketing

        i. Monthly Newsletter

        ii. Special Offers Via Email

        iii. Advance Notice of New Products/Sales

        iv. Personalized Marketing -- Notification of upcoming events/holidays/previous gift purchases, gift reminders – Automated. **R4

        v. E-mail Item to Friend

        vi. E-mail Shopping Cart **R2

        vii. E-mail Wish List **R3

    b. Catalog Request

    c. Cross/Partner Marketing – Gifts, Grilling, Cooking, Chef, Caterers, etc. [PHASE II]

    d. Chef's Corner – featured chefs recommendations, recipes

7. Administration Site

    a. Catalog/Item Management

    b. Up-Sell Management **R3

Allen Brothers, Inc.
December 31, 2004
Page 5

      c.   Promotion Management

      d.   Reporting

      e.   Marketing Administration

      f.   Merchandising Administration

8.   On-Going Site Enhancements, Marketing and Operations

      a.   Continuously enhance and improve the site based on performance, customer feedback, and technology and market conditions.

      b.   Advertising, Marketing, and Promotion Management – provide effective ongoing management of on-line advertisement, marketing and promotions using Allen Brother's advertising budget.

CLOSING

I appreciate the confidence you have placed with me and my company and I look forward to working with you in the future. A part of this proposal is a Performance License Fee which is a critical element to the success of your future site. This performance fee provides the element necessary to allow Prominent to lead your successful effort in the e-commerce marketplace. It will elevate your site's quality to a level of excellence and provides the ongoing incentive to continuously improve and enhance your site and e-commerce sales.

Best regards,

Kurt Seidensticker
Chief Executive Officer
Prominent Consulting, LLC

## EXHIBIT 2

### Pre-Existing Works

The following pre-existing third party software has been incorporated into the Allen Brothers Web Site:

| Name of Software | Copyright Owner | Source of Consultant's Right |
|---|---|---|
| BEA Web Logic Server 8.1 | BEA Systems, Inc. | Limited License |
| Oracle 10 G – Standard Edition | Oracle Corporation | Limited License |
| Apache Web Server 2.0 | Apache | Open Source License |
| Red Hat Linux ES 3 | Red Hat, Inc. | Owned by Allen Brothers |
| Jakarta Struts, Commons | Apache | Open Source License |
| Sun Java 2 Platform, Standard Edition, version 1.4.2 (J2SE) | Sun | Licensed at no Cost |
| Borland Jbuilder X Foundation Edition | Borland Software | Limited License used only during development of New Web Site |
| Macromedia DreamWeaver MX 2004 | Macromedia, Inc. | Limited License used only during development of New Web Site |
| RichFX | Rich Catalog | |
| NetIQ Web Trend 7 + On Demand | | |

## EXHIBIT 3

3(a).  Assuming  2003 monthly sales were as shown (note total is correct – monthly figures are estimates) below:

Month of

| | 2003 Sales |
|---|---|
| January | $495,000.00 |
| February | $495,000.00 |
| March | $495,000.00 |
| April | $617,000.00 |
| May | $617,000.00 |
| June | $618,000.00 |
| July | $537,000.00 |
| August | $537,000.00 |
| September | $538,000.00 |
| October | $900,000.00 |
| November | $1,100,000.00 |
| December | $3,123,000.00 |
| Total | $10,072,000.00 |

Then if site became active on 11/1, the 2005 Percentage of the Base would be:

Total Nov. and Dec. 2003 Sales divided by
Total Sales

$4,223,000.00/
$10,072,000.00
_____
41.93%

Therefore, if the Base Amount is $2,200,000.00 for a full year, which is then multiplied by the 2005 Percentage of the Base, the Base Amount for 2005 would equal:

Base Amount multiplied by
2005 Percentage of the Base times

$2,200,000.00
x 41.93%
_____
$922,419.00

The Base Commission for years two and three will be based on a Base Amount of $2,200,000.00.

