26. The Employment Agreement prohibits Marland from disclosing any of Allen Brothers' Confidential Information during or after his employment. (Employment Ag., **Ex. 1**, § 7(a).) He also agreed to return and surrender any records, notes, memoranda, information or documents or other property belonging to the Company upon his termination. (*Id.*, § 7(b).).

**ANSWER:** Marland admits that he signed the document attached as Exhibit 1 to the Second Amended Complaint. Except as expressly admitted, Marland denies the allegations of this paragraph.

27. Marland acknowledged in the Employment Agreement "that the relationships between [Allen Brothers] and its customers are of a near-permanent nature and but for [his] association with [Allen Brothers], [Marland] would not have had contact with [Allen Brothers] customers." (*Id.*, ¶ 10(b).)

**ANSWER:** Marland admits that he signed the document attached as Exhibit 1 to the Second Amended Complaint. Except as expressly admitted, Marland denies the allegations of this paragraph.

28. The Employment Agreement also prohibits Marland from:

> solicit[ing], servic[ing], hav[ing] contact with, divert[ing], or attempt[ing] to divert any entity which is, as of the time of termination of [his] employment, or was, in the immediate six-month period prior to such termination, a customer or prospective customer of [Allen Brothers] that [Marland] had prior dealing with or knowledge about.

(*Id.*, ¶ 10(c).)

**ANSWER:** Marland admits that he signed the document attached as Exhibit 1 to the Second Amended Complaint. Except as expressly admitted, Marland denies the allegations of this paragraph.

29. Under the terms of the Employment Agreement, Marland also may not engage in any business activity that is competitive with any business activity of Allen Brothers for at least 18 months after his termination from Allen Brothers. (*Id.*, § 10(f).) The parties specified a list of companies that they agreed are competitors of Allen Brothers in Exhibit B to the Employment Agreement. (*Id.*, Ex. B thereto.)

**ANSWER:** Marland admits that he signed the document attached as Exhibit 1 to the Second Amended Complaint. Except as expressly admitted, Marland denies the allegations of this paragraph.

30. The Employment Agreement remains effective from January 1, 2005 until 2 years after Marland's employment terminates, except as to Marland's confidentiality and non-disclosure obligations, which are permanent. (*Id.*, § 4.)

**ANSWER:** Marland admits that he signed the document attached as Exhibit 1 to the Second Amended Complaint, but denies that Exhibit 1 is or ever was effective, valid, or otherwise enforceable. Except as expressly admitted, Marland denies the allegations of this paragraph.

31. The Phantom Stock Plan provides Marland with certain financial benefits measured by the change in value of hypothetical shares of stock in Allen Brothers. Marland's benefits under the Phantom Stock Plan are tied to his obligations under the Employment Agreement and the Phantom Stock Plan expressly provides that Marland's rights under the Phantom Stock Plan are forfeited upon a breach of the Employment Agreement. (Phantom Stock Plan, Ex. 2, §§ 5.6, 5.7.)

**ANSWER:** Marland admits that he signed the document attached as Exhibit 2 to the Second Amended Complaint. Except as expressly admitted, Marland denies the allegations of this paragraph.

32. The Phantom Stock Plan, like the Employment Agreement, expressly prohibits Marland from engaging in business or any practice that is "in competition with" or "prejudicial to the interests of" Allen Brothers. (Phantom Stock Plan, Ex. 2, § 5.7.) Marland's breach of the Employment Agreement and his violation of this prohibition both result in his forfeiture of his rights and benefits under the Phantom Stock Plan. (*Id.*, §§ 5.6, 5.7.)

**ANSWER:** Marland admits that he signed the document attached as Exhibit 2 to the Second Amended Complaint. Except as expressly admitted, Marland denies the allegations of this paragraph.

