Brothers, send the Email Blasts and monitor compliance with all laws and regulations relating to such marketing (collectively, the "Blasting Services").

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

57. In addition to Prominent's Development, Maintenance and Marketing Services relating to Allen Brothers' Web site, until July 2007, Prominent had acted as Allen Brothers' email network administrator. As the email network administrator, Prominent had access to the email passwords and email accounts of all Allen Brothers' personnel.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

58. Long prior to the execution of the Development Agreement, Todd Hatoff, the President of Allen Brothers, and Seidensticker, a managing member of Prominent, were close friends who actively maintained a social relationship. During the course of the business dealings between Allen Brothers and Prominent, that social relationship continued, in addition to the very close working relationship that Prominent sought to, and eventually did, develop with Allen Brothers.

**ANSWER:** Marland admits that Todd Hatoff and Seidensticker were close friends. Except as expressly admitted, Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

59. On or about August 31, 2006, Allen Brothers and Prominent negotiated a first amendment to the Development Agreement (the "First Amendment"). A true and correct copy of the First Amendment is attached hereto as Exhibit 4. A certain degree of contentiousness appeared in the negotiations between Allen Brothers and Seidensticker surrounding the First Amendment, reflecting economic tensions between, on the one hand, Allen Brothers' belief that very expensive radio advertising, Optimization Services and Blasting Services, the cost of all of which were being paid for separately by Allen Brothers and which very significantly increased ecommerce traffic through the Allen Brothers Web site, were resulting in over-compensation to Prominent, and on the other hand, Prominent's belief that the Marketing Services and other "IT services" it was performing for Allen Brothers were not being accorded sufficient economic weight in Allen Brothers' calculation of the relative value it was deriving from Prominent's performance of the Services. On information and belief, the principals of Prominent, Seidensticker in particular, would come to

12/11/07 17:49 FAX 312 984 7700 ☒029

harbor enormous resentment, anger and hostility towards Allen Brothers on account of Prominent's belief that the First Amendment was unfair to Prominent - which resentment, anger and hostility Prominent and its principals concealed from Allen Brothers.

**ANSWER:** Marland admits that a First Amendment to Website Development and License Agreement ("First Amendment"), dated August 31, 2006, is attached to the Second Amended Complaint

**ANSWER:** as Exhibit 4. Except as expressly admitted, Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

### III. Allen Brothers Joint Venture Negotiations with Prominent.

60. In early 2007, just before Marland's resignation, Allen Brothers and Prominent had begun to engage in negotiations surrounding the formation of a joint venture to develop certain software programs to be owned by Allen Brothers and Prominent or by their respective owners, to be known as "iChieve" (the "iChieve Venture"). The contemplated software programs were intended to have specific functionality for use in a "business-to-consumer" Web site, like Allen Brothers'. From Allen Brothers' perspective, the purpose of the iChieve Venture would be to develop Web site software and technology that Allen Brothers wished to utilize in connection with its own Web site (collectively, the "iChieve Technology"). However, the parties believed that the iChieve Technology, once developed, would be highly valuable to and desired by third parties with "business-to-consumer" Web sites similar to Allen Brothers' and that the iChieve Technology could therefore be profitably sold to such third parties by the iChieve Venture.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

61. Allen Brothers and Prominent discussed various alternative deal structures for the iChieve Venture. However, the parties mutually appropriated a very high priority to commencing development of the iChieve Technology immediately in order that it might be completed in time for Allen Brothers to use it during Allen Brothers' busiest time of the year, the 4th calendar quarter. Consequently, the parties, after an initial meeting, made the decision to proceed with the commencement of the development of the iChieve Technology even though no agreement had been reached by the parties on the deal structure of the iChieve Venture. Accordingly, between May 11, 2007 and June 4, 2007, Allen Brothers advanced

CHI99 4904764-2.072860.0011

$178,559.86 to Prominent to fund Prominent's costs of developing the iChieve Technology despite the absence of mutual agreement on the terms of iChieve Venture.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

62. The negotiations related to the deal structure of the iChieve Venture soon became mired in disagreement. At a meeting held on May 3, 2007, after a long afternoon of unsuccessful negotiating, Allen Brothers offered to agree to a deal structure in which Allen Brothers and Prominent (or their owners) would not be joint venturers, but instead, only Prominent (or its principals) would be the owners of the iChieve Venture, and that Allen Brothers would be a licensee, and earn both royalties on any other licenses of the iChieve Technology that might be entered into and, in the instance where Allen Brothers introduced the iChieve Venture to a licensee, a commission on the sale of that license (collectively, the "New iChieve Business Arrangement"). Prominent immediately indicated enthusiastic support of the New iChieve Business Arrangement.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

63. Following that meeting, Prominent's counsel was to prepare proposals for the New iChieve Business Arrangement. More than a month elapsed during which, on the one hand, Allen Brothers continued to fund Prominent's development of the iChieve Technology, but on the other hand, no proposals were received from Prominent's counsel.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

