reformat their home computers, re-install their operating systems, and replace their hard drives in order to keep Allen Brothers from discovering that Marland had copied Allen Brothers' Confidential Information from the MOM database to his home computer. Seidensticker also directed Debbie Marland to only access her gmail account from her work computer as Seidensticker opined that it would be more difficult for Allen Brothers to obtain that information in discovery.

ANSWER: To the extent paragraph 76 attempts to interpret the meaning of the May 3-25 emails, Marland denies the Plaintiff's characterization to the extent that interpretation is different from the May 3-25 emails. Marland denies that he or Debbie Marland ever followed the directions in the May 3-25 emails to obstruct or thwart Allen Brothers' investigation or pursuit of claims. Marland further denies that he or Debbie Marland ever reformatted their home computers, reinstalled their operating systems, or replaced their hard drives. Except as expressly admitted, Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

77.  Seidensticker also disclosed to the Marlands highly sensitive information regarding the fair market value of Allen Brothers, the compensation of its executives and the value of Marland's phantom stock interest in Allen Brothers. Some of this financial information, including a portion of the information that was based on hypothetical performance metrics and therefore was highly inaccurate, could only have been obtained by Seidensticker by intercepting communications between Allen Brothers and its counsel.

ANSWER: To the extent paragraph 77 attempts to interpret the meaning of the May 3-25 emails, Marland denies the Plaintiff's characterization to the extent that interpretation is different from the May 3-25 emails. Except as expressly admitted, Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

III.   **Evidence that Seidensticker Wrongfully Monitored Allen Brothers' Email, Intercepted Privileged Communications and Passed Information to Marland.**

- 31 -

78.     Upon reviewing the April Seidensticker Email, Allen Brothers was convinced for several reasons that the source of that email was Seidensticker. First, there was information in that email that was possessed only by Seidensticker. For example, the April Seidensticker Email contains a sloppy attempt to implicate Allen Brothers' long-time corporate counsel Robert Schwimmer ("Schwimmer") as the source of that email. Schwimmer was known by Seidensticker to be Allen Brothers' legal counsel, and Seidensticker had often heard Schwimmer referred to as Allen Brothers' "protector" by Todd Hatoff. Further, Schwimmer had negotiated with Seidensticker in connection with the iChieve Technology. The April Seidensticker Email bears a "signature" which reads: "the protector RIS," using Schwimmer's initials and a term that Todd Hatoff had used to describe Schwimmer. *See* **Ex. 5**. Todd Hatoff never referred to Schwimmer as the "protector" of Allen Brothers to anyone other than Seidensticker.

**ANSWER:**   Marland admits that the April 21, 2007 email is signed "the protector RIS," and that Schwimmer's initials are RIS. Furthers answering, to the extent paragraph 78 attempts to interpret the meaning of the April 21, 2007 email, Marland denies the Plaintiff's characterization to the extent that interpretation is different from the April 21, 2007 email. Except as expressly admitted, Marland lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in this paragraph, and therefore denies these allegations.

79.     The April Seidensticker Email contains other factual information known only to a very small and trusted inner circle of Allen Brothers owners and advisors, including the Hatoffs and their legal counsel and investigators. Outside of that trusted inner circle, the only person who possessed that specific factual information was Seidensticker, who had been told the information by Todd Hatoff. In addition, the April Seidensticker Email demonstrates an inordinately high level of technical knowledge about computers and emails that could only be enjoyed by an industry expert, and that is therefore consistent with Seidensticker's background.

**ANSWER:**   Marland lacks knowledge or information sufficient to form a belief as the allegations contained in this paragraph, and therefore denies these allegations.

80.     On or about June 26, 2007, Todd Hatoff confronted Seidensticker with the April Seidensticker Email. Seidensticker denied having any involvement with its preparation or transmittal.

- 32 -

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as the allegations contained in this paragraph, and therefore denies these allegations.