3(b). The fourth year will have to account for the remaining balance of our three year agreement as follows:

The first ten months base will be computed as follows to equal the <u>2008 Percentage of the Base</u>:

| | |
|---|---|
| Total Jan thru Oct. 2003 Sales divided by<br>Total Sales | $5,849,000.00/<br>$10,072,000.00 |
| Stated as the 2008 Percentage of the Base | 58.07% |

Therefore, if the Base Amount is $2,200,000.00 for a full year, which is then multiplied by the 2008 Percentage of the Base, the <u>Base Amount for 2008</u> would equal

| | |
|---|---|
| Base Amount multiplied by<br>2005 Percentage of the Base times | $2,200,000.00<br>x 58.07% |
| | $1,277,581.00 |

The last two months base will be the remaining base as computed above of $922,419.00 ($2,200,000.00 less $1,277,581.00)

---

3(c).  For example, if sales would be equal to an annualized amount of $2,200,000.00 per year, the <u>Base Commission</u> due would be computed as follows:

| | | Sales | | Base<br>Percentage | Base<br>Commission | |
|---|---|---|---|---|---|---|
| 2005 | Nov and Dec | $922,419.00 | x | 1.75% | $16,142.00 | |
| 2006 | Full Year | $2,200,000.00 | x | 1.75% | $38,500.00 | |
| 2007 | Full Year | $2,200,000.00 | x | 1.75% | $38,500.00 | |
| 2008 | Full Year | $1,277,581.00<br>$922,419.00 | x | 1.75%<br>0.00% | $22,358.00<br>$0 | |
| | Total | $7,522,419.00 | | | $115,500.00 | |
| 2009 | Full Year | $2,200,000.00 | times | No Base % | $0 | three years and<br>two months at<br>$922,419.00 at<br>$2,200,000.00 per<br>year |

3(d).  A matrix highlighting the actual plan then could be:

| | | Starting | | Ending | Percentages |
|---|---|---|---|---|---|
| 2005 | Nov and Dec | $0<br>$922,420.00 | to<br>and higher | $922,419.00<br>$0 | 1.75%<br>5.00% |

| 2006 | Full Year | $0 | to | $2,200,000.00 | 1.75% |
| | | $2,200,000.00 | and higher | | 5.00% |
| 2007 | Full Year | $0 | to | $2,200,000.00 | 1.75% |
| | | $2,200,001.00 | and higher | | 5.00% |
| 2008 | Full Year | $0 | to | $1,277,581.00 | 1.75% |
| | | $1,277,582.00 | to | $2,200,000.00 | 0.00% |
| | | $2,200,000.00 | and higher | | 5.00% |
| 2009 | Full Year | $0 | to | $2,200,000.00 | 0% |
| | | $2,200,001.00 | and higher | | 5.00% |

**Exhibit 4**

**Server, PDF Conversion and Other Incurred Costs Reimbursement**

**Section 1**

| Description of Hardware, Software or Service | Fee | Recurrence? | Payment Status / Schedule |
|---|---|---|---|
| Rich FX Catalog Setup | $2,500.00 | One-time | Paid |
| Rich FX Catalog Conversion | $3,080.00 | One-time | Paid |
| Rich FX Catalog Serving for 3 Months | $750.00 | One-time | Paid |
| NetIQ WebTrends Professional Edition | $3,387.46 | One-time | Paid |
| HP ProLiant Database Server | $12,356.67 | One-time | Paid |
| Rich FX Catalog Serving | $250.00 for up to 50,000 catalog views; $450.00 total for 50,001 – 100,000 catalog views; $450.00 + $40.00 for each additional up to 10,000 catalog views for catalog views above 100,000 | Monthly | To be invoiced quarterly as incurred by Consultant |

**Section 2**

| Description of Ala Carte Service | Fee |
|---|---|
| Changing copy or price in PDF (up to 5 changes) per PDF) | $10 per change / $50 minimum per page |
| Unscheduled replacement of a PDF | Contract page price |
| Changes to integration after sign off that require re-work from RichFX | $95 / hour |
| Changing left navigation bar | $300 |
| Changing help / instructions, email to a friend, feedback, top navigation Bar | $50 each |
| Changing color or page alias in top navigation bar | $50 |
| Changing any copy or price in pop up (for text extraction clients) | $25 per product |
| Changing copy or price in PDF (up to 5 changes per PDF) | $10 per change/ $50 minimum per page |
| Changing merchandising instructions (URLs or bridge pages) | $25 per batch |
| Replacement of a PDF | $70/page |
| Changes to integration that require re-work from RichFX | $95 / hour |
| Regenerating a catalog after any change (required after any change above. charged in addition to the change) | $300 |

**Exhibit 5**

**Escrow Agreement**

# FLEXSAFE ESCROW AGREEMENT

Deposit Account Number _____

This agreement ("Agreement") is effective _____, 20____ between Iron Mountain Intellectual Property Management, Inc. ("IMIPM") and _____ ("Depositor"), who collectively may be referred to in this Agreement as the parties ("Parties") and who are more fully identified in Exhibit A.