- 12 -

### VII. Marland's Repeated Affirmations of Loyalty Following Termination of His Wife's Employment at Allen Brothers

33. Marland's wife, Debbie Marland, also was a long-time employee of Allen Brothers. Debbie Marland became employed by Allen Brothers in 1996 as a shipping clerk and occupied a number of different positions, eventually becoming executive assistant to Allen Brothers' Chairman Robert ("Bobby") Hatoff. She remained an Allen Brothers' employee until April of 2006, when her employment was terminated as a result of her persistent pattern of inappropriate workplace conduct. While Debbie Marland's behavior prior to her termination by Allen Brothers might properly have been characterized as providing cause for her termination, out of regard for her years of service and her marital relationship with Marland, her termination was treated as being without cause and she was paid a severance benefit.

**ANSWER:** Marland admits the first two sentences of this paragraph. Marland further admits that Debbie Marland worked at Plaintiff until April 2006 when she left the company. Finally, Marland admits that Debbie Marland's departure from Plaintiff was without cause and she was paid a severance benefit. Except as expressly admitted, Marland denies the allegations of this paragraph.

34. Immediately following the termination of Debbie Marland's employment, Allen Brothers was extremely concerned whether Marland remained loyal to Allen Brothers and whether he would continue to perform the responsibilities of his job. On several occasions immediately thereafter and subsequently, and in connection with more than one specific incident involving Marland's wife following the termination of her employment, Allen Brothers requested Marland's express affirmation of his loyalty to Allen Brothers, his desire to continue working for the company and his commitment to the company's success. On each of those occasions, Marland specifically and unequivocally assured Allen Brothers' President Todd Hatoff that Marland remained committed to the company and was willing and able to perform his job and devote his best efforts to the success of Allen Brothers.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the concerns of Plaintiff upon the departure of Debbie Marland. Marland admits that he told Hatoff that he was committed to his job and the success of Plaintiff. Except as expressly admitted, Marland denies the allegations of this paragraph.

### VIII. Marland's Sunday Resignation

- 13 -

35. On Sunday, February 25, 2007, Marland called Todd Hatoff, the president of Allen Brothers, in Buenos Aires, Argentina, where Todd Hatoff was traveling, and resigned. Marland's resignation was wholly unexpected and he gave no prior notice whatsoever. Marland stated that his resignation was effective immediately. In the period since his resignation, Allen Brothers has learned that Marland engaged in significant misconduct between the time he decided to leave Allen Brothers and the date he resigned.

ANSWER: Marland admits that he resigned from Plaintiff on February 25, 2007, and that the resignation was immediate. Marland lacks knowledge or information sufficient to form a belief as to whether he called Hatoff to inform Hatoff of his resignation, or if Marland resigned after answering one of Hatoff's many calls on February 25, 2007, and therefore denies this allegation. Further answering, Marland lacks knowledge or information sufficient to form a belief as to whether Marland's resignation was unexpected, and therefore denies this allegation. Except as expressly admitted, Marland denies the allegations of this paragraph.

IX. **Specific Instances of Marland's Failure to Perform His Job Responsibilities Prior to His Resignation**

36. In the month leading up to Marland's sudden resignation, there were several specific instances where he failed to perform basic responsibilities of his job, causing significant harm to Allen Brothers.

ANSWER: Marland denies the allegations of this paragraph.

37. For example, in Todd Hatoff's absence, Marland was responsible for authorizing marketing emails to be sent to certain Allen Brothers' customers under an Allen Brothers' email marketing campaign. One of Allen Brothers' outside direct marketing consultants designs a continuing email marketing campaign whereby approximately every six days, customers who have provided their email address for the purpose of receiving updates from Allen Brothers are sent an email highlighting featured products (an "Email Blast"). During a period in February 2007 when Todd Hatoff was traveling, Marland was responsible for providing final approval to the direct marketing consultant for each Email Blast. At least four Email Blasts were scheduled in February as part of this campaign, but Marland neglected to provide the required approval for the Email Blasts to be sent.