64. Finally, on June 13, 2007, Prominent circulated to Allen Brothers Prominent's first set of proposals for the New iChieve Business Arrangement, which was followed one week later by a second set of proposals from Prominent for the New iChieve Business Arrangement. Upon Allen Brothers discovery of the perfidy of Prominent and Seidensticker described below, Allen Brothers terminated further discussions with Prominent over the New iChieve Business Arrangement, though Allen Brothers did not immediately advise Prominent of this fact out of an apprehension that premature disclosure by Allen Brothers might lead to calamitous retribution by Prominent, such as shutting down Allen Brothers' Web site. In the end, however, in reliance on the parties' agreement to develop the iChieve Technology for their joint benefit, Allen Brothers fronted almost $180,000 to Prominent for development of the iChieve Technology. Allen Brothers has not received any products, services, remuneration or reimbursement in exchange for this amount.

- 25 -

CHI99 4904764-2.072860 0011

ANSWER: Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

**Factual Background - Grievous Misconduct by
Prominent and Participation by the Marlands**

I. **Allen Brothers Files Suit and Discovers Additional Misconduct by Marland.**

65. After discovering Marland's significant misconduct and potential misappropriation of Allen Brothers' Confidential Information at and prior to the time of his resignation, Allen Brothers filed its complaint against Marland in this matter on May 2, 2007. On the same day, Allen Brothers filed a motion for limited expedited discovery and for a preservation order. In this motion, Allen Brothers informed the Court of its concern that if Marland had copied or stored any Allen Brothers' Confidential Information on his personal computer or other storage device, it could be altered, deleted or destroyed before discovery could commence. Accordingly, Allen Brothers requested that it be permitted to immediately inspect and copy Marland's personal computers, hard drives, disks and other media for company information and that Marland be ordered to preserve all such computers and devices until such an inspection had occurred.

ANSWER: Marland admits that Allen Brothers filed the original complaint in this action on May 2, 2007, but denies that Marland has committed any misconduct or misappropriation of Allen Brothers' Confidential Information. Marland admits the remaining allegations contained in this paragraph.

66. The Court granted Allen Brothers' motion on May 4, 2007, and ordered that an independent forensic computer consultant be permitted to create a copy of the data, documents and information on Marland's personal computers and computer devices.

ANSWER: Marland admits the allegations contained in this paragraph.

67. On May 8 and 9, 2007, Elijah Technologies, a forensic computer expert selected pursuant to the provisions of the Court's Order, went to Marland's home and made a forensic image of Marland's two desktop computers, one laptop computer, a 120 GB external hard drive and six CDs (the "Forensic Images").

ANSWER: Marland admits the allegations contained in this paragraph.

-26-

68. Allen Brothers' counsel retained another forensic computer expert, Kroll Associates ("Kroll"), to review the Forensic Images for Allen Brothers' Confidential Information or other information related to the company, its customers, vendors or competitors. Kroll conducted this review on June 4 to 8, 2007.

**ANSWER:** Marland admits that representatives from Kroll Associates ("Kroll") conducted a review of the Forensic Images from June 4-8, 2007. Marland lacks knowledge of information sufficient to form a belief as to who retained Kroll or what Kroll was retained to review, and therefore denies the remaining allegations in this paragraph.

69. Kroll discovered several documents and files on Marland's personal computers and storage media that relate to Allen Brothers and contain Allen Brothers' Confidential Information, including:

- proof pages from Allen Brothers print catalog, including product prices;

- spreadsheets of Allen Brothers catalog products and their costs for October 2005, November 2005, and Spring 2006;

- email correspondence between Marland and Allen Brothers customers from December 2006 through February 2007;

- promotional information from one of Allen Brothers' competitors, Pfaelzer Brothers;

- a database query specifically designed to be used in connection with information from Allen Brothers' call center database; and

- numerous emails forwarding copies of Marland's resume that contains confidential information regarding Allen Brothers' catalog sales.

**ANSWER:** Marland admits that the documents and files described in this paragraph were on Marland's home computers and electronic storage media. Marland denies that the information contained on Marland's home computers contained Allen Brothers' confidential information. Except as expressly admitted, Marland denies the allegations of this paragraph.

-27-

II. **Prominent and Seidensticker's Outrageous Breach of Trust and the Marlands' Participation Therein.**

70. In addition to the Allen Brothers' Confidential Information found on Marland's computers through examination of the Forensic Images, Allen Brothers discovered on Marland's computer an email from the anonymous email address "scottmarlandwatchoutforhatoffs@gmail.com" dated April 21, 2007, 11 days before Allen Brothers filed its Complaint in this matter (the "April Seidensticker Email"). A true and correct copy of this email is attached hereto as Exhibit 5. While the author of the April Seidensticker Email took pains to obscure his identity, as is shown below and will be proved in this matter, the author was Seidensticker. The April Seidensticker Email warned Marland that he was under scrutiny and that the Hatoffs (the owners of Allen Brothers) intended to take action against him.