81. The "smoking gun" confirming that the April Seidensticker Email and the May Seidensticker Emails came from Seidensticker was discovered when Allen Brothers obtained the response to its subpoena in this matter to Google (the "Google Subpoena Response"). A true and correct copy of the Google Subpoena Response is attached hereto as Exhibit 7. The Google Subpoena Response shows the IP addresses from which several of the May Seidensticker Emails were sent. One of those IP addresses is registered to Prominent, as shown on the IP address registration attached hereto as Exhibit 8.

**ANSWER:** Marland admits that documents received in response to a subpoena to Google, Inc. ("Google Subpoena Response") are attached to the Second Amended Complaint as Exhibit 7. To the extent paragraph 81 attempts to interpret the meaning of the Google Subpoena Response, Marland denies the Plaintiff's characterization to the extent that interpretation is different from the Google Subpoena Response. Further answering, Marland admits that the IP address registration for one of the IP addresses related to the May 3-25, 2007 emails is attached to the Second Amended Complaint as Exhibit 8. To the extent paragraph 81 attempts to interpret the meaning of Exhibit 8, Marland denies the Plaintiff's characterization to the extent that interpretation is different from Exhibit 8. Except as expressly admitted or denied, Marland lacks knowledge or information sufficient to form a belief as to the allegations in this paragraph, and therefore denies these allegations.

82. The fact that the April Seidensticker Email and the May Seidensticker Emails incontrovertibly came from Prominent, combined with the unique knowledge of detailed information contained in those emails possessed only by Seidensticker, the technical knowledge possessed by Seidensticker and conveyed in the emails and the hostility Seidensticker exhibited toward Allen Brothers, all conclusively establish that Seidensticker sent the emails in breach of Prominent's contract, its fiduciary duty to Allen Brothers and all imaginable ethical business standards.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the allegation contained in this paragraph, and therefore denies these allegations.

- 33 -

IV.  **Prominent's Failure to Perform the Functions Required by the Development Agreement Following Allen Brothers' Discovery of Seidensticker's and Prominent's Misdeeds.**

83.  Even before Todd Hatoff confronted Seidensticker with the April Seidensticker Email on June 26, 2007 (and Seidensticker untruthfully denied any involvement with that email), the quality of Prominent's performance of Marketing Services for Allen Brothers had begun to deteriorate substantially.

ANSWER:  Marland lacks knowledge or information sufficient to form a belief as to the allegation contained in this paragraph, and therefore denies these allegations.

84.  At his meeting with Todd Hatoff on June 26, 2007, Seidensticker feigned indignant outrage at being accused of sending the April Seidensticker Email. Immediately following that meeting, Seidensticker caused a further drastic decrease in the quality of the services that Prominent provided to Allen Brothers. Seidensticker refused to have direct contact with Todd Hatoff and other Allen Brothers personnel, despite the fact that close and frequent communication and coordination between key personnel at Allen Brothers and at Prominent was essential to Prominent's performance of virtually all of the Marketing Services and the parties' course of dealing was to have such close and frequent communication throughout the parties' relationship. In particular, Seidensticker had personally overseen and consulted with Allen Brothers regarding performance of the majority of the Marketing Services. His refusal to deal with Allen Brothers, among other failures in performance, resulted in deficient performance of the Marketing Services and harm to Allen Brothers.

ANSWER:  Marland lacks knowledge or information sufficient to form a belief as to the allegation contained in this paragraph, and therefore denies these allegations.

85.  Prominent's intentional failure to use good faith efforts in performing the Marketing Services, its refusal to perform its obligations consistently with the course of performance under the Development Agreement and its other breaches of the Development Agreement in performing the Marketing Services and otherwise have caused and continue to cause substantial harm to Allen Brothers in the form of lost sales and increased costs to Allen Brothers.

ANSWER:  Marland lacks knowledge or information sufficient to form a belief as to the allegation contained in this paragraph, and therefore denies these allegations.