A.     Depositor and Depositor's client have entered or will enter into a license agreement, development agreement, and/or other agreement regarding certain proprietary technology of Depositor (referred to in this Agreement as the "License Agreement").

B.     Depositor desires to avoid disclosure of its proprietary technology except under certain limited circumstances.

C.     Depositor desires to establish an escrow with IMIPM to provide for the retention, administration and controlled access of the proprietary technology materials of Depositor.

D.     The parties desire this Agreement to be supplementary to the License Agreement pursuant to 11 United States [Bankruptcy] Code, Section 365(n).

## ARTICLE 1 -- DEPOSITS

1.1     <u>Obligation to Make Deposit.</u>  Upon the signing of this Agreement by the parties, Depositor shall deliver to IMIPM the proprietary technology and other materials ("Deposit Materials") to be deposited under this Agreement.

1.2     <u>Identification of Tangible Media.</u>  Prior to the delivery of the Deposit Materials to IMIPM, Depositor shall conspicuously label for identification each document, magnetic tape, disk, or other media upon which the Deposit Materials are written or stored.  Additionally, Depositor shall complete Exhibit B to this Agreement by listing each such media by the item label description, the type of media and the quantity.  Exhibit B shall be signed by Depositor and delivered to IMIPM with the Deposit Materials.  Unless and until Depositor makes the initial deposit with IMIPM, IMIPM shall have no obligation with respect to this Agreement, except the obligation to notify Depositor regarding the status of the account as required in Section 3.2.

1.3     <u>Acceptance of Deposit.</u>     When IMIPM receives the Deposit Materials, IMIPM will conduct a visual deposit inspection.  At completion of the deposit inspection, if IMIPM determines that the labeling of the media matches the item descriptions and quantity on Exhibit B, IMIPM will date and sign Exhibit B and mail a copy thereof to Depositor.  If IMIPM determines                                                                                    that the labeling does not match the item descriptions or quantity on Exhibit B, IMIPM will (a) note the discrepancies in writing on Exhibit B; (b) date and sign Exhibit B with the exceptions noted; and (c) mail a copy of Exhibit B to Depositor.  IMIPM's acceptance of the deposit occurs upon the signing of Exhibit B by IMIPM.  OTHER THAN IMIPM'S INSPECTION OF THE DEPOSIT MATERIALS, IMIPM SHALL HAVE NO OBLIGATION TO THE ACCURACY,

COMPLETENESS, FUNCTIONALITY, PERFORMANCE OR NON-PERFORMANCE OF THE DEPOSIT MATERIALS.

1.4    Depositor's Representations.  Depositor represents as follows:

  a.    Depositor lawfully possesses all of the Deposit Materials deposited with IMIPM;

  b.    With respect to all of the Deposit Materials, Depositor has the right and authority to grant to IMIPM the rights as provided in this Agreement;

  c.    As of the effective date of this Agreement, the Deposit Materials are not the subject of any liens or encumbrances; however, any liens or encumbrances made after the execution of this Agreement will not prohibit, limit, or alter the rights and obligations of IMIPM under this Agreement; and

  d.    The Deposit Materials are readable and useable in their current form or, if any portion of the Deposit Materials is encrypted, the decryption tools and decryption keys have also been deposited.

1.5    Deposit Updates.  Updates to the Deposit Materials will be added to the existing deposit. All deposit updates shall be listed on a new Exhibit B and Depositor shall sign the new Exhibit B.  Each Exhibit B will be held and maintained separately within the escrow account. An independent record will be created which will document the activity for each Exhibit B.  Any deposit updates shall be held in accordance with Sections 1.2 through 1.4. All references in this Agreement to the Deposit Materials shall include the initial Deposit Materials and any updates.

1.6    Removal of Deposit Materials.  The Deposit Materials may be removed and/or exchanged only on written instructions signed by Depositor or as otherwise provided in this Agreement.