ANSWER: Marland denies the allegations of this paragraph.

-14-

38.  During the period leading up to his resignation, Marland also failed to provide timely authorization of payment to various other Allen Brothers' marketing consultants.

**ANSWER:**  Marland denies the allegations of this paragraph.

### X.  Marland Accesses and Prints Critical Allen Brothers Confidential Information in Preparation for His Resignation.

39.  Between February 19, 2007 and February 24, 2007, Marland accessed, printed and deleted various computer files and confidential information from Allen Brothers' network and computers and, the day before his unexpected resignation, Marland used his computer to access a device attached to Allen Brothers' system used to "burn" CD-ROMs that can hold significant amounts of data and information.

**ANSWER:**  Marland admits that between February 19, 2007 and February 24, 2007 he accessed, printed and deleted various computer files in the ordinary course of performing his employment duties for Plaintiff. Marland further admits that on Saturday, February 24, 2007, he accessed the CD-ROM device attached to Plaintiff's system, to remove personal files and information that had accumulated over the course of his 14-year employment with Plaintiff. Marland admits that CD-ROMs can hold data and information. Except as expressly admitted, Marland denies the allegations of this paragraph.

40.  Specifically, on February 19, 2007, Marland received an email from an Allen Brothers' customer regarding a significant order to be shipped to the Bahamas. Marland forwarded this email from his Allen Brothers email account to Debbie Marland at her business and personal email addresses. There is no legitimate business reason for Marland to have forwarded this customer email to a non-Allen Brothers employee.

**ANSWER:**  Marland admits that on or about February 19, 2007 he received an email from a personal friend and customer of Plaintiff regarding an order, and that he forwarded that email to his wife, Debbie Marland. Marland further admits that since the author of the email was a former customer and personal friend of Debbie Marland, Marland wanted to make sure that Debbie Marland knew the customer's order had been taken care of. Except as expressly admitted, Marland denies the allegations of this paragraph.

- 15 -

41. During that same week, Marland also deleted one of his two user profiles from the MOM system. Marland also accessed approximately 11 customer files contained in the Allen Brothers Database during the week of February 19, 2007. Allen Brothers has been unable to ascertain any legitimate business purpose for Marland engaging in those activities.

**ANSWER:** Marland admits that during the week leading up to his resignation from Plaintiff, he accessed, printed and deleted various computer files in the ordinary course of performing his employment duties for Plaintiff. Marland lacks knowledge or information sufficient to form a belief as to whether Allen Brothers has been able to "ascertain any legitimate business purpose" for Marland's activities. Except as expressly admitted, Marland denies the allegations of this paragraph.

42. Between February 21 and 23, 2007, Marland also accessed a spreadsheet of Allen Brothers' 10-year sales history and a schedule of mailing dates for all catalog orders from January through June 2007. Allen Brothers is aware of no legitimate business reason for those actions. Moreover, Allen Brothers' catalog mailing schedule and changes in sales patterns during corresponding time periods is sensitive Allen Brothers' confidential information.

**ANSWER:** Marland admits that during the week leading up to his resignation from Plaintiff, he accessed, printed and deleted various computer files in the ordinary course of performing his employment duties for Plaintiff. Except as expressly admitted, Marland denies the allegations of this paragraph.

43. On Friday, February 23, 2007, Marland visited the Web site of Five Herds Trading Co., a company that sells bison meat and other beef products and a competitor of Allen Brothers. Allen Brothers has no business relationship with that company nor was any such business relationship under consideration.

**ANSWER:** Marland admits that during the week leading up to his resignation from Plaintiff, he accessed the web site of Five Herds Trading Co. in the ordinary course of performing his employment duties for Plaintiff. Except as expressly admitted, Marland denies the allegations of this paragraph.