**ANSWER:** Marland admits that an email from "scottmarlandwatchoutforhatoffs@gmail.com," dated April 21, 2007 ("April 21, 2007 email"), was saved on his personal computer, but denies that this email is attached to the Second Amended Complaint as Exhibit 5. Marland lacks knowledge or information sufficient to form a belief as to the identity of the author of the April 21, 2007 email, and therefore denies this allegation. To the extent paragraph 70 attempts to interpret the meaning of the April 21, 2007 email, Marland denies the Plaintiff's characterization to the extent that interpretation is different from the April 21, 2007 email.

71. In the April Seidensticker Email, Seidensticker instructed Marland to set up a private and similarly anonymous email address through "gmail," the free email service provided by Google, and directed Marland to contact the sender for information on technical direction on how to delete computer files so the data could not be recovered by Allen Brothers for use as evidence in this lawsuit. (*Id.*)

**ANSWER:** Marland admits that the April 21, 2007 email was saved on Marland's personal computer. Marland lacks knowledge sufficient to form a belief that the April 21, 2007 was authored or sent by Seidensticker, and therefore denies those allegations. To the extent paragraph 71 attempts to interpret the meaning of the April 21, 2007 email, Marland

- 28 -

denies the Plaintiff's characterization to the extent that interpretation is different from the April 21, 2007 email.

72. Debbie Marland, Marland's wife, subsequently used her computer at her current place of employment, ManagCare, Inc., to set up a gmail account with the address "icareaboutscott@gmail.com" so that she could communicate with the sender of the April Seidensticker Email, now known to be Seidensticker. Ms. Marland had additional email communications with Seidensticker between their two clandestine gmail accounts between at least May 3 through May 25, 2007. A true and correct copy of that chain of email correspondence is attached hereto as Exhibit 6 (the "May Seidensticker Emails").

**ANSWER:** Marland admits that Debbie Marland set up the email account "icareaboutscott@gmail.com" to communicate with the sender of the April 21, 2007 email. Marland lacks knowledge or information sufficient to form a belief as to the identity of the author of the April 21, 2007 email, and therefore denies that the April 21, 2007 email was sent by Seidensticker. Marland further admits that Debbie Marland exchanged emails with the "scottmarlandwatchoutforhatoffs@gmail.com" account between May 3, 2007 and May 25, 2007 ("May 3-25, 2007 emails"), but lacks knowledge or information sufficient to form a belief as to the identity of her correspondent(s), and therefore denies this allegation. Marland denies that the May 3-25, 2007 emails are attached to the Second Amended Complaint as Exhibit 6.

73. In the May Seidensticker Emails, Seidensticker discloses Allen Brothers Confidential Information of the greatest sensitivity, including detailed information regarding Allen Brothers' legal strategy in its complaint against Marland, the existence and contents of private investigator reports and specific legal advice provided to Allen Brothers by its attorneys.

**ANSWER:** To the extent paragraph 73 attempts to interpret the meaning of the May 3-25 emails, Marland denies the Plaintiff's characterization to the extent that interpretation is different from the May 3-25 emails. Except as expressly admitted, Marland

- 29 -

lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

74. For example, one entire paragraph of the May Seidensticker Email was copied verbatim from an email sent to Allen Brothers by its counsel that discussed the terms of Marland's phantom stock agreement. Similarly, following Allen Brothers' receipt of confidential legal advice from its counsel regarding a possible press release related to this matter, Seidensticker advised Marland that Allen Brothers was considering such a press release and, based upon legal advice that had been provided to Allen Brothers, how Marland should respond to such a release if issued. On more than one occasion, Seidensticker offered to send to Scott and Debbie Marland copies of legal documents that Allen Brothers had not yet filed with the court or that had just been filed.

ANSWER: To the extent paragraph 74 attempts to interpret the meaning of the May 3-25 emails, Marland denies the Plaintiff's characterization to the extent that interpretation is different from the May 3-25 emails. Further answering, Marland denies that either he or Debbie Marland never accepted the offer of copies Allen Brothers' draft or final legal documents. Except as expressly admitted, Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

75. The reason that Seidensticker was able to obtain and misuse this sensitive information is as simple as it is reprehensible - as administrator of the Allen Brothers' email system, Seidensticker - as a principal of Prominent - had total access to Allen Brothers' email even though that access was intended only to enable Prominent to perform its function as Allen Brothers' network administrator. Instead, Seidensticker used that access to spy on Allen Brothers' most sensitive communications and then to pass highly confidential information on to Marland so he could attempt to avoid liability in this suit.

ANSWER: Marland lacks knowledge or information sufficient to form a belief as the allegations in this paragraph, and therefore denies these allegations.

76. In the May Seidensticker Emails, Seidensticker provided explicit instructions to Debbie Marland on how she and Marland could attempt to obstruct and thwart Allen Brothers' investigation and pursuit of its claims against Marland and the recovery of Allen Brothers' Confidential Information. Specifically, Seidensticker suggested that the Marlands