V.  **Seidensticker's and Prominent's Theft of Funds from Allen Brothers' Optimization Services Budget to Benefit echoMountain.**

CHI99 4904764-2.072860.0011

86. After learning of Prominent's material breaches of the Development Agreement, Allen Brothers began to take over certain of the Marketing Services performed by Prominent, including but not limited to some or all of the Optimization Services that Prominent had performed but as to which Prominent no longer was dedicating its good faith efforts.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the allegation contained in this paragraph, and therefore denies these allegations.

87. On or about September 5, 2007, Allen Brothers obtained access to a Google account reflecting information about one of the Internet advertising campaigns that Prominent was responsible for administering on behalf of Allen Brothers as part of the Optimization Services. Upon examining the advertising history reflected for that account, Allen Brothers discovered that Prominent and Seidensticker had further betrayed the trust and confidence reposed in them by Allen Brothers. In administering that Internet advertising campaign, Prominent and Seidensticker committed theft of funds from the Allen Brothers' budget Prominent controlled to benefit another of Seidensticker's companies, echoMountain.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the allegation contained in this paragraph, and therefore denies these allegations.

88. While Allen Brothers had entrusted Prominent and Seidensticker with a total budget of over $1.2 million dollars for Optimization Services to be expended solely for Allen Brothers' benefit, Prominent and Seidensticker misused that budget by purchasing advertising to drive traffic to echoMountain's Web page for the exclusive benefit of echoMountain. Prominent and Seidensticker used Allen Brothers' money to pay for the cost of advertisements for echoMountain, despite the fact that the advertisements provided absolutely no benefit to Allen Brothers.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the allegation contained in this paragraph, and therefore denies these allegations.

89. To date, Allen Brothers has been able to identify at least $20,000 that Seidensticker and Prominent misappropriated to purchase Internet advertising to benefit echoMountain, expenditures which were not authorized and did not benefit Allen Brothers.

**ANSWER:** Marland lacks knowledge or information sufficient to form a belief as to the allegation contained in this paragraph, and therefore denies these allegations.

## COUNT I
### Injunctive Relief for Breach of Employment Agreement
### (Against Marland)

90.  Allen Brothers repeats and realleges Paragraphs 1-89 herein.

**ANSWER:** Marland repeats his answers to paragraphs 1 through 89 as if fully set forth herein.

91.  The Employment Agreement is a valid and enforceable contract.

**ANSWER:** Marland states that paragraph 91 sets forth a legal conclusion to which an answer is neither necessary nor appropriate. Further answering, Marland denies that Exhibit 1, including but not limited to the non-compete and non-disclosure provisions, is valid and enforceable.

92.  Allen Brothers has performed all of its obligations to Marland under the Employment Agreement.

**ANSWER:** Marland denies the allegations of this paragraph.

93.  Marland has breached Section 8 of the Employment Agreement by, *inter alia*:

- accessing Allen Brothers' sales and customer data, in a manner not related to and/or exceeding the scope of his duties as Vice President;

- making and/or printing copies of Allen Brothers' customer, supplier, vendor and consultant contact information;

- retaining copies of Allen Brothers sales and customer data;

- deleting his second user name from the MOM system;

- deleting files from his computers issued by Allen Brothers;

- participating in a conspiracy to interfere with Allen Brothers' investigation of Marland's wrongdoing and to spoliate evidence.

**ANSWER:** Marland denies the allegations of this paragraph.

94. The information that Marland accessed, used and/or deleted constitutes Confidential Information, as defined in Section 7(a) of the Employment Agreement.

**ANSWER:** Marland denies the allegations of this paragraph.

95. Marland has breached Section 7 of the Employment Agreement by using and/or disclosing Allen Brothers' Confidential Information (as defined therein) related to its customer and vendor contact as well as its catalog and online sales data.

**ANSWER:** Marland denies the allegations of this paragraph.

96. On information and belief, Marland also has used and/or intends to use Allen Brothers' Confidential Information to contact or solicit Allen Brothers' customers or potential customers, or used or intends to use Allen Brothers' Confidential Information to compete with Allen Brothers in violation of Section 10(e) and (f) of the Employment Agreement and in violation of Section 5.7 of the Phantom Stock Plan.