## ARTICLE 2 -- FLEXSAFE BENEFICIARY ENROLLMENTS

2.1    FlexSAFE Enrollment(s).  After IMIPM's acceptance of the Deposit Materials, Depositor may enroll one or more beneficiaries ("FlexSAFE_Beneficiary") under this Agreement. Depositor will execute and submit to IMIPM a FlexSAFE Beneficiary Enrollment document, referenced in this Agreement as Exhibit T, listing each beneficiary to be enrolled as a FlexSAFE Beneficiary under the Agreement.  Upon IMIPM's receipt of Exhibit T or any additional Exhibit T thereto, IMIPM will issue an enrollment letter and a copy of this Agreement to the FlexSAFE Beneficiary.

## ARTICLE 3 -- CONFIDENTIALITY AND RECORD KEEPING

3.1    Confidentiality.  IMIPM shall have the obligation to reasonably protect the confidentiality of the Deposit Materials.  Except as provided in this Agreement or any subsequent agreement between the Parties, IMIPM shall not disclose, transfer, make available or use the Deposit Materials.  IMIPM shall not disclose the terms of this Agreement to any third party.  If IMIPM receives a subpoena or any other order from a court or other judicial tribunal pertaining to the disclosure or release of the Deposit Materials, IMIPM will immediately notify the parties to this

Agreement unless prohibited by law. It shall be the responsibility of Depositor and/or FlexSAFE Beneficiary to challenge any such order; provided, however, that IMIPM does not waive its rights to present its position with respect to any such order. IMIPM will not be required to disobey any order from a court or other judicial tribunal, including, but not limited to, notices delivered pursuant to Section 8.6 below.

3.2    Status Reports. IMIPM shall provide to Depositor and FlexSAFE Beneficiary a report profiling the account history semi-annually. Depositor will notify IMIPM if the account history is not to be provided to FlexSAFE Beneficiary.

## ARTICLE 4 -- RIGHT TO MAKE COPIES

4.1    Right to Make Copies. IMIPM shall have the right to make copies of the Deposit Materials as reasonably necessary to perform this Agreement. IMIPM shall copy all copyright, nondisclosure, and other proprietary notices and titles contained on the Deposit Materials onto any copies made by IMIPM. With all Deposit Materials submitted to IMIPM, Depositor shall provide any and all instructions as may be necessary to duplicate the Deposit Materials including but not limited to the hardware and/or software needed. Any copying expenses incurred by IMIPM as a result of a request to copy will be borne by the party requesting the copies. Alternatively, IMIPM may notify Depositor requiring its reasonable cooperation in promptly copying the Deposit Materials in order for IMIPM to perform this Agreement.

## ARTICLE 5 -- RELEASE OF DEPOSIT

5.1    Release of Deposit Upon Depositor's Instruction. Upon receipt by IMIPM of written instruction(s) directly from Depositor, Depositor's trustee in bankruptcy or a court of competent jurisdiction, IMIPM will release a copy of the Deposit Materials to the FlexSAFE Beneficiary identified in the instruction(s). However, IMIPM is entitled to receive any fees due IMIPM before making the release. FlexSAFE Beneficiary's enrollment will terminate upon the release of the Deposit Materials held by IMIPM.

5.2    Filing for Release of Deposit by FlexSAFE Beneficiary.

    a.    Upon notice to IMIPM by FlexSAFE Beneficiary of the occurrence of a release condition as defined in Section 5.3, IMIPM shall provide Depositor with a copy of FlexSAFE Beneficiary's notice by commercial express mail. Such notice from FlexSAFE Beneficiary will be signed and on company letterhead. From the date IMIPM mails the notice requesting release of the Deposit Materials, Depositor shall have sixty (60) days to deliver to IMIPM contrary instructions ("Contrary Instructions").

        Contrary Instructions shall mean the written representation by Depositor that a Release Condition has not occurred or has been cured. Such notice shall be signed and on company letterhead. Upon receipt of Contrary Instructions, IMIPM shall send a copy of the Contrary Instructions to FlexSAFE Beneficiary by commercial express mail. Additionally, IMIPM shall notify both Depositor and FlexSAFE Beneficiary that there is a dispute to be resolved pursuant to Section