- 16 -

44. Among the most troubling actions Marland engaged in using Allen Brothers' computer systems occurred on Saturday February 24, 2007, the day before his unexpected resignation. On that non-business day (the "Crucial Saturday"), Marland came into Allen Brothers' offices. During his employment at Allen Brothers, it was extremely rare for Marland to work on weekends and virtually unprecedented for him to do so other than (a) during the Holiday season, the busiest time for Allen Brothers' catalog and Internet sales, or (b) when Marland was working on a major project, such as a product photography shoot. On the Crucial Saturday, there obviously was no holiday season activity and there was no Allen Brothers project in which Marland was involved.

**ANSWER:** Marland admits that on Saturday February 24, 2007 he came to Plaintiff's offices and accessed his Allen Brothers computer to remove personal files and information that had accumulated over the course of his 14-year employment with Plaintiff. Except as expressly admitted, Marland denies the allegations of this paragraph.

45. While at Allen Brothers' offices on the Crucial Saturday, Marland called one of his subordinates, Mark Felix, and requested Felix's computer login information, purportedly to retrieve certain contact information that Marland claimed only was on Felix's computer. Using Felix's login information, Marland logged into his own computer as Felix.

**ANSWER:** Marland admits that on Saturday, February 24, 2007, and in the course of performing his job duties for Plaintiff, he contacted Mark Felix and requested Felix's Allen Brother email account login information. Marland further admits that he used this information to access Felix's email account from Felix's computer to retrieve information contained in an email sent only to Felix, and needed by Controller, Saul Cyvas, who was also in the Allen Brothers offices on Saturday, February 24, 2007. Finally, Marland admits that these actions were taken in the ordinary course of performing his employment duties for Plaintiff. Except as expressly admitted, Marland denies the allegations of this paragraph.

46. One or more witnesses also observed Marland go into the private office of Todd Hatoff on the Crucial Saturday. It was out of the ordinary for Marland to enter Todd Hatoff's private office when he was not present, other than occasionally to leave materials on Todd Hatoff's desk. When Todd Hatoff next returned to his private office, there were no materials left there by Marland, however, items in Todd Hatoff's desk appeared to have been disturbed.

-17-

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to whether he entered Hatoff's office on Saturday, February 24, 2007, or whether he left anything on Hatoff's desk, and therefore denies this allegation. Marland denies that it was out of the ordinary for him to enter Hatoff's office when Hatoff was not present, regardless of whether Marland was leaving materials on Hatoff's desk. Further, Marland lacks knowledge or information sufficient to form a belief as to whether, upon Hatoff's return to Allen Brothers' offices, there was anything from Marland on Hatoff's desk, or whether the items on Hatoff's desk appeared to have been disturbed. Except as expressly admitted, Marland denies the allegations of this paragraph.

47. On the Crucial Saturday, immediately preceding his unexpected Sunday resignation, Marland engaged in the following acts using Allen Brothers' computer system, none of which was related to any work legitimately performed for Allen Brothers at that specific time:

- Marland printed a spreadsheet of Allen Brothers' 2006 inventory;

- printed two copies of an Allen Brothers' contact list maintained by Marland, a 15 page list containing approximately 250 contacts;

- accessed the Allen Brothers Database on the MOM system;

- accessed two other Allen Brothers inventory files;

- accessed the Allen Brothers Direct CD drive, a device used to create a CD-ROMs on which significant amounts of Allen Brothers' confidential information could be copied and stored;

- accessed a spreadsheet indicating Allen Brothers' sales history from 1997- 2006;

- accessed the mailing schedule for Allen Brothers' catalog for January-June 2007;

- changed the contact information on a life insurance policy; and

- deleted more than 100 files from his computer.

- 18 -

CH99 4904764-2.072860.0011

**ANSWER:** Marland admits that on Saturday February 24, 2007 he came to Plaintiff's offices and accessed his Allen Brothers computer to remove personal files and information that had accumulated over the course of his 14-year employment with Plaintiff. Marland further admits that on Saturday, February 24, 2007, he accessed, printed and deleted various computer files in the ordinary course of performing his employment duties for Plaintiff. Except as expressly admitted, Marland denies the allegations of this paragraph.