**ANSWER:** Marland denies the allegations of this paragraph.

97. Marland's several breaches of the Employment Agreement have caused and will in the future cause Allen Brothers to suffer irreparable harm, including lost business and strained customer and vendor relationships. Marland's continued and further breaches of the Employment Agreement will cause Allen Brothers to suffer further lost business and erosion to customer and vendor relationships.

**ANSWER:** Marland denies the allegations of this paragraph.

98. The Employment Agreement expressly provides that if Marland violates any of its terms, monetary damages will be difficult to ascertain and will not afford an adequate remedy to Allen Brothers (Employment Ag., **Ex. 1**, § 13.). It also provides that Allen Brothers is entitled to injunctive relief in the case of Marland's breach. (*Id.*)

**ANSWER:** Marland admits that he signed the document attached as Exhibit 1 to the Second Amended Complaint. To the extent paragraph 98 attempts to interpret the terms or meaning of the Employment Agreement, Marland denies the Plaintiff's characterization and refers the Court to the document for its true meaning and effect. Except as expressly admitted, Marland denies the allegations contained in this paragraph.

99.  Marland's several breaches of the Employment Agreement result in a forfeiture of his rights and benefits under the Phantom Stock Plan. (Phantom Stock Plan, Ex. 2, §§ 5.6, 5.7.)

**ANSWER:**  Marland denies the allegations of this paragraph.

100.  Allen Brothers is entitled to recover all reasonable attorneys' fees and costs incurred in enforcing the Employment Agreement against Marland. (Employment Ag., Ex. 1, § 15.)

**ANSWER:**  Marland denies the allegations of this paragraph.

## COUNT II
### Breach of Fiduciary Duty
### (Against Marland)

101.  Allen Brothers repeats and realleges Paragraphs 1-89 herein.

**ANSWER:**  Marland repeats his answers to paragraphs 1 through 89 as if fully set forth herein.

102.  As the Vice President of Retail Operations for Allen Brothers, Marland owed the highest fiduciary duties of loyalty, honesty, candor, rectitude, care and good faith to Allen Brothers and to act solely in the best interest of Allen Brothers.

**ANSWER:**  Marland states that paragraph 102 sets for a legal conclusion to which an answer is neither necessary nor appropriate. Further answering, Marland lacks knowledge or information sufficient to form a belief as to what a "highest fiduciary duty" is, and therefore denies this allegation.

103.  Marland has breached, or will inevitably breach his fiduciary duties to Allen Brothers by:

- Copying and retaining customer, vendor and consultant information, sales data and other trade secrets and confidential information;

- Disclosing communications with Allen Brothers' suppliers and vendors to third parties;

-38-

Case 1:07-cv-06357   Document 37-11   Filed 12/18/2007   Page 9 of 11

12/11/07 17:51 FAX 312 984 7700                                         044

- Deleting and destroying confidential information on the Allen Brothers Database; and

- Using time and effort while still employed at Allen Brothers for his future business operations and dealings.

**ANSWER:** Marland denies the allegations of this paragraph.

104. As a result of Marland's breach of his fiduciary duties, Allen Brothers has been damaged to an extent that cannot be calculated or ascertained, but which includes, lost investment of money and resources and potential strained relationships with customers and vendors.

**ANSWER:** Marland denies the allegations of this paragraph.

## COUNT III
### Declaratory Judgment of Forfeiture of Rights Under Phantom Stock Plan
(Against Marland)

105. Allen Brothers repeats and realleges Paragraphs 1-89 herein.

**ANSWER:** Marland repeats his answers to paragraphs 1 through 89 as if fully set forth herein.

106. The Phantom Stock Plan is a valid and enforceable contract.

**ANSWER:** Marland states that paragraph 106 sets forth a legal conclusion to which an answer is neither necessary nor appropriate. Further answering, Marland denies that certain portions of Exhibit 2, including but not limited to the non-compete and distribution provisions, are valid and enforceable.

107. Allen Brothers has fully performed all of its obligations under the Phantom Stock Plan and has a legal and tangible interest in the administration of the Phantom Stock Plan.