48. In the course of his normal duties as Vice President of Allen Brothers, Marland would have no need to have accessed or printed any of the data or files that he accessed and printed on the Crucial Saturday, many if not all of which contained confidential information belonging to Allen Brothers. In addition, while he accessed the Direct CD drive, there are no CD-ROMs that Marland prepared on that date for legitimate Allen Brothers' purposes.

**ANSWER:** Marland denies the allegations of this paragraph.

49. The contacts list that Marland printed out contained the names, addresses, phone numbers and email addresses for at least six of Allen Brothers' major wholesale customers. Two of those specific customers are listed on Exhibit B to the Employment Agreement, which specifies the companies for which Marland is prohibited from working for 18 months following his employment at Allen Brothers.

**ANSWER:** Marland admits that prior to his resignation from Plaintiff, he printed his list of personal contacts from his Allen Brothers computer. Marland denies that to the extent the contact list contains customers listed on Exhibit B to Exhibit 1, he has or intends to use or disclose those names in contravention of Exhibit 1. Except as expressly admitted, Marland denies the allegations of this paragraph.

50. Marland's contact list also included the names and contact information for at least 45 of Allen Brothers' exclusive suppliers and vendors as well as names of Allen Brothers' creative team and consultants. All of this information is specifically deemed Confidential Information that Marland is prohibited from disclosing under the Employment Agreement.

CHI99 4904764-2.072860 0011

**ANSWER:** Marland admits that prior to his resignation from Plaintiff, he printed his list of personal contacts from his Allen Brothers computer. Marland denies, that to the extent the contact list contains customers listed on Exhibit B to Exhibit 1, he has or intends to use or disclose those names in contravention of Exhibit 1. Except as expressly admitted, Marland denies the allegations of this paragraph.

### Factual Background - Claims Against Prominent and Seidensticker

I. Allen Brothers' Engagement of Prominent to Develop and Maintain the allenbrothers.com Web site.

51. On January 11, 2005, Allen Brothers and Prominent entered into a Website Development and License Agreement (the "Development Agreement"). A true and correct copy of the Development Agreement is attached hereto as Exhibit 3. Pursuant to the Development Agreement, Prominent was to develop www.allenbrothers.com to permit Allen Brothers' customers to purchase its products online. (Develop. Ag., Ex. 3, § 2.A.) Under the Development Agreement, Prominent is to perform several discrete sets of services: (i) Web site development services (the "Development Services") and, in connection with the operation of the Web site, (ii) Web site software maintenance services (the "Maintenance Services") and (iii) a variety of marketing services ("Marketing Services" and together with the Development Services and the Maintenance Services, collectively, the "Services"). In consideration for Prominent's performance of the Services, Allen Brothers agreed to pay Prominent a commission based upon the sales generated by the Web site that Prominent developed. (*Id.*, § 2.D.)

**ANSWER:** Marland admits that a document titled Web Site Development and License Agreement ("Development Agreement"), dated January 11, 2005, is attached to the Second Amended Complaint as Exhibit 3. Except as expressly admitted, Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

52. In the Development Agreement, the parties acknowledged that incident to Prominent's performance of the Services, Prominent would be given access to Allen Brothers' confidential and proprietary information. (Develop. Ag., Ex. 3, §§ 5.A(2), 13.) Prominent agreed that this Allen Brothers confidential information would remain the intellectual property of Allen Brothers and that Prominent would not use or disseminate this Allen Brothers' confidential information to any third parties. (*Id.*, §§ 5.A.(2), 13.A.) The parties

-20-

also acknowledged that any disclosure of Allen Brothers' confidential information in violation of the Development Agreement would cause Allen Brothers irreparable harm and would support the imposition of injunctive relief. (*Id.*, § 13.F.)