**ANSWER:** Marland denies the allegations of this paragraph.

CHI99 4904764-2.072860.0011

108. Marland has breached his obligations under the Employment Agreement and under Section 5.7 of the Phantom Stock Plan as outlined herein. Marland's interest in the Phantom Stock Plan is adverse to Allen Brothers.

**ANSWER:** Marland denies the allegations of this paragraph.

109. Marland's breach of his obligations under the Employment Agreement constitute grounds for a termination "for Cause" under the Phantom Stock Plan (Phantom Stock Plan, **Ex. 2**, § 5.6.). Upon Marland's termination "for Cause," he forfeits all rights and benefits under the Phantom Stock Plan. (*Id.*)

**ANSWER:** Marland denies the allegations of this paragraph.

110. Marland's breach of his obligations under Section 5.7 of the Phantom Stock Plan also results in a forfeiture of his rights under the Phantom Stock Plan. (*Id*)

**ANSWER:** Marland denies the allegations of this paragraph.

111. There is an actual and justiciable controversy regarding Marland's breach of his obligations under the Employment Agreement and the Phantom Stock Plan and his forfeiture of all rights that otherwise may be possessed and benefits that otherwise may be due to Marland under the Phantom Stock Plan.

**ANSWER:** Marland denies the allegations of this paragraph.

112. A declaration regarding Marland's forfeiture of his rights and benefits under the Phantom Stock Plan will terminate this controversy.

**ANSWER:** Marland denies the allegations of this paragraph.

## COUNT IV
### Violation of Illinois Trade Secrets Act (765 ILCS § 1065/1 *et seq.*)
### (Against Marland)

113. Allen Brothers repeats and realleges Paragraphs 1-89 herein.

**ANSWER:** Marland repeats his answers to paragraphs 1 through 89 as if fully set forth herein.

114. The Allen Brothers Database on the MOM system, Allen Brothers' supplier and vendor network, its creative team, its historical sales data as well as its development of its

catalog and online retail sales are all trade secrets as defined in 765 ILCS § 1065/2(d) (the "Trade Secrets Act"). This information is sufficiently secret in order to derive economic value from not being generally known to others who could get economic value from its disclosure or use. Allen Brothers developed this information at great expense over a long period of time and has taken reasonable efforts to maintain its secrecy. This confidential information regarding online and catalog retail sales and suppliers and vendors for its catalog and online products is a valuable part of Allen Brothers' business and is not known or available to its competitors or to the public.

**ANSWER:** Marland states that the first sentence of paragraph 114 sets forth a legal conclusion to which an answer is neither necessary nor appropriate. Further answering, Marland lacks knowledge or information sufficient to form a belief as to the level of secrecy of the information described in paragraph 114, and to what extent this information is known to competitors and the general public, and therefore denies these allegations. Except as expressly admitted, Marland denies the allegations of this paragraph.

115. In the Employment Agreement, Marland acknowledged that this information was a trade secret under the Trade Secrets Act (Employment Ag., **Ex. 1**, § 7(a).).

**ANSWER:** Marland admits that he signed the document attached to the Second Amended Complaint as Exhibit 1. To the extent paragraph 115 attempts to interpret the terms or meaning of Exhibit 1, Marland denies the Plaintiff's characterization and refers the Court to the document for its true meaning and effect.

116. Marland acquired Allen Brothers' trade secrets while employed as an officer of the Company and while under a contractual and fiduciary obligation to maintain their confidentiality. Marland secretly accessed, copied and printed Allen Brothers' trade secrets, many of which he was not authorized to access, in the days before he unexpectedly resigned. He also disclosed at least one communication between Allen Brothers and one of its vendors regarding a retail sale to a third party, which may have contained confidential ordering information. Thus, Marland knowingly misappropriated Allen Brothers' trade secrets through these surreptitious means in breach of his duty of loyalty and confidentiality to the Company.

**ANSWER:** Marland denies the allegations of this paragraph.

CH99 4904764-2.073860.0011