**ANSWER:** Marland admits that a Development Agreement is attached to the Second Amended Complaint as Exhibit 3. Except as expressly admitted, Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

53. Allen Brothers and Prominent agreed that Prominent retained all intellectual property rights related to the software, code, templates and development techniques used in creating the Allen Brothers' Web site. (Develop. Ag., Ex. 3, § 5.A(2).) In part because Prominent was retaining these property rights as well as maintaining the site, which is Allen Brothers' primary means of processing consumer orders, Prominent also warranted to Allen Brothers:

> No portion of any elements delivered hereunder will contain any protection feature designed to prevent its use. [Prominent] further warrants that it will not impair the operation of any such Web Site Pages in any way other than by order of a court of law or in accordance with the terms of this Agreement.

(*Id.*, § 10.E.)

**ANSWER:** Marland admits that a Development Agreement is attached to the Second Amended Complaint as Exhibit 3. Except as expressly admitted, Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

II. **Expansion of Relationship Between Allen Brothers and Prominent.**

54. Pursuant to the terms of the Development Agreement, Prominent performed the Development Services and successfully completed the Allen Brothers Web site, which went into operation in the Spring of 2005. Allen Brothers and Prominent worked very closely and effectively with each other to complete development of the Web site, forging a strong working relationship between the two companies. In consequence, over time, Prominent began to perform a wide range of information technology services for Allen Brothers, eventually becoming the functional equivalent of Allen Brothers' "Information Technology Department." Based on that functional relationship, which was actively fostered by

-21-

Prominent, Allen Brothers entrusted Prominent completely with the development, operation, maintenance and control of all dimensions and aspects of Allen Brothers' Internet presence and related functions. In performing those services on Allen Brothers' behalf, Prominent exercised extensive judgment based on its vastly superior expertise and experience.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

55. The Marketing Services contemplated by the Development Agreement were not spelled out in detail in that Agreement. Instead, those Marketing Services evolved to the mutual benefit of Allen Brothers and Prominent - that is, by Prominent's performance of the Marketing Services, the revenues derived by Allen Brothers from its Web site increased, thereby increasing the compensation paid by Allen Brothers to Prominent. While Prominent had originally represented to Allen Brothers that there would be no additional expense to Allen Brothers arising from Prominent's provision of the Marketing Services, Prominent ultimately requested that Allen Brothers pay substantial third party costs related to the Marketing Services and Allen Brothers agreed to pay certain reasonable costs in connection with those services. In addition, as traffic on Allen Brothers' Web site increased, Prominent's equipment no longer was able to handle the demands placed upon it by that traffic. At Prominent's request, Allen Brothers paid in excess of $150,000 for additional hardware to allow Prominent to perform the services required from Prominent in the Development Agreement.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

56. The Marketing Services performed by Prominent fell into several discrete categories. First, Prominent performed a wide variety of Web site related functions known in the e-commerce trade as "optimization," the process by which the owner of a Web site engages in various activities (such as the placement of ads with other Web sites, etc.) for the purpose of maximizing e-commerce traffic on Allen Brothers' Web site (collectively, the "Optimization Services"). As evidence of the extent of the trust and confidence that Allen Brothers placed in Prominent and the depth of their relationship, as part of Prominent's Optimization Services, Prominent was allowed oversight of a consistently increasing annual budget paid by Allen Brothers and to be expended on the purchase of advertising on other Web sites and for the procurement or performance of other optimization efforts. In the first year of the parties' relationship, that budget was approximately $150,000 and grew to $300,000 budgeted for 2006, which budget was exceeded by Prominent, and $750,000 budgeted for 2007. Second, Prominent performed significant tracking, analysis and reporting of the use and performance of Allen Brothers Web site (collectively, the "Analytics Services"). Third, Prominent administered Allen Brothers' "Email Blast" program, a program by which Allen Brothers would send emails, under which Prominent would design and propose various specific Email Blasts, obtain approval of those Email Blasts from Allen